James A. Quadra (SBN 131084)
Email: jquadra@calvofisher.com
Rebecca M. Coll (SBN 184468)
Email: rcoll@calvofisher.com
**CALVO FISHER & JACOB, LLP**
One Lombard Street, Second Floor
San Francisco, California 94111
Telephone: (415) 374-8370
Facsimile: (415) 374-8373

Rosemary M. Rivas (SBN 209147)
Email: rrivas@finkelsteinthompson.com
Danielle T. Stoumbos (SBN 264784)
Email: dstoumbos@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94115
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

James Pizzirusso (*Pro hac vice*)
Email: jpizzirusso@hausfeldllp.com
Spencer S. Jenkins (SBN 274761)
Email: sjenkins@hausfeldllp.com
**HAUSFELD LLP**
1700 K. Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

*Interim Co-Lead Counsel and Counsel for Plaintiffs*

[Additional Counsel Listed On Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SONY PS3 "OTHER OS" LITIGATION | CASE NO. CV-10-1811-RS |
| | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

This Complaint supersedes and amends all previously filed Complaints in the consolidated actions herein.  Plaintiffs Anthony Ventura, Jonathan Huber, Jason Baker, and Elton Stovell, on behalf of themselves and all others similarly situated, based on personal knowledge, the

1

1    investigation of their counsel, and on information and belief, allege the following against

2    Defendant Sony Computer Entertainment America LLC:

3                                          **NATURE OF ACTION**

4        1.      Defendant Sony Computer Entertainment America LLC, formerly Sony Computer

5    Entertainment America, Inc. (referred to herein as "Defendant" or "SCEA"), in conjunction with

6    related Sony entities and affiliates, is one of the world's leading manufacturers of advanced video

7    gaming and computer entertainment systems.  Defendant's PlayStation® 3 video game console

8    ("PS3") has been purchased by approximately 48 million consumers across the globe.

9

10       2.      Since it first introduced the PS3 in 2006, SCEA and its Sony partners have engaged

11   in an extensive advertising campaign in an effort to distinguish itself from and beat out competitors

12   in the gaming console and video game markets.  SCEA advertised, promoted, marketed,

13   warranted, and sold the PS3 as more than just a video game console.  Indeed, SCEA's slogan for

14   the PS3 has been: "It only does everything."  Prior to the removal of the "Other OS" feature,

15   "everything" included the ability of the PS3 to function as a personal computer.  SCEA touted the

16   additional features of the PS3, including its ability to function as a personal computer through the

17   "Other OS" feature, as the reason for its premium price point above that of its competitors such as

18   Nintendo's Wii and Microsoft's X-Box 360.

19

20       3.      One of the unique features that SCEA specifically advertised, promoted, warranted,

21   and marketed was the PS3's ability to operate as an upgradeable "computer" in addition to its use

22   as a gaming console.  The computer features were not a part of the standard "Game OS" that came

23   with the console (which also allowed users to access the Internet, for example, through a limited

24   browser).  The PS3 was able to operate as a computer through its newly developed processor and

25

26

27

28
                                                  2

the "Other OS" feature, which enabled users to install Linux as another Operating System ("OS") on the PS3 and then use the PS3 as a personal computer.

4.      SCEA also advertised, promoted, warranted, and marketed the fact that the PS3 could be updated through "firmware updates" that SCEA would directly provide to users as part of their purchase of the PS3, ensuring users would be able to constantly upgrade their systems.  Users did not just purchase a simple gaming console from a retailer; they were told they were purchasing a constantly evolving gaming console *and* computer that was promoted as having a lifespan of at least a decade as a result of the ability to upgrade it through SCEA's direct updates.

5.      The ability to run another OS, such as Linux, allowed PS3 users to perform functions on their PS3 previously available only on personal computers.  For example, if PS3 users installed Linux, they had the ability to download and engage digital media unsupported by the PS3's native operating system "Game OS," use word processing, photo and video editing software, call upon tens of thousands of freely available applications for the Linux operating system, and even write their own computer programs using the full suite of development tools available to Linux users.  Initially, SCEA actively encouraged these efforts and provided direct support for them by, for example, setting up and funding competency research centers that incorporated Sony PS3s as stand-alone and clustered computer systems to promote the use of the Linux OS on PS3s.

6.      With "PS3 clusters," users could interconnect multiple PS3 units, taking advantage of the advanced computer processor and Linux applications, to create "super-computers" built from these commodity systems.  Indeed, based on SCEA's representations of the computer functionality of the PS3, numerous entities, including the United States Air Force and United States Immigration and Customs Enforcement, purchased PS3 units for the sole purpose of linking them together to create these "clusters" that enabled high-powered computer research. SCEA was

3

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    not only aware of these efforts, but actively supported them until the internal decision was made to

2    remove this feature to save money.

3          7.     As another example of SCEA's promotion of the computer functionality of the PS3,

4    in 2006, SCEA engaged Terra Soft Solutions of Colorado to develop a supercomputing facility that

5    would house a massive PS3 cluster, which was to be made available for free to universities

6    engaged in life sciences research.  Those researchers could then use the PS3 computing cluster

7    remotely to improve their research and test new models.

8

9          8.     In addition to the computer functionality realized through the Other OS and

10   firmware upgrades, SCEA also advertised, promoted, and marketed the unified online gaming

11   service called the PlayStation Network ("PSN").  The PSN enables online gaming, access to the

12   PlayStation Store, PlayStation Home and other services.  It was available to all PS3 purchasers as

13   part of their purchase of the product.

14          9.     SCEA also represented that the PS3, like its predecessor the PlayStation 2, had a

15   lifespan of 10 years.  For example, in an interview with CNET News, Sony Computer

16   Entertainment of America President Kaz Hirai stated in August 2006 that consumers can expect to

17   use the PS3s for 10 years.  As late as February 14, 2011, SCEA's director of corporate

18   communications, Patrick Seybold, confirmed the PS3's 10-year lifespan.  Based on SCEA's

19   representations about the PS3, SCEA's customers reasonably expected to be able to use the PS3's

20   advertised features, including the "Other OS" feature, for at least ten years.  Sony never informed

21   consumers that it retained the purported right (or even had the ability) to terminate core advertised

22   features of the PS3, such as the ability to install another OS.

23

24         10.    On April 1, 2010, however, SCEA released a software update for the PS3,

25   Firmware version 3.21 (hereinafter referred to as the "Update 3.21"), that intentionally disabled the

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

"Other OS" feature that had allowed the PS3 to be operated as a personal computer through Linux. SCEA publicly stated that this firmware update was for "security reasons" as a pretext to justify the decision under the language of its System Software License Agreement ("SSLA"), its Limited Hardware Warranty And Liability ("Warranty"), and its Terms of Service and User Agreement ("TOS"). As discussed herein, this alleged justification was false. SCEA removed this advertised and promoted feature of the PS3 to save money and was not authorized to do so under any agreements allegedly entered into between it and the Class. SCEA has thus far refused to compensate PS3 purchasers or return the "Other OS" feature.

11.     Even if "security reasons" did play some role in the release of Update 3.21, however, no language in the SSLA, Warranty and TOS authorized the removal of the PS3's advertised features. Moreover, SCEA failed to adequately disclose that it retained the purported right to remove a core advertised feature so under the SSLA, Warranty and TOS. SCEA advertised and promoted that the firmware updates were intended to extend the console's life span and add functionality to the PS3, not destroy it.

12.     If "security reasons" were truly a concern, SCEA could also have taken other less intrusive or extreme measures, rather than disabling the "Other OS" feature, to address its purported concerns, such as banning users who violated its Terms of Service from the PSN, as it recently announced it would do. SCEA has the ability to determine if players' conduct constitutes breaches of the purported agreements with SCEA by having unauthorized software or having "jail-broken" their consoles.

13.     SCEA told users that they would not have to download Update 3.21 if they did not wish to do so. SCEA's decision to implement Update 3.21 placed Plaintiffs and Class members in a "Hobson's Choice." PS3 owners who chose not to install Update 3.21 could no longer access

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

many of the *other* important PS3 features including the PSN, the ability to play games online, the ability to access online features, or the ability to play newer PS3 games and/or Blu-ray discs that required Update 3.21.  On the other hand, PS3 owners who did install Update 3.21 lost all access to the computer functionality of the PS3's "Other OS" feature.

14.     Plaintiffs and other purchasers paid significant sums and a premium for the advertised features of the PS3, including the "Other OS" feature and access to the PSN.  These features were part of the basis of the bargain between purchasers and SCEA.  Either way, by installing Update 3.21 or by not installing Update 3.21, users lost access to core advertised, promoted and warranted features for which SCEA has refused to offer any compensation.

15.     Plaintiffs have suffered injury in fact and have lost money and property as a direct result of Defendant's acts.  Plaintiffs and the class members have paid more for a product than they otherwise would have paid had those advertised features not been available and they are owed a refund of some or all of their entire purchase price.  In addition, those users who chose not to download Update 3.21 may have pre-paid money into their PSN accounts for which they are also owed refunds.

16.     Plaintiffs bring this action on behalf of three Nationwide classes of similarly situated persons who purchased a PS3 containing the "Other OS" feature and who had not yet used "Other OS", or who did use the feature and either did, or did not install Update 3.21.  Plaintiffs, on behalf of themselves and the proposed Classes, hereby seek damages, injunctive relief, and any other relief the Court deems just.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**PARTIES**

**Plaintiffs and Proposed Class Representatives**

17.      Plaintiff ANTHONY VENTURA is a citizen of California and resides in Santa Clara, California.  He purchased a PS3 in or around July 2007 for $499.00 plus tax.  He purchased the PS3 for personal, family, and/or household purposes.  Before purchasing the PS3, Plaintiff was exposed to Defendant's long-term and extensive advertising campaign regarding the PS3's features, including the "Other OS."  Before purchasing the PS3, Plaintiff recalls reviewing and relying upon representations about the PS3's features, including the "Other OS" feature which would allow the PS3 to have computer functionality, the ability to access the PSN, play Blu-ray movies and play video games; the PS3's 10-year lifespan; and that there would be updates issued to maintain or upgrade the PS3's features.  Plaintiff conducted research before making his purchase, including on the Internet, and recalls reviewing SCEA's website, articles on the Internet, and the PS3 box before making the purchase.  Plaintiff relied on SCEA's representations about the PS3's features in making his purchase. These representations were a substantial factor in influencing Plaintiff's decision to buy the PS3.  Plaintiff was not aware that SCEA retained the purported right to disable core advertised features of the PS3, such as "Other OS," and would do so when it became expedient and to save money.  Such a disclosure would have been material in Plaintiffs' purchasing decision and/or the amount Plaintiff would have paid for the product.

18.      Mr. Ventura has not installed Update 3.21 so that he can continue to use the "Other OS" functions and he is now no longer able to access advertised features of his PS3.  As a result of Defendant's actions, Mr. Ventura has suffered injury in fact and has lost money and property.

19.      Plaintiff JONATHAN HUBER is a citizen of Tennessee and resides in Knoxville, Tennessee.  Mr. Huber purchased a PS3 on or around December 26, 2006 for $599.00 plus tax.  He

7

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

purchased the PS3 for personal, family, and/or household purposes.  Before purchasing the PS3, Plaintiff was exposed to Defendant's long-term and extensive advertising campaign regarding the PS3's features, including the "Other OS."  Before purchasing the PS3, Plaintiff recalls reviewing and relying upon representations about the PS3's features, including the "Other OS" feature which would allow the PS3 to have computer functionality, the ability to access the PSN, play Blu-ray movies and play video games; the PS3's 10-year lifespan; and that there would be updates issued to maintain or upgrade the PS3's features.  Plaintiff conducted research before making his purchase, including on the Internet, and recalls reviewing SCEA's website and articles on the Internet before making the purchase.  Plaintiff relied on SCEA's representations about the PS3's features in making his purchase. These representations were a substantial factor in influencing Plaintiff's decision to buy the PS3.  Plaintiff was not aware that SCEA retained the purported right to disable core advertised features of the PS3, such as "Other OS," and would do so when it became expedient and to save money.  Such a disclosure would have been material in Plaintiffs' purchasing decision and/or the amount Plaintiff would have paid for the product.

20.     Mr. Huber downloaded and installed Update 3.21 and therefore could not access advertised features of his PS3.  As a result of Defendant's actions, Mr. Huber has suffered injury in fact and has lost money and property.

21.     Plaintiff JASON BAKER is a citizen of North Dakota and resides in Grand Forks, North Dakota.  Mr. Baker purchased a PS3 the weekend of March 15-16, 2007 for $599.99 plus tax.  He purchased the PS3 for personal, family, and/or household purposes.  Before purchasing the PS3, Plaintiff was exposed to Defendant's long-term and extensive advertising campaign regarding the PS3's features, including the "Other OS."  Before purchasing the PS3, Plaintiff recalls reviewing and relying upon representations about the PS3's features, including the "Other OS"

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

feature, the ability to access the PSN, play Blu-ray movies and play video games; and that there would be updates issued to maintain or upgrade the PS3's features.  Plaintiff conducted research before making his purchase, including on the Internet, and recalls reviewing SCEA's website and articles on the Internet and in magazines before making the purchase.  Plaintiff relied on SCEA's representations about the PS3's features in making his purchase. These representations were a substantial factor in influencing Plaintiff's decision to buy the PS3.  Plaintiff was not aware that SCEA retained the purported right to disable core advertised features of the PS3, such as "Other OS," and would do so when it became expedient and to save money.  Such a disclosure would have been material in Plaintiffs' purchasing decision and/or the amount Plaintiff would have paid for the product.

22.    Mr. Baker did not install Update 3.21 and therefore could not access advertised features of his PS3.  As a result of Defendant's actions, Mr. Baker has suffered injury in fact and lost money and property, including access to the funds in his PSN account.

23.    Plaintiff ELTON STOVELL is a citizen of California and resides in Springs Valley, California.  Mr. Stovell purchased a PS3 on November 24, 2007 for $499.00 plus tax.  He purchased the PS3 for personal, family, and/or household purposes.  Before purchasing the PS3, Plaintiff was exposed to Defendant's long-term and extensive advertising campaign regarding the PS3's features, including the "Other OS."  Before purchasing the PS3, Plaintiff recalls reviewing and relying upon representations about the PS3's features, including the "Other OS" feature which would allow the PS3 to have computer functionality, the ability to access the PSN, play Blu-ray movies and play video games; and that there would be updates issued to maintain or upgrade the PS3's features.  Plaintiff conducted research before making his purchase, including on the Internet, and recalls reviewing SCEA's website and articles on the Internet about the PS3 and visiting trade

9

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   shows featuring the PS3 and before making the purchase.  Plaintiff relied on SCEA's

2   representations about the PS3's features in making his purchase. These representations were a

3   substantial factor in influencing Plaintiff's decision to buy the PS3.

4        24.   Mr. Stovell downloaded and installed Update 3.21 and therefore could not access

5   advertised features of his PS3.  As a result of Defendant's actions, Mr. Stovell has suffered injury

6   in fact and lost money and property.

7

8   **DEFENDANT**

9        25.   Defendant Sony Computer Entertainment America, LLC is a Delaware entity with

10  its principal place of business in Foster City, California.  During the time of the development of the

11  PS3 and Update 3.21, SCEA was a wholly-owned subsidiary of Sony Computer Entertainment,

12  Inc. ("SCEI").  It is now a wholly owned subsidiary of Sony Corporation of America, Inc.

13  ("Sony").

14       26.   Sony, based in New York, NY, is the U.S. subsidiary of Sony Corporation,

15  headquartered in Tokyo, Japan.  Sony also worked with SCEI and SCEA to develop and promote

16  Linux on the PS3 through the use of "Other OS" feature.

17       27.   SCEA's website states: "Sony Computer Entertainment America LLC (SCEA) is

18  responsible for keeping PlayStation® growing and thriving in the United States, Canada and Latin

19  America. Based in Foster City, California, SCEA serves as headquarters for all North American

20  operations and is a wholly owned subsidiary of Sony Corporation of America Inc."

21       28.   SCEA markets, promotes, advertises, and sells PlayStation video game consoles

22  throughout the United States, including the PS3 at issue here – at all pertinent times acting as the

23  North American agent of SCEI and/or Sony.  SCEA also services PS3 units sold in the United

24  States.  These activities are directed through SCEA's headquarters in Foster City, California.

1

2

3

4

29.     SCEI controls most of the design and manufacturing decision regarding the PS3, but worked (and continues to work) jointly with SCEA to promote the PS3 and its features (including "Other OS") in North America.  SCEA served as the North American agent of SCEI and jointly developed, promoted and sold the PS3 with SCEI and Sony.

5

6

7

8

9

10

11

12

13

30.     SCEA, Sony, and SCEI acted in concert and collusively in the acts and omissions described herein including promoting and advertising the PS3's computer functionality through the "Other OS" feature, promoting and advertising the ability to play games online through the PSN network, promoting and advertising the 10-year life span of the PS3 through the use of firmware updates that would increase functionality, failing to adequately disclose that they may might remove core advertised features of the PS3 through the firmware update process, and misrepresenting and omitting key facts about the reasons for the removal of the Other OS feature.

14

## JURISDICTION AND VENUE

15

16

17

18

19

20

21

22

31.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant; there are more than 100 Class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.  This court has personal jurisdiction over the parties because Defendant conducts substantial business in this State, has had systematic and continuous contacts with this State, and has agents and representatives that can be found in this State.

23

24

25

26

27

32.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred within this District, Defendant has caused harm to Class members residing within this District, and Defendant maintains its headquarters in this District.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**INTRADISTRICT ASSIGNMENT**

33.     Pursuant to Local Rules 3-2(c) and 3-5(b), this action should be assigned to the San Francisco Division of California because Defendant resides in the County of San Mateo.

**CHOICE OF LAW**

34.     California law governs the state law claims asserted herein by Plaintiffs and the Class Members.

35.     In its Terms of Service and User Agreement ("TOS"), which all users must agree to prior to signing into the PSN and to which SCEA contends all users are bound, SCEA states: "Except as otherwise required by applicable law, this Agreement shall be construed and interpreted in accordance with the laws of the State of California applying to contracts fully executed and performed within the State of California."

36.     Upon information and belief, SCEA's acts and omissions alleged herein were orchestrated and implemented at and through Defendant's headquarters in California.

37.     California has a substantial interest in protecting the rights and interests of California and other U.S. residents against wrongdoing by a company based in California, which interest is greater than that of any other State.

38.     Application of California law with respect to Plaintiffs' and the Class Members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that give California a substantial interest in the claims of the Plaintiffs and the Nationwide Class.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**FACTUAL ALLEGATIONS**

**SCEA and PS3 Background**

39.     Defendant, SCEA, was founded in 1994 to act as the North American marketing, sales, and servicing agent and division of SCEI.

40.     Originally a division of Sony Electronic Publishing, as part of a worldwide restructuring at the beginning of 1997, Sony Computer Entertainment America Inc. (currently Sony Computer Entertainment America LLC) was reestablished as a wholly owned subsidiary of SCEI.

41.     According to its website, SCEA is responsible "for keeping PlayStation® growing and thriving in the United States . . . ."   During the release of Update 3.21 and during the key events outlined in this Complaint, SCEA was a direct subsidiary of SCEI.  In 2010, as part of another restructuring, SCEA became a wholly owned subsidiary of Sony and SCEI became its sister corporation.

42.     SCEA, SCEI and Sony Corporation of America have jointly developed, promoted, advertised, marketed, warranted, and supported the PS3 and the "Other OS" feature and the other features discussed herein.

43.     The PlayStation brand has been wildly successful.  In 1995, the original PlayStation game console ("PS1") was introduced in the United States.  More than 100,000 units were sold during its debut weekend and more than one million units were sold within the first six months.

44.     SCEA and its Sony partners later introduced the Playstation 2 ("PS2"), which was also successful.  SCEA's website states: "Now in the tenth year of its product lifecycle, PlayStation® 2 is still going strong and continues to be one of the world's most popular video game systems, with more than 50 million units sold in North America alone.  During its lifespan,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

PS2®not only has pushed video gaming to the forefront of entertainment, but also introduced the concept of an entertainment system becoming a hub in the living room.  To date the PlayStation®2 system has served as the entertainment centerpiece in many living rooms, accounting for one in three homes across the U.S."

45.     In August 2002, SCEA introduced the option to play games online with the PS2 through a separate Network Adaptor (Ethernet/modem), later incorporated into the actual PS2 units.  The PS2 was not advertised and promoted as a "computer."

46.     To advance the next generation of gaming, in mid-2000, SCEI began seeking to develop a new processor for its PS3 that would be the most powerful chip ever introduced in a portable gaming system.  Ken Kutaragi, the CEO of SCEI at the time, was the visionary and instigator for this decision.  He wanted the PS3 to be a media center and also function as a computer, a gaming console, and high definition DVD player.  Thus, he set out to develop the new chip that would allow this vision to become a reality.

**STI – and the Cell Processor**

47.     In 2001, SCEI, Toshiba and IBM entered a partnership (called "STI") to create a new computer processor that would power the PS3 and other computer and similar devices. Toshiba desired to use the new chip in its computers and other products, whereas IBM hoped to use it in its high-end computer servers.  SCEI and Ken Kutaragi were the leaders of this new consortium and had significant authority over the design of the new chip since it was primarily being developed for the PS3 to function as a computer.

48.     The three companies committed to spend $400 million over five years to develop the processor.  They also planned to spend billions of dollars for two state of the art chip

14

fabrication facilities.  SCEI also agreed to pay IBM hundreds of millions of dollars to set up a

production line at IBM's new facility in Fishkill, New York.

49.     The history of the development of the new chip is outlined in a book written by two

of the IBM engineers who worked on the project, David Shippy and Mickie Phipps, entitled, *The*

*Race for a New Game Machine – Creating the Chips Inside the Xbox 360 & the PlayStation 3*.

50.     According to the authors of the book, with the PS1 and PS2's phenomenal success,

Kutaragai felt that he must and could realize a grander dream for the broadband market looming on

the horizon.  He wanted the PS3 to be a *personal computer* that also played games, with a chip that

could take on roles in many broadband applications, from on-demand television to online gaming

to real-time video chats.

51.     Most computer or game machine processing chips are built upon the foundations of

earlier chips that are already in use.  Designing a new chip from the ground up is a costly and time-

intensive process.  Instead of modifying an existing chip, however, which would have been less

expensive and taken less time, Kutaragi insisted on the development of an entirely new chip

design.  Kutaragi challenged the IBM engineers designing the chip to create something new that

would leapfrog Intel's chip technology (which had powered Microsoft's Xbox); and would be, as

he called it, a "supercomputer on a chip."  Kutaragi insisted on multi-gigahertz frequency and a

very high floating-point mathematical computation capability.  In essence, since Kutaragi wanted

the PS3 to function as a computer, he sought a chip design that would allow it do so.

52.     Eventually, the STI development team decided on a technology called "Cell."  Cell

is shorthand for Cell Broadband Engine Architecture, commonly abbreviated CBE or Cell BE. Cell

combines a general-purpose Power Architecture core of modest performance with streamlined co-

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

processing elements which greatly accelerate multimedia and vector processing applications, as well as many other forms of dedicated computation.

53.     The CBE is multi-core processor that consists of a Power Processing Element ("PPE") that handles the operating system and multiple Synergistic Processing Elements ("SPE") that provide number-crunching power as needed.  The PPE and SPEs are linked together by an internal high speed bus dubbed "Element Interconnect Bus."

54.     One of the issues to address was how to handle the operating system so that the PS3 could function as a computer, as well as gaming machine.  Mike Day, the software technical lead at IBM, was instrumental in the overall architecture of the PS3.  He came up with a plan to use "hypervisor" technology on the PS3 chip that would allow multiple operating systems to run on the unit simultaneously.

55.     In computing, a hypervisor, also called virtual machine monitor ("VMM"), is one of many virtualization techniques which allow multiple operating systems, termed guests, to run concurrently on a host computer – a feature called "hardware virtualization."  Hypervisor is so named because it is conceptually one level higher than a supervisor.  The hypervisor presents to the guest operating systems a virtual operating platform and monitors the execution of the guest operating systems.  In this way, multiple instances of a variety of operating systems may share the virtualized hardware resources.

56.     Under the PS3 hypervisor scheme, a UNIX operating system served as the master supervisor, and a game kernel operating system ("Game OS") ran underneath it.  The kernel is a piece of software (several hundred thousand lines of code), which directs the operation of the game console.  The top-level Unix code handles the normal system-level scheduling as well as managed interaction with the disk drive, keyboard, and displace console – all the same functions as an

16

operating system handled on a traditional PC.  Additionally, users would be allowed to install Linux to perform other, traditional computing functions.

57.     The pressure to develop, design, and test this new Cell chip was tremendous as SCEI sought to get the new PS3 to market by Christmas of 2005.  Numerous problems and delays slowed down development, however.

58.     Along the way, a new "partner" entered the STI picture.  In late 2002, Microsoft approached IBM about making the new chip for Microsoft's rival game console, the (as yet unnamed) Xbox 360.  In 2003, IBM's Adam Bennett showed Microsoft the specifications for STI's (and PS3's) still-in-development Cell core.  Microsoft was very interested and contracted with IBM for its own chip, to be built around the exact same core that IBM was still building with SCEI.

59.     All three of the original STI partners had agreed that IBM would eventually be allowed to market the Cell to other clients.  But it never occurred to SCEI that IBM would sell key parts of the Cell technology that SCEI was paying for and helping to develop before it was actually complete.  Nor did SCEI contemplate that IBM would sell the Cell technology to SCEI's primary videogame-console competitor, Microsoft, even before Sony got to use it.  The result was that SCEI's research and development money was spent creating a component for Microsoft to use *against* SCEI as both companies fought to bring their new consoles to the market first.

60.     Things only got worse for SCEI as there was a rush to get the system into stores prior to Christmas of 2005.  While designs for both chips were delivered on time to IBM's manufacturing division, there was a problem with the first chip run for both companies.  Microsoft had the foresight to order backup manufacturing capacity from a third party for its Xbox 360 chip, but SCEI did not have a manufacturing backup plan and had to wait another six weeks to get its

first chips.  Thus, Microsoft actually got the chip that SCEI initiated and helped design before SCEI even did.

61.     In the end, Microsoft's Xbox 360 hit its target launch date in November 2005, becoming a huge success in its own right.  The Xbox 360 was not designed to function as a computer through the use of another operating system, opting instead for less customization of its new chip, and it also had a lower price point because the Xbox's chip was less complicated and built around some existing architecture.  Because of various other delays, the PS3's launch date was pushed back a full year.  By the time the PS3 was released, the Xbox 360 was well-entrenched in the market.  Moreover, as a result of its numerous features (including the "Other OS"), the PS3 was significantly more expensive than its rival, the Xbox 360.  The PS3 never sold as many units as the Xbox 360.

62.     The current generation of videogame console sales has been dominated not by Sony, or Microsoft, but by Nintendo's Wii: a modest machine that relies on an older, cheaper, and less powerful chip.  With an input device that allows players physically to interact with games (which SCEI and Microsoft have since tried to copy), the Wii has been a runaway success, selling almost as many consoles as the Xbox 360 and Playstation 3 combined.  The PS3 is third in terms of overall sales.

63.     While the Wii and Xbos 360 are able to access the Internet, they were not advertised and promoted as a "computer" through the ability to install Linux.  PS3 was unique in its computer abilities and ability to install Linux.

64.     For SCEI, the Cell processor was such an expensive and embarrassing debacle given the amount of money it cost to develop and Microsoft's victory in getting to the market first, that two weeks after the PS3 finally appeared in stores, the company essentially fired Ken

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Kutaragi, the head of its gaming unit, who had championed the Cell and built the Playstation line from its inception.

65.     The enormous costs of designing, building, and implementing the Cell on the PS3, as well as the implementation of the numerous features associated with trying to make it a media center, gaming console, and personal computer, have caused the PS3 to be an extremely expensive endeavor for Sony.  Sony has lost hundreds of millions of dollars on the system, selling the PS3 at a significant loss, and has faced tremendous pressure to lower the costs of the unit, as well as recoup some of the investment it spent in developing the Cell chip.

66.     Due to variations in hardware configurations and software versions, the cost of ongoing support and software updates to the PS3 with the "Other OS" feature intact exacerbated the financial failure of the PS3 for SCEA.

67.     It is this tremendous financial pressure that caused SCEI and SCEA to remove the "Other OS" feature, not any purported "security concerns."

**The Aggressive Marketing and Promotion of the PS3's Computer Feature**

68.     From before the time SCEA introduced the PS3 in November 2006, various Sony executives involved with the PS3 consistently and aggressively promoted the PS3 as the most advanced "computer" entertainment system in the industry to distinguish the PS3 from its competitors.  The "computer" functions of the PS3 were related to its new Cell chip, which gave users the ability to install Linux and utilize the PS3 as a personal computer.

69.     The "Other OS" feature allowed users to run word processor software, spreadsheet software, email, game development, and media programs.  It also allowed PS3 users to run a number of web browsers, which provide more functionality than the one browser Defendant has in

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

its native PS3 operating system.  The "Other OS" feature also allowed for Cell programming and the operation of supercomputer clusters.

70.     The affiliated Sony entities touted the computer functions as a major feature of the PS3.  In June 2006, Ken Kutaragi, SCEI's former President and CEO, in promoting the ability of the PS3 to run as a computer through the Linux OS, stated that "[the PS3] is radically different from the previous PlayStation.  *It is clearly a computer.*  Indeed, with a game console, you need to take out any unnecessary elements inside the console in order to decrease its cost. . . . This will of course apply to the PS3 as well."

71.     Kutaragi also stated that "[l]owering costs is important but more important is its capacity to evolve. . . . Everything has been planned and designed so it will become a computer. The previous PlayStation had a memory slot as its unique interface.  In contrast, the PS3 features PC standard interfaces.  Because they are standard, they are open. . . . We put up no restrictions. Because it is a computer, it can interact with anything, freely.  If someone is familiar with PC building, he or she can upgrade easily PS3's HDD."

72.     In remarks made to Japanese website Impress Watch, which were widely distributed throughout the United States, Ken Kutaragi commented in more detail on the concept that the PS3 was designed to be a computer, rather than a game console.  Kutaragi noted, "We don't say it's a game console (*laugh*) - PlayStation 3 is clearly a computer, unlike the PlayStations [released] so far."

73.     In May 2006, Phil Harrison, President of Sony Computer Entertainment Worldwide Studios from 2005-2008 stated: "We believe that the PS3 will be the place where our users play games, watch films, browse the Web, and use other computer functions.  *The PlayStation 3 is a computer.  We do not need the PC*."

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

74.     Izumi Kawanishi, head of Sony's Network System Development Section, stated in May 2006: "Because we have plans for having Linux on board [the PS3], we also recognize Linux programming activities . . . Other than game studios tied to official developer licenses, we'd like to see various individuals participate in content creation for the PS3."

75.     In February 2007, Phil Harrison, stated in an interview with *Newsweek* videogame journalist, N'Gai Croal, that "[o]ne of the most powerful things about the PS3 is the 'install Other OS' option."

76.     Kutaragi and the Sony entities jointly promoting the PS3 envisioned and promoted the fact that the "Other OS" and computer functions of the PS3 would survive the life of the product, which had a least a ten year life span.  The PS3 was designed to "evolve" with continual updates which were promoted as allowing sustained and *improved* computer functionality.

77.     In one interview, Kutaragi discussed that many parts of the PS3 were upgradable models, much more like a personal computer, noting, "[s]ince PS3 is a computer, there are no 'models' but 'configurations.'"  The Sony CEO gave another example in the interview: "As PS3 is a computer . . . it also wants to evolve."

78.     The upgradeable and "evolving" aspects of this "computer" were the firmware updates that SCEA distributed to US customers (including Update 3.21 which ultimately disabled the highly touted computer functionality that it was instead supposed to improve).

79.     As is typically done in the video game industry, manufacturers and sellers, such as SCEA and its Sony partners, regularly issue press releases, attend public conferences such as the annual Electronic Entertainment Expo (known as "E3"), give media interviews and give their products away to multimedia news and review websites for purposes of spreading the word about their latest products.  SCEA was no exception with the marketing of its PS3.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

80.     In 2005, SCEA and its Sony partners began an extensive media blitz, beginning with the 2005 E3 where they touted the PS3's features and represented that the console would be shipped with Linux pre-installed on the PS3 hard drive or the ability to install it.  As is often the case, numerous multimedia news and review websites picked up the story and reported SCEA and its Sony partners' representations about the PS3's attributes as a computer, including the ability to run Linux.  Further, even before the release of the PS3 in 2006, SCEA gave the PS3 consoles away to multimedia news and review websites to generate product reviews and publicity.

81.     For example, in November 2006, the review website, IGN.com, which focuses on video game consoles and related products, had this to say about the PS3's marketing campaign: "There wasn't a television network in North America that wasn't talking about the PlayStation 3 launch last week, which should tell you just how ingrained the system is in the public conscious. The bizarre but fashionable television ads with creepy babies and melting Rubik's Cubes were different enough to make people notice, while giving systems to mainstream and enthusiast press outlets like IGN provided plenty of prerelease coverage to help plant the seed of anticipation."

82.     As a result of Defendant's aggressive marketing campaign, numerous multimedia and review websites and tech blogs spread Defendant's marketing message:  that the PS3 was a computer that would constantly evolve and be with consumers for a long time to play video games, watch movies, access the PSN, and use Linux.  Numerous websites such as IGN.com, Gamespot.com, PopularMechanics.com, Engadget.com and many others reported on SCEA's public statements and representations about the PS3 in 2005 and to the present.

83.     For instance, in 2005, IGN.com assembled an "IGN PlayStation Team" devoted to news coverage and reports about the PS3.  Beginning in July 2005, the "IGN PlayStation Team" posted on its website "IGN's Official PlayStation 3 FAQ – Everything you need to know about

22

Sony's next system", which answered important questions about the PS3's features, including the ability to run Linux, based on Defendant's representations.

**PS3 is Released with Computing Functionality Through the Other OS Feature**

84.    On November 17, 2006 (a year late), SCEA eventually introduced the PS3 to the North American market, touting it as "*the most advanced computer system* that serves as a platform to enjoy next generation computer entertainment."  SCEA's website still states:

> On November 17, 2006, Sony Computer Entertainment America revolutionized the way games are played and developed by releasing the PlayStation®3 (PS3®) computer entertainment system. The PlayStation®3 system reset the bar for entertainment by utilizing a combination of Cell and RSX™ processors, a state-of-the-art Blu-ray player and a pre-installed hard disk drive (HDD).  Equipped with basic input/output ports, PS3® supports a broad range of displays from conventional NTSC/PAL standard TVs to the latest full HD (1080i/1080p) flat panel displays, offering the joy of the most advanced computer entertainment content to homes around the world.  *These technological advancements coupled with its all-in-one entertainment solution made **PS3® the most advanced computer system***, which served as a platform to enjoy next-generation games and the best in home entertainment on the market.

85.    The manufacturer's suggested retail price for the PS3 was originally $599, considerably higher than many of its competitors given its unique features.  SCEA has reportedly sold more than 12 million PS3 systems in the United States.

86.    From its inception until the feature was removed, SCEA advertised, marketed, promoted, warranted, and sold PS3 systems as including the ability to function as a computer through the installation of Linux through the "Other OS" feature, as well as a built-in Blu-ray DVD player and the ability to go online to access the PSN and play against other players.  The widely promoted slogan for the PS3 was "It only does everything."  That "everything" originally included the ability to function as computer through the "Other OS" feature.

23

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

87.     SCEA advertised, marketed, warranted, and promoted the computer functionality and "Other OS" feature on the PS3 box, in its manual, on numerous websites, and on the console itself.  This feature became a part of the basis of the bargain for consumers.

88.     The PS3 box states: "A portion of the hard disc capacity is reserved for use in connection with system administration, maintenance, and *additional options*.  This may occur upon installation of system software or *other software*."

89.     SCEA explicitly marketed and warranted the "Other OS" feature in the manual that came with every PS3.  In particular, SCEA included instructions in its manual about the "Other OS" feature indicating the availability of this feature and directing consumers to its "Open Platform" website to learn more about the "Other OS" feature and its installation.  Those manual instructions stated: "Install other system software on the hard disk.  For information on types of compatible system software and obtaining the installer, visit Open Platform for PlayStation®3."

90.     The "Open Platform for Playstation®3" website promoted in the PS3 manual was designed to give users detailed information related to the PS3's "Other OS function" and its abilities.  SCEA directed users to this website if they had questions about the "Other OS" capabilities and to learn how to utilize the Other OS feature on the PS3 and install Linux.  Through the manual that came with the PS3, this website also become a basis of the bargain between users and SCEA.

91.     SCEA's "Open Platform" website provides, "[t]here is more to the PLAYSTATION®3 (PS3™) computer entertainment system than you may have assumed.  In addition to playing games, watching movies, listening to music, and viewing photos, *you can use the PS3™ system to run the Linux operating system*.  By installing the Linux operating system, you can use the PS3™ system not only as an entry-level personal computer with hundreds of

24

familiar applications for home and office use, but also as a complete development environment for the Cell Broadband Engine™ (Cell/B.E.)."

92.     Sony's "Open Platform" website is still maintained and active today.  The website includes a "manual" for installing the boot loader and Linux Operating System.  It also includes a Frequently Asked Questions ("FAQ") section with questions and answers about the installation and use of Linux on the PS3.

93.     From 2006 until the feature was removed in 2010, SCEA's PS3 Knowledge Center website similarly promoted and warranted the availability of the "Other OS" function.  It stated: "The PlayStation 3 provides an option for third-party system software to be installed on the PS3™ system instead of the system software provided by Sony Computer Entertainment Inc.  Such third-party system software is referred to as an 'Other OS'."

94.     SCEI and SCEA also developed and promoted a PS3 Linux Distributor's Starter Kit for Linux users: "The Linux Distributor's Starter Kit provides information, binary and source codes to Linux Distribution developers who wants (sic) to make their distro support PS3."

95.     This kit was distributed and maintained by Sony employee, Geoffrey Levand.

96.     Geoffrey Levand is a Principal Software Engineer at Sony Corporation of America in San Jose, California.  Prior to Update 3.21, he worked as the lead maintainer of Linux for the PS3 game console, and also co-maintainer of the Petitboot bootloader for Linux.  Mr. Levand joined Sony in 2000, and has worked on other Linux projects for Sony including the development of PS2-Linux, and the preparation of Linux kernels used in various Sony products including the Cybershot digital still camera and the Handycam video camcorder.

97.     Aside from the numerous manuals and websites that SCEA and its Sony partners maintained, the PS3 Console itself also contained distinct representations about the ability of users

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to utilize the "Other OS" feature, apportion the hard drive, install Linux, and use the PS3 as a computer.  When users turned on the PS3, in the menu there was an option called, "Format Utility" – a screen shot is shown below:



98.     Users could then select the amount of memory to add to the "Other OS" feature:



99.     Users could then install the "Other OS":

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT



100.    Users could also set the default system to "Other OS":



101.    In addition to the manual, website, and console, SCEA and SCEI promoted the use of the Other OS feature with numerous third parties.

102.    The PS3 did not come pre-installed with Linux from Sony, but shortly after the PS3's release, Sony issued a firmware update that allowed booting into Linux from the hard drive or from a Live CD.  SCEA worked with closely with several Linux developers to ensure that consumers could install Linux on the PS3.

103.    SCEA's "Open Platform" website directed consumers to contact these third party Linux distributors:

> There are many flavors of Linux available, which are developed, managed, and distributed by the respective companies and development communities.
>
> As Sony Computer Entertainment Inc. (SCE) does not develop or directly support a version of Linux for the PS3™ system, SCE is

27

pleased to provide links for the following Linux distributions that
support the PS3™ system:

> \* Yellow Dog Linux
> \* OpenSUSE
> \* Fedora
> \* Ubuntu

The respective websites provide instructions for downloading or
purchasing the Linux operating system, as well as information
about installation and post-installation configuration.

104.    Terra Soft was one company that developed Linux for PS3s and re-sold PS3s with

Yellow Dog Linux installed.  SCEA promoted and supported these efforts, as well as the

development of Linux on PS3 for the purpose of promoting the use of the PS3 as a supercomputing

node.  SCEA specifically contracted with Terra Soft to develop a Linux OS for the PS3.  In return,

Terra Soft promoted the Other OS features and Linux-capabilities of the PS3 for SCEA.

105.    In 2007, SCEA sponsored a "Hack-a-thon," an event held at Terra Soft's

supercomputing facility which was funded by SCEA, hosting more than forty researchers, software

developers and vendors who were granted first-access to twenty of the then new-to-market and

difficult to obtain PS3s.

106.    As one article notes:

Hack-a-thon was the kickoff of Terra Soft's HPC (high
performance computing) Consortium.  This summer, under a
contract with Sony Computer Entertainment, the company built a
3,000-square-foot addition to its facility to house the world's first
Cell-based supercomputing center.  Sony was interested in using
its PS3 to power a computing cluster that could be used by
research universities and national laboratories, and it tapped Terra
Soft to get that accomplished.

Terra Soft planned to have the computing cluster up and running
already.  Sony was going to send the company 480 beta (pre-
production) units of the PS3 to power the cluster.  However, the
corporate office was concerned about the safety of using the beta

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

units because the firmware on them was not as secure as the production units.

Now, the cluster will consist of 128 production PS3s, with the ability to grow to 256 units.  Staats said there are currently 14 PS3 units and seven BladeCenters - servers from IBM that operate on the same processor as the PS3.  He expects to receive an additional 20 PS3s in the following weeks and hopes to have all of the initial units within a few months.

107.    In another interview, Kai Staats, former CEO of Terra Soft, stated, "[t]he PlayStation 3 places a supercomputer in the home . . . Yellow Dog Linux provides a complete Linux OS for the PlayStation 3 resulting in a very powerful computing platform.  We are thrilled to be working with RapidMind to make this platform more accessible for professional developers and hobbyists alike . . . With our operating system, the Playstation could very easily be your home CD player, DVD player, MP3 player and home computer, as well as a great game box . . . This is not an application-limited appliance.  This is a full-blown computer.  There is no issue of 'can it do this or that?'  It can do everything."

108.    SCEA worked with Terra Soft to develop a massive PS3 cluster specifically to promote the concept that the PS3 could be used as a computer through the "Other OS" and use of Linux:

In October 2006, Terra Soft announced its plan to build the world's first supercomputing cluster using the Sony PlayStation 3 (PS3), which utilizes the IBM Cell Broadband Engine and the Linux operating system.  *The idea emerged when Sony Computer Entertainment came knocking on Terra Soft's door, interested in showing that the PS3 is more than merely a game box.*  After building a 3,000-sq-ft supercomputing facility, located at Terra Soft's headquarters, and adding a heavy dose of good old-fashioned tinkering, the cluster is well underway.  Terra Soft's CEO Kai Staats called the building of the PS3 cluster a 'highlight of [his] time in this industry'.

29

109.    In another interview with Kai Staats, former CEO of Terra Soft, he discusses the company's work with SCEA and development of the PS3 computing cluster:

> **LJ: Thank you for agreeing to talk with us, Kai. Tell us, why did Sony come to Terra Soft to build this cluster?**
>
> KS: Terra Soft has, for eight years, dedicated itself to the Power architecture, providing a leading Linux OS for systems built upon the IBM and Freescale CPUs, such as Apple's PowerPC product line. This experience and expertise gave Sony the confidence that Terra Soft would provide a high-quality end-user experience with professional support.
>
> **LJ: The PS3 cluster you have created together with Sony is an interesting application of what is marketed primarily as a home-entertainment machine. T he PS3 is really a flexible, powerful machine, isn't it?**
>
> KS: Yes, the PS3 is both. I believe we are experiencing an interesting paradigm shift, from three decades of personal computers competing with dedicated game boxes to the industry's first game box offering true personal computer functionality.
>
> Sony recognizes that, with its Cell Processor, the PS3 is not just another image processing engine, but a full-featured, fully capable home computer and lightweight development workstation. This is a tremendous market differentiator.
>
> At home, the PS3 elegantly consolidates the CD, DVD, MP3 player and home computer into a single "appliance". In supercomputing, the PS3 offers an inexpensive, lightweight compute node. Not designed to compete with the Mercury and IBM Cell blades, the PS3 enables individuals and labs to develop and optimize code for this new nine-core architecture within a limited budget. The same code seamlessly migrates to the high-performance Cell products.

110.    The US Air Force, with SCEA's and Terra Soft's assistance, bought over 2,200 PS3s to use in a massive super-cluster.  One article discussed the Air Force's program:

> The U.S. Air Force is connecting PS3 gaming consoles into an experimental supercomputer. Why? Because the chip inside is cheap and powerful.

30

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

> The U.S. Air Force recently issued a request for proposals to purchase 2,200 Sony PlayStation 3 video game consoles. Does the Air Force plan to play lots of Grand Theft Auto? No -- rather, the Air Force Research Laboratory in Rome, N.Y., is interested in the chip technology inside the PS3, specifically the Cell Broadband Engine Architecture, according to a blog post by Gartner Inc. analyst Andrea DiMaio.
>
> The Air Force is studying whether the PS3 chips could be a cost-effective technology for modernizing the military's high-performance computing systems.
>
> Supercomputer experts at the Air Force already have 336 PS3 consoles hooked together in an experimental Linux- based cluster. Now they want 2,200 more to expand the research project. The laboratory evaluated chips from other vendors, such as IBM and Intel Corp., but found the PS3 chips to be much cheaper.
>
> An RFP-related document justified the purchase this way: "With respect to cell processors, a single 1U server configured with two 3.2-GHz cell processors can cost up to $8k, while two Sony PS3s cost approximately $600. Though a single 3.2-GHz cell processor can deliver over 200 GFLOPS, whereas the Sony PS3 configuration delivers approximately 150 GFLOPS, the approximately tenfold cost difference per GFLOP makes the Sony PS3 the only viable technology for HPC applications."

111.   Similarly, another article described the purposes of the Air Force's PS3 computing Cluster to image targets:

> Once thought to be just a part of home entertainment systems, Sony's PlayStation 3 is proving itself to be more than just an online death-match machine.
>
> The console's price-to-performance ratio inspired one Air Force research team to place an order for 1,700 of them to go with the 336 they already have.
>
> The brains behind the Air Force Research Laboratory in Rome, N.Y., are clustering the consoles, along with some off-the-shelf graphic processing units, to create a supercomputer nearly 100,000 times faster than high-end computer processors sold today.

31

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

The research group was awarded a $2 million grant for the PlayStation 3 cluster.

Key to the whole idea is the console's cell processor, which was designed to easily work in concert with other cell processors to combine processing power and has been critically acclaimed for its number crunching ability.

This lets the researchers leverage power toward running such applications as Back Projection Synthetic Aperture Radar Imager formation, high definition video image processing, and Neuromorphic Computing, which mimics human nervous systems.

"With Neuromorphic Computing, as an example, we will broadcast an image to all PS3s and ask if it matches an image it has in its hard drive," said Dr. Richard Linderman, the senior scientist for Advanced Computing Architectures at the laboratory.

Mimicking humans will help the machine recognize images for target recognition, said Mark Barnell, the high performance computing director for the laboratory's information directorate.

"Humans can routinely do these things, but a computer struggles to do it," Barnell said. "In a general sense, we are interested in making it autonomous."

112.    The Air Force computer cluster is able to monitor a 25-km area in real time making it one of the fastest computers in the world:

The cluster, known as the Condor Cluster, includes servers with general purpose graphical processor units.  It is intended for a persistent surveillance role using the synthetic aperture radar and algorithms developed for a sister project, the GOTCHA synthetic aperture radar.  With the power of the PS3 cluster and aerial surveillance, scientists will be able to monitor a 25-km area in real time.

"By using the cell processors in the PS3s and the GPGPUs in unison, we've produced a system that does a very good job at handling this kind of information," said Mark Barnell, the project engineer for the cluster and AFRL high performance computing director. "We've developed the most powerful heterogeneous supercomputer in the world for a fraction of the cost of building it using individual chips and servers."

32

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

The Condor cluster looks more like a PS3 storage room than what some might imagine a supercomputer should look like. Thousands of consoles are stacked side-by-side on bread racks with homemade power management and mounting brackets. However, there is function and purpose in this construction.

"The PS3s arrive stacked on pallets," said Mr. Barnell. "We store them in one of the lab's warehouses and, after cataloging and testing each unit, we install them in racks of about 24. These modular racks can then be connected to the cluster as needed."

Putting it in Perspective
A floating point operation is a single operation done by a computer. The PS3 cluster is capable of performing 500 trillion operations every second. That's about a third of the speed of the third fastest computer in the world, the IBM Roadrunner computer used by the Department of Energy.

According to Mr. Barnell, the Roadrunner cost more than $120 million dollars to build, a 60-fold increase in cost for three times the performance of the AFRL cluster. However, the savings aren't limited to the upfront cost of building the computer. Modern computers require huge amounts of energy to run. Fortunately for AFRL, Sony had already figured out how to make the consoles energy efficient.

"The PS3, which is designed to function in a living room, requires a very efficient power requirement," said Dr. Linderman. "They also have a sleep feature when they're not in use. This means that when they aren't in use they only use a fraction of the power."

113.    The U.S. Immigration and Customs Enforcement agency's Cyber Crimes Center in Fairfax, Va., also clustered a bank of 40 interconnected PS3 consoles to decrypt passwords.  It was actively seeking to add 40 more units.  In one article, Chris Landi, senior special agent and section chief at ICE's Cyber Crimes Center, said each PlayStation 3 in the center's decryption silo is capable of generating 25,000 passwords per second while a Dell PowerEdge server, several of which are part of the silo, produces 17,000. "The cost for each Dell server is around $3,500," he said.  Landi estimated the cost of the silo - which is used in child exploitation and pornography

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

investigations and is often used by local, state, federal and even foreign agencies - to be around $1 million. The figure for a machine with similar capabilities that didn't use PS3s would be much higher, he said.

114.    At least two federal government agencies spent millions of dollars buying PS3s, with the direct support and knowledge of SCEA, solely to use them as super-computing clusters, because of their low cost, significant computing power, and their ability run Linux through the "Other OS" feature.  It is extremely unlikely that these agencies would have undertaken such massive and expensive efforts had they believed that SCEA would remove the "Other OS" or that this feature was not designed to last the life of the product.

115.    Indeed, the Air Force expressed disappointment with SCEA's decision. "We will have to continue to use the systems we already have in hand," the lab told Arstechnica.com, but "this will make it difficult to replace systems that break or fail.  The refurbished PS3s also have the problem that when they come back from Sony, they have the firmware (gameOS) and it will not allow Other OS, which seems wrong.  We are aware of class-action lawsuits against Sony for taking away this option on systems that use [sic] to have it."

116.    Numerous other researchers at colleges and universities also used the PS3's computer functionality through the "Other OS" feature to take advantage of the Cell processor. For example, in early 2007, Dr. Frank Mueller, Associate Professor of Computer Science at NCSU, clustered eight PS3s for research.  In the Summer of 2007, Dr. Gaurav Khanna, a professor in the Physics Department of the University of Massachusetts Dartmouth independently built a message-passing based cluster using 16 PS3s running Fedora Linux, called the "PS3 Gravity Grid."  This cluster was built with a donation from Sony and was the first such cluster that generated published scientific results.   This PS3 cluster performs astrophysical simulations of

34

large supermassive black holes capturing smaller compact objects.  Khanna claims that the cluster's performance exceeded that of a 100+ Intel Xeon core based traditional Linux cluster on his simulations.

117.    As researchers began to look to the PS3 as a potential computing platform, they also began documenting the best practices for wringing high performance out of the Cell architecture.  Currently, there are published papers on PS3 programming, practical how-to guides on setting up a PS3 cluster, and benchmark comparisons between the PS3 and comparable server hardware available throughout the internet.

118.    Before it decided to remove the "Other OS" feature, SCEA, SCEI and Sony widely supported and endorsed and promoted the efforts to tout the PS3's computing functionality through the use of "Other OS" – even directly funding some of these operations.  SCEA was involved with the US Air Force contract, in particular, and knew the purpose for which the US Air Force was buying the PS3 consoles (research – not gaming).  Thus, SCEA had widespread knowledge that many users would utilize the "Other OS" features that it had promoted as being for the life of the product (ten years) through updates via firmware.

119.    All of this work research and computing work with PS3 was done with the expectation that the "Other OS" feature would remain for the life of the PS3 console.  No one suspected that SCEA had retained the purported right (much less ability) to remove a core advertised feature and would eventually seek to do so through vague and inapplicable language in its Warranty, SSLA and TOS.

**The PS3's Intended Lifespan of 10 Years**

120.    The expected lifespan of the PS3 and the features with which it was promoted (including "Other OS"), like its predecessor, is at least a decade.  Sony never marketed, promoted

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

or represented that the advertised features that came with the PS3 would only last the length of the discrete express warranty covering the PS3 unit from product defects or failures.   Indeed, no reasonable consumer would purchase a PS3 if they believed Sony would come in 366 days after they purchased it and remove an advertised feature for which they had paid a premium, such as the ability to use the PS3 as a computer or play games online.

121.   The limited duration of the PS3's express warranty from defects and failures has no application to the express warranties that SCEA itself created through advertising the PS3's numerous features in its manual, on its website, on the console itself, and elsewhere.  SCEA and its Sony partners repeatedly touted a 10-year life span of the PS3 and its features.

122.   In August 2006 before the release of the PS3, Sony Computer Entertainment of America Chairman Kaz Hirai was asked by CNET News about the PS3's high price tag of $600, which at the time was two times the cost of the competing Wii.  According to Hirai, "[t]he pricing that we announced for the PlayStation 3 is a price that ultimately offers fantastic value to the consumers.  I think that we are offering a very good value for the consumers.  *We look at our products having a 10-year life cycle, which we've proven with the PlayStation.  Therefore, the PlayStation 3 is going to be a console that's going to be with you again for 10 years*.  We're not going to ask the consumers to suddenly buy another PlayStation console in five years time, and basically have their investment go by the wayside.  So far all those reasons, I think at $599 we're offering a very good value to the consumers." (emphasis added).

123.   In 2009, Hirai told Official PlayStation Magazine: "And with the Xbox - again, I can't come up with one word to fit.  You need a word that describes something that lacks longevity . . . .  Last time I checked, they've [Microsoft] never had a console that's been on the market for more than four or five years and *we've committed to a ten year life cycle*, so you do the math."

36

124.    In Spring 2009, Peter Dille, the Senior Vice President of Marketing at SCEA, confirmed the 10-year lifespan by saying, "we firmly believe that the PS3 will not only be around in 10 years but it'll be driving the business – driving this industry.  I don't know if our competitors' platforms will still be viable in 10 years; I do know that the PlayStation 3 will be."

125.    On February 14, 2011, SCEA announced that since the PS2's introduction in March 2000, that system had shipped 150 million units.  At this time, SCEA again confirmed the PS3's 10-year lifespan as a "commitment with every PlayStation consumer."  According to SCEA's senior director of corporate communications, Patrick Seybold:  "We at PlayStation have never subscribed to the concept that a console should last only five years . . . Both the original PlayStation and PlayStation 2 had life cycles of more than 10 years, and the PlayStation 3 will as well.  *The 10-year life cycle is **a commitment we've made with every PlayStation consumer to date***, and its part of our philosophy that we provide hardware that will stand the test of time providing that fun experience you get from day one for the next decade."

126.    Before the PS2, the typical life span of a video game console was four to five years, which held true for PlayStation competitors such as Xbox and Gamecube.  Since the PS2, however, consumers could expect and were told by SCEA that their PS2 and PS3 consoles would last 10 years or more, in particular because of the ability for the console to be upgraded via firmware updates.  As such, consumers believed that the functions that came to be advertised as part of the PS3, including the "Other OS" feature, would also be expected to last ten years.  Certainly, SCEA never disclosed that it retained the right to or would come in and remove core advertised features after the expiration of the one year warranty covering defects.

127.    Indeed, consistent with the 10-year lifespan, video game developers have provided PlayStation customers with thousands of video games and will continue to do so in the future. To

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

date, more than 1.5 billion PS2 games have been sold worldwide.  There are over six hundred titles for the PS3 and new games are expected in the future.

### SCEA Promoted Firmware Updates as Way to Ensure Functionality

128.    To aid the lengthy life span of the PS3 and as part of the purchase of the PS3, SCEA also promoted that users are entitled to receive firmware updates *directly* from SCEA with the purchase of the PS3 to ensure the functionality of the PS3.  This put PS3 purchasers into a direct contractual and privity relationship with SCEA as part of their purchase of the PS3 console once they accessed the PSN to receive these updates.

129.    In a SCEA press release, dated March 20, 2007, SCEA confirmed that its firmware updates were designed to allow the PS3 to last ten years.  Scott A. Steinberg, vice president, product marketing, SCEA is quoted as stating: "With these regular firmware updates and future-proofed technology, SCEA is making the 10-year lifecycle of PS3 possible."

130.    On SCEA's website, it represents that firmware updates *add* new features:

> Evolution is free and easy
> Keeping ourselves healthy and looking good: hard.  Keeping your PlayStation®3 system in top form: easy.  *System software updates are constantly adding new features and upgrades* as well as additional security features so you don't have to worry about your PlayStation®3 system becoming outdated or missing out on cool new features.

131.    SCEA also represents: "Downloading and installing the PlayStation®3 system software update will update your PS3™ system's operating system to include the latest security patches, settings, features and other items.  We encourage you to check this page from time to time for system software updates and to always maintain your system to use the latest version of the system software."

132.     Further, in SCEA's Instruction Manual, which accompanies each PS3, SCEA represented and warranted that "By updating the PS3 system software, you can add features and/or security patches.  Frequently update your system to use the latest version of the system software" under the heading "PS3 system updates[.]"  SCEA never disclosed that it would use this firmware update process to remove advertised and warranted features of the PS3 in their entirety and reasonable consumers such as Plaintiffs and the Class would not have expected as such.

133.     SCEA requires users who download firmware updates to agree to its TOS.  SCEA contends that this agreement applies to all purchasers in the class.  The TOS places users in contractual privity SCEA: "THIS AGREEMENT IS A CONTRACT BETWEEN YOU AND SONY COMPUTER ENTERTAINMENT AMERICA LLC ("SCEA") . . . ."

134.     The SSLA states:

ACCESS TO OR USE OF THE SYSTEM SOFTWARE IN THE SONY COMPUTER ENTERTAINMENT INC. ("SCE")'S PlayStation®3 COMPUTER ENTERTAINMENT SYSTEM UNIT ("PS3™ system") IS EXPRESSLY CONDITIONED UPON ACCEPTANCE OF THE TERMS OF THIS AGREEMENT.

*This Agreement is a contract with SCE*. This Agreement applies to any system software or firmware included in the PS3™ system, and any patches, updates, upgrades, or new versions of the system software or firmware provided to or made available for your PS3™ system through any SCE service or online network, SCE website or PS3™ system game disc (software is collectively, "System Software").

135.     Further, the SSLA purportedly gives SCE the right to sue users: "*SCE and its licensors reserve the right to bring legal action in the event of a violation of this Agreement*."

136.     SCEA also provides a direct warranty to purchasers that gives every user "specific legal rights" to enforce against SCEA.

39

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

137.     SCEA has used these agreements, in particular the TOS, to claim direct privity in suing users it contends violate these agreements.  For example, SCEA contends that it has contractual relationships with users of the PSN network.  All members of the class used the PSN network and are in privity with SCEA.

**Defendant removes the Other OS feature from later versions of the PS3**

138.     On or around August 18, 2009, SCEA announced the release of the PS3 "slim" model that would become available on September 1, 2009.  While it still contained the Cell processor, SCEA reduced the form factor (which specifies the physical dimensions of major physical components) and made other hardware adjustments in an attempt to lower production costs and also allow for a lower retail price in line with its competitors.

139.     In the new PS3 slim, SCEI removed the ability to access the "Other OS" feature. Thousands of PS3 users criticized SCEI for this move given its prior widespread promotion of this feature.

140.     At the time the computer and "Other OS" feature of the newer "slim" models was removed, SCEA did not attempt to allege that the removal of this feature was for "security" purposes.  Instead, SCEA admitted that it was solely a *financial* decision related to having to maintain the hypervisor.

141.      In a message posted on a PlayStation message board (which SCEA scrubbed from its online message board presumably given its embarrassing content, but which was reprinted in several articles), a SCEA representative discussed the financial reasons for no longer offering the "Other OS" feature on the new "slim" PS3 models:

> I'm sorry that you are frustrated by the lack of comment
> specifically regarding the withdrawal of support for OtherOS on
> the new PS3 slim. The reasons are simple: *The PS3 Slim is a major*

40

*cost reduction involving many changes to hardware components in the PS3 design. In order to offer the OtherOS install, SCE would need to continue to maintain the OtherOS hypervisor drivers for any significant hardware changes – this costs SCE.* One of our key objectives with the new model is to pass on cost savings to the consumer with a lower retail price. Unfortunately in this case the cost of OtherOS install did not fit with the wider objective to offer a lower cost PS3.

142.     As discussed in further detail, these same financial considerations (and not security concerns) later led to the removal of the "Other OS" feature in the older, "fat" models, as well.

**SCEA Reassures Users That Computer Functions
and "Other OS" Will Remain Available.**

143.     After realizing that SCEA was selling newer slim models without the "Other OS" functionality, owners of the older models became concerned that support for the PS3's computer feature would be eliminated system-wide.  Nevertheless, SCEA continued to represent that on the older, "fat" PS3 models that were shipped with the "Other OS" this feature would not be removed – further confirming that SCEA had always intended for this feature to be used and to survive (and be upgraded) during the estimated ten year life of the PS3 unit.

144.     For example, in an interview with arstechnica.com in August, 2009, John Koller, SCEA's director of hardware marketing, when asked about the removal of this feature from the slim models, stated that "[i]f anyone wants to use previous models and change the OS, they can do so."

145.     These comments about the "Other OS" feature not being removed on older models were further substantiated in an interview with SCEI employee, Akira Takase on Av Watch. When asked about the lack of the Other OS on the PS3 Slim, Takase-san stated: "There would be no time in the future when the Other OS would be moved from those models (CECHL00)."

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

146.     Cbe-oss-dev is a mailing list and website for "Discussion about Open Source Software for the Cell Broadband Engine."  The archives for the site note: "This mailing list provides a forum for free discussion about Open Source Software (Linux, gcc, toolchain etc.) as it relates to the Cell Broadband Engine device."

147.     Sony employee, Geoffrey Levand (discussed above), often posted to this mailing list.  His official job duty was to maintain Linux for the PS3 and to assist with technical problems.  People posted to this mailing list asking for his advice and for solutions to problems involving Linux-related PS3 issues.

148.     On August 18, 2009, François Galea posted a message to this list asking: "Is this just a rumour or is it for real?  Sony seems to have dropped the otheros feature on the new ps3 slim hardware.  If anybody has reliable news, I'd be glad to hear about."

149.     On August 22, 2009, Mr. Levand, on behalf of SCEI, replied that SCEI was *committed* to maintaining this feature on the older PS3 models (emphasis added):

> The feature of "Install Other OS" was removed from the new "Slim" PS3 model to focus on delivering games and other entertainment content.
> ***Please be assured that SCE is committed to continue the support for previously sold models that have the "Install Other OS" feature and that this feature will not be disabled in future firmware releases.***
> -Geoff

150.     In a follow-up message posted on this board on February 27, 2010, Mr. Levand replied (emphasis added):

> Please understand that in my position as PS3-Linux maintainer I can really only provide users with technical support for Linux and the LV1 hcall interface.
> ***The text above was provided to me by SCE management***. If you have any questions regarding it or any other feature of the PS3 please contact the Playstation Customer Support in your country.

42

1

2

> Using Playstation Customer Support will insure your inquiry is
> processed through the correct channels within SCE.
> -Geoff

3     151.    Mr. Levand's statement, provided to him by "SCE management," proves that SCEI

4  and SCEA always intended and represented that the Other OS feature would last the life of the

5  product, which was touted to be ten or more years as alleged herein.

6

7          **SCEA Disables the "Install Other OS" Feature And Other PS3 Functions**

8     152.    In direct contrast to its previous statements about this issue, on March 28, 2010,

9  Patrick Sebold, SCEA's Senior Director of Corporate Communications and Social Media,

10  announced on SCEA's website that Update 3.21 would be released on April 1, 2010 and its

11  installation would disable the "Install Other OS" feature that was available on the older. "fat" PS3

12  systems.

13

14     153.    Many users thought this was an April Fool's joke.  However, on April 1, 2010,

15  SCEA released Update 3.21 and proved that it was no joke as SCEA informed users that Update

16  3.21 would indeed disable the "Other OS" feature.

17     154.    PS3 owners were forced to install Update 3.21, or lose other important and

18  promoted features of the PS3.  For example, if a user failed to download Update 3.21, he or she

19
20  would lose the following advertised features: (1) the ability to sign in to the PSN; (2) the ability to

21  use online features that require a user to sign in to the PSN, such as chat; (3) the ability to use the

22  online features of PS3 format software; (4) playback of new PS3 software or Blu-ray discs that

23  require Update 3.21 or later; (5) playback of copyright-protected videos that are stored on a media

24  server; and (6) use of new features and improvements that are available on PS3 Update 3.21 or

25  later.

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

155.     Since the ability to play Blu-ray discs and play games online through the PSN were features unique to the PS3 console and also important to users, installing Update 3.21 was not optional for users wishing to retain those features.  Even SCEA's console games are increasingly reliant on online updates, online content, and online play.  SCEA did not present PS3 users with a valid choice.  Rather, users either lost the ability to use their PS3 as a computer through the "Other OS" feature, or they lost the ability to access online, Blu-ray, and gaming features if they did not install Update 3.21.

156.     In other words, installing Update 3.21 rendered the PS3 inoperable for its use as a computer; on the other hand, the failure to install Update 3.21 rendered the PS3 inoperable for its other intended purposes as an online gaming and Blu-ray disc console.

157.     Moreover, when consumers send a defective PS3 console to Defendant for repair, Defendant's repair service automatically installs Update 3.21.  As Defendant states on its website:

> Q: "I was using Linux and now my PS3 needs service.  Can I use Linux after it comes back from repair?
>
> A: No, we repair the PS3 system with the latest system software. Users will not be able to use Linux after the repair."

158.     Users who chose not to install Update 3.21 were also damaged in that they lost access to any prepaid PSN account balances since they could no longer access the PSN.  SCEA has failed to provide full refunds of these balances to users who did not download Update 3.21.

**SCEA's purported Justifications for Removal were False**

159.     SCEA suggested initially that the removal of the "Other OS" function from the "fat" models in April 2010 was for security and intellectual property reasons.

160.     On its website, SCEA wrote:

> Why did you delete the "Other OS" feature?

44

A. To protect the intellectual property of the content offered on the PS3 system as well as to provide a more secure system for those users who are enjoying games and other entertainment content on the PS3 system, we have decided to delete the feature to address security vulnerabilities of the system.

161.    This statement is a fabrication.  SCEA gave these reasons as a pretext so that it could attempt to argue that the Warranty, SSLA, and/or TOS allowed for the removal of the "Other OS" feature.  In reality, SCEI and SCEA removed this feature because it was expensive to maintain (as they previously admitted when the feature was removed from the "slim" models – but which they conveniently removed from SCEA's website); they were losing money on every PS3 unit sold (due to poor decisions in the planning and design of the Cell chip as noted above and given the PS3's extra features);  SCEA needed to promote and sell games to make their money back on the loss-leading PS3 consoles (and there was no profit in users utilizing the computer functions of the PS3); and IBM wanted to sell its expensive servers utilizing the Cell processor (users could cluster PS3s for the same purposes much less expensively).

162.    SCEA has never revealed how its "intellectual property" would be unprotected through the use of Linux on the PS3.  Moreover, the utilization of Linux did not make the PS3 less "secure."

163.    It is virtually impossible to use the "Other OS" for piracy because the PS3 is specifically designed to avoid allowing piracy through using the "Other OS" feature.  When the "Other OS" feature is enabled, the software prevents the proper operation of the gaming feature to avoid allowing the features to interplay.  In order for a hacker to pirate a game, it is necessary to perfectly emulate the operating system for which the game is designed, including the API, which is the interface for the game OS that supports all of the features of a game.  However, when the Other OS is in use, the API and other hardware features are blocked, including the graphics chip in the

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

PS3, which makes it impossible to run a pirated game on the Other OS.  As of January 2011, Sony had yet to identify a single instance in which someone used the Other OS to pirate protected content.

164.    Blu-Ray piracy using the Other OS was not a unique threat.  In order to pirate a Blu-Ray disc, a hacker requires a secret code or key; with that key, a hacker can pirate a Blu-Ray using a PC or a PS3 or any other computer – there is nothing unique about the PS3 in this regard.

165.    In the AV Watch article discussed *supra*, Takase-San also commented on security *not* being an issue by saying: "That with respect to the Other OS security becomes the hole, but with the PS3 very firm security measures are being done, *presently there is no such problem*.  If anything, support power is lightened."

166.    In short, SCEA has offered no valid security justifications for removing the Other OS feature.  The PS3 became subject to hacking *after* SCEA removed the "Other OS" feature and angry users sought ways to have their advertised and paid for features turned back on.

167.    Further, in February 2011, well after the Other OS feature was removed, it was a Sony employee who "tweeted" (sent a message via Twitter) the code that allowed users to get around the protections that prevent the PS3 from playing pirated games.

168.    It was only on February 16, 2011, that SCEA announced that "[u]nauthorized circumvention devices for the PlayStation 3 system have been *recently* released by hackers." Notably, this was only after SCEA had removed the "Other OS" feature and then tweeted the PS3's anti-circumvention codes to the world.

169.    SCEA could have taken other steps that were less intrusive than removing an advertised function of the device if security truly were a concern.  Indeed, SCEA revealed that it had the capacity to monitor PS3 systems using "hacking" software and would remove those

consoles from its PSN if they violated the TOS.  In its February announcement, SCEA stated: "Consumers using circumvention devices or running unauthorized or pirated software will have access to the PlayStation Network and access to Qriocity services through PlayStation 3 system terminated permanently."

170.    Thus, if any security concerns truly did exist at the time that justified SCEA's removal of the "Other OS" feature, it could have taken alternative steps at that time and barred "hackers" or "jailbroken" consoles from the PSN as opposed to removing the "Other OS" feature for all users.

171.    Instead, the true reason SCEI, SCEA and Sony removed the "Other OS" feature was because of financial concerns.

172.    Initially priced at $599 (much more than its competitors), SCEA was losing money on every PS3 console sold.  In 2006, isuppli.com estimated that it cost Sony $806 to produce each PS3.  That meant that each console sold resulted in a net loss to SCEI and SCEA of over $200.

173.    SCEA priced the PS3 with the expectation that it would make back the money lost on the console through the sale of games and accessories.  The problem for SCEA arose from consumers and researchers who used the PS3 for its value as a computer through the other operating system.  Such users bought few or no games or accessories, giving SCEA no way to recoup its losses on the console.

174.    As one article noted, Sony "isn't pleased with the handful of private research labs, companies, and individuals using racks of PS3s as a relatively inexpensive Cell cluster node or workstation.  Because Sony sells the PS3 at a loss, any customer who doesn't buy games for the console is bad for the bottom line."  Further, on the Air Force cluster alone, SCEA likely lost hundreds of thousands of dollars.

47

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

175.    SCEA and the other Sony entities were constantly looking for ways to cut costs and lower prices.  For example, IBMs Cell chips originally went from 90-nanometers to 65-nanometers and eventually to 45-nanometers in 2009.  The 65-nanometer Cell cost Sony $46.46 per unit, and the 45-nanometer Cell was $37.73.   This reduction did not substantially alter performance, but was less expensive to manufacture, and reduced the power usage of the PS3, reducing the need for cooling mechanisms.

176.    Instead of maintaining the original price in an attempt to profit from these types of lower costs, Sony cut the price of PS3 from $599 to $399 and then to $299 to increase market share and as a result of increasing competition.  Isuppli estimates that Sony was still losing money on consoles with a sale price of $299, however, as production costs, while lower, were still estimated at $348 per unit.

177.    As SCEA admitted when it removed the "Other OS" feature from the "slim" models, maintaining the hypervisor which allowed for multiple operating systems was very expensive. The tremendous financial pressure to cut costs further led to the removal of this feature – not "security" concerns.

178.    On the Fixstars message board forums, Kai Staats (former CEO of Terra Soft Solutions and later of Fixstars)  explained how the hypervisor became increasingly difficult and expensive to maintain for Sony:

> Sony was quite diligent about testing, and with each new rev of the GameOS (which acts as the hypervisor for Linux) there was a battery of tests. Often the GameOS had to be modified to support things which otherwise broke in Linux, so it is not a one-way street. GameOS affects Linux, and Linux affects GameOS.  If a component on the mobo changed, the hypervisor code would change to  support the new component, and then the testing starts again. While I am not aware of a time when the GameOS was modified to correct something we discovered to be broken in

48

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

> Linux, I can state that with nearly every third release of updated GameOS versions, something broke in Linux for which we compensated on our end, often with the assistance of Geoff [Levand] (who was great to work with, BTW).

179.    As the sonyinsider.com website notes, based on this evidence, the decision to remove the "Other OS" feature appears to be "100% cost-based."

180.    Other sources have speculated that, IBM, SCEI's partner in STI, also applied pressure to convince SCEI to remove the "Other OS" feature as it was losing sales of its expensive servers to those who were clustering PS3s (which had the same Cell processor) for much less money.

181.    Although they contained lower performance per unit, PS3s were an inexpensive alternative to IBM's Cell Blade servers which cost approximately $18,000.  When the US military purchased thousands of PS3 for a super-computing cluster, the purchasing report noted that SCEA was the only company capable of manufacturing the required hardware at an economical price.

182.    When an article in *The Economist*[1] noted that the military was making a substantial saving by creating the PS3 network compared to building a traditional super computer, users speculated:  "Do you think that other investors in Cell technology. Such as IBM [sic] might be a little pissed at Sony selling devices that are near equivalent to their own more expensive products? One could speculate the pressure to remove PS3 linux came from external sources."[2]

183.    Financial pressures were what led SCEI and SCEA to remove the "Other OS" feature.  SCEA had no valid basis to remove an advertised feature from its PS3, for which users had paid significant sums, merely because it no longer wanted to pay to support that feature or it

---

[1] http://www.economist.com/node/15063872?story_id=15063872
[2] http://www.neogaf.com/forum/showthread.php?t=383838

was losing money on sales of games and accessories.  SCEA's pretextual "security" or "intellectual property" concerns were not the true reason for the removal of the feature.

184.     SCEA relies on wording from its Warranty, SSLA, and TOS to argue that "security" concerns allow it to remove the Other OS feature.  Even if security were a concern, the language in these documents does not support SCEA's interpretation.

185.     The Warranty states that "[s]ome [warranty] services may . . . cause some loss of functionality."

186.     Update 3.21 was not a "warranty service."  Nor did Update 3.21 cause "some loss of functionality."  Users who downloaded Update 3.21 had a core advertised feature removed from their system.  Users who did not download Update 3.21 lost other core advertised features.  SCEA's Warranty does not authorize the removal of Other OS or those other features.

187.     The SSLA states "SCE may provide updates, upgrades, *or services* to your PS3TM to ensure it is *functioning properly* in accordance with SCE guidelines or provide you with new new offerings. . . .  Some *services* may . . . cause a loss of functionality."

188.     Update 3.21 was not a "service" as intended in the meaning of the SSLA.  It was an optional "update."  SCEA's SSLA does not claim that an "update" will cause a loss of functionality – only "services" are mentioned as possibly doing so.  Nor did Update 3.21 cause "a loss of functionality."  Users who downloaded Update 3.21 had a core advertised feature removed from their system.  Users who did not download Update 3.21 lost other core advertised features.  SCEA's SSLA does not authorize the removal of Other OS or those other features.

189.     SCEA's TOS states "[f]rom time to time, it may become necessary for SCEA to provide certain content to you to ensure that Sony Online Services and content offered through Sony Online Services, your PlayStation3TN computer entertainment system . . . is functioning

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

properly. . . . Such content may include *automatic updates or upgrades* which may . . . cause a loss of functionalities or utilities."

190.    Update 3.21 was not an "automatic update or upgrade" as intended in the meaning of the SSLA.  It was an "optional" update, meaning that the user selected whether to download the update, and lose a critical feature, or not download the update, and lose a different critical feature.

191.    None of the agreements which SCEA claims apply state that an optional Firmware Update will cause a user to lose core advertised features of the PS3, nor do they alert users that the "Other OS" feature might be disabled, particularly in light of Defendant's representations that the "Other OS" is a central feature of the PS3 and that Defendant would support it for the ten year lifespan of the PS3.  The "Other OS" feature and the ability of the PS3 to operate as a computer (or the elimination of access to the PSN network and play games online, as well as other features) were not "functionalities" – they were core advertised features of the PS3 along the lines of its ability to play games or play Blu-Ray DVDs.

192.    Thus, even if security issues were a valid concern, SCEA was not authorized by any of the purported agreements it has cited to issue Firmware Update 3.21 and remove the "Other OS" feature for millions of users.

193.    In February 2011, SCEA released Firmware Update 3.56.  This Update contained a security patch preventing "jailbroken" consoles (such as those that had been "hacked" to actually allow the "Other OS" feature back on to the consoles) from accessing the PSN.  Thus, if SCEA truly wanted to prevent "unauthorized" consoles that may have been "hacked," it had other methods available to it, such as barring access to the PSN (to the extent allowed under its purported agreements), as opposed to removing a feature that it no longer wanted to pay to

support, that was causing it to lose money on game sales, and/or that IBM was upset about because of a loss in sales of Blades servers.

### Users Complain

194.    Since Defendant released Update 3.21, thousands of users have written complaints on Internet websites and message boards, including the message board Defendant maintains on its website, regarding Update 3.21 and its removal of the "Install Other OS" feature.  Users complain that Defendant's actions are similar to a bait and switch, where users purchased a product with a specific feature and later had it taken away.  Simply put, PS3 users paid for a product that included certain features and regardless of whether they install Update 3.21, they will lose advertised and paid-for features and full functionality of their PS3 consoles.  Typical of those numerous complaints are the following:

> I bought a PlayStation 3 for $600 US Dollars on November 17, 2006 advertised as a Computer Entertainment System with a feature that allowed consumers to install Linux as an operating system. This feature was called Other OS from system menu which allowed users to use the machine not just as a console but also as a computer. On April 1, 2010 Sony updated the console's firmware and removed this feature and no longer can the console be used as a computer. The console which I bought for 600 US dollars has now the same features as the newer cheaper low end models. . . .I am seeking a new firmware which will put back the promised feature that was once advertised as being part of the product or a refund.

> I'll start by saying I have been a loyal sony customer and have bought all their systems at launch since the ps1. they have done a few dirty things but it wasn't until today until my eyes finally opened to see what an evil company full of liars sony really is. i mean this isn't the first time sony has lied to us, but to me this is the same as theivery. i bought a ps3, waited a week in freezing rain and paid 600 dollars for it under the impression i would have a system that could use linux, i've spent YEARS learning and playing with linux on my ps3, and 3 years later sony steals it back. A FEATURE THAT THEY ADVERTISED. I feel like I've been

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

stabbed in the back by my best friend. i was the one who was defending the ps3 from all the haters during its first couple years when it had pretty much no games. I hope sony realizes they have pulled a benedict arnold and have betrayed the most loyal of their consumers with this move. now i have to buy a new ps3 to keep the feature? HA! no more, sony. enough is enough. I'm contacting the better business bureau today to see what can be done about this treason. also I'm not updating my system and i plan on selling it in the very near future if something isn't done.

\* \* \*

I don't know how you figure. It absolutely entered my cost benefit analysis when choosing between PS3 and Xbox360. The PS3 needed every advantage it could get at launch and running linux was something the others could not claim. Remember, at the time there was no reason to believe that Blu Ray was going to be the standard. The only real advantage the PS3 had over the Xbox was Other OS. Xbox had more gamers and more games, still does. Xbox was already established in the market and many people had friends who were already using it. Both do High def 720p vs 1080p big deal, regardless image quality has been proven exactly the same time and again at all the review sites.Both have online features, Xbox is paid but the PS3 cost twice as much for the machine. Xbox had and still has the advantage with developers, see Carmack's latest statement on PS3 development. PS3 could run Linux, Xbox had no answer.

It factored into my decision and you'd be silly to think that it didn't factor into other people's decision as well since the PS3 had many disadvantages.

195.    Defendant originally misinformed users that the release of Update 3.21 – in particular, the disabling of the "Other OS" feature – was intended to protect the "security" of users systems.  In emails to PS3 users, Defendant later stated that the update was released in order to "protect the intellectual property of the content offered on the PS3 system."  In reality, as described herein, the "Other OS" feature was removed because of money.

## RULE 9(b) ALLEGATIONS

196.    WHO:  Defendant made material misrepresentations and failed to disclose, or adequately disclose, material facts as alleged herein.  Except as identified herein, Plaintiffs are

1    unaware of, and therefore unable to identify, the true names and identities of those individuals at

2    SCEA and its Sony partners who are responsible for such material misrepresentations and

3    omissions.

4          197.    WHAT: Defendant made affirmative material representations that the PS3 could be

5    used as a computer through the "Other OS" feature, that users would be able install other operating

6    systems such as Linux, and that the computer features of the PS3 would be available for the life of

7    the product (ten years or more) through continued updates designed to enhance functionality.

8    Defendant also made affirmative, material representatives that the PS3 could be used to access the

9    PSN, play video games online, and watch Blu-ray movies, among other things.   Defendant further

10   represented that firmware updates were for the purposes of providing new features, not to remove

11   core advertised features.  Defendant failed to disclose that it reserved the purported right to remove

12   core advertised features or that it would seek to do so under the Warranty, SSLA, or TOS.

13   Defendant misrepresented that those purported agreements gave it the right to remove the "Other

14   OS" feature or other advertised features.  Defendant further misrepresented that Update 3.21 was

15   to address "security" or "intellectual property" concerns.  Defendant's representations were untrue

16   and misleading.  Defendant knew and intentionally failed to disclose or adequately disclose, the

17   material facts as alleged herein, such as that it reserved the purported right to unilaterally disable or

18   remove the advertised PS3 features, including the "Other OS" feature.   Defendant knew and

19   intentionally failed to disclose or adequately disclose that financial concerns were the true reason it

20   was removing the "Other OS" feature.   Based on Defendant's affirmative representations about

21   the PS3's functions and firmware updates, Defendant had a duty to disclose the material

22   information alleged herein.

23

24

25

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

198.    WHEN:  Defendant made the affirmative material misrepresentations, omissions, and non-disclosures beginning in 2005 through sometime around April 2010.

199.    WHERE:  Defendant's affirmative, material misrepresentations, omissions, and non-disclosures were made on the Internet (including on its website at www.usplaystation.com), in press releases, on the PS3's packaging, in the PS3 owner's manual, on the console itself, in various promotional materials and interviews, and in its email communications with PS3 users, through third-party websites and among other places as detailed herein.

200.    HOW:  Defendant heavily marketed the PS3's features, including the ability to install other operating systems such as Linux, and the ability to access the PSN, play video games, watch movies, and listen to music, among other things.  Defendant marketed these features by placing advertisements, promoting "Other OS" at trade shows, funding PS3 computing centers, and putting material misrepresentations on its console, in its manual, and on the Internet, as well as encouraging third parties to do the same.  Defendant failed to disclose or adequately disclose material information to Plaintiffs and Class members.  Defendant failed to disclose or adequately disclose in its advertising and marketing that it retained the purported right to disable or remove the PS3's advertised functions.  Defendant did not make adequate disclosures until sometime around April 2010 when Plaintiffs and Class members were already locked into their PS3 purchases.

201.    WHY:  Defendant made the affirmative material misrepresentations and omissions for purposes of inducing Plaintiffs and Class members to purchase the PS3 and its video games over the game consoles and video games of its competitors.  Defendant also made these material misrepresentations and omissions to save money from having to refund consumers

55

purchase prices for the PS3 consoles when it intentionally removed core advertised features of the product.

## **CLASS ACTION ALLEGATIONS**

202.    Plaintiffs bring this suit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other similarly situated persons.  The three Classes are  initially defined as follows:

**Class 1.**
**All persons in the United States who purchased a PS3 with the "Other OS" feature available ("Fat" model PS3s) and who accessed the PSN, and did not use the "Other OS" feature.**
**Proposed Class Representative: ELTON STOVELL**

**Class 2.**
**All persons in the United States who purchased a PS3 with the "Other OS" feature available ("Fat" model PS3s) and who accessed the PSN, used the "Other OS" feature, and downloaded Firmware Update 3.21.**
**Proposed Class Representative: JONATHAN HUBER**

**Class 3.**
**All persons in the United States who purchased a PS3 with the "Other OS" feature available ("Fat" model PS3s) and who accessed the PSN, used the "Other OS" feature, and did not download Firmware Update 3.21.**
**Proposed Class Representatives: ANTHONY VENTURA, JASON BAKER**

203.    Excluded from the Classes are Defendant and its subsidiaries and affiliates, as well as Defendant's executives, board members, legal counsel, and their immediate families.  Also excluded are all governmental entities and any judicial officers assigned to hear any aspect of this case.

204.    Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity, further division into subclasses, or by limitation to particular issues.

56

205.   <u>Numerosity</u>.  The proposed Classes are sufficiently numerous, as Defendant has sold millions of PS3 systems to U.S. consumers and required those consumers to download the update at issue or forego other advertised features.  The members of the Classes are so numerous and dispersed throughout the United States that joinder of all members is impracticable.  The Class members can be readily ascertained through Defendant's and/or Class members' records.

206.   <u>Common Questions of Fact and Law</u>.  Common questions of fact and law exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes, pursuant to Federal Rule of Civil Procedure 23(b)(3).  Questions of fact and law that predominate over any individual issues include:

    a.   Whether Defendant breached its express warranties when it issued Update 3.21;

    b.   Whether Defendant represented and warranted  the PS3 as a computer and as having the ability to install and use other operating systems such as Linux, among other things;

    c.   Whether Defendant represented and warranted that firmware updates were to add features and/or security patches or otherwise improve and keep the system up to date;

    d.   Whether Defendant's representations about the PS3's features and updates were false and/or misleading;

    e.   Whether Defendant had a duty to disclose material facts, such as that it reserved the purported right to disable or remove the PS3's advertised features;

    f.   Whether Defendant failed to disclose or adequately disclose material facts to users, such as that it reserved the purported right to disable or remove the PS3's advertised features;

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

g.   Whether Defendant knowingly transmitted Update 3.21 with the specific intent of disabling the "Other OS" feature;

h.   Whether Defendant misrepresented the reasons for the removal of the "Other OS" feature;

i.   Whether Defendant's conduct violated the Consumers Legal Remedies Act, California Civil Code sections 1750, *et seq.* ("CLRA");

j.   Whether Defendant's conduct violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

k.   Whether Defendant's conduct violated California's Unfair Competition Law, California Business and Professions Code sections 17200, *et seq.* ("UCL");

l.   Whether Plaintiffs and the members of the Classes sustained damage and ascertainable loss as a result of Defendant's conduct as alleged herein;

m.   The amount of relief to which the Classes are entitled; and

n.   The amount of attorneys' fees, prejudgment interest, and costs of suit to which the Class is entitled

207.   <u>Adequacy</u>.  Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel competent and experienced in class action lawsuits.  Plaintiffs have no interests antagonistic to or in conflict with those of Class members and therefore will be adequate as representatives for the Classes.

208.   <u>Superiority</u>.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the various Classes is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CAUSES OF ACTION**

**COUNT I**

**Breach of Express Warranty**

**(On Behalf of All Plaintiffs and Class members)**

209.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

210.    Defendant is a merchant as defined by applicable Uniform Commercial Code ("U.C.C.") provisions and sold PS3 consoles, as well as numerous services, to Plaintiffs and members of the Class.  PS3 users who bought the console from retailers were also purchasing the right to continued and free firmware update from SCEA to ensure the promoted ten year life span of the product.

211.    Defendant is in direct privity with Plaintiffs and members of the Class by reason of its express written warranty, TOS, and SSLA.

212.    Defendant expressly warranted via its advertising, statements, brochures, website information, public statements, owner's manuals, console, and other representations that the PS3 would be able to operate as a computer and install Linux through the "Other OS" feature.

213.    Defendant expressly warranted via its advertising, statements, brochures, website information, public statements, owner's manuals, console, and other representations that the PS3 would be able to access the PSN and play games online, as well as the newest DVDs and games.

214.    Defendant expressly warranted via its advertising, statements, brochures, website information, public statements, owner's manuals, and other representations that the PS3 would be upgraded through Firmware Updates and last ten years or more.

215.    The statements made by Defendant are affirmations of fact that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promises.  Plaintiffs placed importance on Defendant's representations.

216.    Upon application of the Update 3.21 and the disabling of the "Other OS" feature,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

the PS3 no longer conformed to these express representations of Defendant.  Alternatively, upon failure to install Update 3.21, the PS3 no longer conformed to these express representations of Defendant.

217.    Defendant produced and sold the PS3 based upon the representations that it was capable of performing both specified online gaming and "Other OS" features.  Defendant currently maintains, by contrast, that the product cannot perform all functions and the user must choose between online gaming on the PSN or the "Other OS" feature. The inability of the PS3 to perform online gaming on the PSN and "Other OS" features promised by Defendant constitutes a breach of warranty.

218.    Defendant produced and sold the PS3 based upon the representations that it would be upgraded through firmware updates.  Update 3.21, which removed the "Other OS" or other advertised features, constitutes a breach of warranty.

219.    As a result of SCEA's breach of the express warranty, Plaintiffs and the Class were injured.

## COUNT II

### Breach of the Implied Warranty of Merchantability

**(On Behalf of all Plaintiffs and Class members)**

220.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

221.    Defendant is a merchant as defined by applicable Uniform Commercial Code ("U.C.C.") provisions and sold PS3 consoles, as well as numerous services, to Plaintiffs and members of the Class.  PS3 users who bought the console from retailers were also purchasing the right to continued and free firmware update from SCEA to ensure the promoted ten year life span of the product.

222.    Defendant impliedly warranted to Plaintiffs and members of the Class that the PS3 was merchantable and fit for use as a computer.  Specifically, Defendant impliedly warranted that

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

the PS3 could utilize other operating systems (such as Linux) and be used as personal computer as a result.

223.     Defendant also impliedly warranted to Plaintiffs and members of the Class that the PS3 was merchantable and fit for gaming.  Specifically, Defendant impliedly warranted that the PS3 could access the PSN and play games online.

224.     Plaintiffs and the Class were in direct privity with Defendant as a result of their access to the PSN, SCEA's firmware updates, and numerous direct financial and other dealings with Defendant.

225.     All users who access the PSN have numerous, direct contacts with SCEA.  This was an integral part of the PS3 and its advertised functions.  Through PSN, users download firmware updates (including update 3.21).  The PSN allows users to pay money directly to SCEA for items through the PlayStation store.  Plaintiffs can put money into their PSN account that goes directly to SCEA.

226.     PSN is an online multiplayer gaming and digital media delivery service provided/run by SCEA for use with the PS3.  Registration for SCEA's PSN is performed via the PlayStation 3 console. Two types of accounts can be created; Master accounts and Sub accounts. Master accounts allow full access to all settings, including parental control, but the Master must be over the age of 18 to create an account. Sub accounts can subsequently be created with desired restrictions set by the master account holder.

227.     Through the PSN, users can access the PlayStation Store.  PlayStation Store is an online shopping-based service for the PlayStation Network where money is directly paid to SCEA. The store uses both physical currency and PlayStation Network Cards.  The PlayStation Store's gaming content is updated every Tuesday with content such as full games, game demos, game add-ons, game trailers, movie trailers, XMB wallpapers and XMB themes.  Video content such as films and television shows are also available from the Store for a fee (paid to SCEA).

228.     Through the PSN, users can pay for and access "Qore" – a subscription based,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

interactive, online magazine.  These funds are also paid to SCEA.

229.    Users can pay for "PlayStation Plus" - a paid-for subscription service (of 3 month or 1 year terms), also paid to SCEA, that provides users with enhanced services on the PlayStation Network, in addition to the free PSN service, including the ability to have demos, game and system software updates download automatically to the PS3.  Subscribers also get early or exclusive access to some betas, game demos, premium downloadable content and other PlayStation Store items as well as a free subscription to "Qore."

230.    Users can access PlayStation Blog through PSN which provides news about the PS3, information about updates, and interviews with third parties and SCEA executives.

231.    SCEA requires users who access the PSN to agree to its TOS.  SCEA contends that this agreement applies to all purchasers in the class.  The TOS places users in direct, contractual privity SCEA: "THIS AGREEMENT IS A CONTRACT BETWEEN YOU AND SONY COMPUTER ENTERTAINMENT AMERICA LLC ("SCEA") . . . ."

232.    The SSLA, another document that SCEA contends all purchasers must agree, states: "*This Agreement is a contract with SCE.*

233.    Further, the SSLA purportedly gives SCE the right to sue users: "*SCE and its licensors reserve the right to bring legal action in the event of a violation of this Agreement.*"

234.    SCEA also provides a direct warranty to purchasers that gives every user "specific legal rights" to enforce against SCEA.

235.    SCEA has used these "agreements," in particular the TOS, to claim direct privity in bringing legal actions against users it contends violate these agreements.  For example, in those legal documents, SCEA contends that it has contractual relationships with all users of the PSN network.   SCEA cannot retain a right to sue purchasers under these purported agreements, but then maintain that users have no privity through which they can sue SCEA.

236.    All members of the class used the PSN network and are in privity with SCEA.

237.    As alleged herein, Defendant's Update 3.21 breached the implied warranty of

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

merchantability because it eliminated the "Other OS" feature and the ability to use the PS3 as a personal computer.  In addition, without Update 3.21, Plaintiffs and the Class lose access to the PSN which includes playing online games and access to other online features.  Defendant's actions have rendered the PS3 unmerchantable and unfit for its intended computer and/or online gaming purpose.

238.    Defendant's conduct in eliminating the "Other OS" functionality and failure to adequately disclose to the Plaintiff and the Class that it retained the purported right to eliminate the "Other OS" or other advertised features, is a breach of SCEA's obligation of good faith and fair dealing.

239.    Defendant knew or should have known that the Update 3.21 had the aforesaid properties and would render the PS3 unmerchantable and unfit for its intended uses or purposes.

240.    Defendant had reasonable and adequate notice of the Plaintiff and the Class Members' claims for breach of implied warranty of merchantability via the publicly available consumer complaints predating the filing of this pleading, and failed to cure.

241.    As a result of Defendant's breaches of implied warranty, Plaintiff and members of the Class have been injured and are entitled to equitable/injunctive relief and/or damages in a measure and amount which are to be determined at trial.

## COUNT III

### Breach of the Implied Warranty of Fitness for a Particular Purpose
### (On Behalf of all Plaintiffs and Class members)

242.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

243.    Defendant is a merchant as defined by applicable Uniform Commercial Code ("U.C.C.") provisions and sold PS3 consoles, as well as numerous services, to Plaintiffs and members of the Class.  PS3 users who bought the console from retailers were also purchasing the

right to continued and free firmware update from SCEA to ensure the promoted ten year life span of the product.

244.   Defendant impliedly warranted to Plaintiffs and members of the Class that the PS3 was fit for the particular purpose of computing.  Specifically, Defendant impliedly warranted that the PS3 could utilize other operating systems (such as Linux) and be used as personal computer.

245.   Defendant also impliedly warranted to Plaintiffs and members of the Class that the PS3 was fit for the particular purpose of online gaming.  Specifically, Defendant impliedly warranted that the PS3 could access the PSN and play games online.

246.   Plaintiffs and the Class were in direct privity with Defendant as a result of their access to the PSN, SCEA's firmware updates, and numerous direct financial and other dealings with Defendant.

247.   All users who access the PSN have numerous, direct contacts with SCEA.  This was an integral part of the PS3 and its advertised functions.  Through PSN, users download firmware updates (including update 3.21).  The PSN allows users to pay money directly to SCEA for items through the PlayStation store.  Plaintiffs can put money into their PSN account that goes directly to SCEA.

248.   PSN is an online multiplayer gaming and digital media delivery service provided/run by SCEA for use with the PS3.  Registration for SCEA's PSN is performed via the PlayStation 3 console. Two types of accounts can be created; Master accounts and Sub accounts. Master accounts allow full access to all settings, including parental control, but the Master must be over the age of 18 to create an account. Sub accounts can subsequently be created with desired restrictions set by the master account holder.

249.   Through the PSN, users can access the PlayStation Store.  PlayStation Store is an online shopping-based service for the PlayStation Network where money is directly paid to SCEA. The store uses both physical currency and PlayStation Network Cards.  The PlayStation Store's gaming content is updated every Tuesday with content such as full games, game demos, game add-

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

ons, game trailers, movie trailers, XMB wallpapers and XMB themes.  Video content such as films and television shows are also available from the Store for a fee (paid to SCEA).

250.    Through the PSN, users can pay for and access "Qore" – a subscription based, interactive, online magazine.  These funds are also paid to SCEA.

251.    Users can pay for "PlayStation Plus" - a paid-for subscription service (of 3 month or 1 year terms), also paid to SCEA, that provides users with enhanced services on the PlayStation Network, in addition to the free PSN service, including the ability to have demos, game and system software updates download automatically to the PS3.  Subscribers also get early or exclusive access to some betas, game demos, premium downloadable content and other PlayStation Store items as well as a free subscription to "Qore."

252.    Users can access PlayStation Blog through PSN which provides news about the PS3, information about updates, and interviews with third parties and SCEA executives.

253.    SCEA requires users who access the PSN to agree to its TOS.  SCEA contends that this agreement applies to all purchasers in the class.  The TOS places users in direct, contractual privity SCEA: "THIS AGREEMENT IS A CONTRACT BETWEEN YOU AND SONY COMPUTER ENTERTAINMENT AMERICA LLC ("SCEA") . . . ."

254.    The SSLA, another document that SCEA contends all purchasers must agree, states: "*This Agreement is a contract with SCE.*

255.    Further, the SSLA purportedly gives SCE the right to sue users: "*SCE and its licensors reserve the right to bring legal action in the event of a violation of this Agreement.*"

256.    SCEA also provides a direct warranty to purchasers that gives every user "specific legal rights" to enforce against SCEA.

257.    SCEA has used these "agreements," in particular the TOS, to claim direct privity in bringing legal actions against users it contends violate these agreements.  For example, in those legal documents, SCEA contends that it has contractual relationships with all users of the PSN network.  SCEA cannot retain a right to sue purchasers under these purported agreements, but

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

then maintain that users have no privity through which they can sue SCEA.

258.    All members of the class used the PSN network and are in privity with SCEA.

259.    As alleged herein, Defendant's Update 3.21 breached the implied warranty of fitness for particular purpose because it eliminated the "Other OS" feature and the ability to use the PS3 as a personal computer. In addition if they did not download Update 3.21, Plaintiffs and the Class lost access to the PSN which includes playing online games and access to other online features.  Defendant's actions have rendered the PS3 unfit for its intended purposes.

260.    Defendant's conduct in eliminating the "Other OS" and other advertised features and failure to adequately disclose to the Plaintiff and the Class that it retained the purported right to eliminate such features, is a breach of SCEA's obligation of good faith and fair dealing.

261.    Defendant knew or should have known that the Update 3.21 (or failure to download it) would have the aforesaid properties and would render the PS3 unfit for its intended use or purpose.

262.    Defendant had reasonable and adequate notice of the Plaintiffs and the Class Members' claims for breach of implied warranty of merchantability via the publicly available consumer complaints predating the filing of this pleading, and failed to cure.

263.    As a result of Defendant's breaches of implied warranty, Plaintiffs and members of the Class have been injured and are entitled to equitable/injunctive relief and/or damages in a measure and amount which are to be determined at trial.

## COUNT IV

### Violation of the California Consumers Legal Remedies Act

**(On Behalf of all Plaintiffs and Class members who purchased the PS3s for personal, family or household purposes)**

264.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

265.    Defendant is a "person," as defined by the California Consumers Legal Remedies

66

1   Act ("CLRA"), Cal. Civil Code § 1761(c).

2   266.   Plaintiffs and the Class members are "consumers," within the meaning of Cal. Civil

3   Code § 1761(d).

4   267.   The PS3 is a "good," within the meaning of Cal. Civil Code § 1761(a).

5   268.   Each Plaintiff's purchase of the PS3 with future updates constituted a "transaction,"

6   as that term is defined in Cal. Civil Code § 1761(e).

7   269.   Since the 2006 introduction of the PS3, Defendant advertised, promoted, marketed,

8   warranted, and represented that the PS3 operates like a computer through the ability to download

9   operating systems such as Linux on the PS3.  This practice continued up to the release of the

10  Update 3.21 which disabled the "Other OS" feature and the ability to use the PS3 as a personal

11  computer.

12  270.   Since the 2006 introduction of the PS3, Defendant advertised, promoted, marketed,

13  warranted, and represented that the PS3 can play online games and access other features through

14  the PSN.

15  271.   Defendant further represented that the PS3 has a lifespan of 10 years, like the

16  previous PlayStation2.  Indeed, since the PS3 was first introduced, there have been numerous

17  video games developed for the PS3 and additional video games are being developed for release in

18  2011.

19

20  272.   With regard to software updates, during the time that it has sold the PS3, Defendant

21  represented on its website and elsewhere that downloading and installing updates would update the

22  PS3's operating system to include additional settings and features.  Further, in the instruction

23  manual which has accompanied each PS3, Defendant represented that, "By updating the PS3

24  system software, you can add features and/or security patches.  Frequently update your system to

25  use the latest version of the system software[.]"   Defendant did not disclose at the time of sale that

26  optional software updates would be used to disable or remove core advertised features of the PS3.

27  273.   Plaintiffs reviewed and relied on the representations regarding the PS3's features,

28

67

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

including the "Other OS" and PSN features, as well as software updates in deciding to purchase the PS3. Based on Defendant's representations, Plaintiffs reasonably believed that they would have the right to utilize all of the PS3's advertised features, including the "Other OS" and online gaming features, for the useful life of the PS3, which, according to Defendant's representations, is 10 years. Further, Plaintiffs reasonably expected that any firmware updates issued by Defendant would be to improve the PS3's operation or to add new features, not to disable or remove core advertised features.

274.    Plaintiffs' expectations were reasonable and are supported by Defendant's statements about the "Other OS" feature in late 2009. For example, in August 2009, Geoffrey Levand, Principal Software Engineer at Sony Corporation, assured PS3 owners as follows: "Please be assured that SCE is committed to continue the support for previously sold models that have the 'Install Other OS' feature and that this feature will not be disabled in future firmware releases."

275.    Even when it decided to remove the "Other OS" feature from the new Slim PS3, Defendant reiterated its commitment to supporting the "Other OS" feature in existing PS3 models. In an interview with arstechnica.com in August, 2009, John Koller, SCEA's director of hardware marketing, stated that "[i]f anyone wants to use previous models and change the OS, they can do so."

276.    Unbeknownst to Plaintiffs, but exclusively within the knowledge of Defendant, Defendant believed it retained the purported right to remove any of the PS3's core advertised features, including the "Other OS" feature, during the PS3's useful life through any means, including through optional firmware updates that were promoted as enhancing functionality, not destroying it.

277.    At the time of sale, Defendant did not disclose to Plaintiffs that it retained the purported right to remove any of the PS3's core advertised features, including the "Other OS" or PSN gaming feature, during the useful life of the PS3 – particularly for the purpose of saving money. Plaintiffs would have considered these facts important in deciding whether or not to

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

purchase (and/or pay the same price) for the PS3.   Had Plaintiffs known that Defendant retained the right to remove any of the PS3's core advertised features, including the "Other OS" feature, during the useful life of the PS3, Plaintiffs would not have purchased the PS3 or would have paid less for the PS3.   Therefore, the facts that Defendant actively concealed, suppressed or failed to disclose at the time of Plaintiffs' purchase were material.

278.   "After disabling the "Other OS" feature through Firmware Update 3.21, Defendant claimed that it had the right to remove any of the PS3's advertised features under the SSLA.   The current SSLA says in part:

> From time to time, SCE may provide updates, upgrades or services to your PS3 system to ensure that it is functioning properly in accordance with SCE guidelines or provide you with new offerings.  Some services may be provided automatically without notice when you are online, and others may be available to you through SCE's online network or authorized channels. Without limitation, services may include the provision of the latest update or download of new release that may include security patches, new technology or revised settings and features which may prevent access to unauthorized or pirated content, or use of unauthorized hardware or software in connection with the PS3 system. Additionally, you may not be able to view your own content if it includes or displays content that is protected by authentication technology.  Some services may change your current settings, cause a loss of data or content, or cause some loss of functionality. It is recommended that you regularly back up any data on the hard disk that is of a type that can be backed up.

279.   Additionally, Defendant has relied on the following provision from its Service Policy set forth in its Warranty:

> You understand and acknowledge that any time SCEA services your PS3 system (either within the Warranty Period or under a separate service arrangement), it may become necessary for SCEA to provide certain services to your PS3 system to ensure it is functioning properly in accordance with SCEA guidelines.  Such services may include the installation of the latest software or firmware updates, or service or replacement of the Ps3 hard disk or the PS3 system with a new or refurbished product.  You acknowledge and agree that some services may change your current settings, cause a removal of cosmetic stickers or system skins, cause a loss of data or content, or cause some loss of

69

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

functionality.

280. Finally, Defendant has pointed to certain terms of the TOS that it requires users to agree to access the PSN. The TOS says in part:

> From time to time, it may become necessary for SCEA to provide certain content to you to ensure that Sony Online Services and content offered through Sony Online Services, your PlayStation3 computer entertainment system, the PSP (PlayStation Portable) system or other SCEA-authorized hardware is functioning properly in accordance with SCEA guidelines. Some content may be provided automatically without notice when you sign in. Such content may include automatic updates or upgrades which may change your current operating system, cause a loss of data or content or cause a loss of functionalities or utilities. Such upgrades or updates may be provided for system software for your PlayStation3 computer entertainment system, the PSP (PlayStation Portable) system, or other SCEA-authorized hardware.

281. The terms set forth in Defendant's SSLA, Warranty, and TOS, however, do not inform users that Defendant reserved the purported right to remove any of the PS3's core advertised features, including the "Other OS" feature, which it did do through Firmware Update 3.21.

282. Even if the terms of the SSLA, Warranty and Terms of Service could be interpreted to give Defendant the purported right to remove any of the PS3's advertised features, including the "Other OS" feature, during the useful life of the PS3, Defendant actively concealed these material facts, and/or also made partial representations but suppressed material facts as the terms of the SSLA, Warranty and Terms of Service were not provided until after purchase and were also buried in numerous paragraphs of legal language in small print. Moreover, because these terms were not presented to Plaintiffs until after they purchased the PS3, Defendant had exclusive knowledge of material facts that Plaintiffs did not, namely, that it had the purported right to remove the PS3's advertised features, including the "Other OS" feature, during the useful life of the PS3.

283. Defendant had a duty to clearly and conspicuously disclose at the time of sale the material facts alleged herein, namely, that it reserved the purported right to remove the PS3's advertised features, including the "Other OS" feature, during the useful life of the PS3. This duty

to disclose was created by (1) Defendant's affirmative representations about the PS3's advertised features and software updates and the expected 10-year life span of the PS3; (2) Defendant's exclusive knowledge of material facts not known to Plaintiffs; (3) Defendant's active concealment of material facts from Plaintiffs; and (4) Defendant's partial representations about material facts. Defendant's misrepresentations and material omissions about the PS3's advertised features and software updates were likely to deceive reasonable consumers.

284.    The CLRA prohibits affirmative misrepresentations, partial misrepresentations and concealment or suppression of material facts which make a representation misleading. Defendant's representations about the PS3's features, including the Other OS feature, and future updates, were false and or misleading because Defendant failed to disclose material facts, namely, that it reserved the unilateral right to remove the PS3's features through updates.

285.    Defendant's misrepresentations and omissions as alleged herein violated Cal. Civ. Code § 1770(a)(5)'s proscription against representing that goods have uses, characteristics, benefits, or qualities they do not actually have; Cal. Civ. Code § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality, or grade when they are of another; and Cal. Civ. Code § 1770(a)(9)'s proscription against advertising goods with an intent not to sell them as advertised.

286.    Defendant also violated Civil Code §1770(19) by inserting one or more unconscionable provisions into a contract.  Defendant's insertion of the terms alleged in Paragraphs 278-280 in the SSLA, Warranty and TOS were unconscionable to the extent that SCEA attempts to use these provisions as a basis upon which to remove the PS3's core advertised features, such as the "Other OS" feature.

287.    Defendant used its superior bargaining strength to impose the terms upon customers, and customers had no meaningful choice whether to accept or reject these provisions. The SSLA, Warranty and Terms of Service were not provided to Plaintiffs at the time of purchase. Thus, the terms Defendant relies on from the SSLA, Warranty and TOS  were the product of

71

oppression and the lack of negotiation, not any meaningful choice.  SCEA's use of these provisions to justify its removal of the "Other OS" feature would be similar to SCEA stating that it was removing the features that allowed consumers to play PS3 games or watch movies on the PS3.

288.   After entering into the contract for the purchase and sale of a PS3, Plaintiffs had no ability to negotiate the terms of the SSLA, Warranty, and TOS, which were only provided to them after they purchased their PS3s, including the terms purportedly allowing Defendant to remove features at will, allowing it to unilaterally change the SSLA, Warranty and Terms of Service at will and forcing customers to either accept any changes in the SSLA, Warranty and Terms of Service or cease their use of their PS3.

289.    In addition, Defendant included these provisions within its small-type, prolix form; disguised them under nebulous headings; and buried them among sundry other unrelated contractual terms.

290.   These provisions are, accordingly, procedurally unconscionable.

291.   In imposing these terms, Defendant sought to create for itself an unlimited ability to alter the SSLA, Warranty and TOS and the core advertised features of the PS3 as it saw fit and without any consideration to Plaintiffs.

292.   These provisions are one-sided and unreasonably favorable to Defendant.  It uniquely favors Defendant at the expense of customers, and Defendant clearly hid these terms in its standard-form contracts to gain unfair advantage over Plaintiffs and consumers.

293.   These terms are, as outlined above, substantively oppressive because they reallocate risk between consumers and Defendant in an objectively unreasonable and unexpected manner by permitting Defendant to change the SSLA, Warranty and TOS and the PS3 functionalities to protect its interests in complete derogation of the rights of consumers.

294.   Both procedurally and substantively, therefore, the provisions identified herein in Paragraphs 2798-80 are unduly oppressive and unconscionable.

295.   Therefore, if Defendant asserts in this action a defense related to these provisions,

by reason of the foregoing, Plaintiffs and other Class members seek declaratory relief in the form of an order finding that these provisions are unconscionable and injunctive relief requiring Defendant to cease enforcement of the foregoing unconscionable contract provisions.

296.    Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Defendant under the CLRA for injunctive relief, restitution and/or disgorgement of funds paid to Defendant to purchase the PS3, and/or an injunction requiring Defendant to enable the "Other OS" feature of the PS3, free of charge, and an award of attorneys' fees and costs.

297.    Plaintiffs' counsel put Defendant on notice that it was in violation of the Consumers Legal Remedies Act.  Attached hereto as Exhibit A are true and correct copies of demand letters from Plaintiffs Ventura and Huber.  As the thirty (30) day period has expired and Defendant failed to cure, Plaintiffs Ventura and Huber seek actual and statutory damages on behalf of themselves and the Class.

## COUNT V

### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

### (On Behalf of Plaintiff Stovell/Class 1 and Plaintiff Huber/Class 2 only)

298.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

299.    The PS3 is a "computer" within the meaning of 18 U.S.C. § 1030(e)(1).

300.    Plaintiffs' and Class members' PS3 consoles are used in interstate commerce or communication, and are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B).

301.    Defendant knowingly caused the transmission of software and intentionally caused damage without authorization to Plaintiffs' and Class members' PS3 consoles; and/or intentionally accessed Plaintiffs' and Class members' PS3 consoles without authorization and recklessly caused damage; and/or intentionally accessed Plaintiffs' and Class members' PS3 consoles without authorization and caused damage and loss.  Defendant's stated purpose of "security" reasons was false.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

302.    Defendant knowingly caused the transmission of software code and intentionally caused damage without Plaintiffs' authorization to Plaintiffs' and Class members' PS3 consoles. Defendant knowingly and admittedly released Update 3.21 for the specific purpose of removing the "Install Other OS" feature – a feature that Defendant had advertised as part of the console and for which Plaintiffs and Class members had paid.  As a result of this knowing transmission, Defendant intentionally caused damage by disabling the "Install Other OS" feature.  The damage was unauthorized because a failure to download Update 3.21 resulted in the loss of other features, as described herein.  Further, Defendant's stated purpose was for security reasons although in reality it was to save money.

303.    Defendant intentionally accessed Plaintiffs' and the Class' PS3 systems and transmitted software without authorization and recklessly caused damage.

304.    Defendant intentionally accessed Plaintiffs and the Class' PS3 systems without authorization and caused damage and loss.  Although Plaintiffs and Class members may have authorized a firmware update for security reasons, they did not authorize the disabling of the "Install Other OS" feature to Defendant money.  Defendant did not present Plaintiffs and Class members with any actual choice because either downloading Update 3.21 or not downloading the update would both result in disabling certain advertised features.  Defendant's unauthorized access caused damage to Plaintiffs' and Class members' PS3 consoles and caused Plaintiffs and Class members to suffer losses, including, but not limited to, the ability to use other operating systems and the money paid for this feature.  Plaintiffs' and Class members' consoles were reduced in value by Defendant's conduct because a gaming console that allows Defendant to remove and disable advertised and material features is worth less than a gaming console that does not allow these unauthorized removals.

305.    Through Defendant's intentional transmission of the software and the unauthorized access of Plaintiffs' and Class members' PS3 systems, Defendant impaired the integrity of Plaintiffs' and other individual Class members' systems and removed a feature that Plaintiffs and

Class members had paid for.  As a direct result of engaging in such acts, Defendant caused damage exceeding an aggregate of $5,000 in value during a one-year period.

### COUNT VI

### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

### (On Behalf of all Plaintiffs and Class members)

306.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

307.    The Magnuson-Moss Warranty Act ("Magnuson-Moss"), 15 U.S.C.§ 2301, *et seq.*, provides a private right of action for purchasers of consumer products against manufacturers or retailers who, *inter alia*, fail to comply with the terms of a written or implied warranty.  15 U.S.C. § 2310(d)(1).

308.    Defendant provided an express written warranty to consumers with every sale of a PS3.

309.    As demonstrated above, Defendant has failed to comply with the terms of its express and implied warranties with regard to the sale of its PS3s.

310.    Defendant's PS3s are "consumer products," as that term is defined in § 2301(1) of Magnuson-Moss.

311.    Defendant is a "warrantor," as that term is defined in § 2301(5) of Magnuson-Moss.

312.    Plaintiffs and each member of the Class are "consumers," as that term is defined in § 2301(3) of Magnuson-Moss.

313.    Defendant had reasonable and adequate notice of Plaintiffs' and the Class's claims of breach of Defendant's express and implied warranties from the sale of its PS3s, to the extent notice is required, and was given a reasonable opportunity to cure its failure to comply with those warranties.  However, Defendant never cured.  As a result of Defendant's breach of its express and implied warranties through Magnuson-Moss, Plaintiffs and members of the Class have been

75

injured and are entitled to equitable/injunctive relief and/or damages in a measure and amount to be determined at trial.

### COUNT VII

### Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.* (False Advertising)
### (On Behalf of all Plaintiffs and Class members)

314.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

315.    Defendant has engaged in false advertising as it disseminated false and/or misleading statements regarding the PS3.  Defendant knew or should have known by exercising reasonable care that its representations were false and/or misleading.

316.    Beginning in 2006 and continuing through approximately April 2010, Defendant engaged in false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq., by misrepresenting in its advertising, marketing, and other communications disseminated to Plaintiffs, the Class, and the consuming public that the PS3 was capable of being used as a personal computer via the "Other OS" feature.  In fact, Defendant knowingly disabled the "Other OS" feature, and with it the PS3's personal computer functionality, by issuing Update 3.21.

317.    Beginning in 2006 and continuing through approximately April 2010, Defendant engaged in false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq., by misrepresenting its advertising, marketing, and other communications disseminated to Plaintiffs, the Class, and the consuming public that, for those who did not download Update 3.21,  that they would be able to access the PSN and play games online with their PS3, among other features.

318.     Beginning in 2006 and continuing through approximately April 2010, Defendant engaged in false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq., by misrepresenting in its advertising that the PS3 has a lifespan of 10 years, like the previous PS2.  In fact, when Defendant released Update 3.21, it eliminated critical functions of PS3 (the "Other OS"

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

feature and the ability to use PS as a personal computer and a development platform for the Cell) well before the expiration of the promised 10-year lifespan, and/or forced Plaintiffs and Class Members who wished to maintain the "Other OS"/personal computing functions to forego updates and features that were critical to maintaining the PS3's promised online gaming functionality during that period.

319.     Beginning in or about 2006 and continuing up to April 2010, Defendant engaged in false advertising in violation of Bus. & Prof. Code §§ 17500, et seq., by omitting, failing to disclose, and/or concealing the material fact that it could or would disable the "Other OS" feature when it became expedient to do so, that it purported to have the right to do so by virtue of unconscionable terms that were not adequately disclosed, and that it intended to do so via Update 3.21.  The Update 3.21 disabled the ability of Plaintiff and the Class to utilize the "Other OS" feature and utilize the PS3 as a personal computer and/or as a development environment for the Cell.

320.     Beginning in or about 2006 and continuing up to April 2010, Defendant engaged in false advertising in violation of Bus. & Prof. Code §§ 17500, et seq., by representing to Plaintiffs, the Class and the consuming public that it would provide regular "updates" to maintain the currency and improve the functionality of the PS3, but then issuing Update 3.21, which in fact degraded the functionality of the PS3 by eliminating the critical "Other OS" feature.  Defendant failed to disclose that its promised "updates" would degrade or eliminate certain existing features and functions for which Plaintiffs and the Class paid when they purchased the PS3, or that the promised "updates" would place Plaintiffs and the Class in the untenable position of choosing between maintaining all of the critical functionality of their existing PS3s and foregoing the promised updates, or accepting the promised benefits of those updates but at the cost of surrendering key features of their existing PS3 consoles.

321.     By disseminating and publishing these statements in connection with the sale of its goods, Defendant has engaged in and continues to engage in false advertising in violation of Bus.

& Prof. Code §§ 17500, et seq.

322.    As a direct and proximate result of Defendant's conduct, as set forth herein, Defendant has received ill-gotten gains and/or profits, including, but not limited to money. Therefore, Defendant has been unjustly enriched.  Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs and members of the Class request restitution and restitutionary disgorgement for all sums obtained in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

323.    Plaintiffs and the Class seek injunctive relief, restitution, and restitutionary disgorgement of Defendant's ill-gotten gains as specifically provided in Cal. Bus. & Prof. Code § 17535.

## COUNT VIII

### Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* (Unfair Competition)

### (On Behalf of all Plaintiffs and Class members)

324.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

325.    Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition."  As used in this section, "unfair competition" encompasses three distinct types of misconduct: (a) any "unlawful"  business act or practice;" (b) any "unfair"  business act or practice;   and (c) "any . . . unfair, deceptive, untrue or misleading advertising."

326.    The first type of violation of Section 17200 is an "unlawful" business act or practice.  In committing the acts alleged above, Defendant engaged in an "unlawful" business act or practice.   An unlawful business act is any act that is prohibited by law.  Defendant's violation of the Computer Fraud and Abuse Act (Count V, supra) constituted such an act prohibited by law. In addition, Defendant's violations of the Consumers Legal Remedies Act (Count IV, supra), the

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Magnuson-Moss Warranty Act (Count VI, supra), and Business and Professions Code §§ 17500, et seq. (Count VII, supra) constituted acts prohibited by law.  Defendant further engaged in an unlawful business act or practice by breaching express and implied warranties (Counts I and II) and the implied covenant of good faith and fair dealing.

327.     The second type of violation of Section 17200 is an "unfair" business act or practice.  A practice may be "unfair" within the meaning of section 17200 even if it does not violate particular provisions of law, and even if the precise nature of the challenged conduct has yet to be addressed in statutes or case law.  Rather, in cases involving consumer goods, the "unfair" prong of 17200 is designed to have the flexibility to deal with new situations and new abuses.  In committing the acts alleged above, Defendant engaged in an "unfair" business act or practice by, inter alia:  (1) representing that PS3 would have the "Other OS" feature and would function as a computer through the installation of Linux, but then issuing an "update" to the PS3 that eliminated the "Other OS" and computing features from the console; (2) promising updates to the PS3 that would improve and keep the functions and features of the PS3 current, but then issuing an update that in fact eliminated a core advertised feature of the PS3 and degraded its functionality, forcing Plaintiffs and Class Members to either accept the harm-causing upgrade or forego other important PS3 features and functions; (3) damaging Plaintiffs' property, which Plaintiffs owned and which Defendant had no right to alter, without Plaintiffs' permission, by requiring Plaintiffs to eliminate features of that property in order to be able to continue using the PS3 to play online games and to perform other functions; and (4) advertising and marketing the PS3 as including the "Other OS" feature and as having the functionality of a computer, while purporting to reserve the right—by virtue of terms that were not fairly disclosed to purchasers and were without legal effect—to eliminate those functions at its discretion.

328.     The third type of violation of Section 17200 is a "fraudulent" business act or practice.  A fraudulent business practice is one that is likely to deceive members of the public, even if the defendant lacked the intent to deceive.  A section 17200 claim based on the

"fraudulent" prong can be based on representations that deceive because they are untrue, and also those representations which may be accurate on some level, but will nonetheless tend to mislead or deceive.  A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under section 17200.  Further, a business practice may be fraudulent within the meaning of section 17200 even if the defendant lacked the intent to deceive or injure any consumer.  Defendant engaged in a "fraudulent business act or practice" by perpetrating an advertising and marketing campaign that was likely to deceive members of the public.  Defendant advertised and marketed the PS3 as including the "Other OS" feature and as being able to as a computer, while purporting to reserve the right—by virtue of terms that were not prominently disclosed to purchasers—to eliminate those functions at its discretion.

329.    Any purported "justification" for Defendant's conduct is outweighed by the gravity of the consequences to Plaintiffs and Class members and Defendant's conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

330.    In committing the acts alleged above, Defendant engaged in "unfair, deceptive, untrue or misleading advertising" by omitting, failing to disclose or adequately disclose, and/or concealing the material fact that it retained the purported right to disable the PS3's core advertised features, including the "Other OS" feature, and/or that it intended to do so via Update 3.21.

331.    These above-described unlawful, unfair and fraudulent business practices and false and misleading advertising by Defendant present an ongoing threat to Plaintiffs and the Class. Plaintiffs are informed and believe and thereon allege that Defendant has systematically perpetrated deceptive and unfair practices upon members of the public and has intentionally deceived Plaintiffs and the Class.

332.    As a direct and proximate result of Defendant's violation of the Unfair Competition Law, Plaintiffs and the Class members have suffered injury in fact and lost money and property because (1) they would not have purchased or would have paid less for the PS3 if they had known

that Defendant reserved the right to disable or remove advertised features of the PS3, including the "Other OS" feature, and that Defendant would, in fact, disable the "Other OS" feature; and/or (2) they purchased the PS3 based in material part on Defendant's promise to provide periodic "updates" that would maintain and improve the functionality of that product, but in fact were provided an "update" that significantly degraded the features and value of that product during its expected useful life, and/or (3) they purchased the PS3 based in material part on Defendant's promise to provide periodic "updates" that would maintain and improve the functionality of that product, but were in fact provided with a choice between accepting the promised "update" and thereby losing the "Other OS" feature for which they had bargained, or foregoing the "update" and surrendering the benefits thereof and the ability to use other critical features for which they had bargained; and/or (4) they owned PS3s that contained a suite of features that included the "Other OS" feature and computing functions, but were wrongfully divested of those features without their consent, and left with products with degraded functionality.   Thus, as a direct and proximate result of Defendant's violation of the Unfair Competition Law, Plaintiffs and the Class members purchased a PS3 that no longer works as a computer or no longer has other core advertised features, and/or have incurred or will be required to incur costs to replace or repair their PS3 with a personal computer.

333.    As a direct and proximate result of Defendant's violation of Cal. Bus. & Prof. Code §§ 17200, et seq., Defendant has been unjustly enriched at the expense of Plaintiffs and the Class. Specifically, Defendant knowingly used promises and representations regarding the PS3's functions and attributes, as well as Defendant's commitment to provide "updates" to maintain the currency and improve the functionality of PS3, for the purpose of inducing Plaintiffs and the Class to purchase the PS3.  At the same time it was making these promises and representations, Defendant either lacked the intent to fulfill them and/or knowingly "buried" terms in contract documents that purported to give it the unilateral right to breach those promises and representations.  As a result of these acts, Defendant should be required to make restitution to

Plaintiffs and the Class members or make restitutionary disgorgement of its ill-gotten profits pursuant to Cal. Bus. & Prof. Code § 17203.

334.    The refusal to reverse Update 3.21 and the threat of future modifications to the specifications as represented, advertised, and disseminated to the class constitute ongoing violations of Cal. Bus. & Prof. Code §§ 17200, et seq., and justify an issuance of an injunction requiring Defendant to act in accordance with the law.  There is no other adequate remedy at law and if an injunction is not ordered, Plaintiffs and the Class will suffer irreparable harm and/or injury in that they will not receive the benefit of their bargain, namely products that works as represented.  All remedies are cumulative pursuant to Cal. Bus. & Prof. Code § 17205.

335.    Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Defendant for injunctive relief in the form of restitution, and/or restitutionary disgorgement, and/or injunctive relief in the form of enabling the "Other OS" function of the PS3, and an award of attorneys' fees under California Code of Civil Procedure section 1021.5.

## COUNT IX

### UNJUST ENRICHMENT

**(On Behalf of Plaintiff Baker and those members of Class 3 who paid money SCEA via the PSN for services they were no longer able to use)**

336.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

337.    Plaintiff Baker and the some members of Class 3 have directly conferred benefits on SCEA by paying money for PSN-related services, such as the PlayStation Store, PlayStation Plus, pre-paid money into the PSN Wallet, and Qore subscriptions.  After failing to download Update 3.21, these individuals were no longer able to access these features and items for which they had directly paid sums to SCEA as SCEA prohibited them from accessing the PSN.

338.    Defendant knowingly and willingly accepted monetary benefits from Plaintiffs and the Class, but Defendant did not honor its obligations.  Rather, Defendant benefited from these

PSN sales, but then prohibited these individuals from accessing the PSN because they declined to download a firmware update that would have caused them to lose access to the a core advertised feature of the PS3 – the "Other OS" feature and the ability of the PS3 to function as a computer.

339.     Under the circumstances described herein, it is inequitable for Defendant to retain the full monetary benefit at the expenses of Plaintiff Baker and those similarly situated members of Class 3.

340.     By engaging in the conduct described above, Defendant has been unjustly enriched at the expense of Plaintiff Baker and those similarly situated members of Class 3 and is required, in equity and good conscience, to compensate those individuals for the monetary harm suffered as a result of SCEA's actions.

341.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiff Baker and the Class have suffered injury and are entitled to reimbursement, restitution, and disgorgement by Defendant of the benefit they conferred upon SCEA.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter judgment against Defendant, as follows:

A.     An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, and designating the undersigned as Class Counsel;

B.     An order enjoining Defendant from further deceptive advertising, marketing, distribution, and sales practices with respect to the PS3 and to enable the "Other OS" feature on the PS3;

C.     An award to Plaintiffs and the Class of compensatory, consequential, punitive and statutory damages, including interest thereon, in an amount to be proven at trial;

D.     An order requiring the restitution and restitutionary disgorgement to the Class of all profits unlawfully obtained by Defendant;

E.     An award of attorneys' fees and costs, as allowed by law;

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

F.      An award of pre-judgment and post-judgment interest, as provided by law;

G.      For leave to amend the Complaint to conform to the evidence produced at trial; and

H.      Such other or further relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, demand a trial by jury of any and all issues in this action so triable.


Dated: March 9, 2011                        **CALVO FISHER & JACOB LLP**

                                            /s/ James A. Quadra
                                            James A. Quadra

                                            Rebecca Coll
                                            One Lombard Street
                                            San Francisco, California 94111
                                            Telephone: 415-374-8370
                                            Facsimile: 415-374-8373

Dated: March 9, 2011                        **FINKELSTEIN THOMPSON LLP**


                                            /s/ Rosemary M. Rivas
                                            Rosemary M. Rivas

                                            Danielle T. Stoumbos
                                            100 Bush Street, Suite 1450
                                            San Francisco, California 94104
                                            Telephone: 415-398-8700
                                            Facsimile: 415-398-8704

Dated: March 9, 2011                        **HAUSFELD LLP**

                                            /s/ James Pizzirusso
                                            James Pizzirusso (*Pro hac vice*)

                                            Spencer H. Jenkins
                                            1700 K St., NW, Suite 650
                                            Washington, DC 20006
                                            Telephone: 202-540-7200
                                            Facsimile: 202-540-7201

84

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

*Co-Interim Lead Counsel for Plaintiffs*

Douglas G. Thompson
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, NW
Washington, DC 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090

Michael P. Lehmann
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone: 415-633-1908
Facsimile: 415-358-4980

Bruce L. Simon
**PEARSON, SIMON, WARSHAW &**
**PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: 415-433-9000
Facsimile: 415-433-9008

Daniel L. Warshaw
**PEARSON, SIMON, WARSHAW &**
**PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: 818-788-8300
Facsimile: 818-788-8104

Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns (*Pro hac vice*)
**CHIMICLES & TIKELIS LLP**
361 W. Lancaster Ave.
Haverford, Pennsylvania 19041
Telephone: 610-642-8500
Facsimile: 610-649-3633

Ralph B. Kalfayan
**KRAUSE, KALFAYAN, BENINK & SLAVENS,**
**LLP**

85

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

625 Broadway, Suite 635
San Diego, California 92101
Telephone: 619-232-0331
Facsimile: 619-232-4019

Jeffrey Carton (*Pro hac vice*)
D. Greg Blankinship (*Pro hac vice*)
**MEISELMAN, DENLEA, PACKMAN, CARTON**
**& EBERZ P.C.**
1311 Mamaroneck Avenue
White Plains, New York 10605
Telephone: 914-517-5000
Facsimile: 914-517-5055

John R. Fabry
**BAILEY & GALYEN**
18333 Egret Bay Blvd., Suite. 444
Houston, Texas 77058
Telephone: 281-335-7744
Facsimile: 281-335-5871

Guri Ademi
Shpetim Ademi
David J. Syrios
John D. Blythin
**ADEMI & O'REILLY LLP**
3620 East Layton Ave.
Cudahy, Wisconsin 53110
Telephone: 866.264.3995
Facsimile: 414.482.8001

Ben Barnow
**BARNOW & ASSOCIATES PC**
One North LaSalle Street
Suite 4600
Chicago, Illinois 60602
Telephone: 312-621-2000
Facsimile: 312-641-5504

Lance A. Harke
Howard Bushman
**HARKE CLASBY & BUSHMAN**
9699 NE Second Ave.
Miami, FL 33138
Telephone: 305-536-8220

86

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Facsimile: 305-536-8229

Robert C. Schubert
Willem F. Jonckheer
Jason Andrew Pikler
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center
Suite 1650
San Francisco, California 94111
Telephone: 415-788-4220
Facsimile: 415-788-0161

*Counsel for Plaintiffs*

I, Rosemary M. Rivas, am the ECF user whose ID and password are being used to file this CONSOLIDATED CLASS ACTION COMPLAINT.  In compliance with General Order 45, X.B., I hereby attest that James A. Quadra and James Pizzirusso have concurred in this filing.

Dated: March 9, 2011                    **FINKELSTEIN THOMPSON LLP**


                                        /s/ Rosemary M. Rivas
                                        Rosemary M. Rivas

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

### DECLARATION OF ROSEMARY M. RIVAS

I, Rosemary M. Rivas, declare as follows:

1.      I am a partner with the law firm Finkelstein Thompson LLP, one of the firms appointed as Co-Interim Lead Counsel for Plaintiffs in this consolidated action.  I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California.  This declaration is made pursuant to California Civil Code section 1780(c).  I make this declaration based on my law firm's research of public records and also upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2.      Public records indicate that Defendant's principal place of business is within this District, as alleged in the accompanying First Amended Consolidated Class Action Complaint.

I declare under penalty of perjury under the laws of the United States on this 9th day of March, 2011 in San Francisco, California that the foregoing is true and correct.

/s/ Rosemary M. Rivas
Rosemary M. Rivas

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# EXHIBIT A

MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.

Attorneys at Law

1311 MAMARONECK AVENUE, WHITE PLAINS, NY 10605
TEL: (914)517-5000   |   FAX: (914)517-5055

April 29, 2010

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUIRED**

Sony Computer Entertainment America, Inc.
919 East Hillsdale Boulevard
Foster City, CA 94404-4249

Re:   *Ventura v. Sony Corporation of America, Inc.*

Dear Sir or Madam:

This office represents Anthony Ventura, on behalf of himself and all those similarly situated, in the matter of *Ventura v. Sony Computer Entertainment America, Inc.* This letter constitutes a notification to you pursuant to California Civil Code § 1782.

As set forth in detail in the enclosed Complaint, Sony Computer Entertainment America, Inc. ("Sony") has violated, and continues to violate California Civil Code § 1770.

Background

The Sony Playstation®3 video game console (the "PS3"), which competes with Microsoft's Xbox 360 and Nintendo's Wii as part of the newest generation of video game consoles, was released in the United States with great fanfare on November 17, 2006.

At the time of its launch, the PS3 was the most expensive gaming console available, retailing for $599.00 in part because it is capable of far more than merely playing games at home. With the growing homogenization of consumer technology and increased competition, Sony looked to market the additional features available in the PS3, such as the "Other OS" feature and the inclusion of Blu-ray technology, to distinguish its product from the others.

MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.

*Ventura v. Sony Computer Entertainment America*
April 29, 2010

In fact, Sony's marketing and advertising of the PS3 highlighted the major features that distinguish the PS3 from other gaming consoles, including its unified online gaming service, the PlayStation Network, its robust multimedia capabilities, its use of a high-definition optical Blu-ray Disc as its primary storage medium, and the Blu-ray 2.0-compliant Blu-ray player.

An important PS3 feature Sony advertised was the Other OS function, which provides users with the unique ability to install another operating system, such as a Linux operating system, alongside the main PS3 system software.

Until recently, Sony promoted the Other OS feature in its marketing of the PS3. Indeed, Sony stated on its website "playstation.com" that when it designed the PS3, "it was fully intended that you, a PS3 owner, could play games, watch movies, view photos, listen to music, and run a full-featured Linux operating system that transforms your PS3 into a home computer."

Sony used a marketing strategy that persuaded consumers that the PS3 could be used as a home personal computer with a direct connection to the Internet, while retaining its other gaming and multimedia features.

On March 28, 2010, Sony announced that it would no longer honor its obligation to support the Other OS feature. On its playstation.com website, Sony announced that it would release software updated 3.21 ("Update 3.21"), which would disable the Other OS feature. PS3 owners are not technically required to install Update 3.21. However, Sony has built a vast and sticky web of restrictions that will prevent users from accessing many of the PS3's other features for anyone who declines the "upgrade." In particular, for users who do not install firmware 3.21:

- It will be impossible for users to access the Playstation Network;
- It will be impossible to play PS3 games online;
- It will be impossible to play new PS3 games;
- It will be impossible to watch new Blu-ray videos;
- New Blu-ray discs could disable the Blu-ray drive entirely if they contain an AACS Host Revocation List that affects the old software version; and
- Videos on DTCP-IP media servers will be disabled.

By forcing users to choose between these features, collectively referred to as "Other Advertised Features," and the Other OS feature, Sony is effectively downgrading PS3s already sold and in the hands of consumers — when consumers purchased the console, the console could play games, play Blu-ray discs, and run Linux. After April 1, it is an inferior product.

2

MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.

*Ventura v. Sony Computer Entertainment America*
April 29, 2010

Provisions of Consumer Legal Remedies Act Violated

In representing that the product would carry the foregoing features, including the Other OS feature and the Other Advertised Features, and failing to advise consumers such features would be removed, Sony violated California's Consumer Legal Remedies Act.

Specifically, Sony represented that the PS3 had characteristics, uses, or benefits which it did not have in violation of Civil Code § 1770(5) when it represented that the PS3 would have both the Other OS feature and the Other Advertised Features, while simultaneously omitting the material fact that users would be forced to choose between them.

To the extent Sony claims its licensing agreement is enforceable, Sony also violated Civil Code §1770(19) by inserting one or more unconscionable provisions into the licensing agreement, including the following clauses:

- "Some services may change your current settings, cause a loss of data or content, or cause some loss of functionality."

- "SCE, at its sole discretion, may modify the terms of this Agreement at any time, including any terms in the PS3TM system documentation or manual, or at http://www.scei.co.jp/ps3-license/index.html. Please check back on this website from time to time for changes to this Agreement. Your continued access to or use of the System Software will signify your acceptance of any changes to this Agreement."

Request That Sony Remedy its Wrongful Conduct

Plaintiff Anthony Ventura, on behalf of himself and all those similarly situated, demands that Sony rectify the foregoing violations by (1) making the Other OS feature, together with the Other Advertised Features, available to all purchasers of the PS3 and/or arranging for a refund of all or part of the purchase price of the product to all owners of the PS3 system, and (2) removing the above-identified unconscionable provisions from PS3 license agreements, and agreeing not to seek the enforcement of these provisions under any circumstances.

3

MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.

*Ventura v. Sony Computer Entertainment America*
April 29, 2010

Please provide a response within thirty days.

Very truly yours,

MEISELMAN, DENLEA, PACKMAN,
CARTON & EBERZ P.C.

Rebecca Coll
(914) 517-5025
rcoll@mdpcelaw.com

RC/bls
00229685.doc

4



 **HAUSFELD**LLP

202.540.7200 ph
202.540.7201 fax

1700 K Street, NW
Suite 650
Washington, DC 20006

James Pizzirusso
jpizzirusso@hausfeldllp.com

May 21, 2010
**FOR SETTLEMENT PURPOSES ONLY**

<u>**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**</u>

Sony Computer Entertainment of America, LLC
Office of General Counsel
919 East Hillsdale Blvd.
Foster City, CA 94404

      Re:  Playstation 3 - Removal of "Other OS" function - Notice of Breach and Opportunity
      to Cure

To Whom It May Concern:

      My firm, Hausfeld LLP, along with Pearson, Simon, Warshaw & Penny, LLP, represent
Jonathan Huber of Knoxville, Tennessee, with regard to the PlayStation 3 ("PS3") that he
purchased from Wal-Mart in December 2007 for $599 plus tax.  The PS3 was advertised,
promoted, marketed, warranted and sold as containing an "Other OS" function that allowed users
to install Linux and utilize the PS3 as a computer.  This was a key feature distinguishing this
product from competitors such as the Nintendo Wii and X-Box 360.  Our client purchased his
PS3, in part, for this reason and installed Linux on his system.  SCEA's most recent firmware
update, which our client installed in order to be able to continue playing games online, removed
this important feature.

      Our research and investigation have led us to the conclusion that there are numerous
other PS3 customers who are also experiencing this same problem.  Given that this issue has not
been resolved, please be advised that we are filing a nationwide class action complaint on behalf
of similar PS3 purchasers.  We are bringing claims for breach of express and implied warranty;
violations of the Magnuson-Moss Warranty Act; Violations of Cal. Bus. and Prof. Code, §§
17200 and 17500; Violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750; and
conversion.

      Pursuant to the California Consumer Legal Remedies Act ("CLRA"), California Civil
Code §§ 1750, et seq. (specifically, §§ 1782(a)(1) and (2)), Jonathan Huber, on behalf of himself
and all other similarly situated consumers nationwide (collectively, the "Class"), through their
undersigned counsel, hereby notify you that Sony Computer Entertainment of America, LLC

**HAUSFELD**LLP

Sony Computer Entertainment of America, LLC
5/21/2010
Page 2
("SCEA") is alleged to have violated the CLRA by warranting, marketing, advertising, and promoting PS3s with the intent not to sell them as advertised.

SCEA's misrepresentations in warranting, marketing, advertising, promoting, and selling PS3s constitute the following violations of the CLRA:

1.     SCEA has represented that its goods have characteristics, uses or benefits that they do not have (§ 1770(a)(5));
2.     SCEA has falsely represented that its goods are of a particular standard, quality or grade when they are of another (§ 1770(a)(7)); and
3.     SCEA has advertised its goods with the intent not to sell them as advertised (§ 1770(a)(9)).

Pursuant to Section 1782 of the CLRA, and based on the foregoing, we hereby demand that within thirty (30) days of receiving this letter, SCEA agree to refund our client his entire purchase price, or, at the very least, provide our client with a firmware update that would allow him to maintain his use of the "Other OS" function, as well as all of the other advertised features of the PS3 (including online gaming).  Our client further requests that SCEA provide a corrective advertising and notice campaign and pay all related attorneys' fees and costs.

If you have any questions, please contact my office.  I look forward to hearing from you soon.

Sincerely,

/S/
James Pizzirusso

HAUSFELD LLP
1700 K STREET, NW
SUITE 650
WASHINGTON, DC 20006



7009 1680 0000 8955 7966



Sony Computer Entertainment of America, LLC
Office of General Counsel
919 East Hillsdale Blvd.
Foster City, CA 94404

NMH

 *UNITED STATES POSTAL SERVICE®*

Track & Confirm          FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: **7009 1680 0000 8955 7966**
Service(s):  **Certified Mail**™
Status: **Delivered**

Your item was delivered at 9:49 AM on May 24, 2010 in SAN MATEO,
CA 94402.

----

Track & Confirm

Enter Label/Receipt Number.

( Go > )

----

Site Map     Customer Service     Forms     Gov't Services     Careers     Privacy Policy     Terms of Use     Business Customer Gateway

Copyright© 2010 USPS. All Rights Reserved.     No FEAR Act EEO Data     FOIA