Rosemary M. Rivas (SBN 209147)
rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
One California Street, Suite 900
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Kathleen Fisher (SBN 70838)
kfisher@calvofisher.com
**CALVO FISHER & JACOB LLP**
555 Montgomery Street, Suite 1155
San Francisco, California 94111
Telephone: (415) 373-8370
Facsimile: (415) 374-8373

James Pizzirusso (pro hac vice)
jpizzirusso@hausfeld.com
**HAUSFELD LLP**
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

*Class Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONY PS3 "OTHER OS" LITIGATION | Case No. 4:10-CV-01811-YGR |
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF** |
| | Date:        January 24, 2017 |
| | Time:        2:00 p.m. |
| | Judge:       Honorable Yvonne Gonzalez Rogers |
| | Courtroom: 1 – 4th floor |

1

**TABLE OF CONTENTS**

2   MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

3   I.      INTRODUCTION ...........................................................................................1

4   II.     BACKGROUND: PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT........4

5   III.    THE PROPOSED SETTLEMENT TERMS ...............................................5

        A.  The Settlement Class and Consumer Classes ....................................5
6
        B.  Benefit to the Class .............................................................................6
7
        C.  Dissemination of Notice to the Settlement Class................................7
8
        D.  Claims ..................................................................................................9
9
        E.  Requests for Exclusions from Settlement and Objections.................9
10
        F.  Incentive Award and Attorneys' Fees and Costs ............................10
11
        G.  Release Provisions ............................................................................11
12
13  IV.     FINAL APPROVAL SHOULD BE GRANTED ...................................11

        A.  The Settlement is Fair, Reasonable and Adequate..........................11
14
            1.  The Relief Obtained through the Settlement ...........................13
15
            2.  The Positive Reaction of the Class .........................................15
16
            3.  The Strength of Plaintiffs' Case Balanced Against the Risk, Expense,
                Complexity and Likely Duration of Continued Litigation .................16
17
            4.  The Extent of Discovery Completed and the Stage of the Proceedings ........18
18
            5.  The Experience and Views of Counsel.....................................18
19
            6.  The Settlement is the Product of Well-Informed, Vigorous and Thorough Arm's-
                Length Negotiations...............................................................19
20
            7.  The Plan of Allocation and Requested Attorneys' Fees are Fair and Reasonable ........19
21
22  V.      NOTICE PROCEDURES FOLLOWED WERE ADEQUATE.................................21

23  VI.     CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE.............................22

    VII.    CONCLUSION...............................................................................................23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

CASES

*Bayat v. Bank of the W.*,
  No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ................................. 16

*Churchill Vill., L.L.C. v. Gen. Electr.*,
  361 F.3d 566 (9th Cir. 2004) ....................................................................................... 15

*Class Pls. v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ....................................................................... 11, 12, 17

*Collado v. Toyota Motor Sales, U.S.A., Inc.*,
  550 Fed. Appx. 368 (9th Cir. 2013) ............................................................................ 20

*Cruz v. PacifiCare Health Sys., Inc.*,
  30 Cal. 4th 303, 66 P.3d 1157 (2003) ......................................................................... 14

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ..................................................................................................... 21

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N. D. Cal. 1980) .................................................................................... 12

*Fairbanks v. Farmers New World Life Ins. Co.*,
  197 Cal. App. 4th 544, 128 Cal. Rptr. 3d 888 (2011) ................................................. 17

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
  630 F. Supp. 482 (E.D. Pa. 1985) ............................................................................... 18

*Hale v. Sharp Healthcare*,
  183 Cal. App. 4th 1373 (2010) .................................................................................... 13

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................................................... 12, 18

*Hayward vs. Ventura Volvo*,
  108 Cal. App. 4th 509 (2003) ...................................................................................... 21

*In re High-Tech Emp. Antitrust Litig.*,
  2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) .............................................................. 15

*In re HP Laser Printer Litig.*,
  No. SACV 07-0667AG (RNBx), 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ........... 21

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009) ........................................................................................ 19

ii

*In re Omnivision Techs., Inc.,*
559 F.Supp.2d (N.D. Cal. 2008) ...................................................................... 12, 16

*In re Zurn Pex Plumbing Prods. Liab. Litig.,*
2012 WL 5055810 (D. Minn. Oct. 18, 2012) ........................................................ 19

*Jefferson v. Chase Home Fin.,*
No. C 06-6510 TEH, 2009 WL 2051424 (N.D. Cal. July 10, 2009) ........................ 21

*Marshall v. Holiday Magic, Inc.,*
550 F.2d 1173 (9th Cir. 1977) .......................................................................... 15

*Morales v. Stevco, Inc.,*
2012 WL 1790371 (E.D. Cal. May 16, 2012) ....................................................... 12

*Murillo v. Pac. Gas & Elec. Co.,*
No. 2:08-1974 WBS GGH, 2010 WL 2889728 (E.D. Cal. July 21, 2010) .............. 15

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
221 F.R.D. 523 (C.D. Cal. 2004) ....................................................................... 16

*Nwabueze v. AT & T Inc.,*
No. C 09–01529 SI, 2013 WL 6199596 (N.D. Cal. Nov. 27, 2013) ...................... 16

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC,*
165 F. Supp. 3d 937 (S.D. Cal. 2016) ................................................................. 13

*Officers for Justice v. Civil Serv. Comm'n,*
688 F.2d 615 (9th Cir. 1982) ................................................................. 11, 12, 16, 19

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ......................................................................................... 19

*Parkinson v. Hyundai Motor Am.,*
796 F. Supp. 2d 1160 (C.D. Cal. 2010) ......................................................... 13, 21

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985) ......................................................................................... 21

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
390 U.S. 414 (1968) ......................................................................................... 18

*Rodriguez v. W. Publ'g Corp.,*
563 F.3d 948 (9th Cir. 2009) ............................................................................ 10

*Shames v. Hertz Corp.,*
2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ....................................................... 12

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ...................................................................... 12, 20

*Vasic v. PatentHealth, L.L.C.*,
    171 F. Supp. 3d 1034 (S.D. Cal. 2016)............................................................ 13

*Vo v. Las Virgenes Mun. Water Dist.*,
    79 Cal. App. 4th 440 (2000) ............................................................................ 21

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) .............................................................................. 18

*Yim v. Carey Limousine NY, Inc.*,
    No. 14CV5883WFKJO, 2016 WL 1389598 (E.D.N.Y. Apr. 7, 2016) ............. 19

STATUTES

28 U.S.C. §1715 ........................................................................................................ 8

Consumers Legal Remedies Act,
    Cal. Civ. Code § 1750 ....................................................................................... 13

False Advertising Law,
    Cal. Bus. & Prof. Code § 17500 ....................................................................... 13

Unfair Competition Law,
    Cal. Bus. & Prof. Code § 17200 ....................................................................... 13


**OTHER AUTHORITIES**

CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) .......................... 11

CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS § 13.45 (5th ed.) ................................... 12

FEDERAL JUDICIAL CENTER,
    *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) ... 7, 22

FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION,
    FOURTH § 30.42 (2004) ..................................................................................... 11

RULES

Fed. R. Civ. P. 23 ..................................................................................................... 22

Fed. R. Civ. P. 23(b)(3) ............................................................................................ 22

Fed. R. Civ. P. 23(c)(2)(B) ....................................................................................... 22

Fed. R. Civ. P. 23(e) .................................................................................................... 11

Fed. R. Civ. P. 23(e)(2) ............................................................................................... 11

Fed. R. Civ. P. Rule 23(a) ........................................................................................... 22

Fed. R. Civ. P. Rule 23(b) ........................................................................................... 22

**TO:    ALL PARTIES AND THEIR COUNSEL OF RECORD**

**PLEASE TAKE NOTICE** that on January 24, 2017 at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 1, 4th Floor of the United States District Court, Oakland Courthouse, located at 1301 Clay Street, Oakland, California, 94612, before the Honorable Yvonne Gonzalez Rogers, Plaintiffs Derrick Alba, Jason Baker, James Girardi, Jonathan Huber, and Anthony Ventura, ("Plaintiffs") will, and hereby do, move the Court, pursuant to Federal Rule of Civil Procedure 23(e), for an order:

1.      Granting final approval of the Stipulation of Class Action Settlement and Release ("Settlement" or "Agreement") they have reached with Defendant in this matter; and

2.      Granting final certification of the Settlement Class.

The grounds for this motion are that the proposed Settlement is fair, reasonable and adequate, as set forth in the accompanying memorandum of points and authorities. This motion is based on the Declaration of Rosemary M. Rivas, submitted herewith, and the exhibits thereto; the Declaration of Stephen Cirami, Executive Vice President and Chief Operating Officer of Garden City Group, LLC, and the exhibits thereto, submitted on December 16, 2016 (Dkt. No. 277); the attached supporting memorandum of points and authorities; the [Proposed] Order Granting Final Approval of Class Settlement, attached to the Stipulation of Class Action Settlement and Release filed with the Court (Dkt. No. 259-1, Ex. A [Settlement] at Ex. 2 [Proposed Order]); the pleadings and papers on file in this action, the Orders issued by the Court and the oral argument of counsel, if any, presented at the hearing on this motion.

DATED: December 20, 2016                    Respectfully submitted,

**FINKELSTEIN THOMPSON LLP**

By: */s/ Rosemary M. Rivas*
     Rosemary M. Rivas

One California Street, Suite 900
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

**CALVO FISHER & JACOB LLP**

By: */s/ Kathleen Fisher*
    Kathleen Fisher

555 Montgomery Street, Suite 1155
San Francisco, California 94111
Telephone: (415) 374-8370
Facsimile: (415) 374-8373

**HAUSEFELD LLP**

By: */s/ James Pizzirusso*
    James Pizzirusso

1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

*Class Counsel for Plaintiffs and the Class*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.       INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs Derrick Alba, Jason Baker, James Girardi, Jonathan Huber, and Anthony Ventura, hereby move for final approval of the Stipulation of Class Action Settlement and Release ("Settlement" or "Agreement") they reached with Defendant Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC (referred to herein as "Defendant" or "SCEA").[1]  Plaintiffs also request that the Court issue final certification of the class for settlement purposes ("Settlement Class" or "Class").

This action arose out of Defendant's marketing and sale of the Sony PlayStation®3 ("PS3"), a video gaming console that could also be used as a computer, to play games online, and to watch Blu-Ray movies.[2] Plaintiffs alleged that in order to have computer functionality, SCEA marketed and sold the PS3 as having the ability to run another operating system, such as Linux (hereafter referred to as "Other OS"), in addition to the native game operating system. Plaintiffs further alleged that the console was designed to last ten years through updates that would increase functionality, not take it away. After millions of PS3 consoles were sold, SCEA removed the Other OS functionality via Firmware Update 3.21.

At all times, Defendant has vigorously denied any wrongdoing or liability. Among other things, Defendant has argued that it had the right to remove the Other OS pursuant to its terms of service and other agreements with users, and that the Other OS was not a feature that was material to the vast majority of PS3 purchasers. For six years, the parties engaged in hard-fought litigation and performed extensive discovery regarding these and other issues. They attended an arm's-length mediation before

---

[1]  The terms of the Settlement are set forth as Exhibit A to the Declaration of Rosemary M. Rivas in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Certification of Settlement Class, Dkt. No. 259-1 ("Rivas Prelim. Decl."), submitted on June 17, 2016, as modified by the Court in its Order Granting Motion for Preliminary Approval of Class Action Settlement and Certification of Settlement Class, Dkt. No. 270, ("Preliminary Approval Order" or "Order") and by the parties as set forth herein.

[2]  Unless otherwise stated, capitalized and bold terms have the same meaning as in the Agreement and the Preliminary Approval Order, and those meanings are expressly incorporated by reference herein.

the Honorable James Warren (Ret.), saw the entire case dismissed with prejudice by the District Court, obtained a partial reversal of the dismissal order by the Ninth Circuit, engaged in more discovery, consulted with damages experts and then attended a second arm's-length mediation, this time before the Honorable Howard B. Weiner (Ret.). The parties then participated in five months of settlement negotiations. All of this eventually resulted in the Settlement pending before the Court.

The Settlement is unquestionably fair, reasonable and adequate. Most importantly, it brings a substantial benefit to the Class. Defendant has agreed to pay $55.00 to all Class Members who submitted valid claims showing that they purchased a PS3 and used the Other OS function (Consumer Class A). Defendant has also agreed to pay $9.00 to all other Class Members who submitted valid claims showing that they purchased a PS3 and attesting that they lost value or were otherwise injured as a consequence of the Firmware Update (Consumer Class B).

The Settlement is designed to prevent fraudulent claims but also to ensure compensation to anyone who believes that they were financially harmed by the Firmware Update. During the claims process, one claimant objected that he had no way of proving that he had purchased a PS3 because he no longer had a proof of purchase or access to his serial number as his PS3 unit had been discarded. In response to these and similar concerns posted on the Internet, the parties implemented an alternative method for obtaining proof of purchase, whereby a claimant could simply obtain a temporary ID from the Settlement Administrator, which SCEA would then use to check against its own records to verify purchase. This meant that a Consumer Class B claimant, for example, could make a claim without submitting anything other than the temporary ID and the form attesting that he or she had lost value via the Firmware Update. This alternative claim process was provided to potential Class Members in the second round of emailed notice and on the Settlement Website.

The Notice Program informing the Class of the Settlement – which the Court modified and preliminarily approved – was highly successful, reaching at least 86% of the target audience. One of the concerns from the outset of this Settlement was that Defendant and Plaintiffs had no way of knowing how many purchasers of the PS3 utilized or cared about the Other OS feature other than that it was quite small. As discussed at the preliminary approval hearing, the only information in the record was that: a) approximately 40,000 individuals did not download Firmware Update 3.21; b) SCEA received

620 inquiries or complaints related to Firmware Update 3.21; and c) an Internet list serve maintained by SCEA for people in the Linux community had only "thousands" of members. Thus, even though notice went out to millions of PS3 purchasers, the actual number who knew or were concerned about the Other OS feature was probably very small. Declaration of Rosemary M. Rivas, filed herewith ("Rivas Decl."), Ex. A [Tr. Preliminary Approval Hearing, July 19, 2016 ("Tr."), at 8:13-16; 16:8-17:4]. Even assuming that 100,000 purchasers were aware of and/or utilized the Other OS feature (more than twice the number of those who did not initially download the update), the ensuing response from the Class has been strong (over 11%). The Settlement and claims process resulted in more than 11,300 claims being filed as of December 13, 2016. This includes 2,346 timely Consumer Class A Claim Forms and 8,970 timely Consumer Class B Claim Forms. In contrast, the claims administrator has received only 27 opt-outs (many of whom expressed no dissatisfaction with SCEA), 5 timely objections (2 of which are from "serial objectors") and 2 late objections (1 of which is from a "serial objector"). This is an outstanding proportion of claims to opt-outs/objections, and reflects a highly favorable reaction from the Class.

Notably, Consumer Class A claimants who can show that they utilized the Other OS feature are getting a significant payout worth 13-18% of the retail price of the product when it was new and generally sold for between $299 and $399. Firmware Update 3.21 did not destroy or eliminate all functionality – only the ability to utilize the Other OS feature. Thus, consumers are obtaining compensation for the elimination of but one of the many features on the PS3; and the other features that remained were more highly touted and promoted, such as gaming, online capabilities, and the ability to play Blu-Ray DVDs. Since used Fat PS3 units routinely sell for around $55 today, (see Rivas Decl. ¶ 7), Class A claimants are getting close to a full refund of the used price and Class B claimants are also getting a partial refund for just knowing about the feature and believing that they were harmed. The lack of more claimants when direct email notice went to over 6 million purchasers (twice) supports Defendant's position that few Fat PS3 owners cared about the Other OS and felt injured by SCEA's conduct.

It was impossible to pre-determine the claims rate in this action, since – as Defendant had argued since day one and as certain evidence has supported – only a small minority of PS3 purchasers

1   actually knew about or used the Other OS function. However, what is clear is that the Settlement, if

2   approved, will provide cash payments (not coupons) to over ten thousand Class Members who would

3   not otherwise have received *any* compensation for the alleged wrongdoing by SCEA. Moreover, the

4   Settlement vindicates consumer rights under California's consumer protection statutes. For these, and

5   all of the reasons set forth below, Plaintiffs respectfully request that the Settlement be approved.

6   ## II.   BACKGROUND: PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

7         A summary of the procedural background of the case, the significant discovery taken by the

8   parties, the mediations attended by the parties, and the settlement negotiations that eventually led to the

9   proposed Settlement is set forth in Plaintiffs' Motion for Preliminary Approval of Class Settlement and

10  Certification of Settlement Class, Dkt. No. 259, filed June 17, 2016 ("Motion for Preliminary

11  Approval"), and Class Counsel's Motion for Award of Attorney's Fees, Costs, and Incentive Awards,

12  Dkt. No. 271, filed November 30, 2016. Rather than burdening the Court by repeating those summaries

13  here, Plaintiffs incorporate them by reference herein.

14        After Plaintiffs filed their Motion for Preliminary Approval, the Court held a preliminary

15  approval hearing on July 19, 2016. At the hearing, the Court directed Plaintiffs to supplement the

16  record with certain exemplars of the forms of proof that could be used to satisfy the claims process.

17  Dkt. No. 268. Plaintiffs supplemented the record on August 5, 2016. Dkt. No. 267. On August 19,

18  2016, the Court inquired about exemplars from additional named Plaintiffs (Dkt. No. 268); thus, on

19  August 26, 2016, Plaintiffs submitted additional requested materials to the Court. Dkt. No. 269.

20        On September 8, 2016, the Court issued its Order preliminarily approving the Settlement and

21  ordering notice to the Class. Dkt. No. 270. The Court provisionally certified a Settlement Class and

22  found that the requirements of Rule 23(a) and Rule 23(b)(3) were provisionally satisfied for that

23  purpose. *Id*. at ¶¶ 3-5. The Court preliminarily approved the Settlement "as fair, reasonable, and

24  adequate, entered into in good faith, free of collusion, and within the range of possible judicial

25  approval." *Id*. at ¶ 6. The Court approved the Notice Program, as modified in the Preliminary Approval

26  Order, finding that it was "the best notice practicable under the circumstances, constitutes valid, due,

27  and sufficient notice to the **Class** in full compliance with the requirements of applicable law, including

28

Federal Rule of Civil Procedure 23 and the Due Process Clause of the United States Constitution, and is the only notice to the **Class** of the **Settlement** that is required." *Id.* at ¶ 10 (bold in original).

In the Order, the Court appointed Class Counsel as James J. Pizzirusso of Hausfeld LLP, Rosemary M. Rivas of Finkelstein Thompson LLP, and Kathleen V. Fisher of Calvo Fisher & Jacob LLP. *Id.* at ¶ 7. The Court appointed Plaintiffs Anthony Ventura, Jason Baker, James Girardi, Derek Alba, and Jonathan Huber as class representatives for the provisionally approved Class. *Id.* at ¶ 8.

Based on the Preliminary Approval Order, the deadline for claims, objections and opt-out was determined to be December 7, 2016; the deadline for the motion for final approval of the Settlement was December 20, 2016; and the fairness hearing was set for January 24, 2017. Dkt. No. 270.[3]   On November 30, 2016, Class Counsel filed their Motion for Award of Attorney's Fees, Costs, and Incentive Awards. Dkt. No. 271.

### III.      THE PROPOSED SETTLEMENT TERMS

#### A.  The Settlement Class and Consumer Classes

On September 8, 2016, the Court preliminarily certified the following Settlement Class:

> [A]ll persons in the United States who purchased a Fat PS3 in the United States between November 1, 2006, and April 1, 2010, from an authorized retailer for family, personal, and/or household use.

Preliminary Approval Order, at ¶ 3. The Court defined "Consumer Class A" as follows:

> [A]ll persons in the United States who purchased a **Fat PS3** in the United States between November 1, 2006, and April 1, 2010, from an authorized retailer for family, personal and/or household use and who used the **Other OS** functionality after installation of a Linux operating system on their **Fat PS3**.

---

[3] There was some confusion about deadlines in the Order.  For example, Paragraph 30 of the Order states that "Class Counsel shall file their Fee Application and any Request for Plaintiff Service Awards by no later than December 20, 2016"; in contrast, in the chart at the end of the Order summarizing the deadlines, the Court sets the deadline for the fee application as "Fourteen (14) days prior to the Objection Deadline," Preliminary Approval Order at p. 9:22-23 (bold in original). Because the Objection Deadline was December 7, 2016, the two stated deadlines for the fee application were in conflict. Similarly, the Order states in paragraph 31: "The Parties shall file any responses to any Class Member objections … by no later than January 10, 2017"; whereas in the chart the Order states: "Deadline … for the parties to provide any responses to Settlement Objections" is "December 20, 2016." *Id.* at p. 10:2.  Because the objections have not yet been officially filed with the Court, the parties intend to respond to those objections by January 10, 2017.

*Id.* (bold in original). The Court defined "Consumer Class B" as follows:

> [A]ll persons in the United States who purchased a **Fat PS3** in the United States between November 1, 2006, and April 1, 2010, from an authorized retailer for family, personal, and/or household use.

*Id.* (bold in original).[4]

### B. Benefit to the Class

Under the Agreement, SCEA agreed to pay $55 to each Class Member who utilized the Other OS functionality (Consumer Class A) and submitted a valid claim. Settlement ¶ 68(A)(1). Consumer Class A claimants were required to attest under oath to their installation of Linux and submit proof of their use of the Other OS functionality. *Id.* at ¶ 68(A)(1)-(2). Under the Agreement, claimants were also required to provide proof of their purchase or their PS3 unit's serial number and PlayStation Network Sign-in ID. *Id.* at ¶ 68(A)(1)(b). The Settlement Agreement set forth a list of acceptable proofs of use, see *id.* at ¶ 68(A)(1)-(2), exemplars of which were provided on the Settlement Website per the Court's Preliminary Approval Order. Preliminary Approval Order ¶¶ 16, 18; Rivas Decl. ¶ 5.

SCEA also agreed to pay $9.00 to each Class Member who, at the time of purchase, knew about the Other OS, relied upon the Other OS functionality, and intended to use the Other OS functionality (Consumer Class B) and submits a valid claim. Agreement ¶ 68(B)(1)(a)(ii)(a). Alternatively, a member of Consumer Class B may attest that he or she lost value and/or desired functionality or was otherwise injured as a consequence of Firmware Update 3.21. *Id.* at ¶ 68(B)(1)(a)(ii)(b). To present a valid claim, Consumer Class B claimants were also required to attest to their purchases and provide proof of purchase or a PS3 serial number and PlayStation Network Sign-in ID. *Id.* at ¶ 68(B)(1)(b)(i)-(ii).

During the claims process it became clear that some Class Members had no proof of purchase and no longer had their PS3 units from which to obtain serial numbers. Dkt. No. 272 [Declaration of Rosemary M. Rivas in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Costs, and

---

[4] Excluded from the Class are: "(a) any persons who are employees, directors, officers, and agents of SCEA or its subsidiaries and affiliated companies; (b) any persons who timely and properly exclude themselves from this Settlement; and (c) the Court, the Court's immediate family, and Court staff." Preliminary Approval Order, at ¶ 3.

Incentive Awards ("Rivas Fee Decl."), filed December 1, 2016, ¶ 42]. Because those records were in SCEA's possession (albeit not in an easily accessible format), Plaintiffs negotiated an option with SCEA whereby Class Members who no longer possessed their PS3 units could obtain a temporary ID number from the claims administrator which SCEA would then use to cross check against its own records after the claim was submitted to verify that Class Members had purchased a PS3. *Id*. This procedure was implemented on November 17, 2016 and communicated to the Class via the second round of email notice and on the Settlement Website, as described below. *See* Declaration of Stephen J. Cirami Regarding Notice and Settlement Administration, filed December 16, 2016, Dkt. No. 277 ("Cirami Decl.") at ¶ 12, Ex. D; Rivas Decl. ¶ 6.

**C.  Dissemination of Notice to the Settlement Class**

The Court approved Notice Program has been implemented. The Settlement Administrator appointed by the Court, Garden City Group, LLC ("GCG"), determined that the measured portion of the Notice Program reached approximately 86% of the target audience of people 18 years of age or older who own a PlayStation or web-enabled console. Cirami Decl. ¶ 7. This is higher than the 77% reach estimated in the Settlement Administrator's pre-notice declaration. *Id*. The Notice Program agreed to by the parties, with expert assistance and endorsement, as amended and ordered by the Court, comports with due process and is the best notice practicable under the circumstances. Preliminary Approval Order ¶ 10; Cirami Decl. ¶ 34; *see also* FEDERAL JUDICIAL CENTER, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) at 3 (stating that it is reasonable to reach between 70% and 95% of class members). The Notice Program included the following:

Delivery of Data File and Confirmation of Email Address Validity. On September 21, 2016 SCEA provided GCG with an electronic data file with the email addresses of all potential Class Members known by SCEA through its Playstation Network Database. Cirami Decl. ¶ 4. The file contained 12,225,679 email addresses ("Class Data"), of which 7,732,456 were found to be potentially valid and 4,493,223 found to be invalid or no longer in existence. *Id*. ¶¶ 4, 10.

First Round of Email Notice. Between September 28, 2016 and October 20, 2016, GCG sent email notice to the 7,732,456 potentially valid email addresses in the Class Data. *Id*. ¶ 10. Of these,

6,956,093 emails were successfully delivered, while 776,363 could not be delivered because of issues such as domain name problems, address error, or inactive accounts. *Id*. ¶ 11. The Email Notice contained the Court-approved Short Form Notice (also referred to as the Summary Notice), along with a link to the Settlement Website. *Id*. ¶¶ 8-9 & Ex. C. GCG was ultimately able to deliver Email Notice to approximately 57% of the email addresses in the Class Data. *Id*. ¶ 11.

Second Round of Email Notice (With Alternative Proof Procedure). Between November 17 and 27, 2016, GCG delivered a Reminder Email Notice to the 6,954,037 potential Class Members who had received Email Notice but who had not yet submitted a Claim Form. Cirami Decl. ¶ 12. In addition to reminding potential Class Members to submit their claims, the Reminder Email Notice notified potential Class Members that if they no longer possessed their PS3 units for purposes of providing serial numbers, they could satisfy the proof of purchase requirement by obtaining a temporary ID number from GCG, as described above. *Id*. ¶ 12, Ex. D.

Settlement Website. On September 25, 2016, GCG launched the Settlement Website, www.otherossettlement.com, containing detailed information about the Settlement and copies of key documents, including the Short Form and Long Form Notices, as well as exemplars of the acceptable forms of proof that claimants could provide to satisfy the claims requirements. Cirami Decl. ¶¶ 24-26; Rivas Decl. ¶ 5. Class Members could download paper copies of the Claim Form or submit a Claim Form online. Cirami Decl. ¶ 26. The Settlement Website also informed potential Class Members that they could obtain a temporary ID number from GCG to satisfy the proof of purchase requirement, as described above. Rivas Decl. ¶ 6. As of December 13, 2016, the Settlement Website had received 246,205 visits. Cirami Decl. ¶ 27.

Paid Banner Advertising, Search Advertising, Twitter-promoted Tweets, Press Release and Social Media Outreach. GCG ran banner advertisements on websites, search advertising campaigns, and promoted tweets on Twitter.com to direct people to the Settlement Website. Cirami Decl. ¶¶ 14-20. A press release was also distributed and outreach performed on social media sites. *Id*. ¶¶ 21-23.

California Consumer Legal Remedies Act Publication. GCG caused the Short Form Notice to be published in USA Today California edition four times. Cirami Decl. ¶ 24 & Ex. I.

Toll-free Number. Pursuant to Paragraph 19 of the Preliminary Approval Order, GCG launched a toll-free telephone number with an Interactive Voice Response system, which provides important information about the Settlement and allowed callers to request copies of the Claim Form. Cirami Decl. ¶ 28. The system let callers speak to a live operator during business hours. *Id.*

CAFA Notice. Pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715, GCG provided notice to the required public officials on June 29, 2016. Cirami Decl. ¶ 3, Exs. A & B.

**D. Claims**

Class Members who wished to make a Consumer Class A claim or a Consumer Class B claim were required to submit a completed Claim Form to GCG via email, the Settlement Website online claims portal, or U.S. Mail, so that it was submitted or postmarked no later than December 7, 2016. Preliminary Approval Order ¶ 21; Agreement ¶ V.69; Cirami Decl. ¶ 31. As of December 13, 2016, GCG had received 2,346 timely Consumer Class A Claim Forms and 0 late Consumer Class A Claim Forms. Cirami Decl. ¶ 31. GCG had received 8,970 timely Consumer Class B Claim Forms and 0 late Consumer Class B Claim Forms. *Id.*

**E. Requests for Exclusions from Settlement and Objections**

Any Class Member who wished to be excluded from the Settlement needed only to make an opt-out request in writing. Preliminary Approval Order ¶ 22; Agreement ¶ VIII.88; Cirami Decl. ¶ 33. The procedures for opting-out were described in the Notices and a sample request for exclusion letter was included on the Settlement Website. Cirami Decl. ¶ 33, Exs. K, C. The opt-out request had to be emailed or postmarked by December 7, 2016. Preliminary Approval Order ¶ 22; Agreement ¶ VIII.88; Cirami Decl. ¶ 33. As of December 13, 2016, GCG had received 27 timely requests for exclusion and 0 late requests for exclusion. Cirami Decl. ¶ 33.

Class Members wishing to object to the fairness, reasonableness, or adequacy of the Settlement or to the Fee Request were required to submit written objections to GCG, emailed or postmarked by December 7, 2016. Cirami Decl. ¶ 32. As of December 14, 2016, GCG has received 5 timely objections and 2 late objections. *Id.* Of these objections, 3 have been filed by "serial objectors" asserting boilerplate objections that are usually summarily rejected by courts. A true and correct copy of the objections received so far, with all personally identifying information redacted pursuant to paragraph

97 of the Agreement and the Court's Preliminary Approval Order (unredacted objector information was briefly placed on the docket but corrected shortly thereafter), are attached as Exhibit J to the Cirami Declaration, filed with the Court on December 16, 2016. Dkt. No. 277. Per the Court's Order, the parties will officially file those objections (and any others they might have received) and respond on January 10, 2017. Preliminary Approval Order ¶ 31.

### F.  Incentive Award and Attorneys' Fees and Costs

Incentive awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). Pursuant to the Settlement, SCEA agreed not to object to an incentive award that does not exceed $3,500 per Plaintiff. Agreement ¶ 112. On November 30, 2016, Class Counsel filed their motion for attorneys' fees, costs and incentive awards. Dkt. No. 271. The motion requests an incentive award of $3,500 for each named Plaintiff, to recognize them for their efforts during the action that resulted in the Settlement, including appearing for deposition and producing their PS3s for inspection. *See* Dkt. No. 271 at 21; Dkt. No. 272 [Rivas Fee Decl. ¶¶ 56-58].

In their motion, Class Counsel also asked the Court for an award of attorneys' fees and reimbursement of costs in the amount of $2,250,000. Dkt. No. 271. Any attorneys' fees and expenses awarded by the Court, as long as they do not exceed $2,250,000 will be paid separately by SCEA and not come out of any Class funds. Dkt. No. 271; Agreement ¶ 109. Class Counsel have worked on this case since 2010, and have committed significant time and expenses to the case, well above the $2,250,000.00 that is being requested. *See* Dkt. No. 271; Dkt. No. 272 [Rivas Fee Decl. ¶¶ 43-54, Exs. C, E]; Dkt. No. 273 [Pizzirusso Decl. ¶¶ 6-8 & 14, Attachs. 1, 2]; Dkt. No. 274 [Fisher Decl. ¶¶ 7-9, Attachs. 1, 2]. The total lodestar by lead Class Counsel reported in the fee petition, which does not include the time spent on final approval briefing and settlement administration since the time of the Motion, was $2,549,922.00 (plus $93,515.50 in expenses).  Dkt. No. 271 at 10:18-19; Dkt. No. 272 [Rivas Fee Decl. Exs. C, E]; Dkt. No. 273 [Pizzirusso Decl. Attachs. A, B]; Dkt. No. 274 [Fisher Decl. Attachs. 1, 2]. In addition, as reported in Class Counsel's Motion, non-lead counsel have expended another 4,037.53 hours in professional time, equating to $2,008,868.75 in lodestar and $114,221.25 in

expenses. Dkt. No. 271 at 10:22-24; Dkt. No. 272 [Rivas Fee Decl. Ex. F]. This yields a total lodestar of $4,558,790.75, resulting in a negative multiplier of 0.45 if the full fee and expense request is awarded.[5]

### G. Release Provisions

Each Class Member who did not timely submit a valid request to opt out of the Settlement released "all claims, demands, rights, and liabilities," whether "known or unknown," that arise from the purchase of a Fat PS3 and/or "relate to, are based on, concern or arise out of the allegations, facts or circumstances that were asserted or could have been asserted (whether individually or on a class-wide basis) in the Action."  Agreement ¶ 35. The Released Claims against SCEA include, but are not limited to, claims arising under the common laws and statutes of all fifty (50) states concerning: (a) whether SCEA falsely advertised or marketed the Fat PS3's Other OS functionality; (b) the disabling of the Other OS functionality in the Fat PS3; (c) the issuance of Firmware Update 3.21; and/or (d) whether the System Software License Agreement and/or PlayStation Network Terms of Service and User Agreement enable SCEA to alter, remove or modify the features and/or functions of the Fat PS3. *Id.*

## IV.   FINAL APPROVAL SHOULD BE GRANTED

### A. The Settlement is Fair, Reasonable and Adequate

Rule 23 requires judicial approval of any class action settlement. *See* Fed. R. Civ. P. 23(e). "In deciding whether to approve a proposed settlement, the Ninth Circuit has a 'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *In re Heritage Bond Litig*., No. 02-ML-1475 DT, 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005) (quoting *Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992)); *see also Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "By their very nature, because of the uncertainties of outcome, difficulties of proof, length of litigation, class action suits lend themselves readily to compromise." CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002); *see also Class*

---

[5] In addition, Plaintiffs discovered that one firm, Bailey & Galyen, inadvertently failed to include in its time submission 173.81 hours of time with a lodestar value of $74,683.25, plus an additional $9,463.98 in costs. This would place Plaintiffs' total lodestar at $4,633,474.00. Rivas Decl. Revised Ex. F [Revised Fees and Costs of Non-Lead Counsel].

1  *Plaintiffs v. Seattle*, 955 F.2d at 1276.

2  A class action settlement must be "fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(2). A

3  settlement is fair, reasonable and adequate when "the interests of the class as a whole are better served

4  if the litigation is resolved by the settlement rather than pursued." FEDERAL JUDICIAL CENTER, MANUAL

5  FOR COMPLEX LITIGATION, FOURTH § 30.42 (2004). The decision to approve or reject a proposed

6  settlement is committed to the "sound discretion" of the Court. *Class Plaintiffs v. Seattle*, 955 F.2d at

7  1276.

8  The Ninth Circuit has identified a non-exhaustive list of factors to guide the final approval

9  inquiry, including:

10  
11     the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of
       further litigation; the risk of maintaining class action status throughout the trial; the
12     amount offered in settlement; the extent of discovery completed and the stage of the
       proceedings; the experience and views of counsel; the presence of a governmental
13     participant; and the reaction of the class members to the proposed settlement.

14  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Staton v. Boeing Co.*, 327 F.3d

15  938, 959 (9th Cir. 2003).

16  The Ninth Circuit has observed that "the very essence of a settlement is compromise, 'a yielding

17  of absolutes and an abandoning of highest hopes.'" *Officers for Justice,* 688 F.2d at 624 (citation

18  omitted). As such, "[t]he proposed settlement is not to be judged against a hypothetical or speculative

19  measure of what *might* have been achieved by the negotiators." *Id.* at 625 (emphasis added). The issue

20  instead is simply "whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027.

21  Where, as here, the settlement is the product of arm's-length negotiations conducted by capable counsel

22  with extensive experience in complex class action litigation, the Court begins with a presumption that

23  the settlement is fair and should be approved. *See* CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS §

24  13.45 (5th ed.); *see also Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N. D. Cal. 1980) ("the

25  fact that experienced counsel involved in the case approved the settlement after hard-fought

26  negotiations is entitled to considerable weight"); *see also In re Omnivision Techs., Inc.*, 559 F.Supp.2d

27  1036, 1043 (N. D. Cal. 2008). All the relevant factors support final approval here.

28

1.   **The Relief Obtained through the Settlement**

The Settlement is claims-made in nature.[6] Agreement ¶¶ 68-75. Class Members submitted claims during the claims period, which ran from September 25, 2016 until December 7, 2016. As stated above, SCEA will pay $55 for valid Consumer Class A claims (verifiable purchasers who present proof that they actually used the Other OS functionality). Agreement at ¶ 68(A). SCEA will pay $9 for valid Consumer Class B claims (verifiable purchaser who attests that (i) they knew about the Other OS, relied upon the Other OS functionality and intended to use the Other OS functionality, or (ii) they lost value and/or desired functionality or were otherwise injured as a consequence of Firmware Update). Agreement ¶ 68(B)(1)(a)(ii)(a), (b).

The Settlement and claims process resulted in more than 11,300 claims being filed. As of December 13, 2016, GCG had received 2,346 timely Consumer Class A Claim Forms and 8,970 timely Consumer Class B Claim Forms. Cirami Decl. ¶ 31. While GCG has not yet determined the final number of claims that will be paid, it is clear that the Settlement will provide payments to thousands of Class Members who would not otherwise have received any financial compensation for the underlying actions by SCEA. Assuming all claims are paid, SCEA will pay $128,975 to Class A claimants, and $80,730 to Class B claimants.

It was impossible in this case to determine how many eligible claimants existed since there was no way to discover how many PS3 purchasers utilized or knew of the Other OS feature. Available evidence that does exist (as discussed above), however, revealed that the number was very small. Additionally, under the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA"); Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"); and False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*. ("FAL"), a private claimant must among other things show injury-in-fact. *See, e.g., Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1386–87 (2010) (CLRA); *Vasic v. PatentHealth, L.L.C.*, 171 F. Supp. 3d 1034, 1041 (S.D. Cal. 2016) (UCL); *Obesity*

---

[6] Courts routinely approve class action compromises that require class members to submit a claim form to obtain settlement benefits. *See, e.g., Shames v. Hertz Corp.*, 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012) (courts "routinely approve claimsmade settlements"); *Morales v. Stevco, Inc.*, 2012 WL 1790371, at *4 (E.D. Cal. May 16, 2012).

*Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 948–49 (S.D. Cal. 2016) (FAL). SCEA argued that the relevant pool of Class Members is not composed of people who merely purchased PS3s, but only those who actually relied on the Other OS in some manner or lost some degree of value or functionality as a consequence of SCEA's removal of the Other OS function. *Cf. Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1168 (C.D. Cal. 2010) ("Further, if the Court uses Hyundai's estimate, that about 25% of the 11,693 potential class vehicles sold underwent repairs, this translates to a class size of about 2,900 people, of which 1,043 have already submitted claims—an impressive response rate of 36%."). Throughout the pendency of the case, SCEA argued that the action was unwarranted and that Other OS was not a core functionality of the PS3 that was material to the vast majority of purchasers. *See* Rivas Decl. Ex. A [Tr. 10:17-13:13]. While Plaintiffs disagreed with SCEA's positions, based on the evidence available, Plaintiffs acknowledged that the Other OS function was geared more towards highly sophisticated computing specialists. *Id.* [Tr. 9:19-24; 15:1-8]. Thus, the number of people who actually cared about SCEA's removal of this feature was relatively small. Of this smaller group, it is likely that a substantial percentage submitted claims.

This conclusion is supported by the facts that the Notice Program is estimated to have reached at least some 86% of the millions of PS3 users, the claims process was standard, and the proof required to submit a claim, while higher for Class A, was minimal for Class B. Further, as explained above, when one claimant objected during the claims process that he could not provide a proof of purchase or serial number for his PS3, the parties implemented a method to make it even easier to meet the proof of purchase requirement by simply obtaining a temporary ID from GCG. Cirami Decl. ¶ 12, Ex. D; Dkt. No. 272 [Rivas Fee Decl. ¶ 42]. This meant that, in the case of a Consumer Class B claimant, a claim could be filed ***without attaching any external evidence*** (other than the required form attesting to loss of value or desired functionality or being otherwise injured as a consequence of the Firmware Update). *See id.; see also* Agreement ¶ 68(B) [Consumer Class B claim requirements]. The successful Notice Program, the straightforward claims process, and the extremely low rate of opt-outs and objections (discussed below), all suggest that those who were actually upset about the Firmware Update submitted claims.

---

MPA IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
CASE NO. 4:10-CV-01811-YGR

The Class also benefitted from the enforcement of important consumer protection statutes, such as California's CLRA and the UCL, which vindicate policies that are important in protecting both individual rights and the public good. *Cf. Cruz v. PacifiCare Health Sys., Inc.*, 30 Cal. 4th 303, 318, 66 P.3d 1157, 1166 (2003) ("[A]lthough Cruz argues that restitution under the UCL accomplishes a public purpose by deterring unlawful conduct, the same could be said of damages under the CLRA or under various federal statutes. This deterrent effect is, however, incidental to the private benefits obtained from those bringing the restitutionary or damages action. [citation omitted]  The Supreme Court has made clear that such actions, notwithstanding the public benefit, are fully arbitrable under the FAA.") (citation omitted). Had it not been for this lawsuit and the proposed Settlement, Class Members' claims, which are modest on an individual scale, would have likely gone without redress. For all of these reasons, this factor weighs in favor of final approval.

### 2.   **The Positive Reaction of the Class**

The Class response to the Settlement has been very positive. The Settlement Administrator has received only 27 requests for exclusion from the Settlement. Cirami Decl. ¶ 33. This is not only an extremely small proportion of the Class Members, but also reflects an outstanding ratio of opt-outs to total claims submitted (11,316), which works out to approximately one opt-out for every 419 claims submitted (or .23%). Such a small proportion of opt-outs weighs heavily in favor of the Court's finding that the Settlement is fair, reasonable and adequate. *See, e.g. Churchill Vill., L.L.C. v. Gen. Electr.*, 361 F.3d 566, 577 (9th Cir. 2004) (upholding district court's approval of class settlement where 500 members opted out from a class of 90,000); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977); *Murillo v. Pac. Gas & Elec. Co.*, No. 2:08-1974 WBS GGH, 2010 WL 2889728 at *9 (E.D. Cal. July 21, 2010) (approving settlement where "358 individuals opted-in to the settlement, and only 25 opted out").

Out of millions of potential Class Members notified and more than 11,300 claims filed, the Settlement Administrator has also received only 5 timely objections (two of which are by serial

objectors) and 2 late objections (1 of which is by a serial objector).[7] Cirami Decl. ¶ 32. This also reflects a highly favorable reaction from the Class. *Churchill Vill., L.L.C.*, 361 F.3d at 577 (approving settlement where "[t]he district court was informed that only 45 of the approximately 90,000 notified class members objected to the settlement"); *see also In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at *3 (N.D. Cal. Sept. 2, 2015) (finding indicia of approval where 11 class members out of 64,466 submitted objections and where less than 0.9% opted out). Indeed, "[i]t is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1043 (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528–29 (C.D. Cal. 2004)).

Accordingly, the favorable reaction of the Class weighs strongly in favor of approving the Settlement.

### 3. The Strength of Plaintiffs' Case Balanced Against the Risk, Expense, Complexity, and Likely Duration of Continued Litigation

Courts recognize "that a settlement is in the interests of class members who otherwise may not be entitled to any relief should their claims fail on the merits." *Bayat v. Bank of the W.*, No. C-13-2376 EMC, 2015 WL 1744342, at *3 (N.D. Cal. Apr. 15, 2015) (citation omitted); *Nwabueze v. AT & T Inc.*, No. C 09–01529 SI, 2013 WL 6199596 at *4 (N.D. Cal. Nov. 27, 2013)). Where the strength of a plaintiff's claims is in doubt, this factor tips in favor of approval of settlement. *Id*. Further, avoiding the "expense, complexity and likely duration of further litigation" is an important settlement consideration. *Officers for Justice*, 688 F.2d at 625.

While Class Counsel strongly believe that the Class's claims are meritorious, SCEA vigorously disputed this. Among other things, SCEA has argued that Plaintiffs' claims cannot ultimately succeed

---

[7] Plaintiffs will address the substance of these objections in their Response to Objections, which Plaintiffs will file by January 10, 2017. Plaintiffs will also show that several of these objections by serial objectors should not even be considered because, among other reasons, they violate the Court's Preliminary Approval Order or are from individuals not in the Class. With respect to the merits of the objections, Plaintiffs will show that none of the objections in any way alters the conclusion that the Settlement is fair, reasonable and adequate.

1    because it had the right to remove the Other OS pursuant to its terms of service and other purported

2    agreements, and because the Other OS feature was not a core functionality of the PS3 that was material

3    to the vast majority of purchasers. Rivas Decl. Ex. A [Tr., 16:16-19]. In support of this, SCEA has

4    argued that it never advertised the Other OS functionality on the product box or its website. *Id.* [Tr.,

5    11:8-11]. After substantial discovery, Plaintiffs continue to disagree with SCEA's positions, but

6    recognized that there is a substantial degree of uncertainty as to how these disputes would be resolved

7    at trial.

8          Further, there is always a risk that in light of the foregoing issues, the Court could ultimately

9    deny class certification or, after initial certification, subsequently decertify any class due to

10   unanticipated individualized issues or manageability concerns. Indeed, Defendant's position throughout

11   the case was that while the Other OS was mentioned in online articles by related SCEA entities, it did

12   not heavily advertise the Other OS feature, and hence, reliance under the UCL cannot be presumed as it

13   is in, for example, false food labeling cases where the challenged misrepresentation is directly on the

14   product label. While Plaintiffs disagree with Defendant, a number of courts have refused class

15   certification where the marketing was not uniform. *See, e.g., Fairbanks v. Farmers New World Life Ins.*

16   *Co.*, 197 Cal. App. 4th 544, 562, 128 Cal. Rptr. 3d 888, 904 (2011), *as modified* (Aug. 1, 2011).

17   Moreover, a trial and potential post-trial appeals would involve uncertainty in terms of both outcome

18   and duration. All of these litigation risks are real, and could threaten, reduce, or even eliminate

19   Plaintiffs' recovery entirely.

20         Continued litigation would involve considerable costs and a significant investment of time by

21   the named Plaintiffs, who have already committed an enormous amount of time and energy to this

22   action over the last six years, as well as Class Counsel, who have collectively spent more than 5,237

23   hours of work on this action. Dkt. No. 271 at 2; Dkt. No. 272 [Rivas Fee Decl. Ex. E]; Dkt. No. 273

24   [Pizzirusso Decl. Attach. B]; Dkt. No. 274 [Fisher Decl. Attach. 2].

25         In addition to the risk of little or no recovery, continued litigation would likely cause lengthy

26   delay in recovery for the Class Members. Even if the Class prevailed at trial, SCEA would likely appeal

27   any adverse rulings – which would delay recovery to Class Members for months or years. Since the

28   Settlement avoids these risks and challenges and provides relief now for Class Members despite

MPA IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
CASE NO. 4:10-CV-01811-YGR

1   uncertainty regarding the strength of Plaintiffs' claims, these factors weigh in favor of final approval.

2   *See City of Seattle*, 955 F.2d at 1291-92.

### 4.   The Extent of Discovery Completed and the Stage of the Proceedings

4   Prior to Settlement, Class Counsel gained a well-grounded understanding of the relative strength

5   of the claims and defenses through discovery, independent investigation of public documents and

6   formal discussions with SCEA's counsel. Specifically, over the six years of litigation, Plaintiffs served

7   written discovery, including document requests and interrogatories, deposed seven (7) SCEA witnesses

8   (three of whom were Rule 30(b)(6) witnesses) and reviewed tens of thousands of pages of documents

9   produced by SCEA as well as interrogatories responses. Dkt. 259-1 [Rivas Prelim. Decl. ¶ 11].

10  Plaintiffs also responded to extensive discovery by SCEA, including producing the named Plaintiffs for

11  deposition. *Id*. at ¶¶ 10-11. Class Counsel gained further understanding of the issues through the

12  research, briefs, arguments, and orders related to SCEA's motion to dismiss the case (which was

13  granted) and Plaintiffs' efforts to secure a reversal of that dismissal by the Ninth Circuit (which was

14  achieved in part). *Id*. ¶ 20.  That understanding was deepened still further by the parties' exchange of

15  two sets of mediation briefs and attendance of two in-person mediations led by retired judges highly

16  experienced with complex litigation issues. *Id*. at ¶¶ 13-14. The parties then continued to test the case

17  through five months of hard-fought negotiation. *Id*. ¶ 15.

18  Based on all of this, Class Counsel has been able to form an accurate assessment of the relative

19  strength of the claims and defenses.

### 5.   The Experience and Views of Counsel

21  Experienced counsel weighed all the foregoing factors and endorse the Settlement. Deciding

22  whether to enter into a class action settlement necessarily requires the exercise of judgment by the

23  attorneys for the parties based upon a comparison of "'the terms of the compromise with the likely

24  rewards of litigation.'" *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (quoting *Protective*

25  *Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)).

26  As courts have explained, the view of the attorneys actively conducting the litigation is "entitled to

27  significant weight." *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985).

28  There is no doubt that Class Counsel were fully informed before accepting the Settlement terms,

as shown above. Class Counsel are also highly experienced in complex class action litigation. *See*, *e.g.*, Dkt. No. 272 [Rivas Fee Decl. ¶¶ 4-6]; Dkt. No. 273 [Pizzirusso Decl. ¶ 3]; Dkt. No. 274 [Fisher Decl. ¶ 2]. The settlement process itself confirms not just the judgment exercised by Class Counsel, but their diligent settlement efforts as well. For their part, Defendant's counsel are also highly experienced and respected. They zealously raised vigorous defenses to Plaintiffs' claims, and their support for the Settlement likewise confirms the reasonableness of the Settlement.

For these reasons, the experience and views of counsel for the parties support final judicial approval of the Settlement.

6.   **The Settlement is the Product of Well-Informed, Vigorous and Thorough Arm's-Length Negotiations**

In considering final approval, the Court must ensure that "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties . . . ." *Hanlon*, 150 F.3d at 1027 (internal quotes and citations omitted); *see also Officers for Justice*, 688 F.2d at 625.

Here, there can be no doubt that the Settlement was the result of extensive arm's-length negotiations. As set forth above, the Settlement was achieved only after nearly six years of vigorous and contentious litigation, two in-person mediations with retired judges with extensive experience mediating complex litigation disputes (the first resulting in no resolution), and nearly five months of intensive negotiations. Far from being the product of collusion, the Settlement is the result of long, hard-fought, adversarial work, such that it is worthy of approval by the Court. As the Supreme Court has held, "[o]ne may take a settlement amount as good evidence of the maximum available if one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arms-length bargaining . . ." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999).

7.   **The Plan of Allocation and Requested Attorneys' Fees are Fair and Reasonable**

The Settlement presents no apparent unfairness and no "unduly preferential treatment of a class representative or segments of the Settlement Class, or excessive compensation for attorneys." *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2012 WL 5055810, at *6 (D. Minn. Oct. 18, 2012). To the contrary, the Settlement provides compensation to qualified Class Members on a claims-made basis depending on whether they utilized or were aware of the Other OS functionality, and the level of proof

available. While Class Members who utilized the Other OS are eligible to receive $55.00 under the Settlement, a higher cash award to this segment is fair when considering, for example, that under the CLRA, one of the claims here, Plaintiffs might have had to show that the Other OS representations were material to consumers. One way to prove materiality is by showing proof of the use of the Other OS. Issues of proof are legitimate considerations in evaluating the relative strength of the Class Members' claims; as such, it is fair and proper to take that into consideration. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009) (affirming approval of settlement despite fact that relief "varied among the different groups of class members"); *Yim v. Carey Limousine NY, Inc.*, No. 14CV5883WFKJO, 2016 WL 1389598 at *5 (E.D.N.Y. Apr. 7, 2016) (holding that that variations in settlement award among subclasses was permissible as long as "rationally based on legitimate considerations") (citations omitted). Class Members who never relied on the Other OS representation, however, are still eligible to receive $9.00 if they believe they were harmed by SCEA's removal of the Other OS functionality, without ever having to show evidence of reliance or materiality.

With respect to the proposed incentive awards, the Ninth Circuit has recognized that incentive awards to the named plaintiffs in a class action are permissible and do not render a settlement unfair or unreasonable. *See Staton*, 327 F.3d at 977. As shown in the Motion for Attorneys' Fees, Costs and Incentive Awards, the proposed service fee here is both warranted in these circumstances and lower than what is presumptively reasonable in the Ninth Circuit. *See* Dkt. No. 271 at 21-22. Moreover, although the Settlement authorizes Plaintiffs to seek an incentive award of $3,500.00 each, it is the Court that will ultimately decide whether Plaintiffs are entitled to such an award and the reasonableness of the amount requested.

Further, as for attorneys' fees, Class Counsel applied for fees and reimbursement of expenses in the amount of $2.25 million, which is significantly less than their collective lodestar and expenses, as shown above. While the fee award requested exceeds the total payout to the Class, using a percentage of the recovery method in this case (where there is no fund), or otherwise reducing the requested fee award because it is larger than the expected payment to the Class, is inappropriate. *See Collado v. Toyota Motor Sales, U.S.A., Inc.*, 550 Fed. Appx. 368, 369 (9th Cir. 2013) ("The district court abused its discretion by computing fees using a percentage of recovery method rather than a lodestar

1  method."). This is because the reality of certain consumer class actions under the CLRA and related

2  statutes is that while Plaintiffs' claims may be very modest, the work to vindicate them against well-

3  funded adversaries is very substantial.

4      While the fee award is higher than the total payout of the settlement, under California law

5  (which governs the application of attorneys' fees in this case[8]), courts often approve attorneys' fees

6  even "where there is significant disparity between the Plaintiffs' recovery and the lodestar fee award."

7  *Jefferson v. Chase Home Fin.*, No. C 06-6510 TEH, 2009 WL 2051424 at *3 (N.D. Cal. July 10, 2009);

8  *Hayward vs. Ventura Volvo*, 108 Cal. App. 4th 509, 512 (2003) (affirming order granting fees that were

9  significantly greater than the class recovery and stating that to "limit the fee award to an amount less

10  than that reasonably incurred in prosecuting such a case, would impede the legislative purpose

11  underlying [the CLRA]"); *Vo v. Las Virgenes Mun. Water Dist.*, 79 Cal. App. 4th 440, 448 (2000)

12  (holding that the trial court did not abuse its discretion in granting attorneys' fees 12.5 times the value

13  of plaintiff's recovery); *Parkinson*, 796 F. Supp. 2d at 1167, 1172-73 (awarding fees of $3,719,282.30

14  where class recovery was $1.2 million). Indeed, if courts did not permit such fees it would effectively

15  end the ability of many wronged plaintiffs with modest claims to vindicate their rights. Accordingly,

16  this factor, like all of the others, weighs in favor of approving the Settlement.

17      For all of the foregoing reasons, the Court should find that the proposed Settlement is fair,

18  reasonable and adequate.

19  **V.      NOTICE PROCEDURES FOLLOWED WERE ADEQUATE**

20      "Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class

21  members who would be bound by a proposed settlement, voluntary dismissal, or compromise . . . [.]'"

22  MANUAL § 21.312, at 293. In order to protect the rights of absent Class Members, the Court must direct

---

24  [8] The Court's jurisdiction in this case arises under the Class Action Fairness Act (CAFA), 28 U.S.C. §

25  1332(d), which means the Court is sitting in diversity. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*,

26  545 U.S. 546, 571 (2005) ("CAFA confers federal diversity jurisdiction over class actions . . . [.]"). In

27  diversity actions, "state law governs both the right to recover attorney's fees and the computation of

28  their amount." *Collado*, 550 Fed. Appx. at 369-370; *Champion Produce, Inc. v. Ruby Robinson Co.,

   Inc.*, 342 F.3d 1016, 1024 (9th Cir. 2003) ("An award of attorneys' fees incurred in a suit based on state

   substantive law is generally governed by state law."). Accordingly, California state law controls the

   method for determining fees here.

the best notice practicable to Class Members. *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-75 (1974). Notice to the class must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hannover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Plaintiffs consulted with a notice expert to devise a comprehensive Notice Program that was refined and approved by the Court. Preliminary Approval Order at ¶10; Dkt. 259-1 [Rivas Prelim. Decl. ¶ 18]. *See In re HP Laser Printer Litig.*, No. SACV 07-0667AG (RNBx), 2011 WL 3861703 at *3 (C.D. Cal. Aug. 31, 2011) (approving a notice plan utilizing direct email notice, publication of the summary notice in print publications, banner advertisements on websites, and "providing a link on both notice forms to a settlement website").

As recounted above, the Notice Program involved nine multilayered elements, the measured portion of which reached approximately 86% of the prospective Class Members, which is a highly successful result. Cirami Decl. ¶ 7; *see also* FEDERAL JUDICIAL CENTER, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), at 3. Accordingly, the Notice Program was "the best notice that is practicable under the circumstances" and accomplished "individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

## VI.   <u>CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE</u>

On September 8, 2016, the Court provisionally certified a Settlement Class for settlement purposes and found that the requirements of Rule 23(a), as well as the predominance and superiority requirements of Federal Rule of Civil Procedure Rule 23(b)(3), were provisionally satisfied for that purpose.[9] Preliminary Approval Order at ¶¶ 3-5. Plaintiffs now submit that the Settlement Class may finally be certified for settlement purposes, as it continues to meet all the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). For settlement purposes only, Plaintiffs request that the Court certify the following proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

---

[9] The arguments for certification presented in Plaintiffs' Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class, Dkt. No. 259, are incorporated by reference herein.

All persons in the United States who purchased a Fat PS3 in the United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal, and/or household use.

*Id*. ¶ 3; Agreement ¶ 12.[10]

## VII.   CONCLUSION

For the reasons set forth above, Plaintiffs request that the Court: (1) grant final approval of the Settlement; (2) grant final certification of the Settlement Class for settlement purposes only; and (3) enter the accompany Proposed Order Granting Final Approval of Class Settlement.

DATED: December 20, 2016                 Respectfully submitted,

**FINKELSTEIN THOMPSON LLP**

By: */s/ Rosemary M. Rivas*
      Rosemary M. Rivas

One California Street, Suite 900
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

**CALVO FISHER & JACOB LLP**

By: */s/ Kathleen Fisher*
      Kathleen Fisher

555 Montgomery Street, Suite 1155
San Francisco, California 94111
Telephone: (415) 374-8370
Facsimile: (415) 374-8373

**HAUSEFELD LLP**

By: */s/ James Pizzirusso*
      James Pizzirusso

1700 K Street NW, Suite 650

---

[10] Again, excluded from the Class are: "(a) any persons who are employees, directors, officers, and agents of **SCEA** or its subsidiaries and affiliated companies; (b) any persons who timely and properly exclude themselves from this **Settlement**; and (c) the **Court**, the **Court's** immediate family, and **Court** staff." Preliminary Approval Order, at ¶ 3 (bold in original).

MPA IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
CASE NO. 4:10-CV-01811-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
*Class Counsel for Plaintiffs and the Class*

MPA IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
CASE NO. 4:10-CV-01811-YGR