Joshua R. Furman, Bar No. 225461
jrf@furmanlawyers.com
JOSHUA R. FURMAN LAW CORPORATION
14724 Ventura Boulevard, Suite 509
Sherman Oaks, California  91403
Telephone:   (818) 646-4300
Facsimile:    (818) 646-4301

*Attorney for Objector,*
John Navarrete

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SONY PS3 "OTHER OS" LITIGATION | **CASE NO.  4:10-CV-01811-YGR**<br><br>**OPPOSITION TO MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>Date:  January 24, 2017<br>Time:  2:00 p.m.<br>Courtroom:  1<br>Judge: Hon. Yvonne Gonzalez Rogers |

Objector John Navarrete opposes Class Counsel's motion for final approval of class action settlement in this case as follows:

## I.  INTRODUCTION

This case presents the archetype of the failed consumer class action settlement. After all claims were received, the response rate was 0.09 percent of potential class members. In comparison, 0.06 percent of the class members making claims also filed objections to the settlement. If all claims are deemed valid, the total amount to be paid to the class members in this case is $209,760. Yet Class Counsel has asked the Court to approve a fee of $2,156,484.50. The percentage-of-the-fund cross-check for Class Counsel's fee comes out to a staggering 1,028 percent of the class common fund. A 25 percent fee on this settlement would be $52,440.

These outrageous numbers come about because the settlement agreement fails to protect class members and because the format of the settlement, as a claims-made only settlement with no *cy pres* contribution, is patently inadequate to provide any relief to the class. Instead of working for the benefit of the class, Class Counsel has worked only to benefit themselves.

Approval must be denied because the class action settlement provides no substantive relief to the class as a result of a failed claims process and lack of *cy pres*, Class Counsel and Class Representatives have failed to adequately represent the absent class members, the purported subclasses are improperly defined and inadequately represented, and because the settlement and result bear the hallmarks of collusion.

## II.  LEGAL ARGUMENT

### A.  Previous Objections to the Settlement are Incorporated In Opposition to the Motion for Final Approval

In conformity with the notice of settlement and prior orders of the Court, Navarrete filed objections to the settlement on December 7, 2016. Doc. 281, Ex.

D. In those written objections, Navarrete opposed the announced settlement on the grounds that (1) the claims process was unfair and overly burdensome to class members; (2) the subclass definitions were improper; (3) there were no representatives appointed for the subclasses and therefore the representation of the subclasses was inadequate; (4) the settlement was inadequate; and (5) the provisions in the settlement provision free-sailing and kicker clauses for Class Counsel's attorneys' fees indicated collusion.

Navarrete reaffirms and incorporates the previously filed objections into this opposition by reference as though stated in their entirety herein. The arguments in this opposition are in addition to the prior objections and prior objections are not waived.

**B.     The Abysmal Response to the Settlement**

   **1.     Claims Response Rate Was Terrible**

The declaration of the settlement administrator Cirami (Doc. 277), first filed eight days after objections were due, provides a devastating counterpoint to the virtues of the settlement expounded by Class Counsel. The numbers speak for themselves.

The total class membership was estimated at 12,225,679. Doc. 277, ¶ 4. Of the total class membership, 11,316 total claims were filed. ¶ 31. 11,316 is 0.09 percent of 12,225,679.

2,346 of the claims were Class A claimants, entitled to $55 per claim if validated. *Id*. 8,970 of the claims were Class B claimants, entitled $9 per claim if validated. *Id*. Accordingly, multiplying the number of respective claims by the respective claim amounts, there were $129,030 in Class A claims and $80,730 in Class B claims. (Class Counsel acknowledges 2,346 Class A claims filed, but calculates the total to be paid as 2,345 without explanation. Motion, p. 13.) The total present potential settlement fund is therefore $209,760. Cirami's declaration does not state whether all claims were accepted or not.

1    The settlement administrator also received seven objections and 27 opt-outs.
2    (Doc. 277, ¶¶ 32, 33.)  The declaration states that two of the objections were late,
3    but does not identify the late objections.  As a percentage of the claims made, the
4    objections represent 0.09 percent of the claimants.  The ratio of opt-outs to
5    claimants is 0.238 percent—slightly higher than Class Counsel's calculation of 0.23
6    percent, which appears to be improperly rounded down.  Motion, p. 15.  Taken
7    together, approximately 0.33 percent of the claimant pool have a problem with this
8    settlement.  That is three times greater than the claims response rate.
9    More critically than quibbling over percentages, there can be no serious
10   argument that the response rate alone is appalling.  In sheer numbers, $209,760 for
11   a class estimated at over 12,000,000 results a recovery of less than two cents per
12   class member.  Even Class Counsel is forced to acknowledge that this number is
13   "very small." (Motion, p. 13.)  This total dollar amount is objectively incongruous
14   with six years of litigation and professed vigorous advocacy on behalf of the absent
15   class members.

### 2. Class Counsel's Excuses for the Very Low Response Rate Sell the Class Out

18   Seeking to prop up this failed settlement, Class Counsel improperly attempts
19   an ad hoc modification of the class member definition.  Class Counsel argues that
20   the 0.09 percent response rate is reasonable because they were not concerned with
21   representing the actual class of consumers who purchased a Fat PS3 between
22   November 1, 2006, and April 1, 2010.  Instead, Class Counsel speculates that the
23   settlement should be seen as successful because "the number of people who actually
24   cared about SCEA's removal of this feature was relatively small.  Of this smaller
25   group, it is likely that a substantial percentage submitted claims." Motion, p. 14.
26   Class Counsel doubles down on its abandonment of the actual class membership by
27   arguing, "those who were actually upset about the Firmware Update submitted
28   claims." *Id*.

These statements are deeply disturbing and irreconcilable with the class member definitions in the settlement—all of whom are subject to the release negotiated by Class Counsel, regardless of their observed degree of upsetness. Class Counsel does not represent only "those who were actually upset" or "actually cared." Class Counsel is supposed to represent "any and all persons in the United States who purchased a Fat PS3 in the United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal, and/or household use." (Doc. 259-1, ¶ 12.)

Under the settlement, all purchasers of Fat PS3 systems during this time period release all claims pertaining to (1) false marketing of the Fat PS3 Other OS functionality; (2) disabling the Other OS functionality; (3) any claims related to Firmware Update 3.21; and (4) any breach of multiple end user agreements for crippling or modifying any features or functions of the Fat PS3. (Doc. 259-1, ¶ 35.)

The scope of the class member definition and the breadth of the release reach well beyond those who were "actually upset" or "actually cared" about the removal of the Other OS functionality.  The release does not purport to apply only to concerns about being upset or caring; the release covers any changes that SCEA made to Fat PS3 features or functions at any time after purchase.

Class Counsel cannot narrow the definition of the class to cover only those who submitted claims just for the purposes of trying to ram this settlement through. Class Counsel has a fiduciary obligation to the actual class to provide a substantive settlement in exchange for their broad release of rights.  Class Counsel's attempt to sell out the interests of the entire class just to collect their fee and benefit 0.09 percent of the class membership is inexcusable.

### B. The Claims Process Was Unworkable and It Failed, Resulting in a Manifestly Inadequate Settlement Fund

Red flags were previously raised concerning the fact that this settlement was to be on a claims-made basis and that there was no set fund for the class common

1  fund—either to be given to claimants or a *cy pres* recipient.  These concerns came
2  to fruition with the extremely low claims response rate, which resulted in an almost
3  unimaginably low total settlement.

4  Federal Rule of Civil Procedure 23(e) states in pertinent part: "The claims,
5  issues, or defenses of a certified class may be settled, voluntarily dismissed, or
6  compromised only with the court's approval.  [… ¶ …]  If the proposal would bind
7  class members, the court may approve it only after a hearing and on finding that it
8  is fair, reasonable, and adequate."  A class action settlement should fall within a
9  "range of reasonableness" for the harms alleged and likelihood of success, and the
10 "primary touchstone of this inquiry is the economic valuation of the proposed
11 settlement."  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768,
12 806 (3d Cir. 1995), *citing Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972);
13 *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

14 Here, because the claims process was too involved and because there was no
15 pre-established settlement fund that could give concrete benefit to the class, the
16 economic valuation of the settlement is the miserable $209,760 actual claim total.
17 Class Counsel never even attempted to estimate a total value for the settlement, but
18 based off its requested fee and a percentage-of-the-fund cross-check at 25 percent
19 (e.g., *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir. 1998) [25 percent in
20 attorneys' fees is a "benchmark award"]), the value to the class would have to be at
21 least $8,625,938 in order to be reasonable.  Class Counsel achieved just over two
22 percent of that goal.  This settlement is manifestly inadequate on those grounds
23 alone.  *Compare e.g., Williams v. Costco Wholesale Corp.*, 2010 U.S. Dist. LEXIS
24 67731, at *9-*10 (S.D. Cal. July 7, 2010) (finding settlement amount constituting
25 approximately 75.6% of the plaintiffs' claimed losses from unpaid overtime pay to
26 be adequate); *Glass v. UBS Fin. Servs.*, 2007 U.S. Dist. LEXIS 8476, at *13 (N.D.
27 Cal. Jan. 26, 2007) (finding settlement of wage and hour class action for 25% to
28 35% of the claimed damages to be reasonable).

### C. Claims-Made Settlement Requires a High Claims Response Rate in Order to Provide an Adequate Settlement

The claims-made settlement process is often unnecessary and results in inequitable and inadequate results. "In too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members. When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms." *De Leon v. Bank of Am., N.A.*, No. 6:09-cv-1251-Orl-28KRS, 2012 U.S. Dist. LEXIS 91124, at *61 (M.D. Fla. Apr. 20, 2012) (quoting the 2010 version of the "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" produced by the Federal Judicial Center).

Here, SCEA knows how many Fat PS3s it sold and it has reasonably good information about who owned those units because almost every purchaser established a PlayStation Network account in order to use the online functionality of the units. Indeed, the parties used SCEA's information about its own consumers as the primary method of distributing the notice of this settlement via email. Doc. 277, ¶ 4 ("on September 21, 2016, SCEA provided to GCG, via a File Transfer Protocol ('FTP') site, an electronic data file reasonably calculated to include the email addresses of all potential Class Members known by SCEA through its Playstation Network Database. The file provided to GCG contained 12,225,679 email addresses (the 'Class Data')."), ¶ 10 (the "Class Data" provided the email addresses for the notice mailing). The bulk of the settlement could have been distributed through using SCEA's own data, without relying on a relatively convoluted claims submission process, including requiring serial numbers for Fat PS3s in order to get any recovery. Undoubtedly, the vast majority of potential claimants saw the serial number requirement and gave up there, without digging through the notice website in order to find an alternative claims method requiring phone calls to the settlement administrator.

In addition, the claims-made process is analogous in some respects to forms of fluid recovery, which have been criticized for failing to adequately compensate the class membership. This approach has the benefit of providing direct, individual relief to class members who make claims, but is totally inappropriate to the extent that the silent class members receive nothing. *State of California v. Levi Strauss & Co.*, 41 Cal.3d 460, 475–476 (1986). "***Hence, the advantages of claimant fund sharing can only be realized where a large proportion of class members participate and submit accurate claims.***" *Id.* at 476, *citing* Durand, *An Economic Analysis of Fluid Class Recovery Mechanisms*, 34 Stan. L. Rev. 173, 178 (1981). *See, also*, *Windham v. American Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977) ("Such a method of computing damages in a class action has been appropriately branded as 'illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper.'"); 3 Newberg on Class Actions, § 9:62, p. 540 (2002) ("[T]he issue of determining individual claims can be avoided by the court's authorization of a class recovery distribution to class members on some per capita, average, or formula basis from available records, without the need to file individual proofs of claim.").

Now that the actual benefit to the class membership has been illuminated by the Cirami declaration (Doc. 277), it is clear that the claims process here was too cumbersome to provide any kind of adequate compensation to the class. Barely any class members made claims. The total fund based on the claims that were received is hardly cognizable as a benefit to the class. The gross deficiency of the settlement demonstrates that the settlement process was flawed and the class is being inadequately compensated for its release.

### D. Class Counsel's Representation of the Class Has Failed

Any proportional discrepancy between the benefit to class members and the fees to class counsel suggests "a strong possibility of impropriety." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 394 (C.D. Cal. 2007), *citing General Motors*, 55 F.3d

at 802 ("At its worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorneys fees."), *quoting* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 714 n. 121 (1986).[1]

Where the class members on the whole receive little or no benefit, a significant fee request for class counsel means that something other than maximizing the absent class members' recovery is motivating class counsel. *See Hanlon*, 150 F.3d at 1021. All of these factors compel the court evaluating a class settlement proposal to be vigilant against abuses by class counsel. *See Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1327 (9th Cir. 1999) ("In a class action, substantial justice may require the court do more than encourage settlement. The absence of individual clients controlling the litigation for their own benefit creates opportunities for collusive arrangements in which defendants can pay the attorneys for the plaintiff class enough money to induce them to settle the class action for too little benefit to the class … .").

Here, the attorneys' fees sought by Class Counsel are 1,028 percent of the recovery by the absent class members. This ratio suggests nothing if not "a strong possibility of impropriety." This gargantuan fee request demonstrates that Class Counsel have worked to ensure they will receive a large fee while doing absolutely nothing to ensure that the class receives tangible benefits. Ultimately, the disparity between the requested fee and the benefit to the class leads to the inescapable conclusion that Class Counsel have negotiated an inadequate settlement with an unworkable claims scheme that must be rejected.

---

[1] The court also noted with disapproval the substantial windfall to defendants in obtaining general releases for the entire settlement class. *Acosta*, 243 F.R.D. at 394 ("Trans Union and Equifax also would receive handsome compensation under the Settlement by way of its release provisions.").

### E. *Cy Pres* Distribution of a Fixed Settlement Fund Would Benefit the Class

The failures and difficulties of this consumer settlement could be rectified by establishing a fixed settlement fund of an ascertainable and adequate amount, and then distributing the funds to consumer protection *cy pres* recipients for the benefit of the class. The absence of this alternative in the settlement agreement, combined with the exceptionally low claims response rate, demonstrates that not only does this settlement fail to benefit the class, it fails to work justice.

A *cy pres* fund is a practical solution for a class action settlement such as this. *Hoffer v. Landmark Chevrolet Ltd.*, 245 F.R.D. 588, 603 (S.D. Tex. 2007) ("In the class action context, courts have applied cy pres primarily (although not exclusively) as a practical solution to the problem of settlement funds remaining after those class members who could be identified with reasonable effort received their distribution."), citing *In re Airline Ticket Commission Antitrust Litigation*, 307 F.3d 679 (8th Cir. 2002); *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703 (8th Cir. 1997); *In re Folding Carton Antitrust Litigation*, 744 F.2d 1252 (7th Cir. 1984); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ("Federal courts have frequently approved [the cy pres] remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly."); *In re Agent Orange Product Liability Litigation*, 818 F.2d 179, 185 (2d Cir. 1987) ("[S]ome 'fluidity' is permissible in the distribution of settlement proceeds.").

*Cy pres* distributions are likewise just and equitable for the vindication of consumer rights by ensuring that the defendant provides some meaningful contribution to the betterment of the class. *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ("In the class action context the reason for appealing to *cy pres* is to prevent the defendant from walking away from the litigation scot-

free because of the infeasibility of distributing the proceeds of the settlement … to the class members.").

A *cy pres* fund would serve the purposes of this litigation because, for example, California Business & Professions Code section 17200 claims result in disgorgement of profits obtained from unlawful advertising by SCEA, and the California Consumer Legal Remedies Act provides for potential statutory damages, as well as punitive damages or treble damages. Cal. Civ. Code, § 1780. Accordingly, the policy behind these statutes is meant to be punitive and have a deterrent effect. While SCEA denies the allegations in this case, any settlement that allows them to escape meaningful liability fails to serve the purposes of the statutes they are alleged to have violated and would be unjust as a matter of public policy for a class action.

### III. CONCLUSION

In light of the foregoing, Objector John Navarrete respectfully requests the Court deny Class Counsel's motion for final approval of this class action settlement.

Dated: January 3, 2017					JOSHUA R. FURMAN LAW CORP.


						By:  **/s/ Joshua R. Furman**
						      Joshua R. Furman
						      *Attorney for Objector,*
						      John Navarrete