Rosemary M. Rivas (SBN 209147)
rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
One California Street, Suite 900
San Francisco, California 94111
Telephone: (415) 398-8700/Facsimile: (415) 398-8704

Kathleen Fisher (State Bar No. 70838)
kfisher@calvofisher.com
**CALVO FISHER & JACOB LLP**
555 Montgomery Street, Suite 1155
San Francisco, California 94111
Telephone: (415) 373-8370/Facsimile: (415) 374-8373

James Pizzirusso (*pro hac vice*)
jpizzirusso@hausfeld.com
**HAUSFELD LLP**
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200/Facsimile: (202) 540-7201

*Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONY PS3 "OTHER OS" LITIGATION | Case No. 4:10-CV-01811-YGR |
| | **DECLARATION OF ROSEMARY M. RIVAS IN SUPPORT OF PLAINTIFFS' RESPONSE TO OBJECTIONS TO THE PROPOSED CLASS ACTION SETTLEMENT** |
| | Date: January 24, 2017 |
| | Time: 2:00 PM |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Courtroom: 1, 4th Floor |

I, Rosemary M. Rivas, declare as follows:

1. I am an attorney licensed to practice by the State of California, and a partner with the law firm of Finkelstein Thompson LLP ("FT"), one of the firms appointed as Interim Co-Lead Counsel and later Class Counsel in the action titled, *In re Sony PS3 "Other OS" Litigation*, Case No. 4:10-CV-01811-YGR.

2. On behalf of my firm, I have been one of the attorneys primarily responsible for this case since its inception, along with co-counsel from Hausfeld LLP and Calvo Fisher & Jacob LLP. Therefore, I have personal knowledge of the matters set forth herein, based on my active participation in the prosecution and settlement of the case and my firm's business records, and, if called as a witness, could and would competently testify thereto.

3. I submit this declaration in further support of Plaintiffs' Motion for Final Approval of Class Action Settlement and in response to the objections to the Settlement Agreement that were submitted to the Settlement Administrator, Garden City Group, LLC ("GCG").

4. According to the objection filed by Eric Michael Lindberg ("Lindberg"), Mr. Lindberg is represented by attorney Sam A. Miorelli (*see* Dkt. No. 281, Ex. E). Mr. Miorelli has indicated that he has "personally objected to unfair proposed class action settlements in the past two year" in a number of cases. (*See id*. at pp. 1-2.) Three of Mr. Miorelli's listed objections in other cases (one with Mr. Lindberg) are still pending—two before the Ninth Circuit Court of Appeals and one before this Court:

   a. In *Patrick Hendricks v. Starkist Co.,* Case No. 13-CV-00729-HSG (N.D. Cal.), Mr. Miorelli filed objections on behalf of Mr. Lindberg to the class action settlement on November 20, 2015. A true and correct copy of the objection is attached as **Exhibit 1**. Mr. Lindberg's objections were denied and the court granted final approval of the class action settlement. *See Hendricks v. Starkist Co*, No. 13-CV-00729-HSG, 2016 WL 5462423, at *7-10, 14-15 (N.D. Cal. Sept. 29, 2016).

b. In *In re Carrier IQ, Inc., Consumer Privacy Litigation,* Case No. 12-md-02330-EMC (N.D. Cal.), Mr. Miorelli objected to the class action settlement on June 16, 2016. The court denied Mr. Miorelli's objections and granted approval of the class action settlement. *See In re Carrier IQ, Inc., Consumer Privacy Litig.,* No. 12-MD-02330-EMC, 2016 WL 4474366, at *5 & n.5 (N.D. Cal. Aug. 25, 2016).

c. In *In re Lithium Ion Batteries Antitrust Litigation,* Case No. 13-md-02420-YGR (N.D. Cal.), Mr. Miorelli objected to the class action settlement on September 26, 2016. The ruling on the objection and the motion for final approval of class action settlement is currently pending before this Court.

d. In *Zepeda v. PayPal, Inc.,* Case No. 10-cv-02500-SBA (N.D. Cal.), Mr. Miorelli, *pro se*, objected to the class action settlement. The ruling on the objection and the motion for final approval of class action settlement is currently pending before this Court.

e. In one other case, *In re: Target Corporation Customer Data Security Breach Litigation*, MDL No. 14-2522 (PAM/JJK) (D. Minn.), Mr. Miorelli filed a *pro se* objection and the Court determined he was not a class member. *See In re Target Corp. Customer Data Sec. Breach Litig.,* No. MDL142522PAMJJK, 2015 WL 7253765, at *2, n. 1 (D. Minn. Nov. 17, 2015).

5. Patrick S. Sweeney states that he believes he is a member of the class based on his review of the Notice of Class Action Settlement ("Notice"). Objector Sweeney has filed at least a dozen objections—not including his objection here—to class action settlements in the past two years that were not disclosed in his objection. So as not to overburden the Court with all of his objections in other cases, a selection of the objections and related documents filed in three cases in the past year are listed below.

a. In *Chimeno-Buzzi v. Holliser Co.*, No. 14-cv-23120 (S.D. Fla.), Mr. Sweeney objected to the class action settlement on March 7, 2016. On March 22, 2016,

the parties stipulated to the withdrawal of Mr. Sweeney's objection indicating that "[h]aving thoroughly reviewed the Plaintiffs' response in opposition to his Objection (D.E. 138) and after meeting and conferring with Plaintiffs' counsel, Sweeney now believes the Settlement is in the best interest of the class, should be finally approved, and therefore agrees to the withdrawal of his Objection." A true and correct copy of the stipulation is attached as **Exhibit 3**.

b. *In re Midland Credit Mgmt, LLC*, No. *Inc.*, No. 11-md-02286 (S.D. Cal.), Mr. Sweeney objected to the class action settlement on April 26, 2016. His objection was withdrawn on August 16, 2016. **Exhibit 4**.

c. In *Legg v. Spirit Airlines, Inc., No. 14-cv-61978* (S.D. Fla.), Mr. Sweeney objected to the class action settlement on June 20, 2016. The objection was withdrawn on July 7, 2016. **Exhibit 5**.

6. According to news articles, in December 2016, a federal indictment was issued against Mr. Sweeney, charging him with wire fraud, identity theft and making a false declaration in a bankruptcy matter. A true and correct copy of an article from the Wisconsin State Journal, entitled "Feds Indict Middleton Lawyer, Alleging Fraud in Loan Scheme," published on December 14, 2016 and located on the Internet at

http://host.madison.com/wsj/news/local/crime-and-courts/feds-indict-middleton-lawyer-alleging-fraud-in-loan-scheme/article_ef9c916c-fe4b-50eb-945b-b53dbe4a776f.html, is attached hereto as **Exhibit 6**.

7. According to the objection filed by John Navarrete, Mr. Navarrete is represented by Attorney Joshua Furman. Public records indicate that Attorney Furman has represented several objectors to class action settlements that Plaintiffs were able to locate, including at least one with the same client, Mr. Navarrete, who filed objections here. These objections include but are not limited to the following:

a. On February 13, 2014, Mr. Furman argued on behalf of Objectors–Appellants Frank, Cope, Cox, Bandas, Sullivan, and Zimmerman before the Ninth Circuit Court of Appeals in *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934,

939 (9th Cir. 2015). The Ninth Circuit rejected all of the arguments made by Mr. Furman and affirmed the district court's decision to approve the settlement. *See id.*

b. Objection filed on June 2, 2014 on behalf of John Navarrete in *Schlesinger v. Ticketmaster*, LASC Case No: BC304565, Cal. Super. Ct., as reflected in the Superior Court's Feb. 27, 2015 Ruling and Order Re: 1) Plaintiffs' Motion For Final Approval Of Class Action Settlement; 2) Plaintiffs' Motion For Fees, Costs, and Incentive Payments; and 3) Objectors' Motions for Attorneys' Fees" ("Order"), (Freeman, J.) at pp. 36-38. A true and correct copy of the Order overruling the objection is attached hereto as **Exhibit 7**;

c. Objection filed on November 11, 2013 in *Pappas v. Naked Juice Company*, CASE NO. 11-cv-8276-JAK (C.D. Cal), Dkt. No. 159. A true and correct copy of the objection is attached hereto as **Exhibit 8**. The court overruled the objection and granted final approval of the settlement. *See Pappas v. Naked Juice Co of Glendora, Inc.*, No. LACV1108276JAKPLAX, 2014 WL 12382279, at *1 (C.D. Cal. Jan. 2, 2014).

d. Objection filed on March 30, 2011 in *In Re Google Buzz User Privacy Litigation*, Case No.: CV 10-00672 JW (N.D. Cal.), Dkt. No. 122. A true and correct copy of the objection is attached hereto as **Exhibit 9**. The court granted final approval of the settlement over the objection. *See In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 13073333, at *1 (N.D. Cal. May 31, 2011) *amended and superseded by* 2011 WL 7460099, at *3 (N.D. Cal. June 2, 2011).

//

//

8. Attached hereto as **Exhibit 10** is a true and correct copy of the Declaration of Stephen J. Cirami.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 10th day of January 2017 in San Francisco, California.

By */s/ Rosemary M. Rivas*
Rosemary M. Rivas

# EXHIBIT 1

1
**Law Office of Sam Miorelli, P.A.**
Sam A. Miorelli (Florida Bar No. 99886, *Pro Hac Vice application pending*)
2
764 Ellwood Avenue
3
Orlando, FL 32804
Telephone: (352) 458-4092
4
E-Mail: sam.miorelli@gmail.com

5
AARON DAWSON (SBN 283990)
1901 Harrison St., Suite 1100
6
Oakland, CA 94612
7
Telephone: (415) 534-5346
Fax: (888) 301-5076
8
E-Mail: adawson@alectolaw.com

9
*Attorneys for Objector Lindberg*

10
UNITED STATES DISTRICT COURT

11
NORTHERN DISTRICT OF CALIFORNIA

12
SAN FRANCISCO DIVISON

13

14
| | |
|---|---|
| PATRICK HENDRICKS, individually and on behalf of all others similarly situated, | ) Case No.: 13-CV-00729-HSG<br>) |
| | ) **OBJECTION TO CLASS ACTION** |
| Plaintiff, | ) **SETTLEMENT OF ERIC M. LINDBERG** |
| | ) |
| v. | ) Date:        December 17, 2015 |
| | ) Time:        2:00 p.m. |
| STARKIST CO., | ) Courtroom:  15, 18th Floor |
| | ) Judge:       Hon. Haywood S. Gilliam, Jr. |
| Defendant. | ) |
| | ) |
| | ) |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      Eric Michael Lindberg is a class member and intends to appear at the fairness
        hearing through his counsel. .................................................................................... 2

II.     The Court has a fiduciary duty to the unnamed members of the class. .................................... 3

III.    The Settlement is a tiny percentage of the value of the Class' damages,
        demonstrating that Class Counsel and the representative class member either sold out
        the absent classs members or that the case is a meritless vehicle for the procurement
        of legal fees and incentive payments. ..................................................................... 5

        A.      The total recovery is a fraction of the class' injury. .................................... 5

        B.      This eight-cents-on-the-dollar settlement is either a sell out by Class Counsel
                or a nuisance settlement whose only purpose is the generation of legal fees. ............. 6

IV.     The individual class member recovery is materially different from the recovery
        promised in the Class Notice and renders that notice ineffectual. ........................................... 7

V.      A class action settlement should not be approved when the primary beneficiaries are
        the class representatives and class counsel. ........................................................... 11

        A.      A large disparity between the recovery of the representative class member
                and the absent class members is not permitted under Ninth Circuit precedent. ........ 11

        B.      There is no basis in law for payment of incentive awards in a class action
                settlement to class members who were not named class representatives in the
                case being settled. ....................................................................... 13

VI.     The "vouchers" are coupons under the Class Action Fairness Act (CAFA). ....................... 13

VII.    As interpreted in *HP Inkjet Printer*, CAFA prohibits the assignment of any value to
        the $4 million in coupons in the Proposed Settlement and also prohibits use of the
        lodestar method to determine the attorneys' fee award. ............................................ 16

        A.      CAFA section 1712(a) prohibits assignment of any value to coupons for the
                purposes of determining a contingent attorneys' fee award until after the
                coupons are redeemed. ................................................................... 16

        B.      CAFA section 1712(b) does not permit an award of contingent or lodestar-
                based attorneys' fees for the Proposed Settlement because there is no
                equitable relief. .......................................................................... 17

        C.      CAFA section 1712(c) does not permit contingent fee or lodestar-based
                attorneys' fee awards arising out of the coupon portion of the settlement due
                to the lack of equitable relief in the Proposed Settlement. ........................... 18

VIII.   Class Counsel should not get more than 25% in a contingent fee-based attorneys'
        fee.......................................................................................................... 19

        A.      The Court should follow the Ninth Circuit's 25% benchmark. ......................... 19

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

B.   The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments. ........................................................... 22

C.   Even if the Court decides that the "vouchers" are not coupons under CAFA, the fee should be less than even the amount suggested by StarKist. ........................ 24

IX.   The silence of the class should not be construed as endorsement of any terms of the Proposed Settlement, including Class Counsel's fee and incentive payment requests.......... 24

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...................................................... 3, 4

*Davis v. Cole Haan, Inc.*, No. 11-cv-01826-JSW, 2015 WL 7015328 (N.D. Cal. Nov. 12, 2015) ........................................................................................................................... 14, 15

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ............................................................ 4

*Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401 (9th Cir. 1989) ........................... 3

*Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439 (W.D. Pa. 2007) ............................. 25

*Erhardt v. Prudential Group, Inc.*, 629 F.2d 843 (2d Cir. 1980) ................................... 7, 10

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434 (S.D. Iowa 2001) .......................... 25

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................................... 4

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) ...................................... 12

*In re Aqua Dots Prod. Liab. Litig.,* 654 F.3d 748 (7th Cir. 2011) ...................................... 12

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig,* MDL No. 1967, Master Case No. 08-1967, 2011 WL 1790603 (W.D.Mo. May 10, 2011) ............................... 15

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)............... 4, 18, 23

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ........................ 25

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979)................. 25

*In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d. Cir. 1995) .................................................................................................................. 3, 25

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) ................................... passim

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977) ...................... 9, 10

*In re Online DVD-Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015)........................... 14, 15, 22

*In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166 (D. Mass. 2005) .............................. 3

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829 (N.D. Cal. May 26, 2015) ........................................................................... 22

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)................................... 3

*In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994) ................. 4

1 | *In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467 (N.D.Cal. Aug. 25, 1994)........................................ 22

2 | *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir.

3 | 1987) .............................................................................................................................................. 25

4 | *Miles v. AlliedBarton Security Svcs., LLC*, No. 12-5761 JD, 2014 WL 6065602 (N.D. Cal.

5 | Nov. 12, 2014) .............................................................................................................................. 22

6 | *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ................................................................................ 4

7 | *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006)................................................. 6, 7

8 | *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) ........................................ 18

9 | *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982).......................................................... 11, 12

10 | *Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y. 1981) ...................................................... 12

11 | *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) ................ 11, 12

12 | *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ......................................................... 22

13 | *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ................................................. 3

14 | *Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075 (7th Cir. 1972) ............................................. 9

15 | *Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992).............................................................................. 3

16 | *Six (6) Mexican Worker v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir.1990)...................... 21

17 | *Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ............................................................................ 4

18 | *True v. American Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ........................................... 3

19 | *Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013)........................................... 11, 12

20 | *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)................................................... passim

21 | *Young v. Polo Retail, LLC*, No. C-02-4546, 2006 WL 3050861 (N.D. Cal. 2006)......................... 15

**Statutes**

22 |

23 | 28 U.S.C. § 1712(a) (2005)............................................................................................... 16, 17, 18

**Rules**

24 | Fed. R. Civ. P. 23 .......................................................................................................................... 7

**Other Authorities**

25 |

26 | American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010)...................... 3

27 | Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class*

28 | *Action Settlements*, 59 Fla. L. Rev. 71 (2007). ............................................................................ 24

Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002). ..................................... 3

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

**INTRODUCTION**

After two-and-a-half years of fishy litigation, this case dives in for a smelly finale. Class Counsel's fee request is so malodorous, in fact, that Charlie the Tuna himself objected! Eric Michael Lindberg, a frequent consumer of StarKist tuna and member of the putative Class, asks this Honorable Court to turn the ship around and cast a net around Class Counsel before they reel in an illegal and unfair windfall while settling their clients' claims for pennies.

The Court should be suspicious of the Proposed Settlement right from the first splash due to the structure of the "recovery." Not only is one-third of the supposed-benefit in the form of rightly-maligned coupons, but once Class Counsel's proposed fee, costs, incentive awards, and notice expenses are deducted, the coupon proportion rises above 50%! Another structural problem is the outrageous plan to pay Class Counsel before they finish their work. While StarKist and Class Counsel agree the case would not be resolved until a significant time after any settlement was approved by the Court, Class Counsel's payment would nevertheless arrive promptly in January 2016.

The Court should also be suspicious of the overall amount of recovery. The available information in the Court's record shows that Class Counsel proposes to settle this case for less than nine pennies on the dollar. This is a strong indicator that either the absent class members are being sold out by the lawyers and class representatives who supposedly have their best interest in mind or that the case was just a frivolous vehicle for the generation of legal fees and incentive payments from the start.

This enormous settlement discount resulted in a wildly oversubscribed settlement fund. Despite splashing promises that claims would be worth $25 cash or $50 in "vouchers" across the class notices, in reality class members are likely to get about $2 in cash or $4 in vouchers. This is materially different from the terms of the Class Notice and renders the notice defective and insufficient.

Not only are the lawyers getting a windfall in the Proposed Settlement, the class representative plus eight people who never even joined the case will, if Class Counsel's proposals are approved, split another $13,000. For the class representative this will be an illegally-high

1    amount compared to the $2 recipients he supposedly represents. For the eight "Interested Parties" it

2    would be a completely illegal windfall.

3           This case also presents yet another attempt by class action attorneys and willing corporate

4    defendants to avoid the Class Action Fairness Act's restrictions on the use of coupons by calling a

5    piece of paper that entitles an absent class member to approximately four free cans of tuna at their

6    local grocer a "voucher" instead of a coupon. No matter the euphemism used, a coupon is a coupon.

7           Finally, Mr. Lindberg agrees with StarKist that Class Counsel's fee request is outrageous.

8    Still, StarKist's Opposition significantly understates Class Counsel's rapacity. The fee should not be

9    reduced, as argued by StarKist, only 25% from Class Counsel's request, it should be reduced by

10   more than 50%. Further, the Court should not award any "incentive payments" as this illegally

11   treats certain class members better than others at the direct expense of those other class members.

12   Both of these measures will restore significant and much-lacking value to the oversubscribed

13   Proposed Settlement.

14          From head to fin, the Proposed Settlement is rotten. This Honorable Court should sink it for

15   the reasons set forth herein.

16   **I.      Eric Michael Lindberg is a class member and intends to appear at the fairness
17            hearing through his counsel.**

18          Eric Michael Lindberg, who resides at 764 Ellwood Avenue, Orlando, FL 32804, is a

19   member of the class. (Declaration of Eric Michael Lindberg 1-2). During the relevant time period,

20   Mr. Lindberg purchased significant numbers of 5 oz. cans of StarKist Solid White Tuna in Water.

21   *Id*. This was and remains his favorite brand and package size for the purchase of canned tuna. *Id.*

22   Mr. Lindberg filed a claim using the website, requested the cash payment option, and intends to

23   appear, through his counsel, at the Fairness Hearing, where he asks to be heard by the Court. *Id.*

24          To the extent that other class members file objections which are not inconsistent with the

25   objections raised herein, Mr. Lindberg reserves the right to adopt those objections and address them

26   at the Fairness Hearing as well. To the extent that any objector participates in discovery relating to

27   the Proposed Settlement, Mr. Lindberg joins their motion to do so and requests equal access to such

28

1    proceedings. Mr. Lindberg also hereby requests the opportunity to depose and cross-examine any

2    witness presenting evidence in support of the Proposed Settlement.

3    **II.    The Court has a fiduciary duty to the unnamed members of the class.**

4            A district court must act as a "fiduciary for the class who must serve as a guardian of the

5    rights of absent class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir.

6    2004). "Both the United States Supreme Court and the Courts of Appeals have repeatedly

7    emphasized the important duties and responsibilities that devolve upon a district court pursuant to

8    Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust*

9    *Litigation*, 360 F.Supp.2d 166, 192-94 (D. Mass. 2005) (*citing, inter alia, Amchem Prods., Inc. v.*

10   *Windsor*, 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust

11   or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'"));

12   *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to

13   exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions").

14           "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the

15   rights of absent class members . . . [T]he court cannot accept a settlement that the proponents have

16   not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pickup Truck Fuel*

17   *Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d. Cir. 1995) ("*GM Pickup Truck*") (internal quotation

18   and citation omitted). "A trial court has a continuing duty in a class action case to scrutinize the

19   class attorney to see that he or she is adequately protecting the interests of the class." Herbert

20   Newberg & Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002). "Both the class

21   representative and the courts have a duty to protect the interests of absent class members." *Silber v.*

22   *Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands*, 876

23   F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff

24   fulfills his fiduciary duty toward the absent class members").

25           There should be no presumption in favor of settlement approval: "[t]he proponents of a

26   settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 2d

27   1052, 1080 (C.D. Cal. 2010) (*citing* 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord*

28

American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010) ("*ALI Principles*").

"Where the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (*quoting Amchem*, 521 U.S. at 620). "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953. "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention where the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties. *Bluetooth*, 654 F.3d at 948 (*quoting Staton*, 327 F.3d at 960). Because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. *Id.* "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (*quoting In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Id.*

**III.    The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the representative class member either sold out the absent classs members or that the case is a meritless vehicle for the procurement of legal fees and incentive payments.**

A.   The total recovery is a fraction of the class' injury.

Class Counsel proudly trumpets the Proposed Settlement as a "world record" in his declaration in support of Class Counsel's Motion for an Award of Attorneys' Fees, Costs and Expenses, and Incentive Awards for the Class Representative and Interested Parties ("Class Counsel's Motion for Fees"). (Dkt 262-1 at ¶ 65). However, while this litigation may have gotten an extraordinary number of claimants, the total recovery for StarKist's 2.3 million injured customers is paltry.

Class Counsel's own expert, Colin Weir, estimated the total sale value of the under-filled tuna cans during the relevant time period to be $1,217,048,619.13. (Dkt 261-3 at Table 1). Using Class Counsel's data from the 2013 rounds of NOAA testing, we know that StarKist Chunk Light Tuna in Water was underfilled 16.7%, StarKist Chunk Light Tuna in Oil was underfilled by 4.5%, StarKist Solid White Tuna in Water was underfilled by 7.9%, and StarKist Solid White Tuna in Oil was underfilled by 4.9%. (Dkt 262-1 at ¶ 10). Expanding Table 1 from Mr. Weir's Declaration to include these percentages of underfilling makes it easy to calculate the loss to the class for each of the tuna varieties at issue in this case:

| TABLE 1 | | | | |
|---|---|---|---|---|
| StarKist Tuna Variety | Dollar Sales | Unit Sales | Percentage Underfilled | Loss to Class |
| Solid White, Oil | $      43,332,791.68 | 32,168,972 | 16.61% | $      7,197,141.87 |
| Solid White, Water | $    315,876,068.24 | 233,666,639 | 4.50% | $    14,208,958.09 |
| Chunk Light, Water | $    662,168,768.09 | 765,602,733 | 7.90% | $    52,329,446.72 |
| Chunk Light, Oil | $    195,670,991.12 | 224,677,628 | 4.86% | $      9,515,914.46 |
| TOTAL SALES: | $ 1,217,048,619.13 | | TOTAL LOSS: | $    83,251,461.14 |

The simple math in Table 1 shows that the total loss according to Class Counsel's testing and Mr. Weir's research is approximately $83.25 million. Additionally, since several of the causes of action which survived StarKist's motion to dismiss are consumer protection statutes which

1   provide for attorneys' fees and costs, the $83.25 million loss is most comparable in evaluating this

2   Proposed Settlement against the *net* class recovery after attorneys' fees, costs, incentive awards, and

3   notice costs are all deducted. In other words, if a jury believed Class Counsel at trial, the Class

4   could expect to recover for itself the entirety of the $83.25 million as the relevant causes of action

5   would result in attorneys' fees and costs being added on top of the class recovery.

6       If Class Counsel's Motion for Fees is accepted, even assuming 100% face value for the

7   coupon portion of the settlement (the relevant value of which under CAFA is addressed *infra*), the

8   net class recovery will be $7,161,050.78. *See* Dkt 262 at ¶ III.A Calculation Box (combining $4

9   million "Total Voucher Fund" and $3,161,050.78 subtotal from the "Total Cash Fund). This means

10  that Class Counsel's "world-record" (Dkt 262 at ¶ I, ¶ V.A.3.a, and ¶ V.C.2.c) Proposed Settlement

11  discounts the value of the absent class members' losses by 91.4%, *recovering just 8.6 cents for*

12  *every actual dollar lost by absent class members*.

13      Nevertheless, these "best results ever accomplished in any class action in history" (Dkt 262

14  at ¶ V.C.2.c) would reward Class Counsel with a bonanza of fees almost three times the rate he sees

15  fit to bill his hourly clients! *See* Dkt 262 at ¶ V.B. Put another way, it's not surprising Class Counsel

16  is so enthusiastic about the Proposed Settlement as his outcome is, on a percentage basis, *34.5 times*

17  *better than that of his absent clients*. If Class Counsel is correct that an 8.6% absent class member

18  recovery combined with enormous attorneys' fees and an unconscionable incentive award is the

19  "best results ever accomplished in any class action in history" (Dkt 262 at ¶ V.C.2.c) then it's hard

20  to imagine any proper public purpose for the class action legal device whatsoever.

21      B.   This eight-cents-on-the-dollar settlement is either a sell out by Class Counsel or a
            nuisance settlement whose only purpose is the generation of legal fees.

22

23      Basic economic theory teaches that settling litigation, rational actors agree to an amount of

24  money approximating their estimation of their probability of success on the merits times their

25  estimation of the amount of their entitlement. Either this Proposed Settlement is the veiled

26  admission of Class Counsel that the case is frivolous, with a 91.4% chance of failure at trial, even

27  after defeating most of StarKist's motion to dismiss, or, more likely, Class Counsel here seeks a

28  nuisance settlement only to justify his outrageous fee. The Seventh Circuit addressed a situation just

like this in *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.). In *Murray*, the defendant and class representative proposed to settle the case for single-digit percentage of the value of their damages in payments that similarly were in the range of $1 per absent class member, while the lawyers received enormous fees and the representative plaintiff received thousands of times more money than the absent class members. *Id.* Judge Easterbrook said "[s]uch a settlement is untenable. We don't mean by this that all class members must receive [full compensation]; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty." *Id.* at 952. However,

> if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment [of an incentive award to representative plaintiff] Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

*Id.* This Proposed Settlement is much the same as that rejected in *Murray*. Just as in *Murray*, here the lawyers will receive a huge fee while class members receive single-digit dollar amounts. Also, just as in *Murray*, the class representative (and perhaps "Interested Parties") will receive thousands of dollars while class members get only a few dollars.

It is impossible to imagine any rational actor pursuing millions of dollars in litigation which they and their lawyers all agreed had less than 9% chance of success on the merits. Certainly it seems unlikely that StarKist's lawyers would have advised their clients that, having lost most of their motion to dismiss, they still had more than a 91% chance of success should this case proceed to trial. For the purposes of this Objection, Mr. Lindberg believes it is unnecessary to take a position as to whether the Proposed Settlement is a sellout or nuisance settlement. However it certainly must be one of the two, and whichever it is, it falls well outside the discretion of this Court to approve.

## IV.   The individual class member recovery is materially different from the recovery promised in the Class Notice and renders that notice ineffectual.

Notice is the due process basis of the entire Rule 23 class action mechanism. "It sets forth an impartial recital of the subject matter of the suit, informs members that their rights are in litigation, and alerts them to take appropriate steps to make certain their individual interests are protected."

1   *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980) (*citing In re Gypsum Antitrust*

2   *Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977)). "[T]he court must direct to class members the best

3   notice that is practicable under the circumstances," and "[t]he notice must clearly and concisely

4   state in plain, easily understood language . . . (vii) the binding effect of a class judgment on

5   members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

6        In the notice sent to the class for the Proposed Settlement, Section 8's heading asks "What

7   does the Proposed Settlement provide if I submit a claim?" and answers the question thus:

8           The settlement provides that StarKist will pay $8 million in cash and
    $4 million in vouchers redeemable for StarKist tuna products. You
9           may submit a claim for either (a) a cash payment of $25, or (b) $50 in
    product vouchers redeemable for StarKist tuna products. You may
10          choose to claim the cash payment or the product vouchers, whichever
    you prefer. These claim amounts may be subject to pro rata dilution if
11          the total amount of claims exceeds the available settlement funds.

12

13  (Class Notice ¶ 8). The clear implication of these four simple sentences is that class members are

14  free to choose "either (a) a cash payment of $25 or (b) $50 in product vouchers redeemable for

15  StarKist tuna products." *Id.* Nothing could be more simple about the first three sentences. The

16  fourth sentence returns to legalese, using a latin phrase to say in entirely contingent terms that, in

17  fact, your $25 cash or a $50 coupon election may not actually get you $25 cash or a $50 coupon.

18       If it turned out that in reality the payments of one or both categories of payout were slightly

19  reduced due to this pro rata dilution, Mr. Lindberg would not have a problem with this notice.

20  However, Mr. Lindberg was shocked when he learned from undersigned counsel after having filed

21  his claim online that his actual recovery would be about $2, not $25. (Declaration of Eric Lindberg

22  2). The actual payout will be less than one-tenth of the amount promised in Section 8 of the Class

23  Notice for absent class members no matter which recovery option they picked. (Dkt 262 ¶ III.A).

24  Imagine the surprise of class members when instead of a check for $25 they receive $2.11 (or less)

25  or instead of coupons for $50 in StarKist tuna they receive $4.68 in coupons (or less). These are

26  dramatic differences between a class member's actual relief and the relief presented in the Class

27  Notice.

28

1    Such a wide disparity between the individualized amounts promised in the Class Notice and

2  the actual amounts which would be paid under the Proposed Settlement creates a significant due

3  process problem with the notice. The overwhelming majority of the more than 2.3 million absent

4  class members who have made a claim do not know that they will receive less than 10% of what

5  they expect. *See, e.g.* Declaration of Eric Lindberg at 2. The only way for an absent class member

6  (who, like the vast majority of absent class members, likely does not use PACER), to know that his

7  or her recovery will be so low is to navigate to the Court Documents page of the notice website,

8  download the fifth document (whose 25-word title "Plaintiff's Notice of Motion and Motion for an

9  Award of Attorneys' Fees, Costs and Expenses, and Incentive Awards for the Class Representative

10  and Interested Parties" is the sort of impenetrable marvel only a lawyer could appreciate) from a

11  bulleted list of eight documents (each with a name more riddled with legal jargon than the last), and

12  read through to pages 12 and 13 of the 33-page document.[1]  Amazingly, even with a 25-word

13  document title, Class Counsel's Fee Motion title gives no hint that buried within is news that your

14  recovery has declined 91.6%. Further, while Mr. Lindberg does not know when this document was

15  placed on the settlement website, it certainly could not have been posted prior to its October 30,

16  2015 filing date, by which time 2,359,877 claims had already been filed, which will surely

17  constitute the vast majority of the total number of claims. *See* Dkt 262 ¶ III.A. For those 2.3 million

18  claimants, there was no way at all to know about the dramatic oversubscription.

19    The quality of notice required under Rule 23 has been a stable point of class action law for

20  decades. As the Fifth Circuit held in 1977,

21        Absentee class members will generally have had no knowledge of the
22        suit until they receive the initial class notice. This will be their
         primary, if not exclusive, source of information for deciding how to
23        exercise their rights under rule 23. Although absentee class members
         are customarily encouraged to make inquiry of the clerk of the district
24        court where the case is filed if they have further questions, this
         worthwhile advice cannot justify omitting material information. This
25        is particularly plain in a case such as the one at bar where class

26

27  [1] Mr. Lindberg notes that the PACER option to access Docket Entry 262 is even less attractive to the absent class
     member. A skilled PACER user must navigate to the Court's CM/ECF page, login, run a "Docket Report" which costs

28  $3, read more than 30 pages of entries to find Docket Entry 262 with its 25-word title, and finally pay an additional $3
     to download Class Counsel's fee motion. The total PACER cost to *find out* that your recovery will be $2.11 instead of
     $25 is roughly *three times* the total amount of money a class member will receive in the Proposed Settlement.

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1
2
3
4
5
6

> members are numerous and widely dispersed. Not only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action. The standard then is that the notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.

7
8
9
10
11
12

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). This rule has been adopted across the country and no Circuit Court of Appeal has ever disagreed with this formulation of the Rule 23 notice requirements. *See Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075, 1082 (7th Cir. 1972) ("The purpose of the mandatory notice and disclosure requirements of Rule 23(c)(2) is to advise all class members of their rights and privileges under the close supervision of the court."); *Erhardt*, 629 F.2d at 846.

13
14
15
16
17
18
19
20

Clearly where, as here, a notice misleads the class members into believing they will receive more than ten times more than their actual recovery, this is not providing "information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class." *In re Nissan*, 522 F.2d at 1105. This is not a case where a formula is provided to class members upon which they can calculate their likely recovery. Most of the class members at the time they filed their claim had no way to know that the recovery would be 91.6% less than suggested by the Class Notice. Class members who do not use the internet would have absolutely no way to know about the reduction in their claim's value.[2]

21
22
23
24

Mr. Lindberg specifically does not argue that all Class Notices must inform each class member with absolute precision what their recovery will be in a settlement. However, when the amount specified in plain language in the Class Notice is more than ten times greater than the actual

25
26
27
28

---

[2] The Pew Research Center reports that in 2015, 16% of American adults do not use the internet, with higher fractions of people who do not use the internet found in older age demographics, persons with lower household income, black and Hispanic ethnic groups, and residents of rural communities. Andrew Perrin & Maeve Duggan, *Americans' Internet Access: 2000-2015*, Pew Research Center, 2-9 (June 26, 2015), http://www.pewinternet.org/files/2015/06/2015-06-26_internet-usage-across-demographics-discover_FINAL.pdf. This means that this particular class notice defect likely harms people commonly associated with economic disadvantages more than class members like Mr. Lindberg, who is a young, white man with high-quality internet access living in a major metropolitan area.

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1  amount class members will receive, that difference is material and unacceptably confusing.

2  Consequently, the Class Notice is fundamentally flawed and the Proposed Settlement should not be

3  approved without a new, more accurate notice sent to all class members who filed claims, as well as

4  similar public notice efforts as were expended for the Proposed Settlement, and a renewed

5  opportunity for Class Members to opt-out, object, or decide whether they prefer the cash or coupon

6  payment option.

7  **V.      A class action settlement should not be approved when the primary beneficiaries
          are the class representatives and class counsel.**

8

9         Under the Proposed Settlement and Class Counsel's Fee Motion, while class members will

10  get about $2 cash each, the class representative will receive $5,000 cash and eight Class Counsel-

11  picked people, who never even filed a lawsuit and never joined this case will receive $1,000 cash

12  each. This is an outrageous disparity of 2,500X between the Class Representative and absent class

13  members. Further, the eight "Interested Parties" each will receive 500X more than absent class

14  members even though these "Interested Parties" had no cognizeable involvement in this case! These

15  incentive awards are also purely conditional – they are only paid if the settlement with all of its

16  many fatal defects is approved. (Dkt 183-1 ¶ 3.2). That conditionality makes the incentive awards

17  even more odious.

18       A.    <u>A large disparity between the recovery of the representative class member and the
                absent class members is not permitted under Ninth Circuit precedent.</u>

19

20       Courts around the country, including the Ninth Circuit, while often approving incentive

21  awards to class representatives who are *actually named in the case*, regularly reverse when those

22  awards represent a large disparity when compared to the absent class members. In *Radcliffe v.*

23  *Experian Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013), the Ninth Circuit

24  reversed an approved settlement due to a 6.67-192.3 times disparity between class representatives'

25  recovery and that of absent class members. The Ninth Circuit reasoned that "the significant

26  disparity between the incentive awards and the payments to the rest of the class members further

27  exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* "There is a

28  serious question whether class representatives could be expected to fairly evaluate whether awards

1 ranging from $26 to $750 is a fair settlement value when they would receive $5,000 in incentive
2 awards." *Id.*

3      The Sixth Circuit has also rejected a large disparity between the named plaintiffs and absent
4 class members' treatment in *Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013). In
5 *Vassalle*, the settlement provided for absent class members to receive $17.38 each while the named
6 plaintiffs would be paid $2,000 each plus, in the case of one named plaintiff, have $4,516.57 in debt
7 forgiven. *Id.* at 755-56. In total, this resulted in named plaintiffs receiving approximately 374 times
8 as much benefit from the settlement as absent class members. The Sixth Circuit found the
9 settlement was unfair and that the district court abused its discretion by approving it. *Id.* at 756.

10      The Second Circuit also is skeptical of the fairness of incentive payments. In *Plummer v.*
11 *Chemical Bank*, 668 F.2d 654 (2d Cir. 1982), the Second Circuit affirmed the Southern District of
12 New York's denial of a proposed class action settlement where absent class members received
13 $1,000 each while the four representative class members received between $8,500 and $17,500
14 each. The district court held that "where representative plaintiffs obtain more for themselves by
15 settlement than they do for the class for whom they are obligated to act as fiduciaries, serious
16 questions are raised as to the fairness of the settlement to the class." *Plummer v. Chemical Bank*, 91
17 F.R.D. 434, 441-42 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982).

18      The Eleventh Circuit directly cited that same district court language in *Plummer* when it
19 rejected a class settlement which allocated approximately 6.25% of a lump sum settlement to the
20 eight representative class members, while the absent class members each received, on average,
21 approximately 0.42% of the settlement. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1146, 1148
22 (11th Cir. 1983). The court found the 14.75 times disparity between representative and absent class
23 member recovery was facially unfair and reversed the district court's approval of the settlement. *Id.*
24 at 1151.

25      In *Radcliffe* the disparity between the class representatives and the absent members of the
26 class was about 6 to 192 times, in *Vassalle* it was 374 times, in *Plummer* it was 8.5 to 17.5 times,
27 and in *Holmes* the disparity was 14.75 times. In each of those cases, the appellate court rejected the
28 settlement as unfair.

1   In this case the disparity is at about 2,500 times. That disparity is vastly above the levels

2   which the Ninth, Second, and Eleventh Circuits have all rejected. This Court would invite error to

3   approve this much-worse disparity. Class certification is not appropriate when the class

4   representative and class counsel bring a lawsuit to benefit not the class, but themselves. *See In re*

5   *Aqua Dots Prod. Liab. Litig.,* 654 F.3d 748, 752 (7th Cir. 2011). This Proposed Settlement, with its

6   enormous attorneys' fee and thousands of times difference in recovery between the class

7   representative and absent class members appears to be just such a self-serving case and should be

8   rejected.

    B.   <u>There is no basis in law for payment of incentive awards in a class action settlement</u>
9        <u>to class members who were not named class representatives in the case being settled.</u>

10

11      Regardless of Class Counsel's claims that the "Interested Parties" provided efforts which

12  "greatly enhanced the settlement value," (Dkt 262 at ¶ VII) they are legally no different from any

13  other absent class member settling their claims and releasing StarKist in the Proposed Settlement.

14  They were never named a class representative in the litigation, they never filed a case related to

15  StarKist's conduct, and their own lawyers agreed to never have their intervention motions heard.

16      Class Counsel's Motion for Fees cites no law supporting the proposition that the "Interested

17  Parties" should be treated differently than any other absent class member. All of the cases cited in

18  the incentive award section of Class Counsel's Motion for Fees relate to incentive awards to named

19  class representatives, not last-minute not-quite-present-interlopers like the "Interested Parties."

20      The Court should not award anything beyond their recovery as an ordinary absent class

21  member. Any preferential treatment for them would invite error as well as a barrage of similar

22  frivolous motions to intervene in every other pending class action in the Northern District of

23  California.

24  **VI.   The "vouchers" are coupons under the Class Action Fairness Act (CAFA).**

25      The Proposed Settlement creates a fund of "$8 million in cash and $4 million in vouchers

26  redeemable for StarKist tuna products." (Class Notice at ¶ 8). The Proposed Settlement does not

27  provide any other benefit for the class other than the cash and "vouchers." (Stipulation of

28  Settlement at ¶ 2.1). Neither the cash nor the "vouchers" would be paid until after the "Final

-13-

1    Settlement Approval Date." *Id.* at ¶ 2.3.d, ¶ 2.4.d. The meaning of "Final Settlement Approval

2    Date" is actually the later of either 35 days after entry of an un-appealed order approving the

3    Proposed Settlement or after all appeals have been exhausted.[3] *Id.*at ¶ 1.13.

4           The "vouchers" will also have significant restrictions on their use, which may be determined

5    by StarKist at its own discretion, and such restrictions have not been notified to the Class or the

6    Court. *Id.* at ¶ 2.4.c. Additionally, the "vouchers" shall be "subject to retailer policies" which are

7    also completely open-ended and undefined but potentially highly damaging to any putative value of

8    the "voucher." *Id.* These "vouchers" clearly are coupons within the ambit of Section 3 of CAFA,

9    codified at 28 U.S.C. § 1712.

10          Just days before filing this Objection, this District Court reiterated that "[t]he fact that

11   Plaintiffs have labelled this benefit as a voucher is not dispositive." *Davis v. Cole Haan, Inc.*, No.

12   11-cv-01826-JSW, 2015 WL 7015328, at *3 (N.D. Cal. Nov. 12, 2015). Judge Jeffrey S. White held

13   that a "voucher" for $20 off any merchandise purchase was a coupon for the purposes of CAFA. *Id.*

14   at *5. Additionally, Judge White held that "if the Court were to conclude that this is not a coupon

15   settlement, it could incentivize counsel in future cases to add a non-coupon option that provides

16   some minimal benefit to class members so that counsel can receive fees using the lodestar method."

17   *Id.*

18          The Ninth Circuit, in *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) ("*HP*

19   *Inkjet Printer*") addressed a very similar factual circumstance as the Proposed Settlement and its

20   holding in *HP Inkjet Printer* was extensively relied upon in *Davis*. In *HP Inkjet Printer*, the class

21   received "e-credits" which would not issue until after all appeals were resolved in the case. *Id.* at

22   1176. The court held that "e-credits" was "a euphemism for coupons." *Id.*

23          The Proposed Settlement also has an *HP Inkjet Printer*-like provision in that the "vouchers"

24   will not be issued to class members until after all appeals are resolved in the case. Additionally, in

25   the Proposed Settlement, the restrictions on the "vouchers" are undefined and potentially much

26   more onerous than those in *Davis* and *HP Inkjet Printer* which, at least, were defined at the time of

27   ────────────────

28   [3] The impact of this is that Class Counsel will likely be paid months or years before any absent class members since
     Class Counsel gets paid 30 days after the Proposed Settlement is approved, regardless of any appeals.

1    settlement and appeal. This makes the "vouchers" in the Proposed Settlement even more clearly

2    CAFA coupons than the "voucher" in *Davis* and the "e-credit" in *HP Inkjet Printer*.

3        The "vouchers" in the Proposed Settlement are not the same as the *gift cards* contemplated

4    in *In re Online DVD-Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) ("*Online DVD"*). Class

5    Counsel's analysis of *Online DVD* goes off the rails in its second sentence he asserts that *Online*

6    *DVD* "unambiguously held that gift cards or vouchers should be valued at 100 cents on the dollar

7    for purposes of calculating attorneys' fees under the percentage-of-the-benefit method." (Dkt. 262

8    at 6). The matter at issue in *Online DVD* was a gift card, not a voucher, and was called a "gift card"

9    by the class counsel, the defendant, and the Ninth Circuit. *Online DVD*, 799 F.3d at 940. "Gift card"

10    was an appropriate phrase there because that's exactly what class members got in *Online DVD* – a

11    gift card to WalMart for $12. *Id.* at 941.

12        *Online DVD* only uses the word "voucher" five times in its 21 pages in the Federal Reporter.

13    In the Ninth Circuit's five mentions of "voucher" in *Online DVD*, three of them are in the context of

14    pointing out the differences between *Online DVD*'s gift cards and "vouchers" which were held to be

15    coupons under CAFA by courts or which were specifically mentioned by the Senate Judiciary

16    Committee as the type of settlement against which CAFA was aimed.[4] *Online DVD*'s gift cards had

17    almost no restrictions and were useable at the largest retailer in the world both in store and online.

18    *Online DVD* 799 F.3d at 951. "Vouchers" for cans of tuna with unknown restrictions redeemable at

19    unknown grocers for only four different products are not at all similar to a WalMart gift card. If

---

[4] The first mention of "voucher" is in the context of citing the Senate Judiciary Committee's Report on CAFA that "cites and criticizes coupon settlement awards that provide class members with . . . 'a $5 to $10 voucher good for future purchases of particular computer hardware or software products.'" *Online DVD* at 950. The second and third mentions were in a citation to *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig*, MDL No. 1967, Master Case No. 08-1967, 2011 WL 1790603 (W.D.Mo. May 10, 2011) ("*BPA MDL"*) discussing a case where class members who had purchased products that used BPA, including baby bottles and sippy or training cups could receive a *transferrable* voucher toward the purchase of another product manufactured by Philips Electronics. *Online DVD* at 951, *see also BPA MDL* at *4 *and* http://www.kellersettlements.com/BPA.html. The fourth mention compares *Online DVD*'s gift cards to the "vouchers" in *Young v. Polo Retail, LLC*, No. C-02-4546, 2006 WL 3050861, at *3-5 (N.D. Cal. 2006) and points out that the WalMart gift cards are unlike *Young*'s "vouchers" which were ruled to be coupons under CAFA because they gave former Polo Retail employees who were complaining about having to buy Polo clothing a Polo Retail gift card which could only be used to purchase more Polo clothing! "[W]hy would former employees, who allegedly were forced to buy a great deal of unwanted Polo products, desire product vouchers so that they could purchase even more clothes?" *Online DVD* at 952. The final mention of "voucher" comes in footnote 11 which refers to the internally-cited *Young* case and points out that the *Online DVD* gift cards can be used to purchase a wide variety of things unlike the *Young* gift cards. *Online DVD* at 952 fn 11.

1  *Online DVD* teaches anything about tuna "vouchers," it is that, unlike a gift card to the world's

2  biggest retailer, a "tuna voucher" is the same thing as a "tuna coupon."

3      Just like *Davis*'s shoe "vouchers" and *HP Inkjet Printer*'s "e-credits," the "vouchers" for

4  cans of tuna are actually coupons. Consequently, the settlement relating to these coupons should be

5  analyzed under CAFA.

6  **VII.  As interpreted in *HP Inkjet Printer*, CAFA prohibits the assignment of any value to**
   **the $4 million in coupons in the Proposed Settlement and also prohibits use of the**
7  **lodestar method to determine the attorneys' fee award.**

8      A.  CAFA section 1712(a) prohibits assignment of any value to coupons for the purposes
        of determining a contingent attorneys' fee award until after the coupons are
9        redeemed.

10  Section 1712(a) of CAFA requires,

11      If a proposed settlement in a class action provides for a recovery of
12      coupons to a class member, the portion of any attorney's fee award to
        class counsel that is attributable to the award of the coupons shall be
13      based on the value to class members of the coupons that are
        redeemed.

14

15  28 U.S.C. § 1712(a) (2005). The Ninth Circuit held "an attorney's fees award is 'attributable to' an

16  award of coupons where the attorneys' fees award is a 'consequence' of the award of coupons." *HP*

17  *Inkjet Printer,* 716 F.3d at 1181.

18      The Proposed Settlement, Class Counsel's Motion for Fees, and StarKist's Response to

19  Plaintiff's Motion for Attorneys' Fees ("StarKist Opposition") all agree that the attorneys' fees

20  contemplated in this case are "attributable to" or "a consequence of" the award of coupons. The

21  Proposed Settlement defines the "Settlement Fund" as "the total cash and food voucher commitment

22  of StarKist for purposes of this settlement . . . with a total value of $12 million, comprised of two

23  distinct parts – the 'Cash Settlement Fund' and the 'Voucher Settlement Fund.'" (Dkt 183-1 ¶ 1.25).

24  Class Counsel's Motion for Fees "necessarily values the $4 million in product vouchers at their face

25  value" to reach a Settlement Fund valuation of $12 million. (Dkt 262 ¶ V.A.2). "The total value of

26  the Settlement Fund is $12 million, comprising $8 million in cash and $4 million in product

27  vouchers." *Id.* at ¶ V.A.1. The StarKist Opposition also agrees. (Dkt 285 at 1, line 15-18).

28

Consequently, the evaluation of whether to award a contingent attorneys' fee for the $4 million in coupons must begin with section 1712(a).

*HP Inkjet Printer* holds that the only legal basis for an award of attorneys' fees under section 1712(a) is the "redemption value of the coupons." *HP Inkjet Printer*, 716 F.3d at 1186. However, just as in *HP Inkjet Printer*, Class Counsel seeks to have their attorney fee awarded prior to the redemption of the StarKist coupons. (Dkt 262 at ¶ 1.13, ¶ 2.4.d).

> Because the settlement agreement specifies that no coupons may issue until after entry of a final judgment, it would have been impossible for the district court to calculate the redemption value of the coupons as required by § 1712(a). By structuring the settlement in this way, the parties essentially invited the error here.

*HP Inkjet Printer*, 716 F.3d at 1186. The structure of the issuance of the coupons in the Proposed Settlement is absolutely identical to the structure rejected in *HP Inkjet Printer*. The Ninth Circuit also prohibits district courts from making an estimate of the value of the coupons for purposes of granting a contingent attorneys' fee in cases such as this where the coupons have not yet been redeemed. *Id*. This means it is impossible to grant a contingent fee award under section 1712(a) with regard to the $4 million in coupons because the redemption value of those coupons is impossible to determine since they have not been issued yet.

    B.  CAFA section 1712(b) does not permit an award of contingent or lodestar-based attorneys' fees for the Proposed Settlement because there is no equitable relief.

*HP Inkjet Printer* is emphatic that the language of sections 1712(a) and (b) are not permissive, a settlement can only award attorneys' fees on the basis of coupons according to one of these provisions or their hybrid in section 1712(c) if the requirements of the respective section are met. *Id*. at 1183. With regard to section 1712(b), the Ninth Circuit held,

> [I]f class counsel wants to be paid 'any' fees, and the 'recovery of the coupons is not used to determine' those fees, the entirety of the payment 'shall be' calculated 'based upon the amount of time class counsel reasonably expended working on the action,' *i.e.*, using the lodestar method.

*Id*. Additionally, "[s]ection 1712(b) . . . can only come into play when a settlement contains both coupon relief and equitable relief." *Id*. at 1185.

As discussed *supra* in Section VII.A of this Objection, the only recovery for the class in the Proposed Settlement is $8 million in cash and $4 million in coupons. There is no equitable relief in this Settlement Agreement. Since there is no equitable relief, *HP Inkjet Printer* holds that section 1712(b) cannot be used to award a lodestar-based attorneys' fee for the Proposed Settlement.

      C.  <u>CAFA section 1712(c) does not permit contingent fee or lodestar-based attorneys' fee awards arising out of the coupon portion of the settlement due to the lack of equitable relief in the Proposed Settlement.</u>

The Ninth Circuit explained the applicability and purpose of CAFA section 1712(c) as:

> subsection (c) applies whenever a settlement provides both coupon and equitable relief. In such "mixed" settlements, § 1712(c) serves to ensure that class counsel get paid for all of the benefits they secure for the class. Specifically, the statutory language in § 1712(c), which in part incorporates the standard of § 1712(a), establishes this general rule: If a settlement gives coupon and equitable relief and the district court sets attorneys' fees based on the value of the entire settlement, and not solely on the basis of injunctive relief, then the district court must use the value of the coupons redeemed when determining the value of the coupons part of the settlement.

*Id.* at 1184. However, this settlement does not provide any equitable relief, it only provides cash and coupons. *See supra*, Section VII.A. Much like section 1712(b), section 1712(c) only allows a lodestar method for analyzing the value of an attorney's equitable recovery, and there is no equitable recovery to evaluate in this case. *Id.* Further, section 1712(c). like section 1712(a), only allows a contingent fee recovery based on the value of redeemed coupons, and no coupons have been redeemed in this case since they have not been issued yet. *Id.*

The net result is that the three provisions of CAFA, as interpreted by the Ninth Circuit in *HP Inkjet Printer*, prohibit this Court from assigning any value to the coupon portion of the Proposed Settlement for the purposes of determining an attorneys' fee award. Additionally, CAFA restricts the use of a lodestar analysis of the attorneys' fee requested pursuant to a coupon-containing settlement to only apply in cases where there is also equitable relief for the class. Since the Proposed Settlement has no equitable relief, CAFA, as interpreted by *HP Inkjet Printer*, prohibits the use of the lodestar method to evaluate the attorneys' fee award request altogether.

What remains is the $8 million in cash to form the singular basis of an attorneys' fee which must be determined exclusively on a contingent fee basis since a lodestar-based fee is specifically prohibited by CAFA and *HP Inkjet Printer*.

## VIII.   Class Counsel should not get more than 25% in a contingent fee-based attorneys' fee.

### A.   The Court should follow the Ninth Circuit's 25% benchmark.

In the Ninth Circuit, the 25% benchmark for calculating a contingent attorneys' fee in a class action is settled law. *Bluetooth*, 654 F.3d at 942 (*citing Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 273 (9th Cir. 1989) (establishing that 25% of the fund is the "benchmark" award that should be given in common fund cases)). While the Ninth Circuit has set forth an analytical framework for consideration of an upward departure in *Vizcaino*, such a departure requires more than the naked puffery Class Counsel offers. On this point, Mr. Lindberg agrees generally with the StarKist Opposition, but the absurdity of Class Counsel's aggrandizement is actually much worse than StarKist described.

As explained *supra*, there is nothing extraordinary about a recovery amounting to just 8.6% of the class members' injuries. Further, far from being novel, this claim is merely a rehash of the claims brought on August 2, 2012 by the district attorneys of Riverside, Marin, and San Diego Counties. *See* Dkt 262 at ¶ V.A.3.b. Class Counsel cannot reasonably say that there was no guiding precedent: the facts of the district attorney case was a public record by the time this case was filed and the Class defeated most of StarKist's motion to dismiss. *See* Dkt 57.

A comparison to the upward departure from the 25% benchmark approved in *Vizcaino* is instructive. The class lawyers in *Vizcaino* pursued their case with zero supporting precedents and agreements signed by the class members waiving the very benefit the class sought to vindicate *in spite of the written agreements! Vizcaino*, 290 F.3d at 1048. Compared that to here: an already-settled district attorney case on exactly the same facts and law, scientific findings from government laboratories supporting their case theory, and a mostly-victorious outcome against StarKist's motion to dismiss. This case was a walk in the park compared to *Vizcaino*.

Compared to *Vizcaino*, Class Counsel faced significantly less risk. *Vizcaino* approved the district court calling a case extremely risky where the plaintiffs had lost once on the merits and a second time on the class definition yet both times managed to revive the case. *Id.* at 1048. In this case, Class Counsel defeated most of StarKist's arguments in its motion to dismiss, caught StarKist red-handed paying off witnesses, had colorable claims StarKist's attorneys were abusing attorney-client privilege to cover up the witness payoffs, and were literally hours away from a hearing where they were likely to be allowed to add class representatives from multiple additional states. (Dkt 57; 142; 169; and 174 at 3-4). Class Counsel did not settle this case from a position of procedural or strategic weakness. Class Counsel's claims to the contrary are yet more puffery.

Class Counsel's example of bringing "additional benefit beyond the cash settlement fund" for *Vizciano*'s third factor is more aptly called "doing its job as a diligent attorney." There's nothing about soliciting bids from several suppliers before spending your clients' money which is either remarkable or a benefit beyond the value of the underlying recovery fund used to determine a contingent attorneys' 25% benchmark fee. Using ordinary procurement practices is the bare minimum standard of care an ethical attorney should use when spending his clients' money. Following basic fiduciary duty rules is not an un-compensated additional benefit to the class for which Class Counsel should get extra fees – fees which themselves will come from the absent class members' pockets!

Again, compare Class Counsel's puffery with the facts of the departure approved of in *Vizcaino*. During the *Vizcaino* litigation, defendant Microsoft re-hired 3,000 class members as normal employees and changed other HR practices, a benefit worth $101.48 million which was not captured in the value of the common fund in the *Vizcaino* settlement. *Id.* at 1049. This is the sort of "additional benefit beyond the cash settlement fund" the Ninth Circuit allows benchmark departures to compensate, not soliciting four bids for settlement administration and picking the cheapest one.

By the time Class Counsel reaches the fourth *Vizcaino* factor in Class Counsel's Motion for Fees, his self-congratulatory claims have become ridiculous. Class Counsel seems to believe he has navigated a new sea for class action plaintiff lawyers with this "first-ever private-plaintiff case concerning the under-filling of canned tuna." (Dkt 262 ¶ V.3.d). To the extent that the facts of this

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

case are likely to be the punchline of a class-actions-gone-wild law review article in the future, Class Counsel may have a point regarding novelty. Nevertheless, there is nothing novel about the self-serving settlement Class Counsel asks this Court to approve: enormous attorneys' fees, absent class member claims settled at pennies on the dollar, and a class representative sailing into the sunset 2,5000 times better off than the 2.3 million people he supposedly represents.

Regardless of Class Counsel's ridiculous self-congratulation, the fourth *Vizcaino* factor does not even turn on "novelty, complexity and difficulty" (Dkt 262 ¶ V.3.d) of litigating the case; it turns on whether there is independent evidence that the market would value this representation at more than the benchmark. *Vizcaino.* 290 F.3d at 1049. In *Vizcaino*, at least, there was a contract specifying a fee of 30% of the overall recovery between the class representatives and their lawyers. *Id.* The Ninth Circuit approved the district court using that as a basis to depart above the benchmark as part of an overall analysis of the market rate for such work. *Id.* However, the key factor in *Vizcaino* was that there was a prevailing rate above the benchmark in that particular area of the law – employment law. *Id.* Since this is the "first-ever private-plaintiff case concerning the under-filling of canned tuna," (Dkt 262 ¶ V.3.d) Class Counsel cannot claim there is any prevailing market rate for under-filled canned tuna plaintiffs' lawyers, and thus, cannot rely on this factor as a basis for departure from the benchmark.

The fifth *Vizcaino* factor, if anything, would confirm the benchmark award in this case, not support a departure. The Ninth Circuit in *Vizcaino* approved an upward departure when the contingency work lasted for eleven years, incurred hundreds of thousands of dollars in expenses, and where the plaintiff firm actually showed a decline in its annual income as a result. *Id.* at 1050 (citing *Six (6) Mexican Worker v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990) (where the litigation lasted more than thirteen years)). In this case, Class Counsel has litigated only for two and a half years, expended costs valued at a little over a month's worth of Mr. Bursor's billable time, and made no showing of any significant financial impact on Bursor & Fisher, P.A. because of this case. Consequently the fifth *Vizcaino* factor actually supports a benchmark-only award.

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

Finally, Class Counsel's proposed sixth factor is nothing more than self-congratulation and backhanded compliments for StarKist's legal team. They cite no legal authority for their proposition that doing good work against big corporate law firms entitles plaintiff's lawyers to more of their clients' money. In fact, doing good work is exactly the basis for Class Counsel's entitlement to *any* money under the Ninth Circuit 25% benchmark. If successfully negotiating a settlement that sells your clients' claims for pennies on the dollar, recovers a huge attorneys' fee, and treats the class representative 2,500 times better than the absent class members is grounds for an upward departure from the benchmark, then the benchmark is a dead letter. This Court should take Class Counsel's proposed sixth factor as a tacit admission that their entire *Vizcaino*-based argument for 33% instead of 25% is a meritless grab at absent class members' wallets.

### B.  The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments.

Mr. Lindberg and StarKist agree that the baseline recovery to calculate any contingent fee should exclude the costs of class notice and Class Counsel's costs. *See* StarKist Opposition at 2. However, Mr. Lindberg also believes that, while the incentive payments proposed are plainly illegal under binding precedent (see discussion, *supra*), to the extent that any incentive payments are awarded by the Court, they should also be excluded from Class Counsel's contingent fee calculation.

The Northern District of California "has had a longstanding preference for using the net" when calculating a contingent fee award in class action settlements. *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *1 (N.D. Cal. May 26, 2015) (J. Charles R. Breyer) ("*Transpacific*"). Judge Breyer considered *Online DVD* yet pointed out in *Transpacific* that "[p]laintiffs cite no authority *requiring* the Court to use the gross." *Id.* (emphasis as in original). Judge Breyer is not alone in this preference for net-based calculations. The Northern District of California has approved net-based calculations for decades not only in consumer class actions, but also in securities cases and in employment class actions. *In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467, 471 (N.D.Cal. Aug. 25, 1994); *Miles v. AlliedBarton Security Svcs., LLC*, No. 12-5761 JD, 2014 WL 6065602 at *5 (N.D. Cal. Nov. 12, 2014).

1    In fact, while Judge Phyllis J. Hamilton's 2010 decision to award an attorney's fee based on

2    the gross recovery in *Online DVD* is much celebrated by Class Counsel, it appears to be an outlier

3    in the Northern District of California. The Northern District of California ruling in *Online DVD* is

4    not reported in the Federal Supplement or the Westlaw electronic database. While the Northern

5    District of California's holding in *Online DVD* was unusual, the Ninth Circuit's holding in *Online*

6    *DVD* is unremarkable. *Online DVD* simply reaffirmed the rule that district court judges are free to

7    use either the net or gross method so long as the result is reasonable. *Online DVD*, 779 F.3d at 953.

8    Nothing in *Online DVD* endorses or recommends, much less requires the use of gross instead of net

9    in any case. *Id.* In addition to the frequently-reported preference of the Northern District of

10   California for a net-based analysis, the Seventh Circuit requires a net-based analysis. *Redman v.*

11   *RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("Those [administrative] costs are part of the

12   settlement but not part of the value received from the settlement by the members of the class. The

13   costs therefore shed no light on the fairness of the division of the settlement pie between class

14   counsel and class members.")

15   As explained above, CAFA and *HP Inkjet Printer* force this Court to evaluate the attorneys

16   fee exclusively on a contingent-fee basis and only using the value of the $8 million in cash as the

17   starting place. Subtracting notice costs, Class Counsel's costs, and the proposed incentive awards

18   reduces the basis for the attorneys' fee to $7,161,050.78. Applying the Ninth Circuit's 25%

19   benchmark results in an attorneys' fee of $1,790,262.70.[5]

20   Even if this Court were inclined to use the gross method of calculating fees, if it were to also

21   accept Class Counsel's argument for a 33% award, the resulting fee (applied to a constructive fund

22   of $8 million as required by CAFA) would be $2,666,666.67. Using a net-based analysis, such a fee

23   would be 37.2% of the net class recovery. A 37.2% fee would be far above the 25% Ninth Circuit

24   benchmark. In *Bluetooth*, the Ninth Circuit reversed a gross-calculated attorney's fee, in part,

25

26

27   _____

[5] Despite the clear illegality of the use of a lodestar to award a fee in this case under CAFA and *HP Inkjet Printer*,
28   performing a lodestar cross check *arguendo* results in a lodestar multiplier of 1.33, which is well within the ranges the
Ninth Circuit approved of in *Vizcaino*. *Vizcaino*, 290 F.3d at 1051 n.6 (finding that 83% of all lodestars multipliers are
in the range of 1-4).

1    because the fee, when calculated on a net basis, resulted in an attorneys' fee award far greater than

2    the 25% benchmark. *Bluetooth*, 654 F.3d at 943.

3         This analysis shows that the Court must use particular caution in calculating the attorneys'

4    fee award in this case. The impact of CAFA, as interpreted by *HP Inkjet Printer*, means that a much

5    smaller fee should be awarded if the Proposed Settlement is approved. That reduction also, simply

6    as a matter of mathematics instead of legal precedent, requires this Court, especially if it applies a

7    gross fee calculation method, to use a percentage much closer to the benchmark than Class Counsel

8    requests or the award will almost certainly be overturned on *Bluetooth* grounds.

9         Mr. Lindberg proposes that the Court, if it chooses to approve the Proposed Settlement

10   despite its many flaws detailed in this Objection, only award an attorneys' fee of $1,790,262.70.

11   This reduction from Class Counsel's request would yield more than $1 per absent class member in

12   increased recovery, which would be more than 50% improvement for each absent class member.

13            C.   Even if the Court decides that the "vouchers" are not coupons under CAFA, the fee
                   should be less than even the amount suggested by StarKist.
14

15        The same analysis from section VIII.B of this Objection would still apply even if the Court

16   determines that the "vouchers" are not coupons under CAFA. In that event, the better analysis of the

17   benefit to the class would still be based on the net recovery to the class instead of the gross. Under a

18   net analysis, the $12 million overall amount reduces to a $11,161,050.78 net benefit to the absent

19   class members. As StarKist also proposes, awarding 25% of that net benefit would result in a total

20   attorneys' fee of $2,790,262.70. The reduction of this fee compared to Class Counsel's request

21   would result in approximately a 25% improvement to the recovery of each absent class member.

22   **IX.    The silence of the class should not be construed as endorsement of any terms of the
             Proposed Settlement, including Class Counsel's fee and incentive payment requests.**
23

24        In his motion for fees, Class Counsel telegraphs a common argument raised by plaintiffs'

25   lawyers and corporate defendants in settlements such as this: that a low number of absent class

26   members opting out or objecting to the settlement shows the absent class members support,

27   acquiesce, or endorse the Proposed Settlement and its terms. (Dkt 262 at 1). This argument has been

28   thoroughly criticized in the academy and this Court should pay it no heed.

No matter how outrageous the terms of the Proposed Settlement are, very few class members will object. In a case such as this, where the individual losses are small and hard to prove on a per-class-member basis in individual cases (which is precisely the reason for allowing class actions in the first place), the economic incentive to opt-out of the settlement to pursue a case independently is unlikely to exist for almost all absent class members in almost all class actions alleging consumer harm. Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 73 (2007). "[M]ost likely, silence is a rational response to any proposed settlement even if that settlement is inadequate." *Id.* The incentives for objectors are particularly bad because they must spend significant time and effort to attempt to improve the settlement for millions of their fellow class members, with a gain for themselves that, in this case, likely would only be a few dollars at best. *Id.*

Class Counsel will likely argue that these economic forces have resulted in the absent class members affirmatively deciding that the class action, and in particular their Proposed Settlement, is the ideal solution to underfilled cans of tuna. This is wrong because,

> There may be many reasons why class members in this case didn't register their concerns about the settlement: lack of interest, time, information, etc. Like the Third Circuit in the *General Motors* case, the Court is unwilling to automatically equate class silence with a showing of "overwhelming" support for the settlement. Therefore, the fact that statistically few people bothered to opt-out or file an objection ultimately counts little in the Court's overall fairness analysis.

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), *citing GM Pickup Truck*, 55 F.3d at 812.

"Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680-81 (7th Cir. 1987). "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support

1    from a small number of objectors to a sophisticated settlement." *GM Pickup Truck.*, 55 F.3d at 812,

2    *citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981). "[A] low

3    number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative

4    class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis*

5    *v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007).

6           No matter what reaction the class has to the Proposed Settlement, the Court remains the

7    fiduciary for all class members whether they signed up, opted out, objected via counsel, or

8    handwrote their objection on notebook paper. StarKist and Class Counsel must show that the

9    Proposed Settlement follows the law, is fundamentally fair, adequate, and reasonable. They would

10   bear that burden even if Mr. Lindberg did not file this Objection. On this Proposed Settlement, with

11   these terms, and especially in light of Class Counsel's Motion for Fees, they cannot meet their

12   burden. This Court should reject the Proposed Settlement, but even if it does not reject the Proposed

13   Settlement altogether, it should significantly reduce the attorneys' fees to provide at least a modest

14   improvement for the absent class members.

15   DATED: November 20, 2015

16                                    /s/ Sam A. Miorelli
                                      _____
17                                    Sam A. Miorelli, E.I., Esq.
                                      Florida Bar # 99886  (*pro hac vice application pending*)
18                                    Law Office of Sam Miorelli, P.A.
                                      764 Ellwood Avenue
19                                    Orlando, FL 32804
                                      Telephone: 352-458-4092
20                                    E-Mail: sam.miorelli@gmail.com

21                                    /s/ Aaron Dawson
                                      _____
22                                    Aaron Dawson
                                      State Bar No. 283990
23                                    1901 Harrison Street, Suite 1100
                                      Oakland, CA 94612
24                                    Telephone: (415) 534-5346
                                      Fax: (888) 301-5076
25                                    E-Mail: adawson@alectolaw.com

26

27

28

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1

**CERTIFICATE OF SERVICE**

2         The undersigned certifies that the foregoing Objection was electronically filed via the

3   CM/ECF system for the Northern District of California, thus effecting service on all attorneys

4   registered for electronic filing. Additionally, he caused to be served via U.S. Certified Mail a copy

5   of this Objection upon the following:

6   Clerk of the Court                    Scott A. Bursor
    United States District Court          Bursor & Fisher, P.A.
7   Northern District of California       888 Seventh Avenue
    450 Golden Gate Ave.                  New York, NY 10019
8   San Francisco, CA 94102

9
    Robert Hawk
10  Hogan Lovells LLP
    4085 Campbell Avenue, Suite 100
11  Menlo Park, CA 94025

12         Additionally, he caused to be mailed via U.S. Certified Mail two courtesy copies of the

13  foregoing Objection to:

14  Hon. Haywood S. Gilliam, Jr.
    United States District Court
15  450  Golden Gate Avenue
    Courtroom 15 – 18th Floor
16  San Francisco, CA 94102

17

18                                                    /s/ Sam A. Miorelli
                                                      Sam A. Miorelli, E.I., Esq.
19

20

21

22

23

24

25

26

27

28

OBJECTION TO CLASS ACTION SETTLEMENT OF ERIC M. LINDBERG

1  **Law Office of Sam Miorelli, P.A.**
Sam A. Miorelli (Florida Bar No. 99886, *Pro Hac Vice application pending*)
2  764 Ellwood Avenue
3  Orlando, FL 32804
Telephone: (352) 458-4092
4  E-Mail: sam.miorelli@gmail.com

5  AARON DAWSON (SBN 283990)
1901 Harrison St., Suite 1100
6  Oakland, CA 94612
Telephone: (415) 534-5346
7  Fax: (888) 301-5076
E-Mail: adawson@alectolaw.com
8

9  *Attorneys for Objector Lindberg*

10  UNITED STATES DISTRICT COURT

11  NORTHERN DISTRICT OF CALIFORNIA

12  SAN FRANCISCO DIVISON

13

14  PATRICK HENDRICKS, individually and on
behalf of all others similarly situated,
15
                              Plaintiff,
16
17       v.

18  STARKIST CO.,

19                              Defendant.

20

21  _____

                                    )  Case No.: 13-CV-00729-HSG
                                    )
                                    )  **DECLARATION OF**
                                    )  **ERIC MICHAEL LINDBERG**
                                    )
                                    )
                                    )  Date:          December 17, 2015
                                    )  Time:          2:00 p.m.
                                    )  Courtroom:  15, 18th Floor
                                    )  Judge:         Hon. Haywood S. Gilliam, Jr.
                                    )
                                    )
                                    )

22       I, Eric Michael Lindberg, declare as follows:

23       1.       I am a resident of 764 Ellwood Avenue, Orlando, FL 32804 and have filed an objection

24  through my counsel, the Law Office of Sam Miorelli, P.A. and associated local counsel. In my

25  objection I ask to be heard at the hearing on December 17, 2015 through my counsel as I will not

26  attend the hearing in person.

27       2.       During the period mentioned in the Class Notice I purchased a large number of 5 oz.

28  StarKist Solid White Tuna in Water cans of tuna as well as a few 5 oz. StarKist Solid White Tuna in

1  Oil cans of tuna.

2      3.      I estimate that I purchased approximately three cans per week for the entire period

3  from February 19, 2009 through October 31, 2014. During most of that time, I was a college student

4  in the greater Chicago, IL area. Tuna salad, occasionally eaten with Triscuit crackers, was my primary

5  lunch of choice.

6      4.      I know almost all of the tuna I purchased during the time period was 5 oz. StarKist

7  Solid White Tuna in Water because that is my favorite brand of canned tuna and the 5 oz. can is my

8  preferred serving size as I was mostly making tuna salad for my own consumption. I know I

9  accidentally purchased and ate a few cans of 5 oz. StarKist Solid White Tuna in Oil because I didn't

10 like it and remembered not to buy it again in the future.

11     5.      I learned about this Class Action Settlement from media reports and informed my

12 lawyer, Mr. Miorelli, of my desire to object. I believe I am the first person to tell Mr. Miorelli about

13 the case and he did not know anything about it when I first approached him.

14     6.      I filed a claim on November 19, 2015 on the website http://www.tunalawsuit.com.

15     7.      I chose the $25 cash payment option when I filed my claim.

16     8.      I believed I would receive $25 when I filed my claim. Mr. Miorelli notified me after I

17 told him this that I would actually receive $2.11 or less. This is very surprising to me and I don't think

18 that is explained anywhere on the notice I saw online or in the online claim form.

19         I declare under penalty of perjury under the laws of the United States, the State of California,

20 and the State of Florida that the foregoing is true and correct. Executed on November 20, 2015 at

21 Orlando, Orange County, Florida.

22

23                                             Eric Michael Lindberg

24

25

26

27

28

- 2 -

DECLARATION OF ERIC MICHAEL LINDBERG

# EXHIBIT 2

1
2
3
4

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| 5  MOISES ZEPEDA, MICHAEL SPEAR,<br>6  RONYA OSMAN, BRIAN PATTEE,<br>CASEY CHING, DENAE ZAMORA,<br>MICHAEL LAVANGA, and GARY<br>7  MILLER, on behalf of themselves and all others<br>similarly situated,<br>8 <br>9              Plaintiffs,<br>10 <br>       v.<br>11  PAYPAL, INC., a Delaware Corporation,<br>Defendant.<br>12 | Case No:  C 10-2500 SBA<br><br>**ORDER STRIKING OBJECTION<br>FILED BY SAM A. MIORELLI**<br><br>Related to:<br>No. C 10-1668 SBA<br><br>Docket 318 |

13      Sam A. Miorelli, an attorney acting pro se, has filed a nineteen page objection to the

14  proposed class action settlement.  Dkt. 318.  The Court's Standing Order, which counsel

15  should have reviewed before submitting his filing, clearly state that briefs (other than those

16  relating to summary judgment motions) are limited to fifteen pages.  The objection also is

17  untimely.  See Dkt. 290.  Papers filed in violation of this Court's rules and orders need not

18  be considered and may be stricken.  Tri-Valley CARES v. U.S. Dept. of Energy, 671 F.3d

19  1113, 1131 (9th Cir. 2012) ("Denial of a motion as the result of a failure to comply with

20  local rules is well within a district court's discretion."); Ready Transp., Inc. v. AAR Mfg.,

21  Inc., 627 F.3d 402, 404 (9th Cir. 2010) (recognizing that the district court has "the power to

22  strike items from the docket as a sanction for litigation conduct").  Accordingly,

23      IT IS HEREBY ORDERED THAT the Objection to Class Action Settlement of Sam

24  A. Miorelli  (Dkt. 318) shall be STRICKEN from the record.

25      IT IS SO ORDERED.

26  Dated: May 13, 2016

*Saundra B Armstrong*

27  SAUNDRA BROWN ARMSTRONG
Senior United States District Judge

28

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

| | | |
|---|---|---|
| ANAMARIA CHIMENO-BUZZI, and LAKEDRICK REED, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 14-cv-23120-MGC |
| v. | ) ) | Hon. Marcia G. Cooke, Presiding |
| HOLLISTER CO., and ABERCROMBIE & FITCH CO., | ) ) ) | Hon. Magistrate Edwin G. Torres |
| Defendants. | ) ) ) | |

## JOINT STIPULATION OF WITHDRAWAL
## OF OBJECTION OF PATRICK S. SWEENEY

Plaintiffs and Objector Patrick S. Sweeney ("Sweeney"), by and through undersigned counsel, hereby provide notice to the Court that the parties hereby stipulate to the withdrawal of Sweeney's Objection (D.E. 136) to the proposed settlement, which is set for a final approval hearing on March 30, 2016. Having thoroughly reviewed the Plaintiffs' response in opposition to his Objection (D.E. 138) and after meeting and conferring with Plaintiffs' counsel, Sweeney now believes the Settlement is in the best interest of the class, should be finally approved, and therefore agrees to the withdrawal of his Objection. This stipulation is intended to effectuate such withdrawal, and will in no way effect the Settlement or the relief to the Settlement Class.

Dated:  March 22, 2016

Respectfully submitted,

By: /s/ Patrick S. Sweeney (with express permission)
Patrick S. Sweeney
2590 Richardson Street
Madison, WI 53711
Telephone: (310) 339-0548

*Objector appearing pro se*

By: /s/ David P. Milian
David P. Milian
*dmilian@careyrodriguez.com*
Frank S. Hedin
*fhedin@careyrodriguez.com*
**CAREY RODRIGUEZ
MILIAN GONYA, LLP**
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Telephone: (305) 372-7474

Facsimile: (305) 372-7475

Robert Ahdoot*
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
1016 Palm Avenue
West Hollywood, California 90069
Tel: 310.474.9111
Fax: 310.474.8585

Joseph J. Siprut*
*jsiprut@siprut.com*
Ismael T. Salam
*isalam@siprut.com*
**Siprut PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.241.1260

*Proposed Settlement Class*

Scott D. Owens
*scott@scottdowens.com*
Patrick C. Crotty
*patrick@scottdowens.com*
**SCOTT D. OWENS, P.A.**
3800 S. Ocean Drive, Ste. 235
Hollywood, FL 33019
Tel: 954.589.0588
Fax: 954.337.0666
*Liaison Counsel*

*\*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF, and on all counsel or parties of record on the Service List below by electronic mail and by Fedex mail.

*/s/ David P. Milian*

## SERVICE LIST

**Patrick S. Sweeney**
2590 Richardson Street
Madison, WI 53711
310-339-0548
*Pro Se*

# EXHIBIT 4

1
2
3
4
5

Douglas J. Campion (SBN 75381)
THE LAW OFFICES OF DOUGLAS J. CAMPION, APC
17150 Via Del Campo,  Suite 100
San Diego, CA 92127
Telephone: (619) 299-2091
Email:  doug@djcampion.com

6
7

*Attorneys for Plaintiffs and the Settlement Class*

8
9

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| **IN RE: MIDLAND CREDIT MANAGEMENT, INC., TELEPHONE CONSUMER PROTECTION ACT LITIGATION** | Case No. 11-md-2286-MMA (MDD) Member cases: 10-cv-02261 10-cv-02600 10-cv-02368 10-cv-02370 **CLASS ACTION NOTICE OF WITHDRAWAL OF OBJECTION BY PATRICK SWEENEY (ECF No. 344)** |

11
12
13
14
15
16
17
18
19

To All Parties, their Counsel and the Court:

20

The objection filed by Patrick Sweeny (ECF No. 344) is hereby withdrawn.

21

Patrick Sweeney has requested that Douglas J. Campion, Plaintiffs' counsel, to file

22

this document on Mr. Sweeney's behalf and has given Douglas J. Campion the

23

authority to file this Notice of Withdrawal of Objection.

24

Dated:  August 16, 2016          */s/ Douglas J. Campion*

25
26

THE  LAW  OFFICES  OF  DOUGLAS  J.
CAMPION,APC

27
28

NOTICE OF WITHDRAWAL OF OBJETION
BY SWEENEY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>Certificate of Service</u>

I, Douglas J. Campion, hereby certify that on August 16, 2016 a copy of the following document was served on all counsel of record who are registered with the Court's electronic case filing (ECF) system by operation of the ECF system:

**NOTICE OF WITHDRAWAL OF OBJECTION BY PATRICK SWEENEY (ECF No. 344)**

<u>/s/ Douglas J. Campion</u>
Douglas J. Campion

NOTICE OF WITHDRAWAL OF OBJETION
BY SWEENEY



# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF
## FLORIDA FORT LAUDERDALE
## DIVISION

### CASE NO. 0:14-cv-61978-JIC (*Legg*) CASE NO. 0:15-cv-61375-JIC (*Rosen*)

CHRISTOPHER W. LEGG,
individually and on behalf of all others
similarly situated,

        Plaintiff,

v.

SPIRIT AIRLINES, INC., a Delaware
corporation,

        Defendant.

---

JOSEPH ROSEN, individually and on behalf
of all others similarly situated,

        Plaintiff,

v.

SPIRIT AIRLINES, INC., a Delaware
corporation,

        Defendant.

## WITHDRAWL OF OBJECTIONS OF KERRY ANN SWEENEY

NOW COMES, Objector KERRY ANN SWEENEY, hereby files her Withdrawal of Objection in this case.

Absent class member, Kerry Ann Sweeney, by and through herself and her counsel of record, Patrick Sweeney, hereby WITHDRAW her objection in the above matter.  Ms. Sweeney hereby stipulates that she shall forgo any appeals or requests for an award of attorney's fees. No compensation or consideration was offered or shall be paid for withdrawal of the objection.

Respectfully submitted, Dated: July 6, 2016

_____

Patrick Sweeney
Attorney for Kerry Ann Sweeney

I hereby certify that on March 18, 2016, I caused to be filed, by filing this Withdrawal of Objection electronically with Clerk of the Court for the United States District Court for the Southern District of Florida. The filing which in turn will be electronically forwarded to all counsel of record.

_____

Patrick S. Sweeney
2590 Richardson Street
Madison, WI 53711
(310)-339-0548
patrickshanesweeney@gmail.com



# EXHIBIT 6

http://host.madison.com/wsj/news/local/crime-and-courts/feds-indict-middleton-lawyer-alleging-fraud-in-loan-scheme/article_ef9c916c-fe4b-50eb-945b-b53dbe4a776f.html

Feds indict Middleton lawyer, alleging fraud in loan scheme

ED TRELEVEN etreleven@madison.com    Dec 14, 2016

A Middleton lawyer who was a partner in a business venture used the name and forged the signature of another man in order to defraud the partnership of more than $420,000, according to an indictment issued Wednesday by a federal grand jury.

The indictment against Patrick S. Sweeney, 61, charges him with wire fraud, identity theft and making a false declaration in a bankruptcy matter.

According to the indictment, Sweeney was the managing member of three limited liability companies — Fairview Ridge, Fairview Ridge II and Fairview Ridge III — and held control of the companies' bank accounts.

In 2007, the indictment states, Sweeney proposed to other members that the companies loan more than $105,000 to a friend of Sweeney at an interest rate of 13 percent. They agreed. According to the indictment, Sweeney then began drawing checks from the companies' bank accounts and used the money himself.

Between March 2007 and September 2009, according to the indictment, Sweeney drew more than $420,000 from the accounts, most of which were made payable to himself or to a corporate entity he controlled.

He told other members of the companies that the checks were loans to the friend, and on many of the checks, noted in the memo line that the checks were for loans to the friend.

By 2011, the indictment states, the three companies had received no money to repay the loans, so one of the companies' members asked Sweeney for the original promissory note between the companies and Sweeney's friend. In response, Sweeney sent the member a promissory note dated June 21, 2007, with the signature of Sweeney's friend forged on it.

The indictment also accused Sweeney of making a false declaration on a bankruptcy petition that Sweeney filed in 2013. In a list of creditors that Sweeney filed, the indictment states, he listed money he owed to the Fairview companies as "loans to debtor" in order to have the debt discharged in bankruptcy.

## Like this story? Get local news sent to your inbox



If convicted, Sweeney faces up to 20 years in prison on the wire fraud charge, five years for the false bankruptcy declaration charge and up to two years for identity theft.

Sweeney could not be immediately reached for comment.

The matter is also part of a five-count complaint filed against Sweeney last year by the state Office of Lawyer Regulation. All but one of the counts relates to Sweeney's alleged conduct in the Fairview matter and the related bankruptcy case, while one other accused Sweeney of practicing law in 2013 while his license was temporarily suspended for failure to pay State Bar of Wisconsin dues.

Sweeney was also sued in February by UW-Madison Athletic Director Barry Alvarez, who accused Sweeney and other lawyers of legal malpractice, negligence, fraud and breach of contract over $1 million in losses that Alvarez, his wife Cindy, and their son, Chad, sustained after investing in what was later revealed to be a $930 million Ponzi scheme run by a University of Miami athletic booster.

The lawsuit alleges that Sweeney and the other lawyers failed to represent Alvarez competently when the company in which Alvarez had invested went into bankruptcy, keeping the Alvarezes from getting their investments back. That case is scheduled for trial in December 2017.

Ed Treleven | Wisconsin State Journal

Ed Treleven is the courts reporter for the Wisconsin State Journal.

## Latest video news




Why The Trump Organization Being $315M In Debt Is A Big Deal


Here's How Planned Parenthood Gets Funding From The Government


GOP Starts To Split On Obamacare: Repeal & Delay Vs. Repeal & Replace


Weed Activists Are Giving Out 4,200 Joints For Trump's Inauguration

## Currents

Ranking the 2017 Golden Globe nominees by fame

Ranking the 2017 Golden Globe nominees by fame


Sponsored Don't hang your own drywall

Who are the largest employers in the US?

QUIZ: What time period do you belong in?

Chicago gets TV spotlight with new comedy, drama

5 Ways Vertex Pharmaceuticals Plans to Grow in 2017 and Beyond

Why Apple Inc. Should Update the MacBook Pro Lineup in the Spring

My 3 Biggest Stock Holdings in 2017

Will Amazon's Airborne Dreams Become Reality?

How Shopify Could Become Profitable by the End of 2017

Washington Monument lights back on after being on the blink

Why Conn's Inc. Stock Rose 12% in December

# EXHIBIT 7

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

FEB 2 7 2015

Sherri R. Carter, Executive Officer/Clerk
By: Roxanne Arreiga, Deputy

# SUPERIOR COURT OF CALIFORNIA

# COUNTY OF LOS ANGELES

| | |
|---|---|
| CURT SCHLESINGER and PETER LO RE, on behalf of themselves and the Class,<br><br>Plaintiffs,<br><br>v.<br><br>TICKETMASTER, a Delaware Corporation,<br><br>Defendant. | LASC Case No: BC304565<br><br>COURT'S RULING AND ORDER RE:<br><br>1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT;<br><br>2) PLAINTIFFS' MOTION FOR FEES, COSTS, AND INCENTIVE PAYMENTS;<br><br>3) OBJECTORS' MOTIONS FOR ATTORNEYS' FEES<br><br>Hearing Date: January 13, 2015 |

## I.

## BACKGROUND

In this litigation, Plaintiffs have alleged that Defendant Ticketmaster deceived and misled customers by representing: 1) that the Delivery Price charged by Ticketmaster was a pass-through of the amount that UPS (United Parcel Service) charged Ticketmaster for that delivery; and 2) that Ticketmaster's OPF (Order Processing Fee) was also deceptive and misleading, in

1

that it did not actually represent Ticketmaster's costs in processing orders, but rather was a profit generator which Ticketmaster required customers to pay. There are therefore two (2) fees being challenged – the "UPS fee" and the "OPF." The OPF charged customers $4.00 per transaction, while the UPS Fee ranged from $15 to $20 per transaction. According to Plaintiffs, all of the transactions included an OPF charge, while about 5% involved UPS delivery. Plaintiffs assert claims under the California Unfair Competition Law ("UCL") and False Advertising Law ("FAL"), seeking the full amount of the OPF price, and the difference between what Ticketmaster charged consumers for UPS delivery of their tickets and the amount Ticketmaster actually paid to UPS.

Initially, after the litigation had proceeded, the Court certified a class of persons who purchased tickets on the Ticketmaster.com website. The case settled, but the Court declined to give preliminary approval on June 3, 2011. The Court had expressed reservations that the settlement did not provide for a *cy pres* contribution. The parties re-worked the agreement to include a *cy pres* provision.

Then, on November 2, 2011, the Court granted preliminary approval of the settlement. The Court approved the notice procedure, and set the final hearing date for May 29, 2012. That date was continued to July 24, 2012. Following the notice procedure, which expired February 16, 2012, Plaintiffs filed their motion for final approval, their motion for attorneys' fees and costs, and their request for incentive payments.

The Court denied the motion for final approval in September of 2012. The Court issued a comprehensive ruling, and rejected the settlement on numerous grounds. The Court determined that the settlement was not in the interests of the class pursuant to the factors set forth under *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794. The Court found, *inter alia*, that the settlement was insufficient to compensate class members, and that the *cy pres* provision was insufficient; that the release was overly broad; that there was no breakdown on the number of

UPS and OPF transactions provided in the agreement; that the lodestar on the attorney's fees being requested could not be determined (given the inability of the Court, based on what was presented, to calculate the actual value of the settlement), and that the multiplier was excessive; that the costs requested were not properly documented; and that the incentive payments being requested were excessive.

Following the denial of final approval, the Plaintiffs filed a Fourth Amended Complaint. The parties continued to negotiate a further settlement. Following a mediation with Judge Carl West of JAMS, the parties reached a subsequent settlement of this matter. Plaintiffs moved for an order granting preliminary approval, approving the class notice, and setting a date for the fairness hearing. The Court granted preliminary approval of the revised settlement on April 30, 2014, and set a fairness hearing.

The Plaintiffs now move for final approval of the settlement, and seek an award of attorneys' fees, costs, administration costs, and incentive payments for each of the class representatives. Two sets of objectors – the Sullivan objectors and the Patton objectors – have separately moved for fees, costs, and incentive payments.

For the reasons discussed *infra,* the motion for final approval is granted. The motion for fees, costs, and incentive payments is granted. The motions of the Sullivan objectors and Patton objectors for fees, costs, and incentive payments are denied.

## II.

## EVENTS SINCE THE LATEST ORDER GRANTING PRELIMINARY APPROVAL

### Notice Process

Plaintiffs have submitted the Declaration of Jennifer Keough. Ms. Keough is Chief Operating Officer of The Garden City Group, or "GCG." Ms. Keough estimates that pursuant to §6.2(a) of the Settlement Agreement, GCG was responsible for providing email notice to class

members.[1] Ms. Keough states that Defendant had provided GCG with electronic lists of class members on November 18, 2011 and May 4, 2012.[2] Included in the data were the names, addresses, last known active email addresses, and consumer identification information for class members at those times.[3] Ms. Keough states that since the class lists were provided to GCG, GCG has maintained a combined prior settlement class list, and has updated the class list to the extent the parties or class members provide contact information updates to GCG.[4]

Ms. Keough says that on May 8, 2014, GCG received a supplemental electronic file containing a list of 16,639,202 records from Defendant Ticketmaster.[5] GCG was informed this class list was comprised of class members who placed ticket orders from Ticketmaster using the Ticketmaster Website during the period October 20, 2011 through February 27, 2013, paid money to Ticketmaster for an OPF, and were residents of the 50 United States at the time of the purchase.[6] The supplemental data file received from the Defendant was promptly loaded into the database created for this action and combined with the prior settlement class lists, maintained by GCG since November 2011.[7]

Ms. Keough represents that prior to sending the email notice to the records on the combined class list, GCG removed redundant and invalid email addresses.[8] Where a record for the same class member appeared in both the older 2011/12 data and newer 2014 data and the

---

[1] Keough Decl., ¶5.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Keough Decl., ¶6.

[6] Keough Decl., ¶6.

[7] Keough Decl., ¶6.

[8] Keough Decl., ¶7.

new email address differed from the old one, the new address was used to provide email notice. Additionally, GCG removed from the email notice distribution class members who submitted timely and valid exclusion requests before the new data was received and class members who requested removal from further mailings about the action.[9]

Keough states that prior to sending the email notices out, it notified various Internet Service Providers ("ISPs") that it communicates with when an ISP will receive large volumes of class action notice emails.[10] GCG also requested the assistance of the ISPs and cooperation with the distribution process.[11] Ms. Keough notes that GCG caused the email notice to be formatted for electronic distribution by email to class members.[12] The email notice directed recipients to the litigation website to obtain additional information about the settlement.[13]

Ms. Keough says that GCG commenced sending the email notice on May 16, 2014 and completed sending all email notices by June 30, 2014.[14] GCG sent 51,980,510 unique emails to 56,954,366 (the differential being attributed to the fact that 4,973,856 class members shared email addresses).[15] Ultimately, 36,536,024 emails were not returned as undeliverable (representing 40,643,785 class members), which resulted in an estimated reach of 71%.[16]

Ms. Keough notes that to supplement the email notice, GCG determined it was appropriate to provide publication notice through print media and internet notice through banner

---

[9] Keough Decl., ¶7.

[10] Keough Decl., ¶8.

[11] *Id.*

[12] Keough Decl., ¶9.

[13] *Id.*

[14] Keough Decl., ¶10.

[15] *Id.*

[16] *Id.*

advertisements.[17]  GCG examined data provided by national syndicated media research bureaus, GfK MediaMark Research and Intelligence, LLC ("GfK MRI") and comScore.[18]

Keough states that based on the media research tools, GCG is able to measure what percent of the target audience is estimated to be reached and how many times the target audience will have the opportunity to view the notice.[19]  GCG determined that "adults who have purchased tickets online to concerts, sporting events, theater or other events" is an appropriate target to consider when measuring reach to the class members as it closely matches the class definition.[20]

GCG caused the notice to be published in the June 23, 2014 edition of *People* Magazine, which has a readership of 41 million-plus with a total circulation of over 3.5 million.[21]  GCG also implemented an internet advertising campaign designed to generate millions of internet banner impressions over a period of four weeks, which commenced on May 19, 2014 and was completed on June 15, 2014.[22]  The banner ads ran on targeted websites such as Facebook, Xaxis, and Univision, and allowed internet users to self-identify themselves as potential class members and then click on a link that would take them directly to the litigation website.[23]  Ultimately, GCG calculated a total estimated overall reach of 90% with a frequency of 3.71 against the target.[24]

---

[17] Keough Decl., ¶11.

[18] *Id.*

[19] Keough Decl., ¶12.

[20] Keough Decl., ¶12.

[21] Keough Decl., ¶13.

[22] Keough Decl., ¶14.

[23] Keough Decl., ¶14.

[24] Keough Decl., ¶15.

Ms. Keough further states that GCG established and maintained an informational litigation website, located at www.ticketfeelitigation.com, providing class members with information regarding the Action and the proposed settlement.[25] The site became publicly available on May 16, 2014, and GCG will continue to maintain and update the site until the last day on which any codes may be used.[26]

There also has been a toll-free Interactive Voice Response (IVR) system made operational to accommodate calls re: the proposed settlement. The IVR will continue to be made available and be updated throughout the administration process.[27]

In California, the notice must have "a reasonable chance of reaching a *substantial* percentage of the class members." *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4[th] 224, 251 (emphasis added). Importantly, however, the plaintiff need not demonstrate that each member of the class has received notice. As long as the notice had a "reasonable chance" of reaching a substantial percentage of class members, it should be found effective. *Id.* In *Wershba,* the Court of Appeal determined that the notice in that case was effective. Notice was mailed or e-mailed directly to more than 2.4 million class members and also published in USA Today and MacWorld (two publications with a total circulation of over 2.5 million subscribers). *Wershba* at 251. Apple also posted notice on its Internet homepage for over 30 days. *Id.*

The Court determines that notice was effective. While the Court has some concerns about the number of returned emails (15,444,486), Ms. Keough represents that the number of email notices which were *not* returned numbered 36,536,024, which resulted in an estimated reach of 71%. Moreover, the publication notice went out in *People* magazine, and a website was established with respect to the settlement. The standard under *Wershba,* as discussed above, is

---

[25] Keough Decl., ¶16.

[26] Keough Decl., ¶16.

[27] Keough Decl., ¶17.

7

whether the notice had a "reasonable chance" of reaching a substantial percentage of class members. The Court finds that based on the Keough Declaration, the notice did meet this standard, and that notice was effective.

## III.

## REQUEST FOR JUDICIAL NOTICE

Plaintiffs request judicial notice of the March 15, 2013 Transcript of Proceedings on Eric Fuller's Motion to Intervene. The request is granted pursuant to Evidence Code §452(d), as this is a record of the Court in this litigation. Judicial notice, however, is limited to the existence of the transcript, and not for the truth of the matters stated within the transcript.

## IV.

## EVIDENTIARY OBJECTIONS

Plaintiffs have lodged evidentiary objections to the Fuller Declarations of September 10 and December 4, 2014. The Court's rulings follow.

**Plaintiffs' Evidentiary Objections to September 10, 2014 Fuller Declaration**

1. ¶4 at 4:11-13: **Overruled.**

2. ¶4 at 4:21-24: **Sustained.**

3. ¶4 at 4:24-25: **Sustained.**

4. ¶4 at 4:26-28: **Sustained.**

5. ¶4 at 5:2-3: **Sustained.**

6. ¶4 at 5:4-5: **Sustained.**

7. ¶4 at 5:5-7: **Sustained.**

8. ¶4 at 5:7-10: **Sustained.**

9. ¶4 at 5:10-13: **Sustained.**

10. ¶4 at 6:1-4: **Sustained.**

11. ¶4 at 6:4-6: **Overruled.**

12. ¶4 at 6:13-16: **Sustained.**

13. ¶4 at 6:17-18: **Sustained.**

14. ¶4 at 6:18-20: **Overruled.**

15. ¶4 at 6:20-22: **Sustained.**

16. ¶5 at 6:24-25: **Overruled.**

17. ¶5 at 6:25-27: **Overruled.**

18. ¶5 at 6:27: **Overruled.**

19. ¶5 at 6:27-7:2: **Overruled.**

20. ¶5 at 7:2-5: **Overruled.**

21. ¶6 at 7:6: **Overruled.**

22. ¶6 at 7:6-8: **Overruled.**

23. ¶8 at 7:12-14: **Overruled.**

24. ¶10 at 7:25-26: **Sustained.**

25. ¶10 at 7:27-28: **Overruled.**

26. ¶10 at 7:28-8:3: **Sustained.**

27. ¶10 at 8:3-5: **Sustained.**

28. ¶11 at 8:6-10: **Overruled.** The objection goes to the weight, rather than to the admissibility, of the evidence of the SEC form 10-Q.

29. ¶11 at 8:10-13: **Overruled.**

30. ¶11 at 8:13-14: **Sustained.**

31. ¶14 at 9:17-18: **Overruled.**

32. ¶14 at 9:18-21: **Overruled.**

33. ¶14 at 9:21-23: **Overruled.**

34. ¶14 at 9:23-24: **Overruled.**

35. ¶14 at 9:24-25: **Sustained.**

36. ¶18 at 10:5-9: **Sustained.**

37. ¶19 at 10:10: **Sustained.**

38. ¶19 at 10:10-13: **Sustained.**

39. ¶19 at 10:14-17: **Sustained.**

40. ¶20 at 10:20-21: **Sustained.**

41. ¶21 at 10:22-23: **Sustained.**

42. ¶21 at 10:23-26: **Sustained.**

43. ¶23 at 11:1-2: **Sustained.**

44. ¶24 at 11:3-4: **Sustained.**

45. ¶25 at 11:5-8: **Sustained.**

46. ¶26 at 11:9-10: **Overruled.**

47. ¶26 at 11:10-11: **Overruled.**

48. ¶27 at 11:12-14: **Sustained.**

49. ¶27 at 11:14-15: **Sustained.**

50. ¶27 at 11:15-17: **Sustained.**

51. ¶28 at 11:18-19: **Sustained.**

52. ¶30 at 11:22-23: **Sustained.**

53. ¶30 at 11:24-25 and 12:1-3: **Sustained.**

**Plaintiffs' Evidentiary Objections to December 4, 2014 Fuller Declaration**

1. ¶1 at 2:6-7: **Sustained.**

2. ¶2 at 2:8-9: **Sustained.**

3. ¶3 at 2:10-11: **Sustained.**

4. ¶4 at 2:12-13: **Sustained.**

5. ¶5 at 2:14-17: **Sustained**.

## V.

## *DUNK* FACTORS

Any party to a settlement agreement may submit a written notice of motion for preliminary approval of the settlement. The settlement agreement and proposed notice to class members must be filed with the motion, and the proposed order must be lodged with the motion. California Practice Guide, Civil Procedure Before Trial, ¶14:138.21 (The Rutter Group 2014).

It is the duty of the Court, before finally approving the settlement, to conduct an inquiry into the fairness of the proposed settlement. California Practice Guide, Civil Procedure Before Trial, ¶14:139.12 (The Rutter Group 2014). The court may design procedures to ascertain the fairness, including in-chamber conferences, examination of documents or witnesses, consideration of objections by class members, and any other appropriate evidence. CRC 3.769(g).

The trial court has broad discretion in determining whether the settlement is fair. In exercising that discretion, it normally considers the following factors: strength of the plaintiff's case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status through trial; amount offered in settlement; extent of discovery completed and stage of the proceedings; experience and views of counsel; presence of a governmental participant; and reaction of the class members to the proposed class settlement. *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801; *In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706, 723. This list is not exclusive and the Court is free to balance and weigh the factors depending on the circumstances of the case. *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 244-245.

11

The proponent bears the burden of proof to show the settlement is fair, adequate, and reasonable. *7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1165-1166; *Wershba, supra,* 91 Cal.App.4th at 245. There is a presumption that a proposed fairness is fair and reasonable when it is the result of arm's-length negotiations. 2 Herbert Newburg & Albert Conte, Newburg on Class Actions §11.41 at 11-88 (3d ed. 1992); *Manual for Complex Litigation* (Third) §30.42; *see also In re Microsoft I-V Cases, supra,* 135 Cal.App.4th at 723 (noting a presumption of fairness exists where the settlement is reached through arms-length bargaining; investigation and discovery are sufficient to allow counsel and the court to act intelligently; counsel is experienced in similar litigation; and the percentage of objectors is small). However, the presumption of fairness does *not* mean a court can rubber-stamp a settlement that displays these criteria. The court must still be provided with *sufficient information* to assess the settlement's fairness. California Practice Guide, Civil Procedure Before Trial, <u>The Rutter Group</u>, ¶14:139.15 (2014); *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 130; *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785, 803.

With these standards in mind, the Court examines the *Dunk/Wershba* factors in turn in assessing the fairness of the settlement.

### 1. Strength of the plaintiff's case

As noted *supra*, Plaintiffs allege that Defendant Ticketmaster deceived and misled customers by representing that the Delivery Price was a pass-through of the amount that UPS (United Parcel Service) charged Ticketmaster for that delivery and that Ticketmaster's OPF (Order Processing Fee) was also deceptive and misleading in that it did not actually represent Ticketmaster's costs in processing orders but rather was a profit generator which Ticketmaster required customers to pay. There are therefore two (2) fees being challenged – the "UPS fee"

and the "OPF." The OPF charged customers $4.00 per transaction, while the UPS Fee ranged from $15 to $20 per transaction.

From the Court's perspective, the case had some merit. Judging from the motion activity in the case, Ticketmaster unsuccessfully fought attempts to have this case removed to federal court, and also unsuccessfully challenged the pleadings numerous times. Plaintiffs were successful in certifying a nationwide class in the case. Thus, Plaintiffs enjoyed significant victories in the litigation, despite substantial opposition from Ticketmaster at every step.

Plaintiffs, for their part, believed they had a strong case for trial, but two of their legal theories were not certified for class treatment. Further, this Court's ruling on the motion for summary judgment called into question the viability of the misrepresentation claim (the only remaining theory) relating to the OPF class.

For these reasons, the Court finds this factor weighs in favor of final approval.

### 2. The risk, expense, complexity and likely duration of further litigation

This case would have been extended indefinitely if the parties did not reach a settlement (and, in fact, has been proceeding for over eleven years, having been filed October 21, 2003). Again, Ticketmaster litigated this case aggressively, and denied liability at every stage. There was a significant (and almost certain) risk that had the case not settled, the expense of litigating the case would have risen (and, indeed, the case was poised for trial).

The case is complex, and involves a nationwide class of over 50 million class members. There was a risk that Plaintiffs and the class could have recovered nothing had this litigation been prolonged, given Ticketmaster's denial of liability. There is also a risk that substantively, Plaintiffs could not have proven any of their claims or those of the class. As Plaintiffs note, even if they had won at trial, it is likely that Ticketmaster would have appealed any adverse verdict (thereby prolonging the case and creating even further uncertainty). This factor weighs in favor of final approval.

### 3. The risk of maintaining class action status through trial

There were risks of maintaining class action status through trial. As noted above, a nationwide class was ultimately certified (after previous unsuccessful challenges to the class by Ticketmaster). Importantly, at the time the case settled, there was yet another pending motion to decertify the nationwide class. Thus, it is possible that the class could have been decertified. This factor weighs in favor of final approval.

### 4. Amount offered in settlement

As part of the Court's analysis of this factor, the Court must take into consideration the admonition in *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 133. In *Kullar*, objectors to a class settlement argued the trial court erred in finding the terms of the settlement to be fair, reasonable, and adequate without any evidence of the amount to which class members would be entitled if they prevailed in the litigation, and without any basis to evaluate the reasonableness of the agreed recovery. The Court of Appeal agreed with the objectors that the trial court bore the ultimate responsibility to ensure the reasonableness of the settlement terms. Although many factors had to be considered in making that determination, and a trial court was not required to decide the ultimate merits of class members' claims before approving a proposed settlement, an informed evaluation could not be made without an understanding of the amount in controversy and the realistic range of outcomes of the litigation.

The *Kullar* noted that trial courts have a responsibility to independently evaluate the settlement, stating as follows:

> [T]he court must ... receive and consider enough information about the *nature and magnitude* of the claims being settled, as well as the impediments to recovery, to make an independent assessment of the reasonableness of the terms to which the parties have agreed. We do not suggest that the court should attempt to decide the merits of the case or to substitute its evaluation of the most appropriate settlement for that of the attorneys. However, as the court does when it approves a settlement as in good faith under Code of Civil Procedure section 877.6, the court must at least satisfy itself that the class settlement is within the "ballpark" of reasonableness. (See *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499–500 [213 Cal. Rptr. 256, 698 P.2d 159].)

While the court is not to try the case, it is "'called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and *the exercise of business judgment* in determining whether the proposed settlement is reasonable.'" (*City of Detroit v. Grinnell Corporation, supra,* 495 F.2d at p. 462, italics added.) This court cannot do if it is not provided with basic information about *the nature and magnitude* of the claims in question and the basis for concluding that the consideration being paid for the release of those claims represents a *reasonable compromise. Kullar, supra,* at 133.

The "amount offered in settlement" consideration was one of the major factors that defeated the prior settlement. Thus, the Court has given special scrutiny to this factor in the current iteration of the settlement.

In the current settlement, Plaintiffs have submitted the Declaration of Rebecca Kirk Fair for purposes of providing consultancy on the projected redemption rates for the discount codes and potential free tickets provided under the settlement.[28] Ms. Fair is the Managing Principal of Analysis Group, Inc. ("AG"), an economics, finance, and strategy consulting firm. She states that she was asked by class counsel to perform the following analysis:

a) Determine the likely value of the discount codes and free tickets that will be redeemed by class members;

b) Determine the minimum value of the discount codes and free tickets that will be redeemed by class members; and

c) Determine the expected attrition rate (based on death rates) of class members through 2020.[29]

Ms. Fair states that the result of the analysis requested by Lead Counsel is as follows:

a) the likely value of the discount codes and free tickets that will be redeemed by class members is $76 million.

b) The minimum value of the discount codes and free tickets that will be redeemed by class members is $42 million.[30]

---

[28] Fair Decl., ¶3.

[29] Fair Decl., ¶5.

[30] Fair Decl., ¶7.

Ms. Fair gives a comprehensive breakdown on how she arrived at these figures in her Declaration. She notes that research conducted between 2012 and 2014 indicates that redemption rates for digitally distributed coupons for non-food items vary between 4.8% and 11.5%, depending on the year and redemption mechanism which puts the potential redemptions in this case in a range of $76 to $159 million.[31]

Ms. Fair says that she calculated the expected yearly redemption values for the Ticketmaster discount codes using 4.8% annual redemption rates.[32] She bases the 4.8% figure on a publication entitled "2014 Mid-Year CPG Coupon Facts," from *NCH,* August 2014. Fair says the expected annual redeemed value of the discount coupons will be approximately $19 million in year one, $18 million in year two, $17 million in year three, and $17 million in year four, for a total of $71 million or 17.8% of the face value for all of the discount codes.[33] Additionally, $5 million in free tickets will be distributed in the first year.[34] Fair says that assuming all of these free tickets are redeemed, the total redemption is $76 million.[35]

Fair notes that in addition to the $5 million in free tickets in the first year, Ticketmaster will provide further free tickets in the following circumstances:

> At the end of each of the years 1 through 4, a calculation of any surplus or Shortfall shall be made by subtracting the aggregate redemptions of Discount Codes, UPS Codes and distribution of tickets from $10.5 million (year 1); $21 million (year 2), $31.5 million (year 3) and $42 million (year 4). A positive number is a "shortfall," and a negative number is a surplus. In years 2, 3, 4, and 5, Ticketmaster shall contribute tickets in the amount of any cumulative Shortfall, but its obligation shall not exceed $10.5 million in tickets in any year. Ticketmaster will further contribute $10.5 million per year in tickets to the ticket pool for distribution in years 6 and 7 if total distribution of tickets and redemption

---

[31] Fair Decl., ¶10.

[32] Fair Decl., ¶12.

[33] Fair Decl., ¶12.

[34] Fair Decl., ¶12.

[35] Fair Decl., ¶12.

of Discount Codes and UPS Discount Codes for order processing fee/UPS credits over the five-year period from Final Approval, does not reach the minimum of $42 million.[36]

Ms. Fair states that she has evaluated the necessary redemption pattern for the settlement to result in the minimum allotted total value of $2 million.[37] Fair presents calculations which show the redemption values and the minimum share of class members to be compensated with free tickets, assuming the extreme outcome of zero redemption of discount coupons.[38] Fair says that under these assumptions, the first year the $5 million in free tickets will be redeemed and distributed, and zero discount codes will be redeemed. However, Fair says that if the same $5 million redemption occurred in the form of discount codes, then the redemption rate would be 1.3%. This rate is about ¼ (26%) of what would be expected based on historic redemption of similar coupons, which makes this scenario "extremely conservative."[39]

Fair says that in the second year, under these assumptions, only the shortfall of $5.5 million in free tickets will be distributed and redeemed, resulting in equivalent of redemption rate of discount codes of 1.4%. In each of the years 3-5, $10.5 million in free tickets will be distributed and redeemed, corresponding to annual redemptive rates 2.7 to 2.9%.[40]

Fair estimates that given that class members can automatically redeem discount codes if they log into their accounts and are reminded of the opportunities.[41] If the discount code

---

[36] Fair Decl., ¶13.

[37] Fair Decl., ¶14.

[38] Fair Decl., ¶14.

[39] Fair Decl., ¶14.

[40] Fair Decl., ¶14.

[41] Fair Decl., ¶15.

redemption rates fall sufficiently, class members can get free tickets on a "first come, first served" basis.[42]  The total minimum value of the settlement, under this scenario, is $42 million.

Previously, the Court analyzed the settlement amount.  The relevant figure in these calculations is the net amount of OPF payments allowing for the $1.09 "offset" as to the entire class (i.e., $505,328,074) and the amount of UPS restitution at $11.64 per UPS transaction as to the entire class ($92,143,288).  These would appear to represent the "outliers" in terms of what the class could have hoped to achieve, had they been 100% successful in this litigation.

The settlement also calls for a *cy pres* component of $3 million, which will go to the University of California, Irvine ("UC Irvine") School of Law.  Plaintiffs have submitted the Declaration of Erwin Chemerinsky, the Dean of the UC Irvine School of Law.  Chemerinsky says that the proposed *cy pres* fund of $3 million will allow the law School to hire an additional clinical professor to establish the existing Consumer Protection Clinic as a permanent clinic within the Law School.[43]  The funding will also allow the Law School to create a clinical fellowship position within the Consumer Protection Clinic to train other lawyers to become professors for consumer law clinics at other legal institutions.[44]  It is Chemerinsky's opinion that establishing a permanent consumer protection clinic will result in the training of hundreds of law students in the practice of consumer law.[45]

Chemerinsky says that approximately one million dollars of the $3 million fund will be used for the operational costs of the Consumer Protection Clinic for the first three years.[46]  This portion of the award will be used to hire one clinical professor and one clinical fellow for three

---

[42] Fair Decl., ¶13.

[43] Chemerinsky Decl., ¶3.

[44] *Id.*

[45] *Id.*

[46] Chemerinsky Decl., ¶4.

18

years (both of whom will be practicing lawyers).[47] The professor and clinical fellow will work with 12 to 16 law students per semester, supervising the students' legal work on behalf of clients with consumer law problems.[48] The award will also be used to pay for the annual costs of operating this clinic.[49] The remainder will be used to establish an endowment for the permanent continuation of the Consumer Protection Clinic, with five percent of those remaining funds being used specifically to develop a larger endowment for this clinic.[50]

Chemerinsky states that the Consumer Protection Clinic will engage in at least three kinds of legal work on behalf of California and national consumers: 1) the clinic will provide direct representation of clients' claims for violations of California's Unfair Competition Law ("UCL") and other unfair and/or deceptive business practices; 2) the clinic will advocate on behalf of consumers concerning issues of national consumer policy; and 3) the clinic will create new educational tools to inform people throughout the country about consumer issues.[51]

In the Court's view, the statements in Mr. Chemerinsky's Declaration demonstrate that the $3 million *cy pres* fund satisfies the requirements under CCP §384.[52] In particular, the *cy*

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] Chemerinsky Decl., ¶5.

[52] CCP §384, which governs *cy pres* distributions, provides in pertinent part as follows:

> (a) It is the intent of the Legislature in enacting this section to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either *to further the purposes of the underlying causes of action*, or *to promote justice for all Californians*. The Legislature finds that the use of funds collected by the State Bar pursuant to this section for these purposes is in the public interest, is a proper use of the funds, and is consistent with essential public and governmental purposes.
>
> (b) Except as provided in subdivision (c), prior to the entry of any judgment in a class action established pursuant to Section 382, the court shall determine the total amount that will be payable to all class members, if all class members are paid the amount to which they are entitled pursuant to the judgment. The court shall also set a date when the parties shall report to the court

*pres* donation to UC Irvine's School of Law is designed to further the purposes of the underlying consumer claims in this case. While not benefiting the class directly, the class will benefit from the establishment of the Consumer Protection Clinic and other relief referenced in the Chemerinsky Declaration.

As it stands, the settlement is for a minimum of $42 million in codes, plus the $3 million in the *cy pres* donation to UC Irvine's Law School, for a total minimum of $45 million. This amount does not account for costs, fees, and incentive payments. Nor does this amount account for the non-economic recovery called for in the settlement (the non-economic relief basically is in the form of changes to Ticketmaster's website regarding the OPF fees).

The Court finds the settlement amount falls within the *Kullar* "ballpark." Importantly, coupon settlements are not inherently suspect or improper. *See Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 54; *Nordstrom Comm'n. Cases* (2010) 186 Cal.App.4th 576, 590. "Nonetheless, the practice of giving coupons instead of cash to class members (especially while the attorneys are receiving money for their fees) has attracted criticism. The court must determine if the coupons represent real value for the class." California Practice Guide, Civil Procedure Before Trial, ¶14:139.16 (The Rutter Group 2014).

While the Court acknowledges that the settlement figure, in the larger scheme of things, is below what Plaintiffs had hoped to achieve, the settlement represents a compromise of heavily disputed claims over an 11 year period. The $3 million in a tangible *cy pres* donation represents a marked change over the prior settlement (and satisfies CCP §384's strictures), as does the

the total amount that was actually paid to the class members. After the report is received, the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest on that sum at the legal rate of interest from the date of entry of the initial judgment, to nonprofit organizations or foundations to support projects *that will benefit the class or similarly situated persons*, or that promote the law *consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs*, or to nonprofit organizations providing civil legal services to the indigent. The court shall ensure that the distribution of any unpaid residual derived from multistate or national cases brought under California law shall provide substantial or commensurate benefit to California consumers. (Emphasis added.)

potential for free tickets to the class members. The Declaration of Ms. Fair also carries significant weight as to the valuation of the settlement, and the discount codes represent value for the class.

Another of the Court's concerns in connection with the earlier settlement was that there was essentially no other relief being offered, outside of the discount codes. The parties previously had included tickets to be donated to charity as a component of the prior settlement, but the Court found there was no way to value the tickets. In terms of valuing the tickets, counsel had previously discussed this in connection with the prior final motion for final approval. The instant settlement is markedly different, with the addition of the free ticket component and the *cy pres* component.

In sum, the Court finds the instant settlement falls within the "ballpark" of *Kullar* reasonableness. As such, the settlement is a reasonable compromise of the claims in this litigation. The Court determines this factor therefore weighs in favor of final approval.

### 5. Extent of discovery completed and stage of the proceedings

Clearly, a significant amount of motion and discovery activity occurred in this case (that is an understatement). The major events in this case were set forth at ¶4 of the Declaration of Robert Stein in Support of the Motion for Preliminary Approval. Mr. Stein has also provides the relevant procedural history at ¶4 of his Declaration in Support of Final Approval.[53]

The major events in the case were as follows. The case was filed on October 21, 2003. Ticketmaster filed a motion to transfer on December 5, 2003, a motion to bifurcate discovery and trial on April 28, 2004, and a motion for summary judgment on July 20, 2004. Ticketmaster removed the case to federal court on September 1, 2005, but the federal court granted the Plaintiffs' motion to remand (an order which was upheld by the 9th Circuit on April 4, 2006).

---

[53] See Stein Decl. in Support of Final Approval, ¶4.

On August 14, 2006, Plaintiffs filed their initial motion for class certification. The Court tentatively certified a nationwide class, but then denied that motion without prejudice on December 19, 2007, to be reconsidered when the Supreme Court was to rule in *In re: Tobacco II*.

Ticketmaster unsuccessfully sought to reclassify the case as complex on August 24, 2006, and unsuccessfully moved yet again for judgment on the pleadings on September 25, 2006. Following the Plaintiffs' filing of the TAC, the Court overruled Ticketmaster's demurrer and motion to strike portions of the TAC on July 2, 2009.

On August 31, 2009, Plaintiffs refilled their class certification motion. The Court granted the motion on February 5, 2010 as to the deceptive practices claims, and denied it with respect to the unlawful/unfair practices claims. Ticketmaster's writ petition of the order granting class certification was denied. Plaintiff also unsuccessfully filed a motion for reconsideration of the Court's denial of nationwide certification.

Plaintiffs filed a motion in limine to preclude Ticketmaster's presentation of the offset defense or, in the alternative, to compel restitution discovery. On June 24, 2010, the motions were granted in part and denied in part, resulting in substantial restitution discovery.

Then, on June 4, 2010, Plaintiffs filed a writ petition asking the Court of Appeal to reverse the decision limiting the Class to California purchasers. The petition was granted with the Court of Appeal ordering recertification as a nationwide class on August 31, 2010. Ticketmaster unsuccessfully filed another motion to bifurcate the trial and discovery into liability and damages phases on March 16, 2010.

On June 11, 2010, Ticketmaster filed its second motion for summary judgment (which was amended on September 28, 2010).

On September 28, 2010, Plaintiffs filed a motion for summary adjudication on Ticketmaster's affirmative defenses. Ticketmaster withdrew many of the defenses, and filed an opposition on the remaining defenses. That motion was set for hearing on December 21, 2010.

Ticketmaster filed a motion to decertify, which was set for hearing on December 21, 2010. Both parties filed motions in limine, followed by opposition briefs, directed primarily at the other party's expert witnesses, which were to be ruled on at the January 10, 2011 pretrial conference.

On December 20, 2010, the parties informed the Court they reached a settlement agreement after two days of mediations. The pending motion for summary judgment/adjudication and motion to decertify were taken off-calendar.

On June 3, 2011, this Court denied preliminary approval. The Court found the relief provided to the class members would be reasonable as to those class members who used it, but that only if a small percentage of class members took advantage of the settlement then, absent a cy pres requirement, the overall settlement would not be adequate.

On September 2, 2011, the Court heard Defendant's motion for summary judgment/summary adjudication and Plaintiffs' motion for summary adjudication on Defendant's affirmative defenses. The Court denied the motions as to many of the issues asserted by both parties, but granted the motion for summary adjudication as to other issues.

On September 26 and 27, 2011, the parties mediated the case, and reached a settlement. The Court granted preliminary approval, but denied the motion for final approval on September 26, 2012.

Between November 2012 and May 2013, the parties again mediated the case, with Judge Leo Wagner and Judge Carl West, and reached a settlement. A fourth amended complaint was filed on May 30, 2013.[54]

The discovery efforts are chronicled at ¶¶14-17 of the Stein Declaration in Support of Final Approval. Mr. Stein states that the discovery taken was exhaustive. Plaintiffs were personally required to respond to the following:

---

[54] See Stein Decl. in Support of Final Approval, ¶4.

23

a. Schlesinger was deposed 3 times;

b. Mr. Lo Re was deposed twice;

c. The two Plaintiffs each answered four (4) sets of special interrogatories totaling 226 interrogatories and 3 sets of form interrogatories;

d. The two Plaintiffs each answered four (4) sets of document requests totaling 116 requests for production of documents;

e. The two Plaintiffs each answered four (4) sets of requests for admission totaling 157 requests.[55]

On "merits" discovery, Plaintiffs propounded 14 sets of special interrogatories and 5 sets of form interrogatories; 8 sets of document requests; and Plaintiffs were required to file three motions to compel discovery.[56] Further, Plaintiffs took and defended 20 depositions, including those of Ticketmaster's current and former CEOs, its former President, several officers and key employees, and experts.[57] Plaintiffs retained four (4) marketing experts, three of whom conducted independent nationwide consumer surveys regarding Ticketmaster's OPF and/or UPS charges, and one of whom provided independent analysis rebutting the marketing experts retained by Ticketmaster.[58]

Plaintiffs' lead counsel paid over $800,000 in restitution, liability, and trial experts.[59] Further, Plaintiffs note that both they and Defendant retained accounting experts who engaged in extensive analysis to determine the proper measure of any restitution. Plaintiffs' experts analyzed gigabytes of data, involving more than 150 million transactions for more than 50 million individual email addresses, as well as Ticketmaster's financial statements and records in

---

[55] Stein Decl., ¶14.

[56] Stein Decl., ¶15.

[57] Stein Decl., ¶16.

[58] Stein Decl., ¶17.

[59] Stein Decl., ¶18.

order to determine both the allocation of any restitution among the class members, as well as the amounts that Ticketmaster paid UPS for delivery of the tickets and what amounts, if any, were actually attributable to order processing costs.[60]

Further, by virtue of the motion activity, discovery, the mediations, and the orders by the Court in this litigation, it is abundantly clear that the settlement was the result of arms-length negotiations. Judging from the statements in the Stein Declaration, there was no further discovery to take in this case.

In sum, significant activity occurred in this case, and this factor weighs in favor of final approval.

## 6. Experience and views of counsel

As Mr. Stein notes, this Court has previously determined that counsel's experience and ability satisfied this factor, and that this was never contested.[61] Counsel believe the instant settlement is fair and reasonable, and in the interests of the class. This factor weighs in favor of final approval.

## 7. Presence of a governmental participant

There is no governmental participant in this litigation, and this factor is neutral.

## 8. Reaction of the class members to the proposed class settlement

Ms. Keough reports that GCG had, as of October 31, 2014, received 477 timely and potentially valid opt-out requests, and one (1) untimely opt-out request. Previously, there were 6,135 timely opt-out requests related to the prior settlement.[62]

There have been a number of objections lodged to the proposed settlement. At the fairness hearing, the Court permitted all objectors to speak. The objectors had also submitted

---

[60] Stein Decl., ¶20.

[61] Stein Decl., ¶33.

[62] Keough Decl., ¶18.

written objections to the settlement and/or to the motion for attorneys' fees, costs, and incentive payments.  The Court, having fully considered all written and oral objections at the hearing, rules as follows:

**List of Objectors**

| Name of Objector | Residence of Objector | Date Objection Filed | Nature of Objection(s) | Represented by Counsel? | Recommended Ruling on Objection |
|---|---|---|---|---|---|
| 1. Rick Asherson | Alabama | June 27, 2014 | Objects to the form of the relief; does not want to do business with Ticketmaster again; wants direct financial compensation | No | **Overruled.** |
| 2. Michael Booker | Missouri | September 16, 2014 | 1. Class members must make future ticket purchases to obtain anything from the settlement<br><br>2. "All money" in the settlement is going to class counsel, class representatives, and a charity (UC Irvine Law School)<br><br>3. Attorneys' fees request is excessive (including an excessive multiplier of 1.9; requests court appoint a "class guardian" on the attorneys' fee issue)<br><br>4. Lack of adequate information for class members to determine | Yes (Lawrence Schonbrunn) | All objections **overruled** |

| | | | | fairness, adequacy, and reasonableness (including a lack of description of the fees charged by Defendant Ticketmaster)

5. Settlement benefits are illusory; no protection against the Defendant raising future ticket prices, future ticket service orders, or future delivery prices

6. Settlement provides no explanation of the significance of the statement in the release that states "the Released Claims shall not extend to any claims relating to the Face Value of Tickets"

7. Existence of "red flags of self dealing" (i.e., structural collusion in the settlement)

8. Class notice is defective (specifically, the language stating "You may hire an attorney to represent you..." and other representations about attorneys' fees and | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | additional alleged defects in the notice) | | |
| | | | 9. No accounting to the class provided, and merely "lodging" or "providing" such a document with the Court is insufficient | | |
| | | | 10. Objection to the $3 million to UC Irvine School of Law (including the clinic's past activity, the clients it served, what lawsuits it filed, the identity of the faculty, the connections of the party to the school, and what other consumer law programs were already considered) | | |
| | | | 11. Language in the notice providing that any counsel retained are to identify all objections they have filed in class action settlements from January 1, 2010 to the present and identify the results of each objection; and requirement of making the class member available for deposition upon 1 days written notice | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | 12. Language in the notice stating that class counsel and individual Plaintiffs are not to issue any press releases publicizing the terms of the settlement, and that the sides shall not disparage each other | | |
| 3. Aisha Burgess and Jason Haug | Gainesville and Orlando, FL, respectively | September 15, 2014 | 1.Settlement is a "classic coupon" settlement, where the discounts are applied to only subsequent purchases<br><br>2. Non-economic benefits are not specific to class members<br><br>3. Absent class members do not have enough information in the published notice to make an informed choice re: whether to remain class members<br><br>4. Attorney fees are unreasonable and excessive<br><br>5. Attorney's fees consist of a separate fund that reverts to Defendant if all the fund is not paid to class counsel for fees and costs | Yes (Michael D. Luppi) | **Overruled** in full |
| 4. G. Kimberly | Phoenix, AZ | September 15, 2014 | 1. Settlement does not make | Yes (Sowders | **Overruled** in full. |

29

| | | | | | |
|---|---|---|---|---|---|
| Carey | | | class members whole, as it requires a claim to secure a code to get a minimal discount; settlement should pay class members directly<br><br>2. Settlement places an artificial cap on 17 transactions<br><br>3. Settlement uses a significant portion of the recovery to fund the start-up consumer law efforts of an unrelated third party when the known class members are only receiving minimal discount codes and are capped in their recovery<br><br>4. Attorneys' fees and incentive payments are disproportionatel y high in relation to discount code | Law, LLC) | |
| 5. Eric Fuller | Rancho Santa Fe, CA | September 29, 2014 | 1. Settlement places a limit of 17 discount codes (even though class members who paid more than 17 OPFs represent 13.5% of the transaction volume for which these fees were charged); the $38.25 proposed for each individual class | Yes (Christopher J. Conant and Michael J. Flynn) | **Overruled** in full |

| | | | | | |
|---|---|---|---|---|---|
| | | | member represents a "tiny fraction" of Mr. Fuller's damages | | |
| | | | 2. "Coupon Only" settlement unfairly allows Ticketmaster to keep all of its more than $587 million in ill-gotten funds without disgorging them to those directly economically harmed; coupons provided are less than half the value of the $5 off coupons Ticketmaster sends out to entice repeat business | | |
| | | | 3. Settlement does not limit what OPF Ticketmaster may charge for new orders when settlement coupons are redeemed | | |
| | | | 4. Settlement does not fairly address *cy pres* requirements under California law, as it does not set a mechanism to deliver the cash value of any unclaimed settlement pool into a proper *cy pres* fund; settlement limits additional cy pres contribution to $2 | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | million in the event the discount code redemption does not reach the anticipated $42 million; few codes will be redeemed given the short amount of time consumers have to purchase tickets for high-demand events; *cy pres* fund itself is objectionable | | |
| | | | 5. Class members are required to make additional purchases to enjoy benefits of settlement | | |
| | | | 6. Less than $15 million in value will go to the settlement class, which suffered a loss in excess of a half billion dollars | | |
| | | | 7. Requests a subclass of individuals and ticket brokers whose losses exceed the best $76.50 maximum value offered by the settlement; requests appointment as a class representative | | |
| 6. Thomas Groom | Swampscott, MA | September 12, 2014 | 1. Settlement limits class members' recovery to a | No | **Overruled** in full |

| 1 | | | | maximum of $38.35, and requires class members to return to Ticketmaster website multiple times to purchase multiple tickets to claim full value of settlement | | |
|---|---|---|---|---|---|---|
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | 2. UPS Codes are unfairly capped at 17, limiting recovery to $85 | | |
| 8 | | | | | | |
| 9 | | | | 3. Settlement unfairly requires class members to make future purchases | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | 4. Ticket Codes for two free tickets are only applicable to Live Nation general admission tickets to Live Nation owned or operated venues, subject to undefined availability and restrictions | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | 5. Unreasonable to set a settlement value on unknown availability of free tickets to yet-to-be determined concerts at unknown and undisclosed venues | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | 6. Class members likely to spend additional money on parking, food | | |
| 25 | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | and beverages at the "free concerts" | | |
| | | | 7. Ticketmaster should be forced to refund fees directly | | |
| | | | 8. $42 million settlement value is unsupported | | |
| | | | 9. Release is overbroad, unfair, and unreasonable | | |
| | | | 10. Notice program is deficient and does not satisfy due process | | |
| | | | 11. Claims process is confusing, ambiguous, and deficient | | |
| | | | 12. Attorneys' fees are excessive | | |
| | | | 13. Nothing in settlement precludes Ticketmaster from increasing its fees by value of the discount codes | | |
| 7. Susan M. Kalp | Nashville, TN | September 15, 2014 | 1. No meaningful provision for any lasting remedy provided in settlement for Ticketmaster's misconduct; actual benefits fall short of losses class members sustained | No (objector is attorney herself) | **Overruled** in full |

| | | | | | |
|---|---|---|---|---|---|
| | | | 2. No injunctive relief provided for | | |
| | | | 3. Objection period too short, and other procedural deficiencies | | |
| | | | 4. Settlement amount is too small; Ticketmaster is actually rewarded for its misconduct under the settlement | | |
| | | | 5. Direct payment should be made to class members in amount of $42 million | | |
| | | | 6. Payment to UC Irvine is outrageous, and bears no relation to losses suffered by class members | | |
| | | | 7. Fees are excessive | | |
| 8.Erika Kron | Ladera Ranch, CA | September 1, 2014 | 1. Cy pres distributions are unfair to the class and should be rejected; cy pres recipient does nothing to right the wrongs caused by the underlying suit | No | **Overruled** in full |
| | | | 2. No documents re: fees and incentive awards were posed to settlement website | | |
| | | | 3. Court should | | |

| | | | calculate fee award as a percentage of the amount of the settlement fund that is distributed to claimants, and distribution of fees should not be made until coupons are redeemed<br><br>4. $386 million settlement value is illusory, and Ticketmaster is likely to generate revenue as a result of coupon settlement<br><br>5. Fees should be reduced in proportion to any amount distributed via cy pres | | |
|---|---|---|---|---|---|
| 9. Raymond Leeper | Unknown | June 4, 2014 | 1. Settlement does not fully indemnify class for damages<br><br>2. Attorneys' fees are excessive; attorneys should be compensated with ticket credits | No | **Overruled** |
| 10. John Navarette | California | June 2, 2014 | 1. Never received notice under the Court's preliminary approval order[63]<br><br>2. Still a coupon | Yes (Joshua R. Furman) | **Overruled** in full |

---

[63] Ms. Keough has submitted a Declaration, stating that the Settlement Database reflects email notice was sent to John Navarette on May 27, 2014 at the email address JROQ2008@YAHOO.COM, and that the email notice was not returned to GCG as undeliverable. See December 5, 2014 Keough Declaration at ¶3. In any event, though, the standard, as noted under *Wershba, supra,* is that the notice must have a reasonable chance of reaching a substantial percentage of the class members. Class counsel need not demonstrate that notice, in fact, reached every member of the class in order to be found effective. As discussed *supra*, the Court has determined that notice was effective.

| | | | | | |
|---|---|---|---|---|---|
| | | | settlement, and does nothing to cure the illegitimate coupon-based nature of the settlement; benefits are illusory (settlement benefits can only be attained when a class member makes another purchase) | | |
| | | | 3. Ticket codes are issued at Live Nation's discretion; shortfall tickets made available is miniscule and provides no meaningful relief to the class | | |
| | | | 4. Proposed settlement does not consider redemption rates; only the amount "made available" | | |
| | | | 5. Incentive awards are unconscionable and indicative of collusion | | |
| | | | 6. Attorneys' fees are excessive | | |
| | | | 7. Cy pres recipients are inadequate and cy pres minimum is improperly valued | | |
| | | | Relative number of opt-outs and objectors are | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | high; to the extent they represent a small percentage of the total class membership, they are meaningless as to the membership's approval | | |
| | | | 2. *Chavez v. Netflix* does not provide cover for the coupon settlement (since this is a "pure" coupon settlement) | | |
| | | | 3. Ticketmaster values the cost of the settlement at a substantially discounted amount of *cy pres* guaranty | | |
| | | | 4. *Cy pres* recipients are not specified | | |
| | | | 5. Settlement constitutes impermissible, unconstitutional speech restraints on class members (i.e., ¶10.2 of the settlement purports to prohibit class members from "disparaging" the settling parties, their past or present business practices, or their counsel) | | |
| 11. Cara L. Patton<br><br>Glenn J. Kassiotis | Huntsville, AL | January 6, 2012 | 1. Notice not the best practicable, as it is designed to discourage class member | Yes (Law Office of John W. Davis, | **Overruled** in full |

| | | | | | |
|---|---|---|---|---|---|
| Brooke Everly<br><br>Russell Cunningham<br><br>Brice Johnston<br><br>George Mattison, IV | | | participation (including the requirement to set forth objections made in prior, unrelated class settlements, and subjecting objectors to deposition)<br><br>2. Release is overly broad, as it encompasses claims beyond those concerning the Order Processing Fees and UPS Delivery Fees; notice did not contain proposed release<br><br>3. Stated value of "in kind" relief is exaggerated, in light of restrictions placed on "credit" or "code" redemption (including lack of transferability and expiration of the codes after just 48 months); no explanation of how to redeem the free tickets<br><br>4. Incentive awards are excessive | Marcus Merchasin, and Helfand Law Offices) | |
| 12. Alexander Skopkis | Chicago, IL | June 2, 2014 | 1. Class members should be getting cash, not coupons for future use<br><br>2. Attorneys' fees are excessive, and should not be | No | **Overruled** in full |

| | | | | | |
|---|---|---|---|---|---|
| | | | paid until Ticketmaster changes its policies | | |
| 13. James Tindall | Marietta, GA | June 9, 2014 | 1. Settlement and fees provides nothing to class members who were harmed by Ticketmaster, but obligates harmed class members to enter into future transactions with Ticketmaster; lead Plaintiffs and class counsel should share in the award and not receive any special award for their efforts (both should receive future Ticketmaster credits instead of monetary compensation) | No (objector is an attorney himself) | **Overruled** in full |
| 14. Rhadiante Van De Voorde | Boulder Creek, California | September 16, 2014 | 1. Settlement is an unfair coupon settlement<br><br>2. Coupon relief is no relief at all; tickets not available until after settlement is approved and have strict limitations (including the fact Live Nation does not have venues in every state)<br><br>2. Class members are unfairly compelled to conduct business with Ticketmaster; settlement should | Yes (Donald A. Green, Esq.) | **Overruled** in full |

| | | | | | |
|---|---|---|---|---|---|
| | | | provide cash benefits and not coupons or free tickets<br><br>3. Coupons are not transferable<br><br>4. Coupons are not convertible into cash by redemption<br><br>5. Settlement is inflated by the coupon value<br><br>6. Release is defective, as it was not included in the class notice and is overly broad | | |
| 15. Michael Wasserman | Davie, FL | September 12, 2014 | 1. OPF fee is simply a discount on future transactions with Ticketmaster, except for AEG owned or operated venues; members of the class are not fairly and adequately compensated by the settlement<br><br>2. "Free tickets" provide no benefit to the class<br><br>3. Fees and incentive payments are excessive | No | **Overruled** in full |

41

There are only fifteen (15) total objections to the motion for final approval. While this Court previously recognized that courts are cautious about inferring support for a complex settlement from lack of objections (particularly where the stake of the individual class member is small, class members are unlikely to make their positions known – see California Practice Guide, Civil Procedure Before Trial, ¶14:139.13a (The Rutter Group 2014) (citing *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.* (3rd Cir. 1995) 55 F.3d 768, 812)), there were ninety-three (93) such objections to the prior settlement. This represents a significant decrease in the amount of objections, in a national class which numbers in the millions.

Moreover, it is unclear what other remedy the class could have gotten. Again, coupon settlements are not inherently suspect or improper. *See Chavez v. Netflix, Inc., supra,* 162 Cal.App.4th at 54; *Nordstrom Comm'n. Cases* (2010) 186 Cal.App.4th 576, 590. The *cy pres* component, in the Court's view, places this settlement into the realm of benefiting the class. The class members' overriding objection that the settlement does not provide adequate value assumes that Plaintiffs would have been successful at trial. However, this was far from a given, and none of the class members weighed the strength of the Plaintiffs' case against the amount of the settlement. *Chavez v. Netflix, Inc., supra,* 162 Cal.App.4th at 54. Again, the Court's obligation under California law is to ensure that the settlement, as presented, is in the "ballpark of reasonableness" – it is *not* to determine whether the settlement "could have been better," as many of the objectors argue. Importantly, the objectors have not submitted any evidence to address the issues affecting the settlement, nor have they provided any analysis of a valuation of the case.

Mr. Fuller's objections in particular are not persuasive. Mr. Fuller is a ticket broker, who claims that he is eligible for thousands of dollars in recoverable OPF and/or UPS fees. Again, the settlement represents a compromise. Mr. Fuller (whose attempt to intervene in this case was rejected by this Court, and affirmed by the Court of Appeal) had the ability to opt-out of the settlement and represent a class of other ticket brokers. However, he did not do this.

42

Given the small percentage of objectors and the Court's order overruling the objections, this factor weighs in favor of final approval.

## Conclusion on *Dunk* Factors

On balance, while perhaps not an ideal settlement, the *Dunk* factors generally weigh in favor of final approval. The *Dunk* factors reflect that this settlement represents a compromise, and there is a real monetary benefit going to a cause which will ultimately benefit the class (the consumer law clinic at UC Irvine). The Court finds the settlement is fair and in the interests of the class. For all of the foregoing reasons, the motion for final approval is granted.

## VII.

## ATTORNEY'S FEES, COSTS, AND INCENTIVE PAYMENTS

The fee request is based on a "clear sailing" agreement. That is, Ticketmaster has separately agreed to pay Class Lead Counsel $14.96 million in fees and $1,230,871.11 in costs/disbursement/expenses. In *Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, the Court of Appeal specifically noted that California law recognizes such agreements, and that the "clear sailing" agreement is valid under California law. In fact, the Court noted that "'[t]o the extent it facilitates completion of settlements, this practice should not be discouraged.'" *Consumer Privacy Cases,* 175 Cal.App.4th at 553 (citing Newberg on Class Actions (4th ed. 2002) § 15:34, p. 112). However, the *Consumer Privacy Cases* court also recognized that, even where there is a "clear sailing" agreement, "thorough judicial review of fee applications is required in all class action settlements...." *Consumer Privacy Cases,* 175 Cal.App.4th at 555. Accordingly, a review of the fee request is warranted here.

## A. Attorneys' Fees

### 1. Determining the Lodestar Amount and Calculating Counsel's Hourly Rate and Fees

The court's first step in setting a fee award is to calculate the lodestar amount. *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311; *Serrano v. Priest (Serrano III)* (1977) 20 Cal.3d 25, 48, n.23; Pearl, California Fee Awards (2006 Supp.), §12.1. The lodestar figure is obtained by multiplying the hours worked by each person entitled to compensation by a reasonable hourly rate for those services. That calculation is fundamental to the trial court's determination of the amount of fees to be awarded. Pearl, California Fee Awards (2006 Supp.), §12.1. The starting point in setting the lodestar figure and calculating the ultimate fee award is an assessment of the number of hours reasonably worked by counsel. *Id.* at §12.2.

When determining the amount of a fee award, the court should calculate it using the community's prevailing hourly rate for comparable legal services, even when the litigant did not pay the attorney the prevailing rate. *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096. The burden is on the successful party to prove the appropriate market rate to be used in calculating the lodestar. Pearl, California Fee Awards (2006 Supp.), §12.33. Among the ways to demonstrate market rates are expert testimony (i.e., testimony from persons with specialized knowledge of billing rates) (*Children's Hosp. & Med. v. Bonta* (2002) 97 Cal.App.4th 740, 783); counsel's own billing rates, which carries a presumption of reasonableness (*Gusman v. & Unisys Corp.* (7th Cir. 1993) 986 F.2d 1146, 1150); rates awarded to the claiming attorneys in previous actions (*Davis v. City of San Diego* (2003) 106 Cal.App.4th 893, 904); rates awarded attorneys of comparable experience in other cases in the same market (*Children's Hosp. & Med. Ctr. v. Bonta, supra,* 97 Cal.App.4th at 783); surveys of billing rates; and opposing counsel's billing rates. Richard M. Pearl, California Fee Awards (2006), §12.33.

"[T]he ' 'reasonable hourly rate [used to calculate the lodestar] is the product of a multiplicity of factors . . . the level of skill necessary, time limitations [imposed by the client or

other limitations], the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case.' '[Citation.]" *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1139. "A more difficult legal question typically requires more attorney hours, and a more skillful and experienced attorney will command a higher hourly rate." *Id.* at 1138-1139. "[I]n assessing a reasonable hourly rate, the trial court is allowed to consider the attorney's skill as reflected in the quality of the work, as well as the attorney's reputation and status." *MBNA American Bank, N.A. v. Gorman* (2006) 147 Cal.App.4th Supp. 1, 13. Once the party claiming fees presents evidence supporting the claimed rate, the burden shifts to the party opposing fees to present equally specific countervailing evidence. Pearl, California Fee Awards (2006 Supp.), §12.34 (referencing, *inter alia, Gates v. Deukmejian* (9th Cir. 1992) 987 F.2d 1392, 1405).

Class counsel seeks fees under the lodestar/multiplier method, using the percentage of the common fund as a cross-check on the lodestar and multiplier figure. As the Court has customarily employed this method in the past, it does so again here. Class counsel seeks a combined fee award of $14,960,000. This amount is not significantly different than the amount sought in connection with the prior motion for final approval and for fees.

The aggregate lodestar for counsel who have represented Plaintiffs and the class is $8,039,000 (after a "billing judgment" across the board reduction). This is broken down as follows, according to Mr. Stein:

| Firm | Lodestar Amount |
| --- | --- |
| Alvarado Smith | $5,131,305.50 |
| Stein Bogot | $836,258.50 |
| Jackson DeMarco | $321,990.75 |
| DiVincenzo Schoenfield Swartzman | $53,640.00 |
| Much Shelist | $2,118,954.00 |
| **TOTAL** | $8,039,000 (reduced from $8,462,148.75) |

Piecing together the information in the Knapton Declaration (¶¶39 and 41, and Exh. 6 thereto), the lodestar figures are as follows:

### Alvarado Smith

| Professional | Hours Spent | Hourly Rate | Lodestar Fee |
|---|---|---|---|
| William M. Hensley | 1,468.5 | $600 | $881,100 |
| Robert J. Stein III | 4,841.9 | $600 | $2,905,140 |
| Marc D. Alexander | 540.1 | $535 | $288,953.50 |
| Claire M. Schmidt | 1,612.6 | $300 | $483,780 |
| Aileen Hunter | 31.8 | $270 | $8,586 |
| Macey Chan | 20.8 | $260 | $5,408 |
| Lowell Zeta | 39.1 | $260 | $10,166 |
| Valerie Brennan | 30.9 | $270 | $8,343 |
| Michelle Zehner | 446.4 | $250 | $111,600 |
| Robert Gonzales | 23.3 | None Given | None Available |
| Valerie Dimalanta-Segal | 5.0 | $175 | $1,250 |
| Shanna Strader | 256.8 | $25 (may be a typographical error; should probably be $250) | $64,200 |
| **TOTAL HOURS SPENT AND LODESTAR FIGURE** | **9,317.2** | | **$5,089,306.50** |

### DiVincenzo Schoenfeld & Swartzman

| Professional | Hours Spent | Hourly Rate | Lodestar Fee |
|---|---|---|---|

| Robert J. Stein III | 89.4 | $600 | $53,640 |
|---|---|---|---|
| **TOTAL HOURS SPENT AND LODESTAR FIGURE** | **89.4** | | **$53,640** |

## Jackson Demarco

| **Professional** | **Hours Spent** | **Hourly Rate** | **Lodestar Fee** |
|---|---|---|---|
| William M. Hensley | 452.3 | $600 | $271,380 |
| Robert J. Stein III | 79.6 | $600 | $47,760 |
| Marc D. Alexander | 6.45 | $535 | $3,450.75 |
| **TOTAL HOURS SPENT AND LODESTAR FIGURE** | **537.35** | | **$321,990.75** |

## Much Shelist

| **Professional** | **Hours Spent** | **Hourly Rate** | **Lodestar Fee** |
|---|---|---|---|
| Michael B. Hyman | 380.2 | $675 | $237,625 |
| Steven P. Blonder | 2030.7 | $600 | $1,218,420 |
| Melinda J. Morales | 400.6 | $475 | $190,285 |
| David T. Brown | 169.4 | $585 | $99,099.00 |
| Joann A. Sarasin | 101.5 | $525 | $53,287.50 |
| Edward D. Shapiro | 12.1 | $545 | $6,594.50 |
| Robert J. Wosniak | 42 | $300 | $12,600 |
| Louis A. Kessler | 368.9 | $280 | $103,292 |
| Jean Janes | 11.3 | $475 | $5,367.50 |
| Autumn Sharp | 12.4 | $300 | $3,720 |

| Cassandra Crane | 30.2 | $255 | $7,701 |
| Gary Krugh | 74.3 | $175 | $13,002.50 |
| Christine M. Ceja Ra | 4.0 | $175 | $700 |
| Katrina Blumenkrants | 9.9 | $300 | $2970 |
| **TOTAL HOURS SPENT AND LODESTAR FIGURE** | **3647.5** | | **$2,118,854** |

**Stein Bogot**

| **Professional** | **Hours Spent** | **Hourly Rate** | **Lodestar Fee** |
| --- | --- | --- | --- |
| Robert J. Stein III | 1,006.5 | $600 | $603,900 |
| William J. Bogot | 321.5 | $535 | $172,002.50 |
| John Koltse | 58.6 | $140 | $8,204.00 |
| Erin Anderson | 5.1 | $150 | $765 |
| Christine Kent | 38.5 | $125 | $4812.50 |
| **TOTAL HOURS SPENT AND LODESTAR FIGURE** | **1,430.2** | | **$836,258.50** |

In addition to these figures, counsel Knapton had further broken down the type of work performed in the litigation, by firm, at ¶¶31-32 of his Declaration. Mr. Stein provides a brief biography of each of the members of Alvarado Smith who worked on the case.

Thus, the combined lodestar for all firms and attorneys who worked on the case is $8,039,000 based on counsel's calculated figure (reduced by counsel from $8,462,148.75). The combined number of lodestar hours among all of the firms, based on the figures counsel has provided, is 15,007.6.

The hourly rates thus range from $125 (for paralegals) up through a maximum of $675 per hour. Based on the evidence in the Knapton, Stein, and Blonder Declarations, the Court determines these rates are reasonable. Mr. Knapton, who has been proffered as an expert witness on fees, says that the hours are in the range that is typical for medium size class actions that settle and the average rate is within the range he has seen.[64] He also says that the rates proffered for some of the individual timekeepers are lower than he expected.[65]

Mr. Knapton also references the 2012 Real Rate Report, which is not a survey, but a database based on "anonymized" actual invoices that the firm reviews for payment and has the benefit of both large scale and grounding in the reality of what was paid.[66] In Los Angeles, the 2012 hourly mean rate for partners was $620.34, and for associates, that sum was $412.53.[67]

Knapton also references the Laffey Matrix, noting that the rates in the Los Angeles legal market for counsel with 20+ years of experience was $541; 11-19 years, $478; 8-10 years, $385; 4-7 years, $312; 1-3 years, $265; and paralegals, $140.[68] Mr. Knapton also sets forth "anecdotal" rates of other counsel, and sets forth a sampling of attorneys whose rates are higher than those claimed in the instant case.[69] Mr. Knapton also concludes that the 15,007.6 hours requested by class counsel is within the range of hours that are usual and reasonable for similar class action litigation.[70]

---

[64] Knapton Decl., ¶35.

[65] Id.

[66] Knapton Decl., ¶43.

[67] Knapton Decl., ¶44.

[68] Knapton Decl., ¶46.

[69] Knapton Decl., ¶50.

[70] Knapton Decl., ¶58.

Based on this evidence, the Court finds the hourly rates are within the realm of reason for attorneys practicing in the Los Angeles legal market. Further, the number of hours claimed is reasonable, especially in light of the fact that this litigation is eleven years and given the Court's familiarity with the history of the case.

Turning to the factors referenced in *Ketchum v. Moses, supra,* 24 Cal.4th at 1139 for calculating the lodestar, there was a significant amount of skill involved here in prosecuting this eight-year case. The Stein Declaration in Support of Final Approval demonstrates the extensive procedural and substantive history of this litigation.[71] This case was opposed at every juncture by Ticketmaster, and the procedural and substantive history evidences the significant skill required to litigate the case, at both the trial and appellate levels. Importantly, discovery in this case was exhaustive (which is an understatement).

The legal questions in this case were not easy to resolve, and the case was settled only after a number of mediation sessions and trips up to the Court of Appeal. By all accounts, the attorneys in this case have good reputations. Further, the case was not the most desirable to prosecute, as it involved a nationwide class against a formidable defendant which holds a corner on the ticket market.

As to the "amount of settlement" factor, the lodestar is reasonable. As noted *supra,* the minimum value of the settlement, according to Plaintiffs' expert Ms. Fair, is $42 million (not including the $3 million *cy pres* payment to UC Irvine). The "likely" value of the settlement, according to Fair, is $76 million (the likely value of the discount codes and free tickets that will be redeemed by class members).[72] Since the Court is basing the settlement value on the $42 million figure, then the lodestar represents just over 19% of the settlement value. In any event,

---

[71] See Stein Decl. in Support of Final Approval, ¶4, ¶5.

[72] Fair Decl., ¶7.

counsel represents that the fee was negotiated only after negotiation of an agreement as to all other material terms of the settlement, including class compensation issues.

In sum, the Court finds the factors referenced above support a finding that the lodestar figure is reasonable.

## 2. Multiplier of 1.86 is requested

Based on a hypothetical aggregate lodestar figure of $8,039,000, counsel is effectively requesting a multiplier of approximately 1.86, resulting in total fees sought of $14,960,000.

Once the Court has calculated the lodestar figure, it may consider other relevant factors that could increase or decrease that figure. "The court expresses these factors as a number (or as an equivalent percentage), and the lodestar is multiplied by that number. Thus, the number is referred to as the 'multiplier.'" Pearl, California Fee Awards (2006 Supp.), §13.1. Although there are some objective standards governing what factors may be used to decide whether to apply a multiplier, the trial courts have considerable discretion in determining the size of the multiplier, as long as they consider the proper factors. *Id.* Indeed, "there is 'no mechanical formula [that] dictate[s] how the [trial] court should evaluate all these factors....[Citation.]'" *Lealao v. Beneficial Cal., Inc.* (2000) 82 Cal.App.4th 19, 41.

"[The lodestar] may be adjusted by the court based on factors including... (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action." *Ketchum v. Moses, supra,* 24 Cal.4th at 1132. *See also Serrano III, supra,* 20 Cal.3d at 49. However, the Court cannot consider the same factors when setting both the multiplier and the lodestar. *See Ketchum, supra,* 24 Cal.4th at 1138; *see also Flannery v. CHP* (1998) 61 Cal.App.4th 629 (reversing the application of a 2.0 multiplier to a fee award, in part because "the skill and experience of counsel" and "the nature of

the work performed" factors were duplicative of factors the trial court had explicitly considered in setting the lodestar).

Given the Court's familiarity with the issues in this case, as well as the work performed by class counsel during the entirety of the litigation, the Court finds the 1.86 multiplier is reasonable, pursuant to the *Ketchum* factors referenced above. In particular, the Court determines the difficulty of the questions involved, the fact that this litigation precluded significant preclusion of other employment by counsel, and the contingent nature of the fee award justify the 1.86 multiplier. In setting the multiplier, the Court has not considered the factors the Court considered in setting the lodestar.

### 3. Conclusion on Motion for Attorneys' Fees

For these reasons, the Court grants the motion for fees in the amount of $14,960,000 to class counsel, as prayed.

### B. Costs

Plaintiffs seek costs in the total amount of $1,230,871.11, among all of the firms who worked on this case. A summary of all expenses sought appears as Exhibit 4 to the Stein Declaration in Support of Final Approval. Plaintiffs state they have excluded charges for computer research, faxes, and in-house copying (except for some documents copied for the court and service list). Plaintiffs also state they have capped their meal costs, including tax and tip, at $60 per person for dinners and $30 for lunches.[73] Airfares were purchased for coach tickets, with limited exceptions.[74] This actually represents a significant reduction from some of the costs requested in connection with the prior motion for final approval.

Counsel represents that the largest category of costs was for experts, who were retained to conduct marketing and survey studies and consultation for the liability issues, forensic

---

[73] Stein Decl., ¶16, Blonder Decl., ¶7.

[74] Stein Decl., ¶16; Blonder Decl., ¶7.

accounting for the restitution recovery, and advertising and marketing expertise for the notice and recovery issues relating to the settlement. The expert fees incurred by Plaintiffs are $977,569.05. For each firm involved in the case, counsel has provided an itemized statement of each expense, with summaries by category.[75]

These cost amounts are broken down by firm, as follows:

| **Firm** | **Costs Sought** |
|---|---|
| Alvarado Smith | $442,174.57 |
| DiVincenzo & Swartzman | None |
| Jackson DeMarco | $12,953.99 |
| Much Shelist | $770,896.14 |
| Stein Bogot | $8,446.91 |
| **TOTAL** | $1,233,871.11 |

### 1. Alvarado Smith

Turning to the individual costs sought, Alvarado Smith's costs are attached as Exhibit 9 to the Stein Declaration. There are significant airline travel reimbursement costs requested for litigation activity which occurred all over the country. In addition to the airline travel, there were substantial court reporter fees, the aforementioned expert fees (which, again, comprise the largest portion of the requested costs), filing fees (which are substantial, given the amount of paper generated in the litigation), hotel stays (which again are significant, given the time counsel spent on the road), meal costs (which, as noted above, are capped at $60 for dinners and $30 for lunches), mediation fees (which are also a substantial portion of the costs), mileage, and miscellaneous travel costs (which include public transportation and train costs).

These costs appear to be generally reasonable on their face, and will ultimately be approved, as prayed, in the amount of $442,174.47.

---

[75] Stein Decl., ¶¶17-19, Exhs. 3, 7, 9; Blonder Decl., ¶¶5-9, Exh. 3.

## 2. Jackson DeMarco

The costs sought by Jackson DeMarco[76] are generally straightforward, and will ultimately be approved, as prayed, in the amount of $12,953,99.00.

## 3. Much Shelist

Much Shelist has, like the other firms, provided a detailed breakdown of costs sought. Many of these costs also seem relatively straightforward. The generalized breakdown is set forth on the sheet entitled "Disbursements Summary," and are as follows:

| Cost Description | Amount Sought |
|---|---|
| Travel | $13,205.08 |
| Airfare | $26,937.46 |
| Meals – Travel | $1,084.28 |
| Auto Rental | $282.70 |
| Filing Fees | $320.01 |
| Recording Fee | $30.00 |
| Court Costs | $120.00 |
| Appearance Fee/Court Fees | $205.00 |
| Witness Fee | $18,310.00 |
| Meals at Meetings | $2,721.41 |
| Outside Professional Services | $667,634.02 |
| Local Transportation | $4,198.58 |
| Court Reporter | $13,415.74 |
| Miscellaneous | $716.40 |
| Outside Photocopying | $1,300.73 |

[76] Exhibit 3 to Stein Declaration in Support of Fees/Costs.

| TOTAL | $731,935.64 |
|---|---|

The "Outside Professional Services" is the largest block cost, and comprises several high-priced items (some of which are self-explanatory, such as costs of mediation at JAMS). Other items are for the cost of experts in the case. All of the other costs claimed by Much Shelist, both in the general blocks and in the itemized costs, are self-explanatory, and are reasonable in amount, given the amount of time this litigation has progressed. The costs will ultimately be approved.

### 4. Stein Bogot

As to Stein Bogot, the charges are self-explanatory. These costs are attached as Exhibit 7 to the Stein Declaration. The costs claimed by Stein Bogot essentially encompass meals, travel costs, and costs for Court Call, and are reasonable in amount. They will ultimately be approved in the amount of $8,446.91.

### 5. Conclusion on costs

For these reasons, the Court grants the motion for costs in the total amount of $1,230,871.11.

### C. Incentive Payments

Plaintiffs request incentive payments in the amounts of $19,000 each to class representatives Curt Schlesinger and Peter Lo Re, and $500 each to the remaining class representatives Roth, Russell, and Aghchay.

The court should consider the following factors, among others, in determining whether to pay an incentive or enhancement award to the class representative(s):

////

////

////

- Whether an incentive was necessary to induce the class representative to participate in the case;
- Actions, if any, taken by the class representative to protect the interests of the class;
- The degree to which the class benefited from those actions;
- The amount of time and effort the class representative expended in pursuing the litigation;
- The risk to the class representative in commencing suit, both financial and otherwise;
- The notoriety and personal difficulties encountered by the class representative;
- The duration of the litigation; and
- The personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation. California Practice Guide, Civil Procedure Before Trial, ¶14:146.10 (The Rutter Group 2014) (citing *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785, 804; *Bell v. Farmers Ins. Exch.* (2004) 115 Cal.App.4th 715, 726; *In re Cellphone Fee Termination Cases* (2010) 186 Cal.App.4th 1380, 1394; *Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles* (2010) 186 Cal.App.4th 399, 412).

Messrs. Schlesinger, Lo Re, Roth, and Russell and Ms. Aghchay have each submitted Declarations outlining the tasks they have performed as class representatives. The lion's share of the incentive payments are sought on behalf of Messrs. Schlesinger and Lo Re, who each seek $19,000. The other three class representatives – Roth, Russell, and Aghchay – seek $500 each. The class representatives seek a total amount of $39,500 in incentive payments.

Mr. Schlesinger states that during the summer of 2003, he retained Bogot and Stein to investigate and pursue his claims against Ticketmaster.[77] He states that during the past 9 years, he has regularly conferred with his attorneys regarding the status of the case.[78] Schlesinger says that he has remained involved and committed to the best interests of the Class throughout the case, even though doing so required substantial amounts of his time, loss of business

---

[77] Schlesinger Decl., ¶3.

[78] Schlesinger Decl., ¶3.

opportunities and additional staffing requirements for his store, and caused him to be threatened by Ticketmaster with the prospect of being bankrupted if the case went to trial and he lost.[79]

Schlesinger claims that the incentive payment was necessary to induce him to serve as class representative, given that a significant portion of his income is tied to the profitability of his store, and that he was required to take substantial time away from work to prepare for and participate in the trial in this case.[80] Schlesinger claims to have suffered not only financial losses as a result of his participation, but has also expended significant amounts of time (including time away from family and friends).[81]

Schlesinger states that throughout each phase of the case, he has regularly consulted with counsel by phone and in person, devoting "many, many hours and numerous weekends" to responding to discovery and being involved with progress of the case.[82] Schlesinger says that he spent "countless" hours looking for documents to produce to Ticketmaster in response to discovery and deposition requests.[83]

Schlesinger proceeds to outline the three primary topics he believes merit consideration: 1) his additional expenses and lost business opportunities as a result of serving as class representative; 2) the additional personal risks he incurred in the case; and 3) the nature of the discovery requests and the time it took him to respond to all of them. He estimates that because of the initial January 2011 trial date, he was required to take one week off from work.[84] Then, with respect to the October 2011 trial date, Schlesinger says that he had, at the very least, an

---

[79] Schlesinger Decl., ¶5.

[80] Schlesinger Decl., ¶4.

[81] Schlesinger Decl., ¶7.

[82] Schlesinger Decl., ¶8.

[83] Schlesinger Decl., ¶8.

[84] Schlesinger Decl., ¶9.

immediate revenue loss (since he would have otherwise accompanied customers of his fly-fishing store on fly fishing trips, for which he personally served as an instructor).[85]

As to the personal risks, he sought to be on the hook for over $1 million in expenses due to Ticketmaster's §998 offer.[86] Moreover, Ticketmaster's efforts to depose his family were "very intimidating" to Schlesinger.[87]

As to the time he spent responding to discovery, Schlesinger details all of the discovery to which he responded at ¶¶17-25. He estimates spending several hours in discovery efforts, plus an additional 15 to 20 hours in connection with the settlement process.[88]

Mr. Lo Re has submitted a separate declaration setting forth the efforts he put into the case as class representative. He says that he has also regularly conferred with his attorney, Mr. Stein, during the past 9 years regarding the status of the case.[89] He notes that his only income is derived from his job as a sales representative for Apollo Distributing in Fairfield, New Jersey.[90] On days he is out of the office, he does not receive commissions for any sales.[91]

Lo Re says that during the past 9 years, he has suffered not only financial loss, but has also expended significant amounts of time, and time away from family and friends.[92] Lo Re, like Schlesinger, says that he spent many hours and numerous weekends to responding to discovery requests and being involved with the progress of the case; spent several days in connection with

---

[85] Schlesinger Decl., ¶11.

[86] Schlesinger Decl., ¶12.

[87] Schlesinger Decl., ¶13.

[88] Schlesinger Decl., ¶¶26.

[89] Lo Re Decl., ¶3.

[90] Lo Re Decl., ¶4.

[91] Lo Re Decl., ¶4.

[92] Lo Re Decl., ¶5.

his two depositions; and spent countless hours looking for documents to produce to Ticketmaster in response to their discovery requests.[93]

Lo Re says that as a result of missing time from his first deposition, it cost him between $2,000 and $3,000.[94] Due to having to attend his second deposition, he lost another $2000 and $3000 in income.[95] He estimates having lost $1,000 in revenue for having to take a week off in January 2011, with the impending trial date.[96] He also claims to have lost business opportunities in October 2011, as a result of having to keep his calendar open in anticipation of a potential October 2011 trial date.[97]

Lo Re also notes that he, like Schlesinger, was on the hook for significant costs following Ticketmaster's §998 offer.[98] Ticketmaster also had requested information about his business clients, which, Lo Re says, could have disrupted his business.[99] Finally, Lo Re outlines the amount of time he spent on discovery responses, estimating he has spent 24-31 hours responding to discovery.[100] He also estimates having spent 12 to 15 hours between phone calls, personal meetings, and reviewing multiple settlement proposals.[101]

Messrs. Roth and Russell have also submitted Declarations in support of their requests for incentive payments. These two Plaintiffs have only recently come into the case, with the

---

[93] Lo Re Decl., ¶6.

[94] Lo Re Decl., ¶7.

[95] Lo Re Decl., ¶8.

[96] Lo Re Decl., ¶9.

[97] Lo Re Decl., ¶10.

[98] Lo Re Decl., ¶13.

[99] Lo Re Decl., ¶15.

[100] Lo Re Decl., ¶¶15-22.

[101] Lo Re Decl., ¶12.

filing of the Fourth Amended Complaint. Both state that they were aware of the substantial

discovery, time and financial burdens posed on Plaintiffs Schlesinger and Lo Re.[102] Each joined

the litigation as an additional class representative because they believed strongly that

Ticketmaster committed wrongful acts which should be vindicated.[103]

With all of these statements by Messrs. Schlesinger and Lo Re in mind, a $19,000

incentive payment is on the high end of incentive payment requests, but the litigation proceeded

for approximately 11 years. It is evident that the class representatives faced substantial risks in

prosecuting this case, and gave up significant periods of time in this endeavor. Undoubtedly, the

prospects for financial ruin by the class representatives were real and significant, given the §998

offer by Ticketmaster. The Court finds that $19,000 is a reasonable incentive payment to class

representatives Schlesinger and Lo Re, and that $500 is a reasonable incentive payment to the

remaining class representatives. The request for incentive payments is granted, as prayed.


## VIII.

## OBJECTORS' MOTIONS FOR FEES, COSTS, AND INCENTIVE PAYMENTS

Two sets of objectors - the Sullivan Objectors and the Patton Objectors – seek an order

awarding attorneys' fees and costs. The Sullivan Objectors also seek incentive payments.

Essentially, the objectors claim that as a result of their efforts, the settlement was revised to

benefit the class, and that their counsel therefore deserves a portion of the fee award. The

Sullivan Objectors point to the following: 1) their objections to the fact that the class relief

included only coupons, with no means to obtain free tickets without paying more money to

Defendant; and 2) the objections to the fact that the coupons could not be "stacked" or

transferred by class members who had paid deceptive UPS fees multiple times and thus were

---

[102] Roth Decl., ¶5; Russell Decl., ¶5.

[103] Roth Decl., ¶7; Russell Decl., ¶7.

60

entitled to multiple redemption codes. The Sullivan Objectors do not seek a specific amount, but instead request the Court defer calculation of the amount of that award until expiration of the one-year grace period when the total value of the coupons redeemed will be known.

The Patton Objectors similarly argue that their objections to the prior settlement agreement benefited the class and entitle them to a fee award under the common fund/substantial benefit doctrines.

At the outset, objectors are not ordinarily entitled to an attorney fees award. California Practice Guide, Civil Procedure Before Trial, ¶14:146.5 (The Rutter Group 2014). Such an award may be appropriate, however, under the equitable common fund or substantial benefit doctrines where the objection *confers a significant benefit* on the class; e.g., where the ultimate class recovery exceeds that which would have been achieved absent the objector's efforts. California Practice Guide, Civil Procedure Before Trial, ¶14:146.6 (The Rutter Group 2014) (citing *Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Mkts., Inc.* (2005) 127 Cal.App.4th 387, 397–398). The benefit conferred on the other class members need not be pecuniary but must be "actual and concrete and not conceptual or doctrinal." California Practice Guide, Civil Procedure Before Trial, ¶14:146.7 (The Rutter Group 2014) (citing *Robbins v. Alibrandi, supra,* 127 Cal.App.4th at 448).

The court must approve any award of attorney fees to the objector's attorney as part of a class action settlement or judgment. The negotiated fee must be "fair and reasonable" but need not perfectly duplicate the amount that would be awarded under the "substantial benefit doctrine." California Practice Guide, Civil Procedure Before Trial, ¶14:146.8 (The Rutter Group 2014) (citing *Robbins, supra,* 127 Cal.App.4th at 450-451).

Moreover, fees might be recoverable under the "private attorney general" theory under CCP §1021.5, where the objector's actions resulted in the "enforcement of an important right affecting the public interest." California Practice Guide, Civil Procedure Before Trial, ¶14:146.9

(The Rutter Group 2014) (citing *Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Mkts., Inc.*, supra, 127 Cal.App.4th at 400–404).

Here, pursuant to these California authorities, the Court is not persuaded that the objections conferred a significant benefit to the class under the substantial benefit doctrine. In other words, the subsequent settlement was not the product of the objectors' efforts. Instead, the objections previously raised by the Sullivan and Patton Objectors were not unique to these class members. The class was not improved due to these objectors' efforts.

Further, the common fund doctrine is not applicable, as there is no "common fund" which is funding the settlement. The settlement is largely in the form of the coupon/discount codes, as well as the potential for free tickets. The $3 million *cy pres* fund does not constitute a "common fund" (although the $3 million *cy pres* fund benefits the class, that sum is not going directly to individual class members).

For these reasons, the objectors' fee motions are not well-taken, and they are both denied.

## VIII.

## RULING AND ORDER

For the foregoing reasons, the motion for final approval is granted. The Court finds the settlement is fair, reasonable, and in the interests of the class. The Court grants the Plaintiffs' motion for attorneys' fees, costs, and incentive payments.

All objections are overruled. The motions for fees, costs, and incentive payments brought by the Sullivan and Patton objectors are denied.

Dated: February 27, 2015

KENNETH R. FREEMAN

_____
Kenneth Freeman
Judge of the Superior Court



# EXHIBIT 8

1   Joshua R. Furman, Bar No. 225461
    jrf@furmanlawyers.com
2   JOSHUA R. FURMAN LAW CORPORATION
    15260 Ventura Boulevard, Suite 2250
3   Sherman Oaks, California  91403
    Telephone:   (818) 646-4300
4   Facsimile:    (818) 646-4301

5   Jon M. Zimmerman, *Pro Hac Vice* forthcoming
    jon@seattletrafficattorneys.com
6   2825 Eastlake Avenue East, Suite 120
    Seattle, Washington  98102
7   Telephone:   (206) 285-5060
    Facsimile:    (206) 686-5076

8
    *Attorneys for Objector,*
9   Joanne Rossignol

10

11                      UNITED STATES DISTRICT COURT

12                     CENTRAL DISTRICT OF CALIFORNIA

13

14   NATALIE PAPPAS, on behalf of          CASE NO.  11-cv-8276-JAK (PLAx)
     herself and all other similarly
15   situated,                             **OBJECTIONS TO FINAL
                                           APPROVAL OF CLASS ACTION
16                 Plaintiffs,             SETTLEMENT; NOTICE OF
                                           INTENT TO APPEAR**
17          v.

18   NAKED JUICE COMPANY, a
     California corporation,
19
                   Defendant.
20

21

22

23

24

25

26

27

28

1 | **NOTICE OF INTENT TO APPEAR**

2     TO THE HONORABLE COURT, ALL PARTIES, AND THEIR

3 ATTORNEYS OF RECORD:

4     PLEASE TAKE NOTICE that Objector Joanne Rossignol will appear

5 through her counsel of record at the final approval hearing in this matter

6 scheduled for December 2, 2013, for the purposes of objecting to this settlement

7 and respectfully requesting the Court not approve the same.

8

9 Dated: November 11, 2013         JOSHUA R. FURMAN LAW CORP.

                    LAW OFFICES OF JON M.

10                         ZIMMERMAN

11

12

13                 By:   /s/ Joshua R. Furman

14                     Joshua R. Furman

            Jon M. Zimmerman, *PHV* forthcoming

15                 *Attorney for Objector,*

                  Joanne Rossignol

16

17

18

19

20

21

22

23

24

25

26

27

28

Objector Joanne Rossignol objects to the proposed class action settlement in this case as follows:

I.   **INTRODUCTION**

This action was brought to rectify the wrong done to consumers when Naked Juice made false statements about the content of its products.  Far from righting the wrong, this settlement creates more problems than it solves because it sets up an unfair and unjustified tiered recovery system based on an arbitrary determination about whether or not the class member kept receipts from grocery purchases for seven years; awards class counsel well in excess of cognizable standards; and tries to side step important consideration by the Court of the true reaction to the settlement by holding the final approval hearing before the claim filing cut-off.

Objector, who understandably does not have receipts for all of her Naked Juice purchases for the past several years, is forced to be relegated to a second-class class member when she ultimately files her claim.  Objector takes issue with this proposition because, among other reasons, there is no class representative designated to look out for her interests as a non-receipt-bearing member.  Instead, Objector's rights have been inadequately represented as the class representatives agree to a deal that limits her recovery without reasonable justification.

Objector submits that class counsel and class representatives need to go back to negotiate a settlement where the rights of all class members are considered, and arbitrary discrimination among class members is avoided.  At a minimum, at least one class member needs to represent the interests of those class members who do not have receipts for their juice purchases.

II.   **LEGAL ARGUMENT**

    A.   **The Standard for Approving Class Action Settlements**

        1.   **General Principles of Federal Rule of Civil Procedure 23**

Class action settlements proposed under Federal Rule of Civil Procedure 23

are subject to a "universally applied standard." *National Rural Telecoms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).  Under this standard, final approval for a class action settlement should only be granted where the proposed settlement is "fundamentally fair, adequate, and reasonable." *Id*. quoting 5 Moore Federal Practice, § 23.85 (Matthew Bender 3d ed.) *citing In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), cert. denied 506 U.S. 953 [113 S.Ct. 408, 121 L.Ed.2d 333] (1992).  *See also*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998) ("District courts must be skeptical of some settlement agreements put before them"), *citing Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 621 [117 S.Ct. 2231, 138 L.Ed.2d 689] (1997).

Generally, the Ninth Circuit applies an eight-factor analysis to determine if the proposed settlement meets this standard.  The factors are: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; [8] and the reaction of the class members to the proposed settlement." *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998), *citing Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

"Where, as here, the parties agree to settle the dispute prior to certification of the class, the court must be particularly vigilant in its scrutiny of the settlement." *Curtis-Bauer v. Morgan Stanley & Co., Inc.*, C 06-3903 TEH (N.D. Cal. Oct. 22, 2008) p. 7, citing *Hanlon*, 150 F.3d at 1026.

As the court in *Hanlon* observed, of Supreme Court precedent:

The *Amchem* Court also noted the problem of counsel "not prepared to try a case."  Such counsel is, almost by definition,

1   inadequate because an inability or unwillingness to try a case
2   means the class loses all of the benefits of adversarial litigation.
3   "Class counsel confined to settlement negotiations could not
4   use the threat of litigation to press for a better offer." *Amchem*,
5   117 S.Ct. at 2248-2249.   District courts must be skeptical of
6   some settlement agreements put before them because they are
7   presented with a "bargain proffered for … approval ***without***
8   ***benefit of an adversarial investigation***." *Id*. at 2249.

9   These concerns warrant special attention when the record
10  suggests that settlement is driven by fees; that is, when counsel
11  receive a disproportionate distribution of the settlement, or
12  ***when the class receives no monetary distribution but class***
13  ***counsel are amply rewarded***.  *See*, *e.g.*, *In re General Motors*
14  *Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768
15  (3d Cir.), cert. denied, 516 U.S. 824 (1995).

16  *Hanlon*, 150 F.3d at 1021 (emphasis added).

17  In this case, the *Linney* factors are conflated by the *Hanlon* analysis and
18  only lead to the conclusion that this settlement is unapprovable.

19  One significant problem faced by the Court is that the timing of the final
20  approval hearing coming before the claims deadline.  While the "reaction of class
21  members" to the settlement agreement can, in part, be evaluated based on the
22  filings of objectors, a better measure, particularly where as here there is a claims
23  process for class members, is the claims history and the amounts therein.

24  While more recent filings seem to indicate that there are a significant
25  number of claims (approximately 575,000 noted in the Vasquez declaration), there
26  is no indication of how many of those claims will be honored, or how many of
27  them will be found defective in some way.  There is no indication of how many of
28  those claims include receipts, and there is no indication of the amounts of the

4

claims, or if they are able to be validated—as opposed to potentially representing fraudulent claims that dilute the benefit to the rest of the class.  Ultimately, the Court does not have enough information to make the requisite findings.

### 2.   Pre-Certification Settlements are Subject to Heightened Scrutiny

Because of the "special difficulties" a court encounters evaluating a class action settlement prior to (and in conjunction with) certification of the class, there must be an even greater showing of fairness and "much stronger indications of sustained advocacy by the *de facto* class counsel" before the settlement can be approved.  *In re General Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 805-806 (3rd Cir. 1995) (hereinafter "*General Motors*"), *citing Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971) ("[W]hen the settlement is not negotiated by a court designated class representative the court must be doubly careful in evaluating the fairness of the settlement to the plaintiff's class."); *In re General Motors Corp. Engine Interchange Lit.*, 594 F.2d 1106, 1125 (7th Cir. 1979) (attributing a need for heightened scrutiny of the settlement to the potential for collusive settlement); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (higher showing of fairness required in pre-certification settlements, and special focus on assuring adequate representation and the absence of collusion); *Malchman v. Davis*, 706 F.2d 426, 434 (2d Cir. 1983); *Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681 (7th Cir. 1987); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir. 1990); Manual for Complex Litigation 2d § 30.42 (citing the informational deficiencies faced by the court and counsel in pre-certification settlements).

Class counsel who proceed directly to settlement negotiations without so much as litigating past the threshold question of certification may be seen as "confining" themselves to settlement and losing all benefit of the threat of litigation.  *See*, *Hanlon*, 150 F.3d at 1021–22, *quoting Amchem*, 117 S.Ct. at 2248-

1  2249 ("Class counsel confined to settlement negotiations could not use the threat

2  of litigation to press for a better offer.")

3       Accordingly, when face with a pre-certification settlement, the court is

4  well-served to consider these questions posed by the Third Circuit in *General*

5  *Motors*:

6            Is the relief afforded by the settlement significantly less than

7            what appears appropriate in light of the preliminary discovery?

8            Have major causes of action or types of relief sought in the

9            complaint been omitted by the settlement?   Did the parties

10           achieve the settlement after little or no discovery?   Does it

11           appear that the parties negotiated simultaneously on attorneys'

12           fees and class relief?   Even acknowledging the possibility of

13           some overpleading, these questions raise a red flag in this case.

14  *General Motors*, 55 F.3d at 806.

15       **B.      The Class or Classes Must be Properly Identified and**

16               **Represented**

17       Class Plaintiffs have the burden of demonstrating that a proposed class is

18  properly subject to certification pursuant to Rule 23(a).   *Amchen Prods. Inc. v.*

19  *Windsor*, 521 U.S. 591, 613–614 [117 S. Ct. 2231, 138 L. Ed. 2d 689] (1997).

20           (1) a district judge may certify a class only after making

21           determinations that each of the Rule 23 requirements has been

22           met; (2) such determinations can be made only if the judge

23           resolves factual disputes relevant to each Rule 23 requirement

24           and finds that whatever underlying facts are relevant to a

25           particular Rule 23 requirement have been established and is

26           persuaded to rule, based on the relevant facts and the

27           applicable legal standard, that the requirement is met; (3) the

28           obligation to make such determinations is not lessened by

overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). "[T]he requirement that there be a class will not be deemed satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760, at 140 (3d ed. 2005). *See*, *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989) ("Though not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class"), abrogated on other grounds, *Amchem Products, Inc.*, 521 U.S. at 591. "An identifiable class exists if its members can be ascertained by reference to objective criteria." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002).

Additionally, the proposed representatives promoting the settlement must be both typical of the class membership and adequate to represent the class. Fed. R. Civ. Proc. 23(a); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course

1  of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011)
2  (internal quotations omitted).

3  "Whether the class representatives satisfy the adequacy requirement
4  depends on 'the qualifications of counsel for the representatives, an absence of
5  antagonism, a sharing of interests between representatives and absentees, and the
6  unlikelihood that the suit is collusive." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125
7  (9th Cir. 2010).

8  In the present case there is at least one significant obstacle to certification
9  based on the present class relief, the distribution plan, and the typicality and
10  adequacy of the proposed representatives: the tiered distribution plan.   The
11  settlement agreement calls for higher payouts for those class members who,
12  through some twist of fate, have managed to save their receipts for purchases of
13  juice over the course of seven years, and penalizes those class members who have
14  not saved their receipts by providing them with a significantly lower potential
15  recovery.  In the context of a consumer food product class action, where the vast
16  majority of class members would never save receipts, this arbitrary discrimination
17  among members of the class is unjustifiable.

18  More importantly the class membership is unable to judge whether or not
19  their representation by the class representatives was adequate or whether class
20  representatives' claims are typical because there is no indication as to whether
21  some or all of the class representatives are the receipt-bearing or non-receipt-
22  bearing kind.

23  Considering the tiered relief, the class definition itself is simply inaccurate.
24  The entire class membership is not being accorded equal relief.  This is not a
25  matter of differing amounts of claims for the same relief, this is a matter of
26  drawing an arbitrary line having nothing to do with claim amount, and saying the
27  absence or presence of receipts will be one of the single most significant deciding
28  factors in determining any give class members' actual recovery.

1   Who is representing the interests of the receipt-bearing class?  Who is
2   representing the interests of the non-receipt-bearing class?  What is the
3   justification for increasing the distribution to the receipt-bearing class and what is
4   the non-receipt-bearing class representatives' (assuming there are any)
5   justification for agreeing to relegate the non-receipt-bearing class members to
6   what is literally a "second class"?

7   These questions are not answered by the present settlement and the Court
8   should deny final approval because of this arbitrary distinction among class
9   members.

10   **C.     Class Counsel's Requested Fee is Excessive and Unjustified**

11   While "clear sailing" agreements, as this one is posed, are theoretically
12   acceptable, the Court must scrutinize them all the same—because a large fee
13   award points to less than ideal motivations by Class Counsel.  *See*, *Zucker v.*
14   *Occidental Petroleum Corp.*, 192 F.3d 1323, 1328, fn. 20 (9th Cir. 1999) ("The
15   evil feared in some settlements—unscrupulous attorneys negotiating large
16   attorney's fees at the expense of an inadequate settlement for the client—can best
17   be met by a careful district judge, sensitive to the problem, properly evaluating the
18   adequacy of the settlement for the class and determining and setting a reasonable
19   attorney's fee … ."), *quoting Parker v. Anderson*, 667 F.2d 1204, 1214 (5th Cir.
20   1982) (alteration in original).

21   Here, the settlement agreement provides for Class Counsel to recover over
22   30 percent of the total fund.  This amount does not account for the additional
23   amounts over $600,000 requested by former class representative Sandys's
24   counsel, or the amounts to administer the settlement, which are already over
25   $800,000 alone.  These funds would consume at least half of the settlement fund
26   and would be well out of proportion for acceptable fee agreements.

27   Class counsels' significantly reduced amount requested in their motion for
28   attorneys' fees is noted.  However, the amount claimed in the motion does not

change the amount stated in the settlement agreement.   Whether or not the settlement agreement is approvable does not turn on class counsel's caprice, the determination must be based on the actual terms of the agreement as stated.

It is also noted that the link to class counsel's motion for fees on the notice website was not working as of this filing and the only way to obtain the motion was by paying for it through PACER.

## III.   CONCLUSION.

In light of the foregoing, Objector Joanne Rossignol respectfully requests the Court deny final approval of this class action settlement.


Dated:  November 11, 2013                JOSHUA R. FURMAN LAW CORP.
                                          LAW OFFICES OF JON M.
                                               ZIMMERMAN


                                   By:  __/s/ Joshua R. Furman____
                                          Joshua R. Furman
                                 Jon M. Zimmerman, *PHV* forthcoming
                                       *Attorney for Objector,*
                                          Joanne Rossignol



# EXHIBIT 9

1   Joshua R. Furman, Bar No. 225461
    jrf@furmanlawyers.com
2   JOSHUA R. FURMAN LAW CORP.
    9663 Santa Monica Boulevard, No. 721
3   Beverly Hills, California  90210
    Telephone:   (310) 809-3016
4   Facsimile:    (310) 861-0449
    *Attorney for Plaintiff-Objector,*
5   Jon M. Zimmerman

6   Jeffrey P. Harris
    Alan J. Statman
7   Melinda S. Nenning
    STATMAN, HARRIS & EYRICH, LLC
8   3700 Carew Tower, 441 Vine Street
    Cincinnati, Ohio 45202
9   Telephone: (513) 621-2666
    Facsimile: (513) 621-4896
10  *Attorneys for Plaintiff-Objector,*
    Alison Jackson
11
    Daniel A. Osborn, Bar No. 132472
12  OSBORN LAW, P.C.
    295 Madison Avenue, 39th Floor
13  New York, New York 10017
    Telephone: (212)725-9800
14  Facsimile:    (212) 725-9808
    *Attorney for Plaintiff-Objector,*
15  Tanya Rudgayzer

16                  UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

18

19
20  IN RE GOOGLE BUZZ USER          Case No.: CV 10-00672 JW
    PRIVACY LITIGATION
21                                  [Hon. James Ware, Courtroom 8]

22                                  **OBJECTIONS TO PROPOSED**
23                                  **ORDER AND FINAL JUDGMENT**
                                    **GRANTING FINAL APPROVAL**
24                                  **OF CLASS ACTION**
                                    **SETTLEMENT AND AWARDING**
25                                  **ATTORNEYS' FEES**
26
27
28

Plaintiff-Objectors JON M. ZIMMERMAN, ALISON JACKSON, and TANYA RUDGAYZER, by and through their respective counsel above (hereinafter, collectively, "Objectors"), object to the Proposed Order and Final Judgment Granting Final Approval of Class Action Settlement and Awarding Attorneys' Fees as follows:

**A.    Proposed _Cy Pres_ Recipients Include Primarily Industry-Supported Organizations That Receive Substantial Funding From Defendant**

Objectors appreciate the need for a balanced selection of _cy pres_ recipients. However, in the arena of online privacy, it is extremely important to note that there is a striking difference between the advocacy of groups that receive substantial industry funding, and the groups that do not receive substantial industry funding.

There are very few national organizations truly focused on online privacy, and fewer still that play a significant role in public policy and consumer protection actions directed at protecting privacy rights from commercial—not governmental—interests.  While both industry-funded and non-industry-funded groups are potentially worthy candidates for funding many reasons, we believe it is imperative for the purposes of the settlement and the benefit of the class that organizations which typically do not receive substantial industry funding be apportioned the bulk of the funding in this case.

To that end, there are several facts regarding the _cy pres_ recipients proposed by Class Counsel that raise red flags—both in terms of the information that Class Counsel has provided to the Court and the information that Class Counsel has omitted.

First, there are only 12 organizations selected, while over 77 applications were received.  (Class Counsel's Submission Brief, p. 1:7–13.)    In addition, some of the most prolific and reputable consumer privacy organizations have been

omitted from the list without explanation.  While Objectors applaud the inclusion of the Electronic Frontier Foundation and appreciate the value of organizations like the Center for Democracy and Technology, the most active and long-standing online privacy organization in the nation was omitted, the Electronic Privacy Information Center.  In addition, applicants with missions that would directly benefit the class were omitted, including the Center for Digital Democracy. Objectors are informed that both of these organizations applied for funding in this matter.  These are but two of the worthwhile, focused organizations that applied for *cy pres* funding and were omitted by Class Counsel.

It also appears from Class Counsel's filing that Defendant was involved in deciding which nominees to submit to the Court.  This participation likely played a role in the omission of the groups identified above, because Defendant has applied pressure on the Rose Foundation (utilized by Class Counsel here) in the past to direct *cy pres* funding away from similar groups.[1]

In addition, Objectors are concerned that Defendant funds a large portion of the existing budget of many of these groups, and often provides funding in excess of the total budgets reported for online privacy programs.  Many of the groups are otherwise extremely well-funded or broad-based organizations that have a number of programs not related to consumer privacy online.

Finally, many of these groups, or the institutions with which they are affiliated, receive funding from Defendant or have other entanglements that were not reported to the Court.  Publicly available information reveals the following:

Berkley Center for Law & Technology reports "0" contributions from Defendant, but Google, Inc. is listed as a current "Corporate Benefactor" of the

---

[1]  Wendy Davis, *Google Tries to Kibosh Funding of Critic*, MediaPost News, Online Media Daily (Feb. 25, 2009) available at http://www.mediapost.com/publications/?fa=Articles.showArticle&art_aid=100929.

Center (http://www.law.berkeley.edu/bcltsponsors.htm).   In addition, the Center lists law firm WilmerHale as a "Benefactor;" the firm represents Google.   Google is also a sponsor of the 2010 "Privacy Law Scholars Conference" convened by the Center and George Washington University Law School (http://docs.law.gwu.edu/facweb/dsolove/PLSC/).

Carnegie Mellon, CyLab Usability, Privacy & Security Lab reports funding from Defendant, but fails to report the access to Google "tools, technologies, and expertise" included with at least one of the grants it provided (http://research.google.com/university/relations/focused_research_awards.html).

Indiana University, Center for Applied Cybersecurity Research reports "0" Defendant funding, but its director (http://www.fredhcate.com/affiliations.shtml) is also a senior policy advisor for the Center for Information Policy and Leadership, which does receive Google money (http://www.hunton.com/Resources/Sites/general.aspx?id=342).

Stanford Center for Internet & Society receives so much money from Google (over 50 percent of its budget) that it has actually agreed to refrain from all litigation involving Google (http://cyberlaw.stanford.edu/about).   How it can reconcile this position with being a further recipient of Google funding in this lawsuit is unexplained.   However, it is clear that an organization that bars itself from being critical of Google cannot serve the class interest in a case like this.

The above concerns are by no means an exhaustive list of the hidden conflicts of interest presented by Class Counsel's selections.   Objectors raise these issues before the Court not to attack these organizations, many of which do important work, but to heighten the Court's awareness of the political landscape from which the nominees were selected.

**B.**     **Class Counsel Improperly Sought Defendant's Approval Prior to Submitting the List of *Cy Pres* Recipients to the Court**

Objectors also strongly question the basis for Defendant's involvement in

4

the selection process that resulted in the 12 nominees anointed by Class Counsel. Objectors respectfully urge the Court to review all applications provided to Class Counsel and not substitute Class Counsel's Defendant-influenced judgment in deciding which *cy pres* nominees to fund.

Pursuant to the original, flawed settlement agreement—to which Objectors continue to strenuously object—Class Counsel and Google were to mutually agree on the *cy pres* recipients. (Settlement Agreement, ¶ 3.4(b).) Objectors argued at length that any such mystery *cy pres* award was improper (E.g., Zimmerman Brief [Doc. No. 83], pp. 14–18; Jackson Brief [Doc. No. 74], pp. 9–10; Rudgayzer Brief [Doc. No. 80] pp. 11–12), and that the settlement agreement exhibited the hallmarks of a collusive settlement.

These matters were argued at the hearing on final approval and Court issued its Order of February 16, 2011, thereafter. For Objectors' part, it seems clear that while Defendant was permitted to make nominations of *cy pres* recipients, the Court did not intend for Defendant to be involved in the final selection of the nominees. Objectors maintain that permitting Google to do so violates the spirit of the February 16, 2011 Order and the purposes of the settlement. Particularly given Defendant's pattern of attempting to exert control over *cy pres* recipients in the past (see, e.g., *supra*, footnote 1), the Court should be vigilant against Defendant's influence here and the detriment to the class interests.

As noted above, in order to avoid Defendant's improper influence on the *cy pres* recipients, Objectors respectfully request the Court order Class Counsel to divulge all applicants for the *cy pres* funds, the details surrounding its selection procedure, including communications with Defendant, and select *cy pres* recipients from all applicants or other organizations without regard for Class Counsel and Google's suggestions.

### C.   Objectors Reiterate Objections to the Pending Proposed Order

Objectors continue to assert that the entire settlement is improper for the

1   reasons set forth in their previous briefing and argument.   This objection to

2   Proposed Order and Final Judgment is not offered as a waiver of any previous

3   objection, but only to express Objector's continuing concerns on behalf of the

4   class membership.

5         Specifically, Objectors continue to assert that, in addition to the above, the

6   relief in the settlement is inadequate and illusory, that there are defects in the

7   notices and the breadth of the class definition (including, but not limited to, the

8   inclusion of personal injury and other actual damage claims in the release), that *cy*

9   *pres*-only distribution is improper in a class action for statutory damages resulting

10  from violations of federal privacy statutes, and that the settlement appears to

11  demonstrate collusion between Class Counsel and Defendant.

12  ///

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Objections to Proposed Order

1    In light of the foregoing, Objectors respectfully request the Court reject the

2  settlement as previously proposed, or, in the alternative, at least select the *cy pres*

3  recipients without regard for the nominees culled by Class Counsel and Defendant

4  from the complete pool of applicants.

5

6   Dated:  March 30, 2011                     JOSHUA R. FURMAN LAW CORP.

7

8
                                        By:   /s/ Joshua R. Furman
9                                            Joshua R. Furman
                                            *Attorney for Plaintiff-Objector,*
10                                           Jon M. Zimmerman

11

12                                      STATMAN, HARRIS & EYRICH, LLC

13

14
                                        By:   /s/ Jeffrey P. Harris
15                                           Jeffrey P. Harris
                                            Alan J. Statman
16                                          Melinda S. Nenning
                                            *Attorneys for Plaintiff-Objector,*
17                                          Alison Jackson

18

19                                      OSBORN LAW, PC

20

21
                                        By:   /s/ Daniel A. Osborn
22                                           Daniel A. Osborn
                                            *Attorneys for Plaintiff-Objector,*
23                                          Tanya Rudgayzer

24

25

26

27

28

Objections to Proposed Order

# EXHIBIT 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re SONY PS3 "OTHER OS" LITIGATION | ) ) ) ) ) ) ) ) ) ) | Case No. 4:10-cv-01811-YGR<br><br>**DECLARATION OF STEPHEN J. CIRAMI REGARDING CLASS MEMBERS AND OBJECTORS JOHN NAVARRETE AND MASON APOSTOL** |

I, STEPHEN J. CIRAMI, declare and state as follows:

1.    I am the Executive Vice President and Chief Operating Officer of Garden City Group, LLC ("GCG"). The following statements are based on my personal knowledge and information provided by other experienced GCG employees working under my supervision, and if called on to do so, I could and would testify competently thereto.

2.    On December 7, 2016, the final day Claim Forms could be electronically submitted by Class Members, GCG received via email at 11:24 pm Eastern Standard Time a completed Claim Form from Class Member John Navarrete. The Claim Form included Mr.

Navarrete's phone number.

3. On December 7, 2016 at 8:24 pm Eastern Standard Time GCG received an incoming call to the toll-free Settlement Helpline from the phone number provided on Mr. Navarrete's Claim Form. The caller navigated the Interactive Voice Response ("IVR") system and then ended the call. The caller did not speak with a live operator. The option to speak with a live operator on the Settlement Helpline is available between 8:00 am and 6:00 pm Eastern Standard Time.

4. Based on GCG's call records, GCG has not received any other calls from someone using the phone number provided on Mr. Navarrete's Claim Form.

5. To date, GCG has not received a Claim Form from Class Member Mason Apostol.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 10th day of January, 2017 in Lake Success, New York.

_____

Stephen J. Cirami