UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA     **ORIGINAL**

Before The Honorable Yvonne Gonzalez Rogers, Judge

| | |
|---|---|
| In re SONY PS3 "OTHER OS"   ) <br> LITIGATION             ) <br>                ) <br>                ) <br> _____) | **Motion for Final Approval** <br> **of Class Action Settlement** <br><br> NO. C 10-01811YGR <br><br><br> **Pages 1 - 38** <br><br> Oakland, California <br> Tuesday, January 24, 2017 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiffs:        Finkelstein Thompson LLP
                      One California Street, Suite 900
                      San Francisco, California  94111
               BY:  ROSEMARY M. RIVAS, ATTORNEY AT LAW

                      Hausfeld LLP
                      1700 K Street, NW, Suite 650
                      Washington, D.C.  20006
               BY:  JAMES J. PIZZIRUSSO, ATTORNEY AT LAW

For Defendant:        Sacks, Ricketts & Case, LLP
                      177 Post Street, Suite 650
                      San Francisco, California  94108
               BY:  WILL DUGONI,
                           MICHELE FLOYD,
                           NEEL LIMAYE,
                           LUANNE SACKS, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography; transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

# A P P E A R A N C E S (CONT'D.)

For Objector Navarrete: Joshua R. Furman Law
                        14724 Ventura Boulevard, Suite 509
                        Sherman Oaks, California  91403
                 BY:    JOSHUA R. FURMAN, ATTORNEY AT LAW


For Objector Lindberg:  Law Office of Sam Miorelli, P.A.
                        764 Ellwood Avenue
                        Orlando, Florida  32804
                 BY:    SAM ANDREW MIORELLI, E.I., ESQ.


--o0o--

```
 1   Tuesday, January 24, 2017                      2:02 p.m.
 2                   P R O C E E D I N G S
 3        THE CLERK:  Calling civil action 10-1811, In Re:
 4   SonyPS3 and Other OS Litigation case.
 5      Counsel, please come forward and stated your appearances.
 6        MS. RIVAS:  Good afternoon, your Honor.  Rosemary
 7   Rivas on behalf of plaintiffs.
 8        MR. PIZZIRUSSO:  Good afternoon, Your Honor.  James
 9   Pizzirusso on behalf of plaintiffs.
10        MS. SACKS:  Good afternoon, Your Honor.  Luanne Sacks
11   on behalf of defendant Sony Computer Entertainment America.
12        THE COURT:  Do I have all the appearances from the
13   plaintiffs?
14        MS. SACKS:  Yes, Your Honor.  It's objectors.
15        THE COURT:  Oh, okay.  Hold on.
16              (Simultaneous colloquy.)
17        THE COURT:  Hold on.  So go ahead.
18        MS. SACKS:  Thank you.  Michele Floyd, William
19   Dugoni, and Neel Limaye also on behalf of defendant Sony
20   Computer.
21      Thank you.
22        THE COURT:  All right.  Thank you.
23        MR. FURMAN:  And good morning.  Joshua Furman
24   appearing for Objector John Navarrete.
25        MR. MIORELLI:  Good afternoon, Your Honor.  Sam
```

1   Miorelli appearing on behalf of Objector Eric Lindberg and his

2   mother Susan Lindberg.

3          **THE COURT:**  Okay.

4       All right.  Well, I'll hear from the objectors first.

5          **MR. FURMAN:**  Good afternoon, Your Honor.  Joshua

6   Furman for John Navarrete.

7       The principal issue here is something that I think

8   court -- you had your finger on when we were -- the other

9   parties were here for the preliminary approval hearing, how is

10  this settlement going to be evaluated, and how are we going to

11  be able to figure out if this is an adequate settlement that

12  serves the purposes of the class?

13      Well, we have the numbers now, and as I stated in my

14  opposition to the motion for final approval, they're terrible.

15  The numbers that -- that were published at that time with

16  Mr. Cirami's declaration showed a total settlement value of

17  approximately $209,000.  And this is judged against a --

18  attorney fee of over $2 million.  And I'll get to the

19  interplay between those two in a moment.

20      But the first thing that the court should be considering

21  is, of course, the adequacy of the settlement, how does that

22  amount of money compensate this class -- this entire class as

23  defined in the settlement agreement -- for the injury that

24  being -- that's been sued on.

25      Since that time --

```
 1              THE COURT:  Can you tell me about your background in
 2     class action and -- in this particular kind of lawsuit.
 3              MR. FURMAN:  In class -- consumer class action
 4     lawsuits, Your Honor?
 5              THE COURT:  Yes.  Do you have any professional
 6     background?
 7              MR. FURMAN:  Yes.  As an objector, I have.
 8              THE COURT:  Not as an objector.  As -- You said
 9     you're a lawyer?
10              MR. FURMAN:  Yes, Your Honor.
11              THE COURT:  Okay.  That's what I thought.  I'm just
12     making sure.
13              MR. FURMAN:  Okay.
14              THE COURT:  Have you ever litigated these kinds of
15     cases on behalf of plaintiffs or defendants?
16              MR. FURMAN:  I've done consumer class action on a
17     defense side, yes.
18              THE COURT:  Okay.  How many cases have you litigated?
19              MR. FURMAN:  One case.
20              THE COURT:  How many objections -- You said -- I
21     think you referred to yourself as -- well, you used an
22     interesting phrase, but are you a professional objector's
23     attorney?
24              MR. FURMAN:  Well, I'm a professional attorney, and I
25     have represented objectors.
```

```
1              THE COURT:  How often?

2              MR. FURMAN:   The professional objector --

3              THE COURT:  How often?

4                     (Simultaneous colloquy.)

5              THE COURT:  So --

6              MR. FURMAN:   In the --

7              THE COURT:  Just hold on.

8              MR. FURMAN:   You -- I can give you a number.

9                     (Simultaneous colloquy.)

10             THE COURT:  You don't have to fold your arms.  I'm

11    just trying to get some background.

12        One of the privileges that a judge has is that we're able

13    to interrupt people.

14             MR. FURMAN:   I apologize.

15                     (Simultaneous colloquy.)

16             THE COURT:  And when we interrupt, you need to be

17    quiet.  So don't interrupt me, but you need to be quiet when I

18    interrupt.

19        So how many times -- and I'm not saying that I disagree

20    with your argument.  I want to know who you are as much as I

21    can.

22        So how many times in 2016 did you object to settlements?

23             MR. FURMAN:   Zero.

24             THE COURT:  Okay.  So how many objectors have you

25    represented?
```

1          **MR. FURMAN:**  I have filed objections in a total of

2   eight cases including this one in a 13-year career.

3          **THE COURT:**  All right.  Go ahead.

4          **MR. FURMAN:**  I mean, for what it's worth, yes, I

5   filed a total of eight objections, some of which class

6   counsel's able to find, some of which they were not able to

7   find.  I filed no objections in the past two years.

8       It's not something that I do very often.  I handle

9   hundreds of cases, and I've just done a few of these

10  objections where it seems to me like an important issue.

11         **THE COURT:**  And what compelled you to do it here?

12         **MR. FURMAN:**  The main thing that compelled me to do

13  it here is we were looking at the class issues between Class A

14  and Class B.  That's the initial thing that caught my eye.

15  And we filed that with our objection.

16         **THE COURT:**  Did you contact the person you are

17  representing, or did they contact you?

18      How did you come to know about this case?  What

19  precipitated your involvement?

20         **MR. FURMAN:**  I received a notice.

21         **THE COURT:**  So you're part of the class?

22         **MR. FURMAN:**  I haven't filed a claim, but I have --

23  would be part of the putative class.

24         **THE COURT:**  Okay.

25      And after you received a notice, you found another person

 1     who received a notice, or they found you, or what?

 2            **MR. FURMAN:**  I don't recall precisely, Your Honor.

 3     I've represented this person before, and we ended up talking

 4     about the case.

 5            **THE COURT:**  And how many times have you represented

 6     this person before?

 7            **MR. FURMAN:**  This is the second time I've represented

 8     him.

 9            **THE COURT:**  Okay.  Continue.

10            **MR. FURMAN:**  To set the record straight on the other

11     objections I've done, we have succeeded in having the *cy pres*

12     changed in one of those cases.

13         We have succeeded in having a coupon settlement changed

14     into a cash and coupon settlement in one of those cases.  That

15     would be the *Ticketmaster* case, which we actually -- our

16     objections were sustained in toto the first time it was heard.

17     The second time around, we objected again, and the settlement

18     was approved.

19         I was part of an objector group that we were able to get

20     $12 million back from the class -- for the class in the

21     *Rodriguez vs. Disner* case, the -- the one that class counsel

22     cited was the second time it went through.

23         And then in *Google Buzz*, we did get the -- the *cy pres*

24     changed.  We got a new *cy pres* recipient put in, so I mean,

25     this is -- I appreciate the -- the inquiry, but, you know,

1    it's always odd to be defending one's self when -- you know,

2    this seems to me the only area of law where a little bit of

3    the experience seems a detriment.

4         **THE COURT:**  But I never said that.

5         **MR. FURMAN:**  I was talking about the allegations we

6    received from the other side.

7         So what I was speaking about before, Your Honor, were just

8    the numbers in this case.  And once we got the final

9    statement, at least the most recent statement from the

10   administrator, the numbers got even worse.

11        First of all, there was a -- a change, approximately six

12   phantom claims that were not set forth in the initial

13   declaration of Mr. Cirami that brought the total of Class A

14   claims up to 2,352.

15        And then they've rejected 589 Class A claims as invalid,

16   and they provide a log for it.  But it doesn't look like

17   people who provided a Class A claim, that the evidence was

18   somehow deficient in a way that it's very hard to judge based

19   on the log that we have.  It doesn't look like they're going

20   to get any money at all.

21        We don't have any information about that, so I hope that

22   class counsel takes the opportunity to speak to that issue

23   'cause they are obviously within the class if they've

24   submitted anything and should be able to receive at least a

25   Class B benefit.

1    When those numbers, which come out to a total of $177,695

2    for the benefit of the class are compared to class counsel's

3    fee, that should raise very significant problems.   The issue

4    is not how much class counsel is getting.   That's not really

5    the issue.   The issue is the comparison.

6    Now, there is state law that class counsel cited to that

7    said, well, we don't look to disproportionality when we're

8    deciding whether a fee is correct or not, and that's correct.

9    However, what we do -- we do look to disproportionality

10    when we're talking about approving a settlement because this

11    court has to decide whether it's adequate, and they have to

12    decide whether or not the representation was adequate.   And

13    when you've got this kind of disparity, which now comes out to

14    over 1200 percent of the -- of the -- the fee is 1200 percent

15    of the total amount that the class is getting, which, of

16    course, you haven't approved that yet, but that's what's being

17    asked for.   That's -- that's a problem.

18    That is something that this court should be looking at and

19    saying this is not a settlement that has succeeded.   This is

20    not a settlement mechanism that has succeeded.   The claims

21    process has not been able to provide adequate compensation to

22    the class, and the claims process is not providing adequate

23    compensation to anybody other than a very small group of the

24    class, who -- who have put in for the claims.

25    And that's why we've asked that this court consider that

1    the *cy pres* option should be made.  We're not asking for a

2    snazzier settlement, as been accused.  We're asking for a

3    settlement that actually provides a benefit to the class, a

4    tangible benefit, a concrete benefit to the class that -- that

5    gives some gravity to the kind of violation that's been

6    alleged in this case.

7        I'll turn quickly to some of the points that were made in

8    the response to objections that were filed by both class

9    counsel and defense counsel.  I've already talked about the

10   fact that I haven't file any objections in the past two years.

11   I'll also point out that requirement was not in the notice.

12       On the facts, there was a concern that my client said he

13   called the number for the settlement administrator but they

14   said he only called once after -- after hours.

15       I can tell the court that he called then because I asked

16   him to and that even I personally called earlier that day and

17   couldn't get through, but that later phone call is 'cause I

18   asked him to call again to make sure.

19       But there's -- on the -- but this brings back the -- the

20   question that the court was concerned about during the

21   preliminary approval hearing.  Why are we asking for serial

22   numbers?  What is the issue that needs to be take -- dealt

23   with, and what -- what is the true purpose of asking for

24   serial numbers?

25       And I quoted some language from a Florida decision

1   recently that talked about, well, there's these concerns about

2   fraud that get raised by defendants in this case.  In

3   particular, in this case, we're told that's what Sony's

4   express concern was.

5       But it's too often this claims process -- particularly

6   were you need documentation of this level of something that

7   happened over ten years ago -- is meant to simply put a choke

8   hold on the claims to ensure that more claims don't get filed.

9   And because of the structure of this settlement, that fact is

10  particularly important.

11      In this case, if more claims don't get filed, that reduces

12  the overall liability.  There is not a set amount that's being

13  given for the benefit of the class.  And it -- And that's what

14  we keep coming back to is the main problem in this case.

15      You can't evaluate the adequacy without knowing that

16  amount.  Now that we know the amount, it's patently

17  inadequate.  And the structure of the claims process was put

18  in place to ensure that would happen.

19              THE COURT:  All right.  Thank you.

20              MR. FURMAN:  I could address anything else if the

21  court's interested.

22              THE COURT:  Mr. Miorelli.

23                  (Pause in the proceedings.)

24              MR. MIORELLI:  Good afternoon, Your Honor.

25              THE COURT:  Good afternoon.

```
 1            MR. MIORELLI:  I'm Sam Miorelli, and I represent

 2   objector Lindberg.

 3            THE COURT:  Okay.  Can you give me your background as

 4   well, sir?

 5            MR. MIORELLI:  Yes, Your Honor.  I am a attorney.

 6   I've been licensed for about four and a half years.  I was

 7   admitted to the bar in 2012.

 8      We set forth in our objection the objections that I have

 9   personally been involved in, as well as the ones that

10   Mr. Lindberg has been involved in in the past two years.  I

11   can go through them if you'd like.

12            THE COURT:  And do you have any experience litigating

13   these kinds of cases, Mr. Miorelli?

14            MR. MIORELLI:  Representing, like, plaintiffs or

15   defendants?

16            THE COURT:  Correct.

17            MR. MIORELLI:  No.

18            THE COURT:  Okay.  Go ahead.

19            MR. MIORELLI:  So the first issue I'm starting is --

20   is the issue the plaintiffs have raised which is whether or

21   not my client is a class member.  He was 15 years old at the

22   time that the PS3 that he owns and has always owned was

23   purchased by his mother for him.

24            THE COURT:  Right.  I read the papers.

25            MR. MIORELLI:  Okay.
```

1          **THE COURT:**  Is there something else that you want to

2     say with respect to that?

3          **MR. MIORELLI:**  Yeah, the -- the main thing we want to

4     talk about this is that this is not a frivolous argument for

5     us to make.  And, you know, class counsel, they're -- they

6     say, well, we cite no law that says that this interpretation

7     is authorized.  They notably don't cite any law that says that

8     our interpretation is prohibited.

9          The cases they cite in their opposition to us authorize

10     the court to decide against us for sure but don't require it.

11          This court has the latitude to make the determination of

12     what is fair, reasonable, and adequate for the class.  And I

13     think that also applies to this question of Mr. Lindberg.

14          You know, I'll note that the ad hominems have been flying

15     fast and furious at my client, and that's exactly why it's not

16     been my practice when I've represented objectors to bring in

17     extraneous parties to an objection, because I have to candidly

18     tell my client that they're likely to be the subject of an ad

19     hominem attack.  Obviously, that's not something that one

20     should willingly subject someone to without it being

21     absolutely necessary.

22          We brought who was the injured party here, and that's

23     Mr. Lindberg.  This argument that, you know, we did not seek

24     reconsideration of preliminary approval order or any of those

25     things, you know, the class hasn't -- the plaintiffs have not

1　sought reconsideration of the issues of the dates of the -- of

2　the fee motion.  And we promptly went and found Mrs. Lindberg

3　and talked to her about it and brought her before the court

4　to -- to resolve any of their issues because we're not

5　interested in actually litigating side issues.  We're

6　interested in talking about the merits of this particular

7　settlement.

8　　　　　　THE COURT:  All right.  So why don't you move to

9　that.

10　　　　　　MR. MIORELLI:  Okay.

11　　　So the first thing is just talking about some of the other

12　objections, we're not the only objector who believes that this

13　lack of notice to the individual owners is unreasonable.

14　Objector Henton agreed with that position.

15　　　We're not the only objector who believes the process to

16　file a claim was un- -- was un- -- was burdensome.  Pro se

17　Objector Bowerman also raised that, as well as objector

18　Navarrete.

19　　　The -- And I'm going to skip talking about the claims-made

20　process.  I'll just point out that this is a response rate of

21　.11 percent, which shows the problems here.

22　　　Now, I want to focus on -- on *Bluetooth*, which is that

23　this settlement manages to raise all three of the red flags

24　pointed out in *Bluetooth*.

25　　　There's -- There's a disproportionate distribution to

1   counsel, as prior counsel has talked about.  There's a clear

2   sailing agreement where Sony agrees not to oppose it.  And

3   there is a kicker provision.  So it's important to remember

4   that Sony is not ambivalent about -- well, they are ambivalent

5   about how the money's distributed 'cause they're -- they're

6   the common source of funds.  And -- And the law does not

7   require the court to only worry about *Bluetooth* if there's a

8   common fund given to the class members.  The court can also

9   consider that when there's a common source of funds.  And

10  here, there is a common source of funds.  There's -- Sony pays

11  one amount.

12      Now, the fact that the settlement agreement ties that in

13  multiple buckets of money and multiple payments doesn't change

14  the fact that it all comes from one corporate defendant.  And

15  so to the extent that attorneys' fees are higher or mechanisms

16  are in there to reduce the number of claims, that -- that all

17  affects the constructive common fund which courts have

18  consistently looked at.

19      We strongly believe that class counsel, before saying that

20  a settlement is fair, reasonable, and adequate, should explain

21  to the court and by virtue of the court, the absent class

22  members, what their estimation of the actual value of the case

23  if it was successful at trial was.

24      And it's -- it's a glaring lack of anywhere in here that

25  there's any sort of explanation of -- of what did they think

1    they could get.  What was their best-case scenario.  And it's

2    possible to conduct the balancing that this court is required

3    to do if you don't know what you're balancing against.  And

4    there's -- there's -- there's been no effort even after our

5    objection to bring any of that information out.

6        You know, we don't think that attorneys' fees can be split

7    amongst the attorneys without a court knowing about it,

8    especially to the extent they try to characterize these

9    attorneys' fees as based on a lodestar.  If one of the firms

10   on the plaintiffs' side has accepted a discount on their

11   attorneys' fees, the class should know that and should know

12   whether that discount is benefiting Sony?  Is that a discount

13   benefiting the class?  Or is that discount benefiting one of

14   the other plaintiffs' firms.  We think that Rule 23H requires

15   that.

16       And then the final point -- and I think we've covered the

17   release adequately in our objection but just to point out that

18   in light of our objection, the parties now disagree about what

19   the release covers.  And we think that vindicates our position

20   on that issue.

21           **THE COURT:**  Thank you.

22           **MR. MIORELLI:**  Thank you, Your Honor.

23           **THE COURT:**  Ms. Rivas.

24           **MR. WHITTAKER:**  Good afternoon, Your Honor.

25           **THE COURT:**  Good afternoon.  I will start by letting

| | |
|---|---|
| 1 | you know that I am not inclined to approve this settlement.  I |
| 2 | am deeply concerned with many issues. |
| 3 | **MS. RIVAS:**  Okay. |
| 4 | **THE COURT:**  First, the disproportionality is one of |
| 5 | the -- let me say it this way.  I'm not exactly sure why the |
| 6 | attorneys' fees are what they are given how little happened in |
| 7 | this courtroom. |
| 8 | So you should know in the future that I always require, |
| 9 | unless I have incredible experience with a case by numerous |
| 10 | motions that I've personally overseen in terms of litigation, |
| 11 | and even then, I usual require -- I require seeing attorneys' |
| 12 | billings. |
| 13 | It is -- This is a public forum.  You have asked this |
| 14 | court to appointment you in a public capacity, that is, as a |
| 15 | class attorney.  The class has the right to know. |
| 16 | Transparency is important to me so summaries are insufficient. |
| 17 | I expressed concerns at the outset with the nature of this |
| 18 | settlement, and I do believe with or without the objections |
| 19 | that have been made that we would be in the exact same place. |
| 20 | And that is that the process that was put in place which |
| 21 | was adjusted midway demonstrates that my concerns at the |
| 22 | outset were right. |
| 23 | So the Ninth Circuit recently in *Briseno vs. ConAgra Foods* |
| 24 | has made clear its perspective on class settlements, on |
| 25 | ascertainability, and reminded district courts that, in part, |

1    these class actions are there to serve a public purpose.

2        Now, I don't necessarily agree that just because some

3    plaintiff's expert says that they are going to -- in

4    litigation posturing says that they can get 4- or

5    $500 million, that the reality of a trial means that that

6    would happen.  And I'm talking hypothetically.

7        So my ability to evaluate is not necessarily dependent on

8    what some expert's report might be, as suggested by one of the

9    objectors, that somehow you have to have those numbers.  But I

10   do have to have some sense as to how you're getting to the

11   numbers that you're getting to.

12       And in this case, it is not at all clear to the court how

13   this settlement came to be in the sense of what you

14   anticipated or what you thought the claim rate was going to

15   be.

16       It is clearly apparent that the process that you assured

17   me would work did not and that it was over burdensome, and it

18   certainly wasn't executed in a competent manner.  Dates were

19   messed up -- I mean, there was all sorts of problems with it.

20       So the notion that I'm going to approve a settlement that

21   says approximately the class gets under 200,000 and attorneys

22   get over 2 million is low to none.  But I'll let you address

23   the court.

24           **MS. RIVAS:**  Thank you, Your Honor.  I appreciate

25   that.

1    In terms of the claims rate, I understand how it appears

2    that the claims rate is very low.

3         **THE COURT:**  It appears?

4         **MS. RIVAS:**  It -- Right, because there's 10 million

5    purchasers.  However, I'd like the court to please consider

6    certain facts about the case.

7         First, we did not know how many people utilized the other

8    OS feature so we had to work off of certain figures, one of

9    them being 40,000 people did not download firmware update 3.21

10   presumably because they wanted to continue using the feature.

11        Second, only 620 people complained to Sony about the

12   firmware update or made an inquiry.

13        Third, during the course of this seven-year -- six-year

14   litigation, we took discovery on those issues, and we also had

15   two mediations.  At one of the mediations, defendants shared

16   information with us showing that 90 percent of the people who

17   bought the PS3 were unaware that the other OS even existed.

18   That means there's a million people who were aware.

19        Out of that million people, Sony -- Sony's survey showed

20   that 2 percent cared about the feature.  That takes it down to

21   20,000 people who cared about the feature.

22        So throughout the litigation, Sony has argued most of the

23   class members have not been injured because they did not know

24   about this feature or they didn't even utilize it.  They said

25   if you go to trial, you're not going to prevail on those types

```
1    of claims.  And while I believe the company was wrong in

2    removing the feature, Your Honor -- And we consulted our own

3    experts -- we spent thousands of dollars on a damages expert,

4    on survey experts.  We did that ourselves during this six-year

5    litigation.  And we had to evaluate those results with what

6    defendant showed us and in light of all the other legal

7    defenses that Sony also had.

8         So in our view, the class -- and -- and -- is probably

9    smaller than the 10 million, although we did allow people who

10   did not use the feature, who didn't know about the feature but

11   felt they were harmed because of the update to make a claim.

12        So that's -- that's what we did, and -- but when you look

13   at the 20 --

14             THE COURT:  Let me ask you, Ms. Rivas?

15             MS. RIVAS:  Sure.

16             THE COURT:  How am I supposed to know any of this,

17   and how is the class supposed to know any of this?

18             MS. RIVAS:  Your Honor, this was in the responses to

19   the objections, and I believe defense counsel Ms. Floyd

20   submitted a declaration on that evidence.

21             THE COURT:  Do you have expert reports?

22             MS. RIVAS:  Not -- the expert reports --

23             THE COURT:  The ones that you referenced as part of

24   your analysis of the strength of your case.

25             MS. RIVAS:  We -- We did not get to that stage of
```

1    preparing those, Your Honor.  But I can tell you under oath

2    who we consulted with, and we view it as work product.

3        **THE COURT:**  Continue.

4        **MS. RIVAS:**  So when you look at the fact that the

5    class -- the people who really care about the other OS feature

6    is -- is about 20,000, and you look at how many claims were

7    submitted, over 10,000, that's -- that's a 50 percent claims

8    rate.

9        And I understand that you had a whole group of people who

10   didn't submit a claim for the $9, but we really did try to

11   make that as simple as possible, Your Honor, and I'll explain.

12       The two -- The two requirements that we had, because Sony

13   was very concerned about fraud.  And, of course, we are -- we

14   want people to file claims.  We would never intentionally try

15   to frustrate that.

16       **THE COURT:**  And I'm not suggesting that you do.  But

17   the concerns by defendants now with respect to fraud have to

18   be significantly downplayed and -- and significantly -- it

19   doesn't mean as much after *Briseno*.  Let me just say that.

20       Go ahead.

21       **MS. RIVAS:**  What we negotiated was people could

22   provide a serial number -- they could provide a receipt, but

23   we acknowledge that some people don't have those or they could

24   provide a serial number and a PlayStation I.D. number.

25       The problem is Sony doesn't sell directly to consumers, so

```
 1   Sony does not have the names of the purchasers.

 2             THE COURT:  But they have serial numbers.  Right?

 3             MS. RIVAS:  They have serial numbers that could be --

 4   but they don't know who -- if someone submits a claim with no

 5   serial number and the person doesn't have a serial number,

 6   they don't know if that person really bought the product.

 7             THE COURT:  Okay.

 8             MS. RIVAS:  So -- So what people could do instead of

 9   a receipt is they could submit a serial number and a PSN

10   network I.D. number.

11             THE COURT:  Right.  But this was the change in the

12   process partway through, correct?

13             MS. RIVAS:  I -- It was -- It was something I think

14   that in the claims process we decided that if someone didn't

15   have it, they could call, get a temporary I.D., Sony could

16   see -- Sony could see --

17             THE COURT:  My point is that at the start of the

18   process, that wasn't an option.

19             MS. RIVAS:  It -- It was -- Correct, Your Honor.  It

20   was not verbalized.  But when -- as soon as we knew that

21   someone was upset about it -- I think someone may have --

22             THE COURT:  Whoever has that phone better leave this

23   courtroom.

24             MS. RIVAS:  As soon as we became aware, Your Honor,

25   we worked with Sony and came up with a solution that was
```

 1    provided in the second round of email notice.  It went out to

 2    7 million people.  And we -- and subsequently people did

 3    utilize that procedure and obtain temporary I.D.'s.

 4          **THE COURT:**  So I have two questions.  One is what is

 5    the point of the temporary I.D.?

 6          And second, given that we all do everything online, why

 7    does anybody have to make a phone call?

 8          Why couldn't all of this be done online, given that we

 9    have some evidence of problems with the phones?

10          **MS. RIVAS:**  Well, Your Honor, I think Sony's defense

11    counsel can best speak to that.  What I would say is the

12    company has had issues with a data breach, and they're very

13    concerned about the -- their information with regards to their

14    customers.

15          What we did was -- it -- a lot of people -- I think it was

16    133 people ended up calling and none of them complained.  They

17    all got a temporary I.D. from the claims administrator so they

18    were able to submit claims.

19          But the purpose of the temporary I.D. was because Sony

20    doesn't have purchase records, it does have a record of

21    someone who registers on the PlayStation Network to play video

22    games.  And as part of that registration process, you can --

23    there -- there may be a serial number associated with it, but

24    that does not mean that that person owns that -- that PS3.

25          It -- Someone who -- who can -- can register on the PSN

 1    network and not even own a PS3.  They could be using their

 2    friend's PS3 or, you know, a family member.

 3        So that was -- that was the purpose, Your Honor.  It

 4    wasn't to make it difficult.  And we did have people submit

 5    claims -- utilize -- had no problems utilizing that process.

 6            **THE COURT:**  Did you answer my question about what the

 7    point is of a temporary I.D.?  I still don't understand.  I've

 8    got a -- I've got a serial number.  Somehow it's going to be

 9    registered.  What was the point of the I.D.?

10            **MS. RIVAS:**  Oh, it was provided to people who did not

11    have a serial number, Your Honor.  So if they did not have a

12    serial number but they had a PSN I.D., they could call the

13    claims administrator, get a temporary I.D., and Sony could

14    find a serial number associated with the PSN I.D. number.

15            **THE COURT:**  All right.

16            **MS. RIVAS:**  Your Honor, in terms of the attorneys'

17    fees issue and the disproportionality -- and I apologize that

18    the time records were not produced.  We can do that.  In -- We

19    could do that as -- you know, very quickly.

20        What I would say, Your Honor, is the litigation has been

21    going on since 2010.  We filed it back, I believe, in May.

22    For a year, we engaged in pleading practice before Judge

23    Seeborg.  He dismissed the case.  It went up on appeal.  We

24    received a partial reversal.  We came back down two years

25    later.

 1          After that, we -- we reviewed thousands and thousands of

 2     documents.  We took the depositions of probably eight Sony

 3     employees, including its person most knowledgeable.  We

 4     engaged at the outset -- I think within the first year, in a

 5     mediation about -- with Retired Judge Warren, and then we

 6     engage in a second one after -- at the -- in 2015 while we

 7     were doing discovery, while we were talking to experts, while

 8     we were preparing for class certification.

 9          So a lot of -- a lot of work has been done in the case,

10     Your Honor.  We have -- Class counsel has a -- a lodestar of

11     2.6 million, which exceeds the requested fee.  When you

12     combine the lodestars of other firms who also had clients in

13     the case, who assisted us with document review, who filed

14     their own cases, the lodestar is significant.  It's 4.6

15     million total, so the -- the lodestar that -- or the fee that

16     we're requesting, Your Honor is essentially a negative

17     multiplier, a multiplier of almost 50 percent.

18          So we believe that when you look at all of that work that

19     we've done and you consider the claims rate, not in a vacuum

20     but in light of the *Hanlon* factors, the strength of the case,

21     the discovery conducted to date, the view of class counsel,

22     the risks of class certification.

23          I mean, one of the things that Sony has said is -- or two

24     of the things that Sony has said is, one, the PS -- the other

25     OS feature wasn't widely advertised.  We -- We think it was

```
 1    advertised and a lot of people knew about it.  That's what we
 2    thought when we filed the case.  Apparently that number is
 3    about 20,000 people, Your Honor.
 4         When you also consider California law, that the purpose
 5    under California law is to compensate attorneys' for pursuing
 6    small class member claims, California law -- it's acceptable
 7    under California law that there's sometimes be some
 8    disproportionality.  And we cited cases to Your Honor where
 9    sometimes the fees were 10 times, 20 times greater and -- and
10    I may be -- I'd have to go back to the cases, but they're
11    greater than -- than the recovery for the class.  And that's
12    because we put a lot of work into this case, but the claims
13    aren't -- aren't always that big.
14         And, you know, we really tried hard with the claims
15    process, with the notice -- we reached 86 percent of our
16    targeted audience, which was everyone 18 years and older who
17    owns a PS3 or a web-based console.  So our reach was right
18    where it should be.
19         And it was -- some -- some notice reaches are at the end,
20    like 70 percent or lower.  We were at 86 percent.  And that's
21    in the Cirami declaration.
22         And I will say if this settlement had been reached in the
23    first year, Your Honor, a lot of your -- I think a lot of your
24    concerns would probably be valid.  But we reached this
25    settlement, you know, five years later after a lot of hard
```

```
 1    work, nights, weekends, so --

 2              THE COURT:  Why not a fixed fund?

 3         MS. RIVAS:  Pardon?

 4              THE COURT:  Why not a fixed fund?

 5         MS. RIVAS:  We could --

 6              THE COURT:  It appears to me that Sony is getting

 7    a -- a windfall because there's no fixed --

 8              MS. RIVAS:  Your Honor, we considered that.  We -- We

 9    considered the claims-made process.  The -- Every -- All of

10    that was on the table at the beginning and at the end.  And at

11    the end, we had to make a decision in light of everything we

12    knew, what our experts told us, what Sony told us, what the

13    evidence told us.  We made a decision that it was fair,

14    reasonable, and adequate.

15         And we felt let's get the money in the hands of the people

16    who -- who care.

17         In terms of the -- the problem with the common fund, Your

18    Honor, is it's a very big group of people.  Sony -- Sony took

19    the position that, you know, only 20 -- 20,000 of these people

20    were harmed.  So I think Your Honor can see that that probably

21    would not have been a possibility to give every single --

22    10 million -- even if you give them -- you know, I wouldn't

23    want -- I wouldn't feel comfortable giving them fifty cents or

24    a dollar.  I feel better about giving a person who used the

25    other OS $55 because that is a substantial amount of the
```

 1   damages.

 2        And I will tell you, Your Honor, based on our experts and

 3   our consultations, that's more than what would be recovered at

 4   trial.  I can say that with confidence.  And -- So I felt

 5   better about giving those people who cared about it and

 6   submitted claims $55 as opposed to a coupon or even a dollar

 7   or $2 out of a common fund.

 8        The other thing I would note, Your Honor, is in terms of

 9   the process, we really -- we really tried to encourage claims

10   and make it as easy as possible.

11        We came up with five types of proof that people could

12   submit to claim the $55.  Those people, we have to remember,

13   are very sophisticated.  They are -- They are downloading a

14   separate operating system and using it to do all sorts of --

15   of things that I couldn't do and -- and I'm sure most people

16   couldn't do.  But they're a very sophisticated group of

17   people.

18        We provided five types of proof that they could give.  We

19   provided examples on the website.  That was a very good idea

20   that Your Honor had at the preliminary approval stage.  We did

21   that.

22        Additionally, as you submitted a claim online, we showed

23   people the types of proof that they could submit as they went

24   through the online process.

25        We also had a catch-all provision.  If someone had some

1    type of proof that we did not think of, they could submit

2    that.

3            **THE COURT:** So I still haven't heard why it was that

4    hundreds of claims were rejected?

5            **MS. RIVAS:** Your Honor, we -- we -- we filed a claims

6    log with the court, and it details what the deficiencies were.

7    Some of them were someone submitted a picture of, you know,

8    something unrelated to the case or receipts that were

9    unrelated to the case.

10       There -- There's a log, and I apologize I don't have it in

11   front of me, but it goes in detail as to what exactly the

12   problem was.

13       I will note, Your Honor, that we are going to send -- If

14   the court approves the settlement, we would send a deficiency

15   letter to the court -- I mean, a deficiency letter to those

16   groups of people, and we would give them time to cure their

17   claims or to elect to go to class B.

18       Someone has just -- one of my colleagues has just given me

19   a copy of the log, Your Honor.  For example, one thing that

20   someone submitted, an image of the bid sheet for constructing

21   a cart -- carport.

22       Document is a theater ticket (sic).

23           **THE COURT:** What about the ones where they gave you

24   statements?  You know, if this case -- if people go to trial

25   and they declare under penalty of perjury that they used or

1    had -- they used the product and they intended -- or were

2    harmed by the -- by the conduct of the defendant, that's

3    evidence.

4        So why isn't it sufficient evidence here?

5            **MS. RIVAS:**  Well, Your Honor, we would first have to

6    have a class certified, and we -- we prepare -- before we

7    would get to the stage; otherwise, these are all individual

8    cases.

9            **THE COURT:**  Of but --

10           **MS. RIVAS:**  And --

11           **THE COURT:**  But it's simultaneous in this context.

12           **MS. RIVAS:**  Your Honor, I will add that if someone

13   does not have -- if someone does not have that kind of proof,

14   they would get the $9 claim without -- with very little.  All

15   they would have to attest is that they were -- they were

16   injured by the firmware update.

17       Even though -- Even though they may not have known about

18   it, they will get $9, which is -- when you compare it to -- a

19   used PS3 constitutes about 20 percent.  If it -- If it is a

20   new PS3, which ranged in price from 299 to 399, it's 2 to

21   3 percent of the retail price.  And that's someone with --

22   with no proof at all that they -- that they used it.

23       But when you -- But I'd like to emphasize again that this

24   is a group of about 20,000 people.

25           **THE COURT:**  No.  I understand your perspective.

1          **MS. RIVAS:**  Okay.

2          **THE COURT:**  All right.  Anything from the defense?

3          **MS. SACKS:**  Yes, Your Honor, if I may.

4      Your Honor, I think one thing that has not been focused

5  upon that really deserves some attention is the reach of

6  notice.  Counsel did mention it.

7      But as she said, there was 86 percent.  If there was an

8  intent here on the part of anyone to try to reduce the number

9  of claims, notice would have been the first way to go at it.

10     Sony did after all have valid email addresses, as they

11 were scrubbed by the settlement administrator, for 8 million

12 purchasers of PS3.  So 8 million people received notice.  And

13 we know that because there were not bouncebacks from those

14 eight million.

15     In addition to that, Your Honor, the amount of Internet

16 advertising here is unprecedented.  One of the things that's

17 most important is to remember that when counsel was talking

18 about advertisements regarding the other OS feature, she

19 mentioned that they appeared in some specialized publications.

20 Those were Internet publications, Your Honor.

21     So what we did here was we went to exactly the same group

22 of Internet publications where those advertisements for the

23 other OS feature had be -- and by the way, they weren't

24 advertisements.  They were mentioned in interviews.

25     So we went to the same publications and we posted there

 1    about the settlement website.  This is what the settlement

 2    administrator did.  Therefore, the same people who were in the

 3    group looking at the publications that the other OS was

 4    discussed in were the group of people who received notice of

 5    this settlement.

 6        In addition to that, there were Tweets.  There were press

 7    releases.  There were running ads consistent with the CRA

 8    requirement of four publications over the course of a month.

 9    So the reach here -- there was one advertisement in which

10    there were 299 million impressions.

11            **THE COURT:**  So why is it that you should obtain a

12    release as broad as you're asking for?  Typically you wouldn't

13    get it in this kind of claims-based analysis.  And if you're

14    so certain of your -- of the factual basis for why you're

15    here, then why is the release so broad?

16            **MS. RIVAS:**  Your Honor, if this is my error, I

17    apologize for it.

18        I do not read that release nearly as broadly as is being

19    argued by the objectors.  When counsel said -- and I heard

20    him, that there's a disagreement between plaintiffs' counsel

21    and defense counsel about the scope of the release, that is

22    simply incorrect.

23        Our position, Your Honor, is that the proper way to

24    evaluate the scope of the release is at the time of the

25    subsequent class action or individual action when the court

1    sitting over that matter uses the identical factual predicate

2    rule and looks at the allegations before him or her and says

3    do these satisfy the identical factual predicate rule.

4         Now, the cases that were cited by one of the objectors.

5    There were nine cases cited about the scope of the release,

6    Your Honor.  Nine -- Of those nine, seven of those were on

7    preliminary approval.  It's the time at which, as Your Honor

8    did here, the court is sitting and looking at the matters

9    without the benefit of whatever might come in from an

10   objector.

11        In seven of those nine cases, Your Honor -- of which were

12   employment cases, the releases were so overbroad, they were so

13   beyond the pale, that the court sua sponte raised the issue of

14   the scope of release.

15        And why did the court do that?  Because those releases

16   were nothing like this.  In some of those cases, the

17   employment cases, people were giving general releases.  They

18   had nothing to do with their employment.  In other cases --

19             **THE COURT:**  You've made the point.  What else?

20             **MS. SACKS:**  So, Your Honor, if you don't need

21   anything else on the release, what I think is really important

22   to take away here is given the scope of the release, 80 -- I'm

23   sorry -- the scope of the reach of notice, the fact that we

24   had seven objections -- a total of seven objections, five of

25   which were timely -- has got to be taken into account here.

```
 1        Of all of those objections, there was only one objection
 2   as to the proof of use requirement for Class A, Your Honor.
 3   One, Your Honor.  And this is the group, as Ms. Rivas
 4   described, as particularly sophisticated and savvy.
 5        And interestingly, that one objector who said these proof
 6   of use requirements are too burdensome, he submitted valid
 7   proof of use.  He submitted an email letter that he had sent
 8   to someone -- a friend talking about it and saying in it, can
 9   you believe that Sony just issued firmware update 3.21?
10        Now, that was not what was one of the four specific
11   elucidated methods of proof but fell in the catch-all.  And it
12   was counted.
13        To go to the question Your Honor raised of why are there
14   so many claims that are being deemed not valid, I think it's
15   very important, Your Honor, to segregate Class A, which had
16   proof of use requirements, from Class B, which only had what
17   I'll call proof of purchase requirements.
18        Your Honor, in Class B, there is only 1.2 percent of the
19   claims that were submitted that were deemed by Garden City
20   Group to not be valid.
21        As I understand it, that was because the person didn't
22   submit anything other than the claim form.  We've already
23   talked about the fact some people said they didn't have a
24   serial number, so the temporary I.D. was created.
25        Ms. Rivas was correct, Your Honor.  We can't just give
```

1    people their account number online.  There've been -- We've

2    already been the victim of data breaches.  This case started

3    from the fact of a hack of the PlayStation 3.

4        But the intention was to enable anyone who provided their

5    PSN account number to receive that temporary I.D. that created

6    sort of a holding place for that, so that based on the

7    person's identification and based on the account number they

8    gave, Sony could go back and look at its records and say, oh,

9    yes, this is the person.  And that was then going to satisfy

10   their need for a serial number.

11       Your Honor, with regard to the proof of use requirements,

12   counsel already went through and explained what kind of

13   evidence of fraud we've been seeing.  Receipts for someone's

14   purchase of a dishwasher.  Pictures of engineering specifics

15   that had nothing to do with this case.  It's clear that we

16   have to give something.

17       And one of the reasons, Your Honor, that we have to have

18   something beyond just an attestation is let's go back and

19   think about what is at issue here.  The vast majority of these

20   units were purchased for between 299 and 399.  They have been

21   in use for years.  Most of them are still in use, Your Honor.

22   People got the value that they paid for.

23           **THE COURT:**  If 20,000 people, as you -- as it has

24   been represented to the court cared and were therefore harmed,

25   at a $55 rate, the amount of damages by your own admission

1    would be over a million dollars.

2        And yet here, the settlement fund is under 200.

3            **MS. SACKS:**  The question --

4            **THE COURT:**  So what kind of deterrent is that to a

5    defendant?

6            **MS. RIVAS:**  A deterrent in a case where we already

7    won a motion to dismiss and the court --

8            **THE COURT:**  Not as to everything, and the court of

9    appeal did not approve it as to everything.

10           **MS. RIVAS:**  That's absolutely correct, Your Honor,

11   because the court of appeal accepted the allegation that there

12   was ubiquitous advertising across the board, including on the

13   box, of the availability of the other OS.

14       And based on that fact acknowledged, as Your Honor brought

15   up during the preliminary approval hearing, that if, in fact,

16   there was ubiquitous advertising, there would not be the need

17   to show materiality here.

18       But as soon as Sony confirmed, which we have, that there

19   was no ubiquitous advertising.  There were very isolated

20   instances of references in interviews, materiality as well as

21   reliance comes back into play.

22       So one of the things that neither of the objectors paid

23   any attention to is the likelihood of success and the risk

24   that the class members would get absolutely nothing.

25       Last thing I would say, Your Honor, and then I'll close

 1    unless there's something I can answer for you is when 20,000

 2    people said they cared about the other OS feature, the

 3    question was not in the context of do you think you were

 4    harmed.  That's very important, Your Honor, because when the

 5    other OS was available for disablement through this firmware

 6    update, there were a lot of people who cheered Sony for doing

 7    it.

 8        As I said, the whole point of this came from the

 9    announcement of use of the other OS system to hack the PS3.

10    To many, many people, even though they liked the other OS

11    system among the 20,000, they would much rather have their

12    personally identifiable information, their credit card

13    information be secure than to be able to run an obscure

14    operating system.

15        Anything else I can answer, Your Honor?

16            THE COURT:  No.  I have other cases.  Thank you very

17    much.

18            MS. SACKS:  Thank you.

19            THE COURT:   Take it under submission.

20         (Proceedings were concluded at 3:54 P.M.)

21                          --o0o--

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that I am neither counsel for, related to,

7    nor employed by any of the parties to the action in which this

8    hearing was taken, and further that I am not financially nor

9    otherwise interested in the outcome of the action.

10

11                    _____

12          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13               Thursday, January 26, 2017

14

15

16

17

18

19

20

21

22

23

24

25