Luanne Sacks (SBN 120811)
lsacks@srclaw.com
Michele Floyd (SBN 163031)
mfloyd@srclaw.com
**SACKS, RICKETTS & CASE LLP**
177 Post Street, Suite 650
San Francisco, CA  94108
Telephone: (415) 549-0580
Facsimile: (415) 374-0640

Cynthia A. Ricketts (*pro hac vice*)
cricketts@srclaw.com
**SACKS, RICKETTS & CASE LLP**
2800 North Central Avenue, Suite 1230
Phoenix, AZ 85004
Phone: (602) 385-3370
Fax: (602) 385-3371

*Attorneys for Defendant*
*SONY COMPUTER ENTERTAINMENT AMERICA LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONY PS3 "OTHER OS" LITIGATION | Case No. 4:10-CV-01811-YGR |
| | **SUPPLEMENTAL BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS** |
| | Date:           November 7, 2017 |
| | Time:           2:00 p.m. |
| | Judge:         Hon. Yvonne Gonzalez Rogers |
| | Courtroom: 1, 4th Floor |

**TABLE OF CONTENTS**

I.    INTRODUCTION AND SUMMARY OF THE SETTLEMENT ................................................. 1

II.   THE EVIDENCE IN THE UNDERLYING LITIGATION ................................................. 2

      A.    DISCOVERY CONFIRMED THAT THE OTHER OS WAS NOT A "CORE
            ADVERTISED FEATURE" ................................................................................. 3

      B.    DISCOVERY CONFIRMED THAT SCEA REPEATEDLY DISCLOSED ITS
            EXPRESS CONTRACTUAL RIGHT TO DISABLE THE OTHER OS .......................... 6

            1.    The PS3 Packaging Disclosed That Console Functionality Could Change ........... 6

            2.    The SSLA Disclosed SCEA's Right to Remove the Other OS Functionality ....... 6

            3.    The PSN TOS Also Disclosed SCEA's Right to Remove the Other OS ............... 7

            4.    The Express Hardware Warranty Disclosed that Updates Could Cause a Loss of
                  Functionality ............................................................................. 8

      C.    DISCOVERY DID NOT SUPPORT PLAINTIFFS' "10 YEAR" THEORY ................... 8

III.  SETTLEMENT NEGOTIATIONS WERE ARM'S-LENGTH ......................................... 9

IV.   ARGUMENT ........................................................................................ 10

      A.    THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE ......................... 10

            1.    NEGOTIATIONS WERE AT ARM'S-LENGTH, MAKING THE
                  SETTLEMENT PROCEDURALLY FAIR ......................................... 11

            2.    THE SETTLEMENT IS SUBSTANTIVELY FAIR AND ADDRESSES ALL
                  PREVIOUSLY ARTICULATED DEFICIENCIES ............................... 12

                  a.    Claims, Fees, and Costs Will Be Paid From A Common Fund ............... 12

                  b.    The Claims Process Has Been Simplified ................................. 13

                        i.    The Claims Period Has Been Lengthened And All Previously
                              Submitted Claims Will Be Paid ..................................... 13

                        ii.   The Parties Have Eliminated Proof Requirements ....................... 13

                        iii.  The Benefit Amount Of $65 Is Likely More Than Plaintiffs Would
                              Have Recovered At Trial ........................................... 15

                  c.    The *Bluetooth* Factors Are Satisfied ................................... 16

            3.    THE SETTLEMENT ADDRESSES THE PREVIOUS OBJECTORS'
                  CONCERNS ............................................................... 16

      B.    THE SETTLEMENT FALLS WITHIN THE RANGE OF POSSIBLE APPROVAL .... 18

i

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1. THE EXTENT OF DISCOVERY COMPLETED, THE STRENGTH OF PLAINTIFFS' CASE, AND THE RISK OF CONTINUED LITIGATION WEIGH STRONGLY IN FAVOR OF PRELIMINARY APPROVAL............... 19

    a. Extensive Discovery Was Completed And The Parties Were On The Eve Of Summary Judgment When They Initially Settled................................ 19

    b. The Evidence Presented Challenges on the Merits................................... 20

        i. The "Advertising" Statements Plaintiffs Pointed To Were Disparate And Made No Ten-Year Promise ................................ 20

        ii. SCEA Disclosed Its Right To Disable The Other OS ................. 21

        iii. SCEA Had A Viable Defense To The Unfair Prong Claim.......... 22

2. PLAINTIFFS' ABILITY TO MAINTAIN A CLASS WAS QUESTIONABLE 22

V. CONCLUSION................................................................................................ 24

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1

### TABLE OF AUTHORITIES

2

**Cases**

3

*Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*,
4
  No. CV 10-03738 AB (CWx), 2015 WL 5311085 (C.D. Cal. Sept. 10, 2015)................................ 22

5

*Bayat v. Bank of the W.*,
  No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ...................................... 5

6

*Bellinghausen v. Tractor Supply Co.*,
7
  306 F.R.D. 245 (N.D. Cal. 2015)........................................................................ 16

8

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ...................................................................... 5, 14

9

*Caro v. Procter & Gamble Co.*,
10
  18 Cal. App. 4th 644 (1993) ......................................................................... 23

11

*Cervantez v. Celestica Corp.*,
  No. EDCV 07-729-VAP (OPx), 2010 WL 2712267 (C.D. Cal. July 6, 2010) ...................... 19

12

*Class Plaintiffs v. City of Seattle*,
13
  955 F.2d 1268 (9th Cir. 1992) .................................................................. 10, 12

14

*Cohen v. DIRECTV, Inc.*,
  178 Cal. App. 4th 966 (2009) ....................................................................... 23

15

*Comcast Corp. v. Behrend*,
16
  133 S. Ct. 1426 (2013)............................................................................. 23

17

*De La Torre v. CashCall, Inc.*,
  No. 08-cv-03174-MEJ, 2017 WL 2670699 (N.D. Cal. June 21, 2017)...................... 11, 12

18

*Gaudin v. Saxon Mortg. Servs., Inc.*,
19
  No. 11-cv-01663-JST, 2015 WL 4463650 (N.D. Cal. July 21, 2015)........................... 19

20

*Hall v. Sea World Entm't, Inc.*,
  No. 3:15-CV-660-CAB-RBB, 2015 WL 9659911 (S.D. Cal. Dec. 23, 2015) ................ 24

21

*Hanlon v. Chrysler Corp.*,
22
  150 F.3d 1011 (9th Cir. 1998) ............................................................... passim

23

*Harris v. Vector Mktg. Corp.*,
  No. C-08-5198 EMC, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ........................... 11

24

*Hart v. Colvin*,
  No. 15-cv-00623-JST, 2016 WL 6611002 (N.D. Cal. Nov. 9, 2016) ........................... 10

25

*Haskell v. Time, Inc.*,
26
  965 F. Supp. 1398 (E.D. Cal. 1997) ............................................................... 21

27

*In re BlueTooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ...................................................................... 16

28

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

*In re iPhone Application Litig.*,
   6 F. Supp. 3d 1004 (N.D. Cal. 2013)............................................................................20

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ..............................................................................12, 15, 16

*In re Sony PS3 "Other OS" Litig.*,
   551 Fed. App'x 916 (9th Cir. 2014) .....................................................................9, 20, 21

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1078 (N.D. Cal. 2007)...................................................................10, 11

*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2009) .....................................................................................23

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 (2003) .....................................................................................20

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) ....................................................................................15

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ......................................................................................22

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ................................................................................23, 24

*McCrary v. Elations Co., LLC*,
   No. EDCV 13-0242 JGB (SPx), 2015 WL 12746707 (C.D. Cal. Aug. 31, 2015) ............5

*McKnight v. Uber Techs., Inc.*,
   No. 14-cv-05615-JST, 2017 WL 3427985 (N.D. Cal. Aug. 7, 2017) .......................12, 18

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*,
   688 F.2d 615 (9th Cir. 1982) ......................................................................................15

*Pardini v. Unilever U.S., Inc.*,
   No. 13-1675 SC, 2014 WL 265663 (N.D. Cal. Jan. 22, 2014)......................................23

*Perrine v. Sega of Am., Inc.*,
   No. 13-cv-01962-JD, 2015 WL 2227846 (N.D. Cal. May 12, 2015)..............................24

*Pfizer Inc. v. Super. Ct.*,
   182 Cal. App. 4th 622 (2010) .....................................................................................23

*Pierce v. Rosetta Stone, Ltd.*,
   No. C 11-01283 SBA, 2013 WL 1878918 (N.D. Cal. May 3, 2013) ..............................11

*Pirozzi v. Apple, Inc.*,
   966 F. Supp. 2d 909 (N.D. Cal. 2013).........................................................................22

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968).................................................................................................15

*Rahman v. Mott's LLP*,
   No. CV 13-3482 SI, 2014 WL 5282106 (N.D. Cal. Oct. 15, 2014)................................21

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

*Ross v. Bar None Enters., Inc.*,
    No. 2:13-cv-00234-KJM-KJN, 2014 WL 4109592 (E.D. Cal. Aug. 19, 2014) ............................... 10

*Satchell v. Fed. Express Corp.*,
    Nos. C03-2659 SI, C 03-2878 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ........................... 11

*Sevidal v. Target Corp.*,
    189 Cal. App. 4th 905 (2010) ............................................................................................................ 23

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ...................................................................................................... 10, 18

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) .............................................................................................................. 23

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) .............................................................................................. 22

*Tucker v. Pac. Bell Mobile Servs.*,
    208 Cal. App. 4th 201 (2012) ............................................................................................................ 23

*William H. Morris Co. v. Grp. W., Inc.*,
    66 F.3d 255 (9th Cir. 1995) ............................................................................................................... 21

**Statutes**

Cal. Bus. & Prof. Code § 17200 ............................................................................................ 2, 20, 22, 23

Cal. Bus. & Prof. Code § 17500 ................................................................................................. 2, 20, 23

Cal. Civ. Code § 1750 .................................................................................................................. 2, 20, 23

**Rules**

Fed. R. Civ. P. 23(e) .......................................................................................................................... 10

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**

2    Defendant Sony Computer Entertainment America LLC, presently known as Sony Interactive

3  Entertainment America LLC ("SCEA"), submits this supplemental brief in support of preliminary

4  approval.

5  **I.    INTRODUCTION AND SUMMARY OF THE SETTLEMENT**

6    This false-advertising litigation challenged the decision to disable the "Other OS" functionality

7  in the "Fat" models of the PlayStation®3 computer entertainment system, which were manufactured

8  between November 2006 and September 2009 ("PS3").  The initial settlement in this action came after

9  years of litigation that included an appeal to the Ninth Circuit and followed an August 20, 2015,

10  mediation.  Ultimately, however, the Court denied final approval of that settlement by order dated

11  January 31, 2017 ("Order," Dkt. 300), in which the Court articulated several concerns regarding the

12  terms of the settlement and the settlement process.  Following the Order, the parties reopened

13  negotiations in an effort to agree on terms that addressed the Court's concerns.  After participating in

14  another mediation and months of subsequent negotiations overseen by the mediator, the parties were

15  finally able to reach the present agreement.

16    The current settlement is materially different than its predecessor and addresses all of the Court's

17  previously articulated concerns.  Specifically, it:

18    • Creates a $3.75 million common fund ("Settlement Fund");

19    • Eliminates all documentary proof-of-purchase and proof-of-use requirements;

20    • Eliminates the "Consumer Class A" and "Consumer Class B" benefit classes and instead
         affords one settlement benefit of up to $65 to *all* claimants;

21
22    • Does not require the re-submission of claims submitted under the prior settlement, even
         those the settlement administrator rejected;

23    • Utilizes a simple Claim Form that requires only an attestation confirming that each
24       claimant used or knew about the Other OS or believed that he or she was harmed by its
         removal; and

25    • Includes no "clear sailing" provision—SCEA is free to oppose Plaintiffs' fee motion.

26    This revised settlement is unquestionably fair, adequate, and reasonable, particularly in light of

27  the significant risk Plaintiffs faced in securing class certification and avoiding summary judgment.

28  Accordingly, the Court should preliminarily approve the revised settlement and order notice.

---

1

## II.    THE EVIDENCE IN THE UNDERLYING LITIGATION

The PS3 was SCEA's third-generation video game player, launched in November 2006.  *See* Second Amended Consolidated Complaint ("SACC") ¶ 2.  It offered many features in addition to gaming, including technology capable of reading Blu-ray format movies and games, an Internet browser, installed memory, and a 60 Gigabyte hard drive.  *Id.*  The PS3 could be used with the PlayStation Network ("PSN"), an online site where members could connect with friends and purchase games, movies, and other products.  The "Fat" PS3 models at issue in this litigation were designed with the ability to run two operating systems:  (i) the native game operating system that came pre-loaded on the PS3 (the "Game OS") and (ii) the "Other Operating System" or the "Other OS," which allowed a user, at his or her option, to partition the PS3's hard drive and load a second operating system.  The Other OS could be used to make "home brewed" games and, if the user was savvy enough, to perform some of the functions of a traditional personal computer, such as Internet browsing and word processing.  When the Fat PS3 launched in 2006, Linux was the only alternative operating system that could run on it through the Other OS functionality.

In April 2010, the Other OS functionality was disabled through Firmware Update 3.21 for security reasons, *i.e.*, to protect intellectual property from unauthorized access by hackers, which was addressed in confidential documents produced in discovery.[1]  Firmware Update 3.21 was optional, but those who did not download it lost access to the PSN.

This suit was filed shortly after the release of Firmware Update 3.21.  SCEA initially prevailed on a motion to dismiss.  *See* Dkt. 185.  Plaintiffs appealed, but only their three statutory claims survived Ninth Circuit review:  violations of the False Advertising Law (Business and Professions Code § 17500 *et seq.*), the Unfair Competition Law (Business and Professions Code § 17200 *et seq.*), and the Consumers Legal Remedies Act (California Civil Code § 1750 *et seq.*).

In the operative SACC, the surviving claims were premised on the same three assertions:

(1)    SCEA promised that firmware updates would improve and keep the functions of the PS3 current but it issued Update 3.21 which eliminated a

---

[1] The documents were sensitive and were produced for "Attorneys' Eyes Only" pursuant to the protective order entered in the litigation.

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

"*core advertised feature*" and degraded the PS3 functionality (SACC ¶ 245) (emphasis added);

(2)     At the time of sale, SCEA *did not disclose* to Plaintiffs that it retained the purported right to remove any of the PS3's core advertised features, including the Other OS or PSN gaming features, during the useful life of the PS3 (SACC ¶¶ 222, 238); and

(3)     Plaintiffs reasonably believed, based on SCEA's advertising, that they would "have the right to utilize all of the PS3's advertised features, including the Other OS and online gaming features, for the useful life of the PS3, which, according to Defendant's representations, is *10 years*" (SACC ¶¶ 218, 237) (emphasis added).

Discovery, however, systematically proved each of these allegations to be unsupportable. Accordingly, Plaintiffs faced insurmountable evidentiary hurdles when settlement discussions began in August 2015.

## A.     DISCOVERY CONFIRMED THAT THE OTHER OS WAS NOT A "CORE ADVERTISED FEATURE"

Plaintiffs' liability theory turned on the allegation that the Other OS was a "core advertised feature" of the Fat PS3.  *See* SACC ¶¶ 9, 245.  Specifically, Plaintiffs alleged that the ability to run Linux on the Other OS was a widely advertised functionality and, as a consequence, the availability of this functionality influenced consumers' purchase decisions.  *Id.* ¶¶ 3, 14.  Discovery, however, established that the Other OS functionality was not advertised:

- The Other OS was not referenced on the outside of the PS3 box, in any point of sale marketing, or in any TV, print, or internet advertising campaign (*see, e.g.*, Floyd Decl., ¶ 4, Exh. 3 (PS3 box); *id.* ¶ 10, Exh. 9 (PS3 marketing materials));

- The "advertising" alleged in the SACC was not advertising at all.  Rather, it was a collection of forward-looking, public relations-type statements, most of which pre-dated the PS3's launch, that appeared in niche publications directed not toward the typical PS3 purchaser, but rather toward software developers and hardcore gamers (*see, e.g.*, SACC ¶¶ 66-73); and

- SCEA's website was silent regarding the Other OS, save for an isolated reference in an online users' guide explaining how to partition hard drives (*see* Floyd Decl., ¶ 11, Exh. 10 (online users' guide screenshot)).

Discovery further confirmed that the vast majority of consumers were *unaware* that the Other OS functionality existed and that it was *irrelevant* to the purchasing decisions of all but a handful of consumers.  SCEA retained experts who conducted two consumer perception surveys aimed at

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1  measuring awareness of the Other OS functionality and the degree, if any, to which purchasers valued

2  the functionality.  The purpose of the first survey, which was presented to 499 actual PS3 purchasers,

3  was to measure consumer awareness.  *See* Floyd Decl., ¶ 12, Exh. 11 (Butler Decl.), at ¶ 4.  The survey

4  questions were designed to determine the extent to which the Other OS was a purchase driver and what

5  type of advertising influenced the purchase decisions.  *Id.*  The survey results revealed that in response

6  to an open-ended question (*i.e.*, one where no response was suggested by a list), only one respondent

7  (0.2%) identified the Other OS as important to his purchasing decision.  This result did not change even

8  when the Other OS was included in a list of options presented to the respondents:

- Only 6% of respondents indicated they were aware of the Other OS functionality;

- Only 2% indicated that it was important to their purchasing decision; and

- Only 4 respondents (less than 1%) indicated that they thought the Other OS was important *and* had actually used it.

12  *Id.* Exh. 11, at ¶ 5.

13      SCEA's experts conducted a second survey as part of a larger study, the purpose of which was to

14  quantify the price premium Plaintiffs alleged as their damages theory.  *See* Floyd Decl., ¶ 14, Exh. 13

15  (Dippon Decl.).  The second survey examined the purchase drivers for the Fat PS3 by asking

16  respondents to rank PS3 features and functions in order of importance.  *Id.* Exh. 13, at ¶¶ 21, 29.[2]  The

17  result of this second study was consistent with the results of the first consumer-perception study:  the

18  average consumer placed no value on the Other OS functionality.  *Id*. Exh. 13, at ¶ 42.  In fact, the

19  average respondent found the Other OS functionality to be *irrelevant* to his or her purchase decision

20  even when made aware that it existed.  *Id.* Exh. 13, at ¶¶ 39-42, 45-46.  Because the Other OS had no

21  intrinsic value to purchasers, Plaintiffs' price-premium theory would have failed generally and, at best,

22  proving damages would have been difficult, if not impossible, on a class-wide basis.

23      The study also confirmed that because the named Plaintiffs contended that they placed

24  significant value on the Other OS, they represented a rare exception to the typical PS3 purchaser.  *Id.*

25  Exh. 13, at ¶¶ 45-47.  Accordingly, Plaintiffs were atypical of the class of Fat PS3 purchasers they

26  sought to represent, a fact that would make class certification difficult.

27

28  [2] The overall study (referred to as a "logit" study), including the results of the second survey, are
explained in full in the Dippon Declaration.  *See* Floyd Decl., Exh. 13.

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

The response rate in the prior proposed settlement further supports the accuracy of the consumer-perception surveys.  The survey results demonstrated that only 6% of all PS3 purchasers knew about the Other OS functionality and only about 2% thought it was an important feature.  Extrapolating from the survey results, the parties could reasonably expect that approximately 600,000 consumers knew about the Other OS functionality and approximately 200,000 thought it was important.[3]  There were 11,325 claims submitted, which reflected a response rate of approximately two percent (2%) if the class was assumed to have 600,000 members or six percent (6%) if the class size was 200,000, neither of which is atypical in consumer class actions.  *See Briseno v. ConAgra Foods*, *Inc.*, 844 F.3d 1121, 1130 (9th Cir. 2017) (noting claims rate of 10-15% not unusual); *McCrary v. Elations Co., LLC*, No. EDCV 13-0242 JGB (SPx), 2015 WL 12746707, at *9 (C.D. Cal. Aug. 31, 2015) (noting prevailing rule of thumb is claims rate of 3-5%); *Bayat v. Bank of the W.*, No. C-13-2376 EMC, 2015 WL 1744342, at *5 (N.D. Cal. Apr. 15, 2015) (granting final approval of consumer settlement with 1.9% claims rate).

At no time during the litigation did Plaintiffs produce any contrary evidence regarding consumer awareness or demand for the Other OS function.  In fact, Plaintiffs' counsel confirmed at the previous final approval hearing that their evidence was consistent:

> So throughout the litigation, Sony has argued most of the class members have not been injured because they did not know about this feature or they didn't even utilize it.  They said if you go to trial, you're not going to prevail on those types of claims.  And while I believe the company was wrong in removing the feature, . . . we consulted our own experts, . . . survey experts.  We did that ourselves during this six-year litigation.  And we had to evaluate those results with what defendant showed us and in light of all the other legal defenses that Sony also had.

> So in our view, the class . . . is probably smaller than the 10 million although we did allow people who did not use the feature, who didn't know about the feature but felt they were harmed because of the update to make a claim.

Floyd Decl., ¶ 23, Exh. 15 (final approval transcript), at pp. 20:22-21:11; *accord* Floyd Decl., ¶ 22, Exh. 14 (preliminary approval transcript), at p. 15:1-8 ("We don't have a precise number, your honor, but . . . we actually received . . . information that led us to believe that that market was very small . . . .").

---

[3] As the Butler Declaration explains, the 2% is likely overstated because more survey respondents perceived a made-up control feature to be more important than the Other OS.  Floyd Decl., Exh. 11, at ¶ 32; *see* Floyd Decl., Exh. 13, at ¶ 47.

Thus, based on the discovery available at the time that the case was stayed pending settlement negotiations, there was no evidence that the Other OS functionality was a "core advertised feature" or that it influenced any purchasing decisions. To the contrary, the evidence conclusively refuted Plaintiffs' allegations.

## B.   DISCOVERY CONFIRMED THAT SCEA REPEATEDLY DISCLOSED ITS EXPRESS CONTRACTUAL RIGHT TO DISABLE THE OTHER OS

Plaintiffs' three claims also depended on their ability to establish that SCEA failed to disclose its right to remove the Other OS functionality. Discovery, however, confirmed that SCEA had the contractual right to remove the Other OS and that its right to do so was explicitly disclosed to consumers at least four different times: on the box, in the System Software License Agreement ("SSLA"), in the PSN Terms of Service and Use Agreement ("PSN TOS"), and in the Hardware Warranty.

### 1.   The PS3 Packaging Disclosed That Console Functionality Could Change

Plaintiffs alleged that SCEA failed to make pre-purchase disclosures that it could remove functionality from the PS3. *See* SACC ¶ 11. That allegation however, was contradicted by the box itself which stated that "design and specifications are subject to change." Floyd Decl., Exh. 3. This language appeared on the back of the box along with other important information (*i.e.*, the customer service number) under a "Consumer Notices" heading that instructed consumers to "Carefully read this package." *Id.*

### 2.   The SSLA Disclosed SCEA's Right to Remove the Other OS Functionality

The SSLA governed consumers' use of the Fat PS3's system software. The SSLA was presented to Fat PS3 users during the console set up process and consumers could not use their PS3's unless they assented to it. The SSLA stated clearly that updates and services could result in a loss of functionality:

> From time to time, SCE may provide certain updates, upgrades or services to your PS3™ system to ensure it is functioning properly in accordance with SCE guidelines . . . . Some services may change your current settings, cause a loss of data or content, *or cause some loss of functionality*.

Floyd Decl., ¶ 2, Exh. 1 (SSLA) (emphasis added); *see* SACC ¶ 223.

Each Plaintiff assented to the SSLA and some confirmed that the language was easily accessible and not difficult to read or understand. *See* Floyd Decl., ¶ 5, Exh. 4 (Alba transcript), at pp. 168:3-169:13; ¶ 6, Exh. 5 (Baker deposition transcript), at pp. 129:22-130:1; ¶ 7, Exh. 6 (Girardi transcript), at

6

pp. 90:18-25, 91:22-92:1; ¶ 8, Exh. 7 (Huber transcript), at p. 99:22-25; ¶ 9, Exh. 8 (Ventura transcript), at pp. 213:3-18, 214:14-17.  Thus, there was substantial evidence that each Plaintiff, and therefore each class member, knew that functionality, including the Other OS, could be removed.  Anyone who disagreed with this contract term could return the PS3 to the retailer for a refund within the return period.

### 3.       The PSN TOS Also Disclosed SCEA's Right to Remove the Other OS

Plaintiffs alleged that Firmware Update 3.21 was not really optional because it presented a "Hobson's choice":  download the update and lose the Other OS or decline the update and lose access to the PSN.  SACC ¶ 13.  Thus, PSN membership was critical to the lawsuit and all class members were allegedly PSN members, including each Plaintiff.  *See* Floyd Decl., Exh. 4, at pp. 122:24-123:4; Exh. 5, at pp. 123:17-25, 235:13-19; Exh. 6, at pp. 116:3-6, 117:4-10; Exh. 7, at p. 59:7-17; Exh. 8, at pp. 232:12-15, 232:25-233:6.  To join the PSN, all consumers had to agree to the PSN TOS by clicking an "agree" button as part of the account set-up process.  *See id.*; Floyd Decl., ¶ 3, Exh. 2 (PSN TOS). Stated differently, users had to assent to the PSN TOS in order to use the PSN.[4]

The PSN TOS explained that software updates could change the operating system and/or could cause a loss of functionality:

> Such content or service may include automatic updates or upgrades which *may change your current operating system*, cause a loss of data or content *or cause a loss of functionalities* or utilities. Such upgrades or updates may be provided for system software for your PlayStation®3™ computer entertainment system . . . .

Floyd Decl., Exh. 2, at p. 6 (emphasis added)); *see* SACC ¶ 225.

Plaintiffs testified that the PSN TOS was neither confusing nor hard to read and that there was "absolutely no limitation . . . [in the PSN TOS] . . . on what the update [3.21] could do with regard to changing features" of the PS3.  Floyd Decl., Exh. 5, at p. 330:10-14; *see* Exh. 4, at pp. 162:25-163:3, 163:19-164:6, 164:19-165:20 (explaining loss of functionality statement means "that sometimes things will change over the time that you have a PlayStation 3"); Exh. 7, at pp. 170:13-171:17 (stating that language in PSN TOS is "not deceptive").  Thus, there was substantial evidence that all class members

---

[4] This was true even though SCEA, unlike its competitor, Microsoft, offered the service for free to consumers.

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

knew that SCEA could remove any functionality from the PS3 after purchase through a software update.

### 4.   The Express Hardware Warranty Disclosed that Updates Could Cause a Loss of Functionality

The Hardware Warranty, which was enclosed in the PS3 console box and shown on SCEA's website, also explained that updates could cause a loss of functionality:

> You understand and acknowledge that any time SCEA services your PS3 system . . . it may become necessary for SCEA to provide certain services to your PS3 system to ensure it is functioning properly in accordance with SCEA guidelines.  Such services may include the installation of the latest software or firmware updates . . . .  You acknowledge and agree that some services may change your current settings . . . or cause some loss of functionality.

SACC ¶ 224.  Reference to the hardware warranty was prominently displayed on the back of the PS3 console box, in a large and bold font, along with the customer service phone number:  "For details on the warranty policy, refer to the Limited Hardware Warranty and Liability in the supplied documentation."  Floyd Decl., Exh. 3.  Plaintiff Baker actually used the Hardware Warranty service when his console broke.  *See* Floyd Decl., Exh. 5, at pp. 26:19-27:23.  Plaintiffs' allegation that SCEA failed to disclose its right to remove functionality from the PS3 was unsupported.

### C.   DISCOVERY DID NOT SUPPORT PLAINTIFFS' "10 YEAR" THEORY

Plaintiffs' final argument was that SCEA falsely promised consumers that they would retain access to the Other OS functionality throughout the lifecycle of the PS3 console, which the company stated publicly was estimated to be about 10 years.  SACC ¶¶ 218, 237.  Their theory was that because SCEA expected the PS3 console platform to last about ten years before being replaced by the next generation console platform, it impliedly represented that all features and functionality present on a console at the time of sale, including the Other OS, would remain unchanged throughout that approximate ten year period.  *Id.* ¶ 9.  Notwithstanding the above express contractual provisions, Plaintiffs' own testimony failed to support this theory.  No Plaintiff was able to identify a representation promising Other OS functionality for ten years.  *See* Floyd Decl., Exh. 4, at p. 54:22-24 (testifying unaware of any promise that the Other OS would be available for ten years); Exh. 5, at p. 249:19-24 (testifying no statement constituting a promise that the Other OS would be supported by Sony Computer for ten years), p. 273:11-20 (testifying no pre-purchase statement promising that PSN access and the

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

Other OS would be available for ten years); Exh. 6, at pp. 40:17-41:3 (testifying no statement that the
Other OS feature would always be there); Exh. 7, at p. 153:14-17 (admitting no promise of 10 year
Linux support).  In fact, Plaintiff Huber admitted outright that there was no such representation.  *E.g.*,
Floyd Decl., Exh. 7, at p. 161:2-8 (testifying "[t]here was never a statement that said ten years means
this punch list of things").  Plaintiffs tried to assert an implied representation, but the Ninth Circuit
disagreed with that theory:  "While Plaintiffs claim that they have pleaded a warranty that the Other OS
function would last for ten years, Sony's statements only promise a ten-year lifespan for the PS3 itself."
*In re Sony PS3 "Other OS" Litig.*, 551 Fed. App'x 916, 919 (9th Cir. 2014).  Thus, the evidence at the
time of settlement indicated that Plaintiffs' last theory would fail.

### III.    SETTLEMENT NEGOTIATIONS WERE ARM'S-LENGTH

Plaintiffs and SCEA participated in three separate mediations before three different mediators
over the course of six years.  The parties first mediated before the Honorable James L. Warren (Ret.) of
JAMS in 2011 while SCEA's motion to dismiss was pending.  After a full day of negotiations, the
parties were unable to reach a settlement and, once the case was dismissed, the parties ended settlement
discussions.  *See* Dkt. 335-1, Exh. B (Settlement Agreement), at ¶¶ 55-56.

Following the Ninth Circuit remand, the parties again agreed to mediate in August 2015.  By this
time, discovery was substantially completed and the parties mediated before the Honorable Howard
Weiner (Ret.).  While the parties did not reach an agreement on all terms that day, they continued their
negotiations and five months later—in January 2016—signed a Memorandum of Understanding
("MOU").  *Id.* Exh. B, at ¶¶ 60-62.  Even then, it took the parties another five months of negotiation to
finalize the material terms and execute a settlement agreement that this Court preliminarily approved.
Notice of the previous settlement achieved an approximate 86% reach.  After identifying a number of
concerns with the settlement, including what it perceived as a low claims rate and a disproportionate fee
request, however, this Court denied final approval on January 31, 2017.  *See* Order, Dkt. 300.

In April 2017, the parties mediated a third time, this time before the Hon. James Lambden (Ret.).
The parties again failed to reach an agreement that day but continued the negotiations for four more
months until they executed the present agreement on or about September 1, 2017.  *See* Floyd Decl.,
¶¶ 15-16.  As it had previously, settlement required months of continued negotiations overseen by

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1   Justice Lambden to arrive at an agreement on all material terms, including returning to Justice Lambden

2   for a binding decision on the maximum benefit to be paid (the "cap")—a term on which the parties had

3   reached impasse.  *Id.* ¶ 16.  Justice Lambden took evidence and argument on the issue and set the cap at

4   $65.  The parties then continued to finalize the agreement and related documents.

5   **IV.   <u>ARGUMENT</u>**

6       **A.   THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE**

7          The Ninth Circuit favors settlement, "particularly where complex class action litigation is

8   concerned."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  Where the parties

9   reach a settlement agreement prior to class certification, the court must review the proposed agreement

10  and confirm both that certification of a settlement class is proper and that the proposed terms are fair.

11  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a pre-certification settlement

12  "requires a higher standard of fairness" and "a more probing inquiry than may normally be required

13  under Rule 23(e)."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  Federal Rule of

14  Civil Procedure 23, subdivision (e) commits the approval or rejection of a class action settlement to the

15  sound discretion of the trial court.  Fed. R. Civ. P. 23(e).  The Court expressed no concerns regarding the

16  certification of the previous settlement class and Plaintiffs have addressed certification thoroughly in

17  their Memorandum.  Accordingly, SCEA will address only fairness here.

18         "[P]reliminary approval of a settlement has both a procedural and a substantive component."

19  *See, e.g.*, *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).  The procedural

20  component looks to the settlement negotiations themselves to ensure that the process was not collusive.

21  The court then scrutinizes the substantive terms of the settlement to confirm that:  (1) there are no

22  obvious deficiencies; (2) the settlement does not improperly grant preferential treatment to class

23  representatives or segments of the class; and (3) the terms fall within the range of possible approval.  *Id.*

24  at 1079; *see also Ross v. Bar None Enters., Inc.*, No. 2:13-cv-00234-KJM-KJN, 2014 WL 4109592, at

25  *9 (E.D. Cal. Aug. 19, 2014).  The consideration is overall fairness—the court does not scrutinize the

26  settlement's individual parts but reviews it as a whole.  *See Hanlon*, 150 F.3d at 1026 (noting court

27  cannot "delete, modify or substitute certain provisions"—the settlement must stand or fall in its

28  entirety); *Hart v. Colvin*, No. 15-cv-00623-JST, 2016 WL 6611002, *4 (N.D. Cal. Nov. 9, 2016) (citing

1   *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080).

2           **1.      NEGOTIATIONS WERE AT ARM'S-LENGTH, MAKING THE
3                     SETTLEMENT PROCEDURALLY FAIR**

4           The procedural component of the preliminary approval analysis determines whether the proposed

5   settlement appears to be the product of serious, informed, non-collusive negotiations.  *See Pierce v.*

6   *Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 1878918, at *4-5 (N.D. Cal. May 3, 2013).  The

7   amount and nature of discovery completed and the manner in which the negotiations occurred are the

8   relevant considerations.  A settlement is presumed to be fair if class counsel recommended it after

9   arm's-length bargaining.  *De La Torre v. CashCall, Inc.*, No. 08-cv-03174-MEJ, 2017 WL 2670699, at

10  *7 (N.D. Cal. June 21, 2017) (citing *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL

11  1627973, *8 (N.D. Cal. Apr. 29, 2011)).  And, "[t]he assistance of an experienced mediator in the

12  settlement process confirms that the settlement is non-collusive."  *Satchell v. Fed. Express Corp.*, Nos.

13  C03-2659 SI, C 03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).

14          Here, the parties' settlement was reached after comprehensive discovery was completed and after

15  three different mediations before three different mediators.  Prior to settlement, Plaintiffs deposed

16  multiple SCEA engineers, a Consumer Services supervisor, a marketing executive, a

17  communications/public relations executive, and a Sony Electronics engineer who specialized in Linux

18  operating systems.  *See* Floyd Decl., ¶ 18.  SCEA deposed all of the Plaintiffs regarding their purchasing

19  experience and use of their PS3s.  The parties also exchanged documents related to all aspects of the

20  case, including the PS3's marketing campaigns, and the facts underlying the decision to issue Firmware

21  Update 3.21.  *See* Floyd Decl., ¶ 19.  The parties therefore had a solid grasp on the strengths and

22  weaknesses of their respective cases.

23          Moreover, this settlement was reached with the assistance of Justice Lambden after:

24  (1) extensive briefing, (2) pre-mediation individual consultation phone calls with the mediator, (3) a

25  mediation session that commenced in the morning and proceeded into the early evening, (4) dozens of

26  additional phone calls between and among the mediator and the parties, and (5) briefing and a hearing

27  that led to the parties' ultimate acceptance of a binding mediator's proposal regarding the benefit cap.

28  *See* Floyd Decl., ¶¶ 15, 16.  Accordingly, the settlement was the product of informed, arm's-length

11

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

negotiations by the parties.

## 2.   THE SETTLEMENT IS SUBSTANTIVELY FAIR AND ADDRESSES ALL PREVIOUSLY ARTICULATED DEFICIENCIES

The substantive component of the preliminary approval analysis considers whether the settlement has any obvious deficiencies, whether it grants preferential treatment to the class representatives or segments of the class, and whether its terms fall within the range of possible approval. In short, the court looks for overall fairness. *See Class Plaintiffs*, 955 F.2d at 1291 (noting court looks for overall fairness and does not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute"). The settlement need not be ideal, but it must be fair, free of collusion, and consistent with a plaintiff's fiduciary obligations to the class. *Hanlon*, 150 F.3d at 1027 ("[T]he question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). The Court articulated a number of deficiencies in the substantive provisions of the previous proposed settlement. This agreement cures them all.[5]

### a.   Claims, Fees, and Costs Will Be Paid From A Common Fund

The Court expressed concern that the previous settlement lacked sufficient "deterrent effect" because there was no common fund and the value of the claims submitted was under $200,000. *See* Floyd Decl., Exh. 15, at p. 28:2-7 ("It appears to me that Sony is getting a – a windfall because there's no fixed – [fund]."), pp. 36:23-37:5 ("If 20,000 people . . . were [] harmed, at a $55 rate, the amount of damages by your own admission would be over a million dollars. And yet here, the settlement fund is under 200."). Although SCEA strongly contests the notion that it engaged in any conduct that need be

---

[5] The Court expressed no concern that the previous settlement improperly granted preferential treatment to the class representatives or any particular segment of the proposed class of all PS3 purchasers. Nor does this settlement: this settlement still allows class members to submit one claim for each Fat PS3 purchased and, because this is now a common fund settlement, the parties revised the class definition to limit class members to those who knew about the Other OS, used it, or believed they were injured by its removal to avoid diluting compensation by allowing uninjured consumers to make claims. *See McKnight v. Uber Techs., Inc.*, No. 14-cv-05615-JST, 2017 WL 3427985, *3-4 (N.D. Cal. Aug. 7, 2017) (noting settlement fair when parties make effort to tailor relief based on individual class member circumstances). In addition, Plaintiffs will seek Service Awards of $3,500 each, an amount that is presumptively fair. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463 (9th Cir. 2000) (affirming service award of $5,000); *De La Torre*, 2017 WL 2670699, at *9 (approving service award of $10,000 per plaintiff and noting service award of $5,000 presumptively fair).

deterred, it nonetheless heeded the Court's guidance in terms of restructuring the settlement to ensure that substantial funds would be available for payment to the class. The parties therefore renegotiated and agreed on a $3.75 million common fund from which all claims, attorneys' fees and costs, administration costs, and Service Awards will be paid. Dkt. 335-1, Exh. B, at ¶¶ 43, 72. Funds will be distributed to class members pro rata up to $65 per valid claim, and the distribution of any remainder funds will be left to the sound discretion of the Court.

### b.    The Claims Process Has Been Simplified

#### i.    The Claims Period Has Been Lengthened And All Previously Submitted Claims Will Be Paid

The previous settlement afforded Class Members forty-five (45) days to submit claims, opt-out, or object. In its Order, the Court found 45 days to be "brief," particularly in light of the documentary proof-of-purchase requirement. Order, Dkt. 300, at p. 5:10. Accordingly, the parties agreed to extend the notice, opt-out, and objection period to ninety (90) days *and* to eliminate all of the proof-of-purchase and proof-of-use requirements (discussed below).[6]

The Court also expressed concern with the number of Class A claims that the settlement administrator rejected due to insufficiency of proof of purchase or proof of use. *See id.* pp. 6:20-7:9. The settlement administrator also invalidated 116 Class B claims that were submitted with insufficient proofs of purchase. *Id.* p. 6 n.6. Because the proposed settlement does not require documentary proof of purchase or proof of use, the parties have agreed to pay all of the claims that were previously submitted, including those that the settlement administrator rejected. Thus, at a minimum, the parties know that at least 11,325 claimants will share in the Settlement Fund.

#### ii.    The Parties Have Eliminated Proof Requirements

The previous settlement had two benefit classes, A and B. Consumer Class A claimants were required to submit documentary proof that they purchased a Fat PS3 and that they used the Other OS functionality in order to claim a $55 benefit. Consumer Class B claimants were required to submit documentary proof of purchase to claim a $9 benefit. The Court found these proof requirements to be

---

[6] As discussed below, claimants do have to provide a serial number, PlayStation Network Sign-in ID, or a PlayStation Network Online ID on the claim form for verification purposes only.

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1    "circular" and "over burdensome."  Order, Dkt. 300, at p. 6:10-19; Floyd Decl., Exh. 15, at pp. 19:16-

2    19; 22:16-19 (citing *Briseno*, 844 F.3d 1121).  Therefore, the parties eliminated them.  Now, there is just

3    one benefit class, all members of which are entitled to submit claims for up to $65 without any proof of

4    purchase or use.  Class members are asked simply to sign an affidavit stating:

5             I declare under penalty of perjury that I purchased a Fat PS3 in the United
              States between November 1, 2006 and April 1, 2010 from an authorized
6             retailer for family, personal and/or household use and that I:  (1) used the
              Other OS functionality; (2) knew about the Other OS functionality; or (3)
7             contend or believe that I lost value or desired functionality or that I was
              otherwise injured as a consequence of Firmware Update 3.21 and/or the
8             disablement of Other OS functionality in the Fat PS3.

9    Dkt. 335-1, Exh. B, at Exh. 1.  This affidavit requirement is not overly burdensome and consistent with

10   *Briseno,* which this Court concluded applied here.  *See Briseno*, 844 F.3d at 1132 ("Given that a

11   consumer's affidavit could force a liability determination at trial without offending the Due Process

12   Clause, we see no reason to refuse class certification simply because that same consumer will present

13   her affidavit in a claims administration process after a liability determination has already been made.").

14   It is also consistent with the concerns expressed by the Court at final approval.  *See* Floyd Decl., Exh.

15   15, at pp. 30:23-31:4 (noting declaration under penalty of perjury would be sufficient evidence of

16   purchase and/or use at trial).

17           Claimants must still provide a PS3 serial number or a PlayStation Network Sign-in ID or a

18   PlayStation Network Online ID on the claim form.  This is not a burdensome requirement, even for

19   those who no longer have their consoles or even a current PSN account:  the serial number is affixed to

20   the game console itself, the PlayStation Network Sign-in ID is the claimant's email address, and the

21   Online ID is the "handle" that the claimant used on the PSN.  SCEA needs one of these in order to be

22   able to verify that claimants actually had a Fat PS3 connected to the PSN Network—information that

23   otherwise cannot be extracted from its records.[7]

24

25

─────────────────

26   [7] During the previous final approval process, the Court noted its understanding that SCEA had provided
     a list of relevant PS3 serial numbers for Class Members to the claims administrator.  *See* Order, Dkt.
27   300, at p. 6:10-17.  The list, however, contained only the email addresses for individuals who at one
     time had a Fat PS3 connected to the PSN, and contained no serial numbers or online IDs because SCEA
28   cannot readily obtain that information for Fat PS3 owners exclusively from its records.

─────────────────

14

### iii. The Benefit Amount Of $65 Is Likely More Than Plaintiffs Would Have Recovered At Trial

To evaluate the fairness of the settlement benefit, the court should "compare the terms of the compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). A settlement, however, is not judged solely against what plaintiffs would have recovered at trial had they prevailed nor must the settlement provide full recovery in order to be fair. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998); *see In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."). Settlement is a compromise: "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982).

Here, SCEA will pay $3.75 million into a common fund from which benefits will be distributed to Settlement Class Members on a *pro rata* basis in an amount up to $65 per claim. The per-claim amount here is not a "fraction of the potential recovery"—it is likely *more than* the maximum potential recovery. The median price of a PS3 during the class period was $388. *See* Floyd Decl., Exh. 13, at ¶ 7. Sixty five dollars therefore represents more than 16% of the median price of a PS3 console during the class period, an amount that far exceeds the value a typical PS3 purchaser placed on the Other OS functionality. *Id.* Exh. 13, at ¶ 12 (noting empirical study confirmed that consumers were not economically injured by removal of Other OS), ¶ 50 (confirming that Other OS was not a purchase driver and concluding that a $60 benefit would overcompensate class members for its removal); *see* Floyd Decl., Exh. 6, at pp. 150:9-17, 166:6-19 (confirming he would have bought a Fat PS3 without Other OS functionality).

Moreover, Plaintiffs' counsel admitted during the previous final approval hearing that the contemplated Class A benefit of $55 was more than Plaintiffs would have recovered at trial:

> And I will tell you, Your Honor, based on our experts and our consultations, that's more than what would be recovered at trial. I can say that with confidence.

Floyd Decl., Exh. 15, at p. 29:2-4. The current proposal offers a pro rata cash benefit capped at $65.

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1   Thus, it not only increases the previous amount by $10, but offers it to *all* valid claimants without any

2   proof of purchase or proof of use.

3   Last, Justice Lambden established the capped benefit amount *after* the parties reached impasse

4   on the issue.  He considered full evidentiary submissions and oral argument before rendering a binding

5   mediator's proposal decision that $65 was fair, adequate, and reasonable, and the parties accepted this

6   decision.  Courts routinely approve settlements that offer only a fraction of potential recovery.  *See In re*

7   *Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (affirming approval of settlement where settlement amount

8   was "roughly one-sixth of the potential recovery"); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D.

9   245, 256 (N.D. Cal. 2015) (finding amount offered in settlement weighed in favor of preliminary

10  approval where the common fund represented between 11% and 27% of potential recovery).  This

11  settlement, in contrast, has the potential to *overcompensate* claimants.  *See* Floyd Decl., Exh. 13, at

12  ¶¶ 12, 50 (noting that $60 per claim would overcompensate).

### c.   The *Bluetooth* Factors Are Satisfied

14  The Court also expressed concern with the previous proposed settlement in light of *In re*

15  *BlueTooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (hereinafter "*BlueTooth*")

16  (holding signs of conflicting interests include disproportionate distribution to plaintiffs' counsel, "clear

17  sailing" provisions and reversion to defendant of remainder funds).  *See* Order, Dkt. 300, at p. 2:5-10

18  (citing *BlueTooth*).  While Plaintiffs will address the propriety of their fee request, this settlement, on its

19  face, does not run afoul of any *BlueTooth* factor.  This settlement includes *no agreement* on any fee

20  award and thus poses nothing from which a conflict could be inferred.  *See* Dkt. 335-1, Exh. B, at ¶¶

21  111-13; *BlueTooth*, 654 F.3d at 947 (noting "clear sailing" provision is sign that counsels' self-interests

22  have infected negotiations).  SCEA is free to object to Plaintiffs' fee motion.  And, this settlement does

23  not provide for an automatic reversion of remainder funds to defendant; instead, the distribution of any

24  remaining funds will be left to the sound discretion of the Court.  *See* Dkt. 335-1, Exh. B, at ¶ 74.

### 3.   THE SETTLEMENT ADDRESSES THE PREVIOUS OBJECTORS' CONCERNS

27  Seven class members objected to the previous settlement on various grounds.  *See* Dkt. 281.  The

28  current settlement addresses each of those objections as well.

1    _Proof Requirements_.  Objectors Henton, Mitchell, Bowerman, and Navarette objected to the

2    previous settlement's proof requirements.  _Id._[8]  The elimination of all proof requirements completely

3    resolves these objections.[9]

4    _Benefit Amount_.  Bowerman and Navarette also objected to the benefit amounts of $55 and $9.

5    The current settlement eliminates the two benefit classes and provides one benefit amount for all

6    claimants of up to $65.  As noted above, $65 was set by Justice Lambden through a binding mediator's

7    proposal, it is an amount that would overcompensate class members and exceeds Plaintiffs' estimate of

8    their recovery at trial.  There is no room here for an objection based on the benefit amount.

9    _Attorneys' fees_.  Navarette and Lindberg objected to the previous attorneys' fee request, arguing

10   that:  (1) Plaintiffs' counsel sought an amount that was disproportionate to the class members' recovery;

11   (2) the clear-sailing provision indicated collusion; and (3) the claims process coupled with the clear-

12   sailing provision in effect created a reversion (or "kicker" as both objectors described it).  Plaintiffs'

13   counsel will presumably address proportionality in their Motion for Attorneys' Fees.  As noted, the

14   current settlement includes no "clear sailing" provision.  And, because the current settlement utilizes a

15   common fund, there is no "kicker" because the funds will be distributed pro rata to all claimants up to

16   $65 and any remaining funds will be distributed in the sound discretion of the Court.

17   _Scope of Release_.  Lindberg objected to the scope of the release, arguing that it was too broad

18   because it "seeks to extinguish literally _any_ claim a consumer might have against Sony arising from their

19   purchase of a Fat PS3."  Dkt. 281, p. 46 (Exh. E, at p. 4:4-6).  The Parties addressed the scope of the

20   release at the final approval hearing (Floyd Decl., Exh. 15, at pp. 33:11-34:19) but the Court's Order

21   was silent on the issue.  _See generally_ Order, Dkt. 300.  To the extent that the scope of the release is

22   ───────────────
[8] Henton:  "[T]he [proof] requirements for this claim are ridiculous."  Dkt. 281, at p. 4 (Exh. A).  The
23   gravamen of Mitchell's objection was a request to be included in Class A despite his lack of proof.  _See_
_id._ pp. 6-7 (Exh. B).  Bowerman:  "My first objection is for excessive proof . . . ."  _Id._ p. 13 (Exh. C).
24   Navarette:  "I do not have a copy of the receipt or bank statement documenting the purchase" (_id._ p. 18,
(Exh. D, at p. 1, ¶ 6)) and objecting to creating "false subclasses based only on which class members
25   retained documentation."  _Id._ p. 26 (Exh. D, at p. 4:3-4).
[9] Bowerman also objected on the ground that the settlement was limited to Linux.  _See_ Dkt. 281, at p. 14
26   (Exh. C).  The elimination of the proof-of-use requirement and the language of the present affidavit
resolves the Linux objection because anyone who attests that they knew about the Other OS, used it, or
27   believed they were injured by its removal are eligible for the benefit—there is no reference at all to
Linux.
28

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

appropriately addressed now rather than if and when the issue arises in subsequent litigation, the parties revised the language of the release to eliminate any issue regarding its scope.  The release is limited to claims "that arise out of or in any way relate to the subject matter of the Action and the Released Claims and that were or could have been alleged in the Action."  Dkt. 335-1, Exh. B, at ¶¶ 35, 117.  The current settlement therefore addresses all of the Court's concerns as well as all of the objections raised at final approval.[10]

### B.   THE SETTLEMENT FALLS WITHIN THE RANGE OF POSSIBLE APPROVAL

While the Plaintiffs' expected recovery balanced against the value of the settlement is the most important factor in determining whether the settlement falls within the range of possible approval (*McKnight*, 2017 WL 3427985, *2), the Court can also consider at the preliminary approval stage the factors that ultimately inform final approval.  *Staton*, 327 F.3d at 959 (quoting *Hanlon*, 150 F.3d at 1026).  Those factors are:  (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.  *Hanlon*, 150 F.3d at 1026.  Some of these factors, such as the class members' reactions and the governmental participation, cannot be assessed until final approval.[11]  The remaining factors, however, are appropriately considered at this juncture.

---

[10] Objectors Sweeney and Apostol expressed general dissatisfaction with the class-action claims process and class counsel respectively.  Apostol voiced his general dissatisfaction with class counsel:  "I . . . feel that class counsel has not represented me fully."  Dkt. 281, at p. 65 (Exh. F).  Sweeney objected to the claims-administration process:  "Claims administration process fails to require reliable future oversight, accountability and reporting about whether the claims process actually delivers what was promised."  Dkt. 281, at p. 73 (Exh. G). Since these objections do not address any specific term of the present settlement, they are not appropriate and the parties need not (and cannot) address or resolve them.

[11] SCEA notes that the notice plan in the previous settlement reached approximately 86% of the target audience and that only seven individuals objected to the settlement.

---

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

1   **1.   THE EXTENT OF DISCOVERY COMPLETED, THE STRENGTH OF PLAINTIFFS' CASE, AND THE RISK OF CONTINUED LITIGATION WEIGH STRONGLY IN FAVOR OF PRELIMINARY APPROVAL**

*Hanlon* directs a court to consider the amount of discovery conducted at the time of settlement, the strength of Plaintiffs' case, and the risk of continued litigation.[12]  *Hanlon*, 150 F.3d at 1026.  These factors are related in that the extent and result of discovery bears directly on the strength of the plaintiff's case and the risk involved in continued litigation.

**a.   Extensive Discovery Was Completed And The Parties Were On The Eve Of Summary Judgment When They Initially Settled**

Extensive discovery weighs in favor of settlement.  *Gaudin v. Saxon Mortg. Servs., Inc.*, No. 11-cv-01663-JST, 2015 WL 4463650, at *5 (N.D. Cal. July 21, 2015); *Cervantez v. Celestica Corp.*, No. EDCV 07-729-VAP (OPx), 2010 WL 2712267, at *4-5 (C.D. Cal. July 6, 2010).  Here, the parties took extensive discovery before agreeing to the initial settlement:

- SCEA deposed all of the named Plaintiffs;
- Plaintiffs deposed six SCEA witnesses, three of which were Rule 30(b)(6) witnesses;
- Plaintiffs deposed one non-party witness;
- SCEA propounded two sets of interrogatories on each named Plaintiff, a set of requests for production of documents on each current and former named Plaintiff, and a set of requests for admission on Plaintiff Ventura;
- Plaintiffs propounded two sets of document requests, three sets of interrogatories, and one set of requests for admissions on SCEA;
- Approximately 27,000 pages of documents were produced;
- SCEA prepared expert reports;
- Plaintiffs moved to compel the production of documents responsive to Plaintiffs' First Request for Production of Documents (*see* Dkt. 112); and
- SCEA moved to compel the five Class Representatives named in the original Consolidated Complaint to appear for deposition and produce requested documents prior to those depositions, including those identified in their Federal Rule of Civil Procedure 26 disclosures (*see* Dkt. 116).

---

[12] The Order noted that:  "[T]he litigation here never progressed beyond a motion to dismiss and an appeal of that motion.  While some discovery was apparently conducted, that discovery does not nearly approach the level that would have been required to take the case to class certification, or beyond."  Order, Dkt. 300, at p. 8:5-8.  When the parties signed the Memorandum of Understanding, however, discovery was nearly complete and motions for class certification and summary judgment were drafted.

1    In fact, discovery was nearly complete and SCEA was prepared to file a motion for summary

2    judgement when the parties reached their initial settlement.  *See* Dkt. 227 (March 31, 2015, summary

3    judgment deadline), Dkt. 233 (order extending summary judgment deadline); Floyd Decl., ¶ 21.

4    Additionally, the Court had ordered Plaintiffs to file their motion for class certification by October 31,

5    2015.  Although the mediation preceding the initial settlement took place in August 2015, the October

6    31, 2015, filing deadline remained on calendar because the parties did not reach an agreement during the

7    mediation and discovery therefore was not stayed until early October 2015.  *See* Dkt. 237 (stipulated

8    motion to extend time to file motion for class certification), Dkt. 239 (order extending November 20,

9    2015, filing date for class certification), Dkt. 241 (order staying proceedings until December 14, 2015,

10   pending settlement discussions).  By the time the case was stayed, the parties fully understood the nature

11   of the evidence and the strengths and weaknesses of their cases.

**b.       The Evidence Presented Challenges on the Merits**

13       Discovery confirmed that Plaintiffs would have faced challenges on the merits and that

14   continued litigation therefore came with significant risk.  Plaintiffs escaped dismissal of their UCL,

15   FAL, and CLRA claims only because the Ninth Circuit had to presume true at the pleading stage their

16   allegation that the Other OS was a core functionality of the PS3 that was uniformly and ubiquitously

17   advertised.  *See In re Sony PS3 "Other OS" Litig.*, 551 Fed. App'x at 922.  As noted, Plaintiffs' amended

18   claims were premised on three factual allegations:  (1) that the Other OS was a core advertised feature;

19   (2) that SCEA failed to disclose that it could disable it; and (3) that SCEA promised the Other OS would

20   remain available throughout the anticipated ten-year PS3 lifecycle.  Discovery at the time of settlement,

21   however, did not support these allegations.

**i.       The "Advertising" Statements Plaintiffs Pointed To Were
Disparate And Made No Ten-Year Promise**

23       In order to prevail on their three claims, Plaintiffs would have had to prove that SCEA made

24   statements that were objectively likely to mislead a reasonable consumer.  *Lavie v. Procter & Gamble

25   Co.*, 105 Cal. App. 4th 496, 504 (2003).  The challenged statements had to create a clear, objective

26   understanding—vague implications are not enough.  *See In re iPhone Application Litig.*, 6 F. Supp. 3d

27   1004, 1019-20 (N.D. Cal. 2013) (granting summary judgment finding "vague 'understanding'"

28   insufficient at summary judgment stage).  Additionally, "likely to mislead" requires more than anecdotal

1  evidence that a few consumers were misled.  *Rahman v. Mott's LLP*, No. CV 13-3482 SI, 2014 WL

2  5282106, at *9 (N.D. Cal. Oct. 15, 2014) (testimony of a single consumer in a putative class of

3  potentially millions is insufficient especially where the statement is literally true and the deceptive

4  nature of the statement is not self-evident); *Haskell v. Time, Inc.*, 965 F. Supp. 1398, 1407 (E.D. Cal.

5  1997) (anecdotal evidence alone insufficient to prove public likely to be misled) (citing *William H.*

6  *Morris Co. v. Grp. W., Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (finding testimony of 2 out of 300

7  recipients of letter insufficient to establish letter deceptive)).  Thus, the five named Plaintiffs' own

8  interpretations of the alleged "advertising" would not be enough to survive summary judgment.

9      After years of discovery, including depositions, interrogatories, document exchanges, and expert

10  analysis, Plaintiffs could prove nothing more than their own unsubstantiated expectations:  Plaintiffs had

11  no "advertising" to rely upon.  To the contrary, the quotes pleaded in the SACC did not mention the

12  Other OS at all:

13          We look at our products having a 10-year life cycle, which we've proven
14          with the PlayStation . . . .

15          Last time I checked, they've [Microsoft] never had a console that's been
        on the market for more than four or five years and we've committed to a
16          ten year life cycle, so you do the math . . . .

17          I don't know if our competitors' platforms will still be viable in 10 years; I
        do know that the PlayStation 3 will be . . . .

18          We at PlayStation have never subscribed to the concept that a console
19          should last only five years . . . Both the original PlayStation and
        PlayStation 2 had life cycles of more than 10 years . . . .

20  SACC ¶¶ 118-21; *see In re Sony PS3 "Other OS" Litig.*, 551 Fed. App'x at 919 (stating "Sony's

21  statements only promise a ten-year lifespan for the PS3 itself").  Even the named Plaintiffs conceded

22  that there was no promise of the continued availability of the Other OS.  Floyd Decl., Exh. 4, at p.

23  54:22-24; Exh. 5, at pp. 249:19-24, 273:11-20; Exh. 6, at pp. 40:17-41:3; Exh. 7, at p. 153:14-17.  Thus,

24  Plaintiffs had no competent evidence that SCEA ever promised the Other OS function would be

25  available for ten years.

26      **ii.**　　**SCEA Disclosed Its Right To Disable The Other OS**

27      Plaintiffs' second theory was that SCEA failed to disclose to consumers that it could disable the

28  Other OS functionality.  This theory was not borne out by the evidence either.  As discussed above,

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR

SCEA disclosed its right to disable features and functions on the box, in the SSLA, in the PSN TOS, and in the Hardware Warranty.  These disclosures constituted actual and constructive knowledge as a matter of law.  In fact, consumers *agreed* as a matter of law that SCEA could remove the functionality because they assented to the terms of the SSLA and the PSN TOS.  *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011) (finding that clicking "Accept" button is enough to show assent to Terms of Service); *Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-03738 AB (CWx), 2015 WL 5311085, at *26 (C.D. Cal. Sept. 10, 2015) (noting enforceability of click-through agreements).

### iii.   SCEA Had A Viable Defense To The Unfair Prong Claim

Plaintiffs' claim for violation of the unfair prong of the UCL would have independently failed because the evidence established that the decision to disable the Other OS was justified.  "The test of whether a business practice is unfair involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ."  *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013) (citing *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007)).  An unfair claim therefore fails when the challenged conduct is justified.

There was no evidence that SCEA disabled the Other OS functionality for any reason other than to protect the integrity of the system.  SCEA produced confidential contemporaneous business records drafted by security personnel that outlined the security concerns and the steps that needed to be taken in response.  Moreover, Plaintiffs acknowledged that they had no evidence to the contrary.  *See, e.g.*, Floyd Decl., Exh. 6, at pp. 93:3-12, 113:2-5, 173:10-14 (admitting no reason to believe Other OS disabled for any reason other than the security concerns).  Thus, the extent of discovery conducted, the mature stage of the proceedings, and the substantial risks to Plaintiffs associated with further litigation weigh strongly in favor of preliminary approval.

### 2.   PLAINTIFFS' ABILITY TO MAINTAIN A CLASS WAS QUESTIONABLE

*Hanlon* also directs the Court to consider Plaintiffs' ability to maintain a class.  While the

22

outcome of a certification motion was not a foregone conclusion, discovery confirmed that Plaintiffs would have faced significant risk if they continued to litigate because they were subject to unique defenses that created issues pertaining to typicality and adequacy.  Further, as shown by the Dippon Declaration (Floyd Decl., Exh. 13), developing a viable class-wide damage model would have been difficult on the facts as they existed at the time of settlement.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (holding plaintiff bears burden of showing that damages "are capable of measurement on a classwide basis").  Finally, Plaintiffs alleged a nationwide class, but California's consumer protection statutes were not available to out-of-state class members, which created variations in state law.  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594 (9th Cir. 2012); *Pardini v. Unilever U.S., Inc*., No. 13-1675 SC, 2014 WL 265663, at *9 (N.D. Cal. Jan. 22, 2014) (providing "[e]ach class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place").  Concerns regarding variations in state law, however, dissipate in the settlement context.  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).

Predominance also would have been a challenge because at the time of settlement, discovery indicated that Plaintiffs likely would have had to prove reliance on an individual basis.  Reliance is an essential element of the UCL, FAL, and CLRA and is also required to establish causation for restitution. *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 221-22 (2012) (noting CLRA requires proof of actual reliance); *Pfizer Inc. v. Super. Ct.*, 182 Cal. App. 4th 622, 631 (2010) (stating "one who was not exposed to the alleged misrepresentations . . . is not entitled to restitution"); *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 924 (2010) ("Even after the *Tobacco II* decision, the UCL and FAL still require some connection between the defendant's alleged improper conduct and the unnamed class members who seek restitutionary relief."); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980-81 (2009) (noting causation prerequisite to a restitution award).

Plaintiffs would have argued that the Court could presume reliance, but a presumption is inappropriate in the absence of a uniformly disseminated material misrepresentation.  *Tucker*, 208 Cal. App. 4th at 222 (citing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009)); *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (1993).  This is because exposure is critical:  the class must be

1   limited to those who were actually exposed to the allegedly misleading advertising.  *See Mazza*, 666

2   F.3d at 596 (noting "the relevant class must be defined in such a way as to include only members who

3   were exposed to advertising that is alleged to be materially misleading"); *Perrine v. Sega of Am., Inc.*,

4   No. 13-cv-01962-JD, 2015 WL 2227846, at *2 (N.D. Cal. May 12, 2015) (denying certification because

5   class definition made "no attempt to limit the class to those who were 'exposed' to the allegedly

6   misleading advertising").  In short, no exposure, no class.

7        This is where Plaintiffs' putative class of all Fat PS3 purchasers likely would have faltered.

8   Plaintiffs pointed to representations that not only spanned six years, but that discovery confirmed were

9   not part of an advertising campaign and, in fact, were disparate.[13]  Some discussed the ten-year product

10  lifecycle, others made "computer" statements but, importantly, none discussed the Other OS

11  functionality itself.  Even the named Plaintiffs did not see the same representations before they

12  purchased their PS3's.  *E.g.*, Floyd Decl., Exh. 4, at pp. 51:13-53:1 (unable to recall where ten-year life

13  cycle statements appeared); Exh. 5, at pp. 247:1-250:10 (saw life cycle statements but could not specify

14  which ones); Exh. 7, at p. 161:2-8 (saw no ten-year life cycle representation with respect to Other OS

15  feature before purchase).  An argument that reliance could be presumed on these facts, therefore, would

16  have failed as would have Plaintiffs' certification motion.  Accordingly, the risk of maintaining class

17  action status also weighs in favor of preliminary approval.

18  **V.    CONCLUSION**

19        Based on the foregoing, SCEA joins in Plaintiffs' request that the Court preliminarily approve

20  the settlement.  The new settlement satisfies all of the Court's previously articulated concerns, the

21  previous objectors' concerns, and the applicable *Hanlon* fairness factors.  Discovery did not support the

22  central premises of the SACC and Plaintiffs would have struggled both on the merits and in their attempt

23  to certify a class had litigation continued.  The amount offered in settlement is fair, reasonable, and

24  adequate in light of the strengths and weaknesses of the case.  Thus, SCEA requests that the Court grant

25

26  [13] Only pre-purchase representations are relevant in a false-advertising case because the statements have
    to influence the purchase decision to be actionable.  *See Hall v. Sea World Entm't, Inc.*, No. 3:15-CV-
27  660-CAB-RBB, 2015 WL 9659911, at *5 (S.D. Cal. Dec. 23, 2015).  SCEA stopped manufacturing the
    PS3 "fat" model in 2009 and issued Firmware Update 3.21 on April 1, 2010.  Plaintiff Girardi was the
28  last of the named Plaintiffs to purchase and he purchased in March 2008.  Thus, representations after
    any of these dates are irrelevant as they could not have influenced a purchase decision.

preliminary approval, direct dissemination of notice to the Class, and set a date for the final approval hearing.

Dated: September 19, 2017                    SACKS RICKETTS & CASE LLP


                                             By: *s/Michele Floyd*
                                                 Michele Floyd

SCEA'S SUPPLEMENTAL BRIEF ISO RENEWED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT; CASE NO. 4:10-CV-01811-YGR